UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2009 SEP 23  A 9: 46

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| TERI TUCKER, | : | CIVIL ACTION NO. |
| Plaintiff, | : | |
| v. | : | |
| AMERICAN INTERNATIONAL GROUP, INC.; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., A SUBSIDIARY OF AMERICAN INTERNATIONAL GROUP, INC., | : | JURY TRIAL DEMANDED |
| Defendants. | : | SEPTEMBER 23, 2009 |

## COMPLAINT

### NATURE OF ACTION

1. This action seeks recovery of compensatory and punitive damages, and equitable relief, caused by the defendant insurers' failure to satisfy a $4 million judgment in favor of the plaintiff and against their insured, Journal Register Company of Pennsylvania. Plaintiff Teri Tucker obtained the judgment after a federal jury trial in this district in July 2008. The judgment was insured pursuant to the terms of a $5 million insurance policy, which was underwritten by defendants American International Group, Inc. (AIG) and National Union Fire Insurance Company of Pittsburgh, PA (National Union).

Having obtained a judgment after trial, Tucker is a subrogee and intended third party beneficiary under the policy, and possesses contractual and statutory rights to take legal action directly against the defendants for failing to satisfy her judgment. Accordingly, she brings common law claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, the tort of bad faith, and statutory claims under the Connecticut Direct Action Statute, Conn. Gen. Stat. § 38a-321, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* The willful acts and omissions of AIG and National Union in processing Tucker's claim, in denying coverage only after a verdict was returned in her favor, in delaying any definitive coverage determination for more than four years after the claim was first submitted, and in refusing to submit the dispute to alternative dispute resolution as required by the terms of the policy, have been the proximate cause of substantial economic and non-economic harm to her.

Their acts and omissions, moreover, are part of a pattern and regular business practice of AIG and its subsidiaries of accepting millions of dollars in premiums, but failing to investigate or properly administer claims; closing claims files without determining coverage or communicating with the insured (a practice known as "parking" claims); attempting to impose extra-contractual obligations on insureds in order to fabricate grounds to deny coverage; delaying or refusing to make coverage determinations for months, or even years, thereby enriching itself financially while misleading insureds into believing that claims are covered; attempting to shift responsibility for claims away from itself and onto its insureds; and refusing to honor alternative dispute resolution terms in its policies, forcing insureds or claimants to either (i) sue and incur burdensome costs and attorney's fees, or (ii) drop legitimate claims to avoid costs and fees.

For the reckless and willful unfair business practices relating to the handling of her claim and others, Tucker seeks actual, compensatory, and punitive damages against AIG and National Union, along with attorney's fees and costs, in addition to satisfaction of her judgment

in the underlying case.

## JURISDICTION

2.      Jurisdiction is founded on diversity of citizenship and amount pursuant to 28 U.S.C. § 1332. Plaintiff Teri Tucker is a citizen of the United States and the State of Florida. Defendants National Union and AIG are Delaware corporations with principal places of business in New York. The matter in controversy exceeds, exclusive of interest and costs, $75,000.

## VENUE

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(a)(2). A substantial part of the events or omissions giving rise to the plaintiff's claims occurred within this judicial district.

## PARTIES

4.      Teri Tucker is a citizen of the United States who currently resides in Florida.

5.      National Union Fire Insurance Company of Pittsburgh, Pa. is incorporated under the laws of Delaware and has a principal place of business in New York. It is a subsidiary and member company of American International Group, Inc.

6.      American International Group, Inc. is incorporated under the laws of Delaware and has a principal place of business in New York. AIG is a holding company which, through its subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad. AIG's primary activities include both general insurance and life insurance and retirement services operations. Other significant activities include financial services and asset management.

The principal business units in each of AIG's operating segments during 2008 were American Home Assurance Company, National Union Fire Insurance Company of Pittsburgh,

Pa., New Hampshire Insurance Company, Lexington Insurance Company, The Hartford Steam Boiler Inspection and Insurance Company, Transatlantic Reinsurance Company, United Guaranty Residential Insurance Company, American International Underwriters Overseas, Ltd., and AIU Insurance Company.

## ALLEGATIONS

7.  In 2004, AIG and National Union sold an Employment Practices Liability Insurance Policy (Policy) to Journal Register Company (Journal Register), a multi-media corporation which owns 19 daily newspapers in various states, including the New Haven Register.

8.  The Policy was entitled "AIG Executive Liability," and states that the insurance is provided by National Union Fire Insurance Company of Pittsburgh, Pa. (Exhibit 1). The Policy was a $5 million claims-made, declining balance policy, and the retention amount, or deductible, was $150,000

9.  Journal Register paid $220,000 for the liability protections afforded by the Policy. The Policy provides coverage for Journal Register, and its subsidiaries, on claims first made between January 12, 2004 to January 12, 2005. The Policy was numbered 729-15-02.

10. In the cover letter accompanying the policy, AIG stated "Congratulations on purchasing your employment practices liability insurance policy from the member companies of American International Group, Inc. (AIG) one of the premier writers of commercial insurance. Your policy offers many outstanding features, including coverage for claims arising from violations of Title VII of the Civil Rights Act of 1964."

