> *St. Paul Fire and Marine Ins. v. Lexington Ins. Co.*, 2006 WL 1295408 (S.D. Fla. April 4, 2006) (abandonment of the insured);
>
> *Handy & Harman v. AIG, Inc.*, 2008 WL 3999964 (N.Y. Sup. Ct. N.Y. County Aug. 25, 2008) (claim of bad faith refusal of coverage, claims file passed from adjuster to adjuster, reliance on inapplicable endorsement for denial of coverage);
>
> *Vincenzo v. AIG Ins. Servs., Inc.*, No. 1:07-cv-00026 (N.D. W. Va. Sept. 21, 2007) (allegation of bad faith denial of coverage);
>
> *Wal-Mart Stores Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004) (allegations of fraud in sale of policies);
>
> *In the Matter of American Home Assurance Company, AIG Casualty Company, Commerce and Industry Insurance Company, Granite State Insurance Company, Illinois National Insurance Company, National Union Fire Insurance Company of Pittsburgh PA, New Hampshire Insurance Company, The Insurance Company of the State of Pennsylvania.* State of Oregon, Department of Consumer and Business Services, Case No. INS 07-05-006 (June 28, 2007) (State of Oregon fined AIG entities $5 million for failure to timely process claims among other misconduct).

54.     In a report released in July 2008, AIG was ranked third among the ten worst insurance companies in the United States for claims handling abuses and other financial improprieties. The report noted that AIG has always focused "on taking in more money in premiums than it pays out in claims. To do that, the company has had to be extremely parsimonious about the claims it pays."

55.     Insurance companies generally rely on income made by investing their policyholders' premiums. AIG, however, has consistently attempted to profit from underwriting itself, i.e., taking in more money in premiums than it pays out in claims.

56.     Former AIG claims supervisors have alleged in other litigation that AIG and its subsidiaries have used a variety of stratagems to deny or delay claims, including locking checks in a safe until claimants complained, delaying payment of attorney fees until they were a year

old, disposing of important correspondence during routine "pizza parties," routinely fighting claimants for years in court over mundane claims, defending claims solely to delay payment, and obstructing discovery.

57. Because of their superior financial resources, it is cost-effective for insurance companies such as AIG to refuse to pay legitimate claims like Tucker's and, instead, to "play the float" during any dispute.

58. By failing to honor its obligations under the Policy, AIG has been able to take advantage of the time value of Journal Register's $220,000 premium, as well as the substantial reserves for Tucker's claim, from 2004 to the present.

59. AIG's income from its combined premiums and withheld reserves may substantially or entirely offset eventual losses on claims which are paid as late as possible in the judicial process. Punitive damages, therefore, are not only appropriate in light of the bad faith conduct in this case, but provide the only real economic incentive for the defendants to honor their obligations under the Policy.

60. AIG, as noted, has a history of bad faith conduct relating to the handling of claims. In 2006, AIG paid $1.6 billion to settle charges of artificially inflating loss reserves to improve the appearance of its financial health through two sham transactions with General Re Corp. of Stamford, Connecticut. Loss reserves are the amount of money an insurer needs in reserve to pay its policyholders' claims.

61. Upon information and belief, AIG or National Union is insured for its losses under the Policy in this case through a separate policy provided by a reinsurer. That reinsurer, upon information and belief, has encouraged AIG or National Union to challenge Tucker's claim solely for economic reasons.

62. On October 3, 2008, Journal Register, through its broker Willis of Pennsylvania, Inc. (Willis), stated its intent in writing "formally to challenge AIGDC's denial of coverage."[1]

63. Willis noted its presumption that "AIGDC's file contains no copies of any written attempts, or documentation of any efforts, by the handling claim examiner(s) to contact the insured or former broker before unilaterally deciding to close the file." AIG had not replied to an earlier request from Willis for documents concerning Tucker's claim.