11. The letter further states the insured can have the confidence of "knowing that

your claims will be handled by a professional team of claims analysts and defended by our panel counsel."

12. The first page of the Policy, however, states that "[t]he Insurer does not assume any duty to defend." The Policy, further, imposed no fiduciary duty on Journal Register to the defendants.

13. Clause 1 of the Policy, "Insuring Agreements," states: "this policy shall pay the Loss of each and every Insured arising from a Claim first made against such insured during the Policy Period . . . and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Employment Practices Violation." Clause 18 provides that "[b]ankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder."

14. Employment Practices Violation(s), in turn, is defined in Clause 2 in pertinent part to include "any" actual or alleged:

(1) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(4) Retaliation (including lockouts);

(5) employment-related libel, slander, humiliation, defamation or invasion of privacy;

(9) wrongful discipline;

(11) failure to provide or enforce adequate or consistent corporate policies and procedure relating to any Employment Practices Violation;

(12) violation of an individual's civil rights relating to any of the above.

15. "Retaliation" is defined in Clause 2 to include "a wrongful act of an Insured relating to or alleged to be in response to any of the following activities . . . (2) the actual or attempted exercise by an Employee of the Company or an Outside Entity of any right such

Employee has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights."

16. Any civil judgment rendered against Journal Register on a covered claim is included within the loss protection provided by the Policy. Specifically, "Loss" is defined in Clause 2 as "damages (including back pay and front pay), judgments, settlements, pre- and post-judgment interest and Defense Costs."

17. The Policy also expressly covered, through a separate addendum, any award of "punitive, exemplary and multiple damages." Exhibit 1, Endorsement # 3, ¶ 3.

18. The parties further agreed in Endorsement # 3 of the Policy that the enforceability of the punitive damages provision "shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages." *Id.*

19. On May 13, 2004, Journal Register, through its broker Marsh USA (Marsh), provided written notice to National Union and AIG, through representative Keith Tinley of AIG Claim Technical Services, of an employment-related retaliation claim filed by Tucker.

20. The claim was filed with the Connecticut Commission on Human Rights and Opportunities (CHRO) and United States Equal Employment Opportunity Commission (EEOC), and a copy was provided to the defendants as an attachment to Marsh's letter.

21. A "Claim" under Clause 2 of the Policy is defined to include any administrative EEOC filing or similar state filing.

22. On June 1, 2004, AIG Technical Services responded that Marsh's submission was "a Claim as defined by the policy." AIG assigned the claim file number 371-031428.

23. The letter stated that Meghan McConville, of the "D&O Claims Department," had been "assigned the future handling" of Tucker's claim. The Policy in this case was not a D&O, or Directors & Officers, policy.

24. While acknowledging that the submission was a claim as defined by the Policy, AIG's June 1, 2004 letter generally reserved rights, without citing any specific Policy provisions. It incorrectly stated that the Policy did not cover punitive damages.

25. The letter requested that Marsh kindly notify AIG of "significant events including, litigation, mediation, arbitration, withdrawal, or settlement within the retention."

26. For the next 10 months, AIG and National Union failed to reasonably investigate the claim, failed to make a definitive coverage determination, and did not communicate with its insured in any fashion.

27. Neither defendant assumed defense of the claim or exercised its right to associate in the defense of the claim. Neither defendant required any information from its insured regarding Tucker's claim, or made any diligent effort to obtain any information regarding Tucker' claim.

28. In March 2005, AIG unilaterally closed National Union's file on Tucker's claim. It did so without disclaiming coverage, while Tucker's EEOC and CHRO action was still pending, and without communicating with its insured.

29. The foregoing acts constituted the extent of AIG's claims handling process.

30. Neither AIG nor National Union communicated with Journal Register about Tucker's claim again for more than four years.

31. In March 2006, Tucker obtained a right to sue and filed suit in district court based on the same facts recited in her CHRO and EEOC claim.

32. In discovery, Journal Register disclosed the existence of the Policy in its initial disclosures under Fed.R. Civ. P. 26(a)(1). It further acknowledged through a discovery response that the Policy provided coverage for Tucker's claim.

33. After the Journal Register's motion for summary judgment was denied, Tucker's case proceeded to trial on July 21, 22, and 23, 2008 after jury selection on July 10.

34. Clause 7(b) of the Policy provides that any related litigation or proceeding based on, arising out of, or attributable to the facts alleged in an initial Claim for which notice has already been given, "shall be considered made at the time such notice was given." In addition to having written notice of Tucker's Claim when it was first made, the related litigation was reported to AIG in July 2008 and, under the terms of the Policy, related back to Tucker's initial Claim for coverage purposes.

35. On July 23, 2008, a jury returned a verdict in Tucker's favor on all counts. It found that Journal Register had retaliated against her in violation of applicable provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et. seq., and Conn. Gen. Stat. § 31-51q. (Exhibit 2, Verdict Form).