64. On November 13, 2008, Journal Register, through Willis, again stated its intent to "challenge AIG's purported denial of coverage and raise all other rights, remedies and defenses under the policy, at law and in equity with respect to coverage for this matter." Willis again stated its presumption that AIG "has nothing in their file showing that they endeavored to contact their insured, you (sic), prior to unilaterally closing the file and ceasing any follow-up and review pending renewal."

65. On February 20, 2009, two days before a settlement conference was to take place in the underlying case before Hon. William I. Garfinkel, Journal Register filed for bankruptcy.

66. Clause 18 of the Policy, as noted, expressly provides that "[b]ankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder."

67. Neither defendant assumed the defense of Tucker's claim before Journal Register filed for bankruptcy. AIG disclaimed coverage five months before the bankruptcy.

68. In the bankruptcy proceeding, Journal Register listed Tucker as the largest

---

[1] AIGDC is a claims handling department of AIG.

unsecured creditor with a judgment of $4.5 million.

69. On March 25, 2009, Tucker subpoenaed National Union and AIG for all documents regarding the handling of Tucker's claim.

70. On April 10, 2009, AIG and National Union objected, and refused to produce "confidential commercial business records created by employees of AIGDC and AIGTS created only for internal evaluation, review and memorlization (sic) of events that occurred subsequent to May 24, 2004 (date of first notice to carrier) and are not distributed outside of AIGDC or National Union."

71. On March 17, 2009, Tucker moved for relief from the automatic stay to pursue a claim on the Policy.

72. On June 22, 2009, the bankruptcy court approved a Stipulation permitting Tucker to commence legal action directly against the defendants.

73. Clause 17 of the Policy states that "[a]ll disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause."

74. It further provides that the mediator or arbitrator "shall give due consideration to the general principles of the law of the state where the (Journal Register) is incorporated or formed in the construction or interpretation of the provisions of this policy." Journal Register was incorporated in Delaware.

75. Clause 17, as amended in Endorsement #3, further provides further that ADR may be commenced in New York, New York; Boston, Massachusetts; Atlanta, Georgia;

Chicago, Illinois; or Denver, Colorado

76. In accordance with this requirement, Tucker agreed to submit her claim to mediation in Boston, Massachusetts. She filed a Request for Mediation with the American Arbitration Association (AAA) on July 27, 2009.

77. On July 29, 2009, National Union requested a two-week extension of time to select a AAA mediator. Tucker consented.

78. Despite having requested this extension, on August 11, 2009, National Union refused to participate in ADR.

79. Its refusal to submit the dispute to ADR, as mandated by the Policy, has forced Tucker to bring this action into the court system and incur additional attorneys' fees and costs.

## COUNT ONE

## BREACH OF CONTRACT

80. Paragraphs 1 through 79 are incorporated by reference.

81. Section 18 of the Policy is entitled "Action Against Insurer." It provides in relevant part:

> Except as provided in Clause 17 of the policy, no action shall lie against the insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.
>
> Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy… Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

82. In view of this contractual language, Tucker is a subrogee and intended third

party beneficiary of the Policy, and has the same legal rights to sue defendants AIG and National Union directly as Journal Register.

83. Tucker obtained a judgment after actual trial against the defendants' insured in the amount of $4 million. Journal Register's bankruptcy filing did not invalidate or effect the judgment.

84. The defendants' insured complied with the material terms of the Policy.

85. Journal Register's bankruptcy filing does not relieve the defendants of their obligations under the Policy.

86. The defendants' failure to provide coverage for Tucker's claim, and pay Tucker's judgment, is a breach of its contract with its insured, which has been the proximate cause of substantial compensatory and actual damages to Tucker.

## COUNT TWO

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

87. Paragraphs 1 through 86 are incorporated by reference.

88. Journal Register and the defendants entered into a contract which conferred a benefit on Journal Register.

89. The defendants have acted in such a way as to injure and deprive the Journal Register of its legitimate benefits under the Policy.