36. The jury awarded Tucker $1 million in compensatory damages, $3 million in punitive damages, and lost wages.

37. On July 29, 2008, the Court entered judgment on the verdict in the amount of $4 million. (Exhibit 3).

38. Judgments are expressly included in the Policy's definition of "Loss."

39. On August 18, 2008, AIG denied coverage of Tucker's claim. This was the first

time that AIG or National Union took a definitive position on coverage since Tucker's claim was submitted more than four years earlier on May 13, 2004.

40. AIG's August 18 letter, which referenced Tucker's file number 371-031428, based its declination solely on Clause 8 of the Policy. Specifically, that Journal Register had "failed to advise" it of Tucker's litigation until "after it received an adverse jury verdict."

41. The same letter acknowledges that AIG had notice of the litigation before the verdict was returned, and does not dispute that it was properly notified of Tucker's claim in May 2004.

42. The defendants did not assume the defense of Tucker's claim before unilaterally closing her file. However, the letter complained that

> National Union did not have an opportunity effectively associate (sic) in the defense of the claim. Moreover, the Insured did not advise National Union of any settlement opportunities. In fact, based on conversations with the Insured, there appears to have been many opportunities to settle prior to judgment, which opportunities were not discussed with National Union. Consequently, this matter is not afforded coverage under the Policy as the Insured breached its obligation under the contract.

43. The August 18 letter again stated incorrectly that punitive damages, which AIG and National Union charged Journal Register to insure, were not covered by the Policy:

> Additionally, we would also direct your attention to the definition of Loss that provides in pertinent part that Loss does not include punitive or exemplary damages. Consequently, even if coverage were available, the award of punitive damages would be precluded from coverage under the Policy.

44. To the contrary, punitive damages were covered. Section 3 of Endorsement # 3 of the Policy expressly provides:

> Notwithstanding the foregoing, Loss shall specifically include, (subject to the policy's other terms, conditions and exclusions), punitive, exemplary and multiple damages (including the multiple or liquidated damages' awards under the Age Discrimination Act and the Equal Pay Act). It is further understood and agreed that the enforceability of the

foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

45. The reasons stated by AIG in the August 18, 2008 in denying coverage were invalid. The Policy only required submission of Tucker's CHRO and EEOC claim to put National Union properly on notice of her claim. Clause 1 of the Policy, further, obligated National Union to pay any loss "arising from" any claim submitted during the Policy's period.

46. Tucker's district court action arose from, and was based on the same facts as, her CHRO and EEOC filing.

47. Clause 8 of the Policy states that "National Union has no duty to defend. Instead, the insured must defend the claim, but may seek reimbursement of defense costs." In the underlying case, National Union did not disclaim coverage (until after an adverse verdict) or assume defense of the claim. Journal Register defended the claim itself, and did not seek reimbursement of defense costs, as was its right under the Policy.

48. The alleged "settlement opportunities" referenced in AIG's August 18, 2008 letter, moreover, were not cause under the Policy to decline coverage.

49. "Settlement Opportunity" is a defined term under Clause 8 of the Policy. It is defined as a settlement offer recommended by AIG or National Union to a claimant, not a settlement demand made by a claimant to the insured:

> If the Insurer recommends a settlement within the policy's applicable Limit of Liability which is acceptable to the claimant (a "Settlement Opportunity"), and the Insureds consent to such settlement, then the Insured's applicable retention amount shall be retroactively reduced by ten percent (10%) for such Loss.

50. Neither AIG nor National Union recommended a settlement to Tucker after her claim was submitted in 2004. The Policy provides that a rejected Settlement Opportunity merely reduces the amount of coverage available by a particular formula set forth in the Policy; it does

not constitute grounds to deny coverage.

51. Upon information and belief, AIG and National Union, failed to conduct any investigation of Tucker's claim. This lack of an investigation was contrary to its own internal claims handling procedures, and adjusting protocols, and was willful, reckless and fraudulent as the defendants had just accepted nearly a quarter-million dollar premium for the Policy.

52. Apart from demonstrating bad faith in the particular case of Tucker's claim, AIG's and National Union's failure to investigate the claim, failure to communicate with their insured, and failure to make any timely coverage determination, were regular business practices of National Union and AIG, and its other subsidiaries.

53. AIG-related cases involving allegations or findings of untimely coverage determinations, abandonment of the insured, pretextual reasons for denying coverage, fraud, and failure to investigate include the following, among hundreds of others:

> *Acacia Research Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA*, No. SACV 05-501 PSG (MLGx), 2008 WL 4179206 (C.D. Cal. Feb. 8, 2008) (failure to investigate, abandonment of the insured);
>
> *United Technologies Corp. v. American Home Assurance Company*, 118 F.Supp.2d 181 (D. Conn. 2000) (bad faith delay in deciding coverage);
>
> *White et al. v. American General Life Insurance Company*, 2:08CV00978 (S.D. West Va.) (pretextual reason for denying coverage);
>
> *Penford Corporation and Penford Products Co. v. National Union Fire Insurance Company of Pittsburgh, Pa., and Ace American Insurance Company*, (09-CV-0013) (N.D. Iowa) (bad faith delay and denial of insurance benefits);
>
> *Lexington Insurance Company v. Devaney*, 50 F.3d 15 (9th Cir. 1995) (use of cover letter to attempt to evade coverage);