90. The defendants acts and omissions in its handling of Tucker's claim, i.e., its failure to investigate, failure to disclaim coverage for more than four years, and failure to pay, were intentional, willful, and reckless, were without any reasonable justification, and were undertaken in bad faith to avoid responsibility for paying any amount on her claim, after just

having accepted a $220,000 premium.

91. Tucker has a contractual right to sue the defendants under the terms of the Policy.

92. Tucker is a subrogee and intended third party beneficiary of the Policy.

93. The defendants' obligations to refrain from taking any action that would injure its insured's right to recover on the policy, and to act at all times in good faith and to deal fairly, extends to Tucker as a matter of law.

94. The defendants' breach of the implied covenant of good faith and fair dealing has been the proximate cause of substantial compensatory and actual damages to Tucker.

## COUNT THREE

## DIRECT ACTION

## Conn. Gen. Stat. § 38a-321

95. Paragraphs 1 through 94 are incorporated by reference.

96. Connecticut General Statutes § 38a-121 provides:

Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or damage on account of the bodily injury or death by accident of any person, or damage to the property of any person, for which loss or damage such person, firm or corporation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty. . . Upon the recovery of a final judgment against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose and if such judgment is not satisfied within thirty days after the date when it was rendered, such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment.

18

97. Tucker is a judgment creditor of the defendants' former insured, Journal Register.

98. Accordingly, having obtained a final judgment, she is subrogated statutorily to all the rights of the Journal Register under the Policy.

99. Tucker's judgment was not satisfied within 30 days after it was rendered.

100. Tucker's judgment was final under applicable law and the Restatement of Judgments:

> A judgment otherwise final for purposes of the law of res judicata is not deprived of such finality by the fact that time still permits the commencement of proceedings in the trial court to set aside the judgment and grant a new trial or the like; nor does the fact that a party has made such a motion render the judgment nonfinal. This is the case even when a statute or rule of court provides that the judgment cannot be executed upon or otherwise enforced during the period allowed for making such a motion and the further period until the motion if made is decided.

101. The Journal Register's bankruptcy terminated its obligation to defend Tucker's claim in the underlying case any further.

102. The defendants' failure to pay the judgment has been the proximate cause of substantial compensatory and actual damages to Tucker.

## COUNT FOUR

### VIOLATION OF CONNECTICUT UNFAIR TRADE AND PRACTICES ACT

### Conn. Gen. Stat. § 42-110a *et seq.*

103. Paragraphs 1 through 102 are incorporated by reference.

104. The defendants' acts and omissions violated provisions of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-815 *et seq.* Section 38a-816 of that Act prohibits unfair claim settlement practices and provides in part:

19

6) Unfair claim settlement practices. Committing or performing with such frequency as to indicate a general business practice any of the following: (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (b) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; (c) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (d) refusing to pay claims without conducting a reasonable investigation based upon all available information; (e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (f) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; . . . (m) failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; (n) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

105.   The defendants, by their actions, have violated subsections (a), (b), (c), (d), (e), (f), (m) and (n) of Section 38a-816 of CUIPA. The defendants failed to properly investigate the facts surrounding Tucker's claim, failed to conduct a timely or thorough investigation of the facts, failed to make any coverage determination for more than four years, and only after an adverse jury verdict against its insured. It has outright refused to even participate in the alternative dispute resolution procedures specified in the Policy itself. The defendants have engaged in both procedural bad faith and wrongful denial of coverage.

106.   Tucker may bring a private right of action against the defendants for the identified CUIPA violations pursuant to the Connecticut Unfair Trade Practices Act.

107.   The defendants' violations of CUIPA have been the proximate cause of substantial compensatory and actual damages to Tucker, entitling her to recover punitive damages, in addition to satisfaction of her judgment.

## COUNT FIVE

## TORT OF BAD FAITH

108. Paragraphs 1 through 107 are incorporated by reference.

109. By their willful, negligent, malicious, and reckless actions, the defendants have violated their common law duty of good faith and fair dealing toward its insured, both in the handling of Tucker's claim, and in the substantive denial of coverage. The defendants took over four years before disclaiming coverage, and did so only after a substantial adverse verdict. The defendants also failed to properly investigate Tucker's claim, and closed her file without making any coverage determination, and without communicating with the insured, within months of accepting a $220,000 premium. This practice is known as "parking" claims in the insurance industry, and it is designed to maximize underwriting profits.

110. The defendants acted in such a way as to mislead and deceive Journal Register into believing that any loss arising from Tucker's claim would be covered, i.e., neither company ever disclaimed coverage for more than four years between June 2004 and August 2008. This conduct was a regular business practice of the defendants and was designed to enrich the defendants financially by taking in premiums but refusing to pay legitimate claims.

111. Tucker is subrogated to the rights of the insured under the Policy, and may assert all causes of action which the defendants' insured could have asserted against the defendants relating to the Policy, including the tort of bad faith.

112. Tucker has suffered substantial compensatory and actual damages resulting from the defendants' bad faith conduct in its handling of her claim, and its denial of coverage.

## COUNT SIX

## EQUITABLE ESTOPPEL

113.   Paragraphs 1 through 112 are incorporated by reference.

114.   The defendants should be equitably estopped from attempting to assume the defense of Tucker's claim to attack or reduce the amount of Tucker's judgment.

115.   More than five years have passed since Tucker's claim was first submitted to the defendants in May 2004. It would be grossly inequitable for the defendants to be permitted to further delay the resolution of Tucker's claim by seeking to attack or reduce Tucker's judgment in Journal Register's bankruptcy proceeding. It is not a party to that proceeding and has no legal standing to intervene on behalf of the debtor, especially having disclaimed coverage in August 2008.

116.   The Policy expressly states that the insured's bankruptcy would have no effect on the defendants' obligations under the Policy, and "judgments" are covered within the Policy's definition of Loss.

117.   The defendants are responsible for the consequences of their failure to investigate Tucker's claim and refusal to assume its defense.

118.   The defendants should also be estopped from denying coverage of Tucker's claim after waiting 4.3 years after Tucker's claim was first submitted to deny coverage, and only after a substantial adverse verdict.

117.   Estoppel is further appropriate given that the defendants never communicated their decision to close the file to its insured, Journal Register. This omission was prejudicial because it created a reasonable belief on the part of Journal Register that any loss it incurred as a result of the Tucker claim would in fact be covered by the Policy, especially since the

22

defendants initially declared that the submission "was a claim as defined in the Policy." This belief was evidenced by Journal Register's disclosure of the Policy in the underlying litigation as providing coverage for Tucker's claim.

118.   The Court has inherent powers to enjoin any inequitable conduct by the defendants.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

1. Assume jurisdiction over this case;

2. Empanel a jury;

3. Award actual and compensatory damages to be established at trial;

4. Award $10 million in punitive damages pursuant to the Connecticut Unfair Trade Practices Act and Unfair Insurance Practices Act;

5. Award punitive damages for the tort of bad faith;

6. Award plaintiff costs and reasonable attorneys' fees in bringing this action;

7. Retain jurisdiction over this case until the defendants have complied with all orders of the Court;

8. Order specific performance of the Policy;

9. Enjoin the defendants from attempting to assume the defense of Tucker's claim more than five years after it was first submitted;

10. Enjoin the defendants from disclaiming coverage;

11. Enjoin the defendants from engaging in any further dilatory behavior designed to frustrate and delay the just and prompt resolution of this case and payment under a policy for which they were compensated;

12. Award such other relief as the Court deems appropriate.

The plaintiff demands a trial by jury on all counts.

THE PLAINTIFF
TERI TUCKER

By: _____
Jeffrey S. Bagnell
Federal Bar No. CT18983

Jeffrey S. Bagnell, Esq., LLC
1465 Post Road East
Westport, Connecticut 06880
(203) 255-4434
(203) 255-4454 (fax)
jbagnell@bagnell-law.com

Attorney for Plaintiff

25