## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

TERI TUCKER,

               Plaintiff,

  v.

AMERICAN INTERNATIONAL GROUP,
INC.; NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA., A SUBSIDIARY OF
AMERICAN INTERNATIONAL GROUP,
INC.,

              Defendants.

3:09 - CV - 1499 (CSH)

## MEMORANDUM AND ORDER

HAIGHT, Senior District Judge:

      Plaintiff Teri Tucker ("Plaintiff" or "Tucker") brings this action to recover damages from her former employer's insurers, American International Group, Inc. ("AIG") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively "Defendants"), arising from her unlawful discharge in 2003.   In this action, she seeks to collect from the defendant insurers the $4 million judgment rendered in her favor in *Tucker v. Journal Register East*, Doc. # 3:06-CV-307 (SRU) (herein "Tucker I"),  the prior action against her employer, Journal Register East.

      Pending before the Court is Defendants' Motion to Dismiss the action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Doc. #18.   Defendants request this Court to dismiss Plaintiff's Complaint  on the grounds that each count falls outside the Court's subject

matter jurisdiction and/or fails to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[1]   Defendants base their motion on three separate arguments.

First, Defendants contend that Plaintiff lacks standing to bring her action against them as insurers under Connecticut's Direct Action Statute, Conn. Gen. Stat. § 38a-321, because she has not obtained a "final judgment" against the insured, as required by the terms of that statute. Second,  Defendants argue that Plaintiff's action fails to state a valid claim against them because that action is outside the scope of Bankruptcy Judge Allan L. Gropper's ruling when he granted a modification of the bankruptcy stay.  *See In Re Journal Register Co., et al*, No. 09-10769 (ALG), Memorandum of Judge Allan L. Gropper (June 22, 2009).  Third, Defendants contend that the Complaint should be dismissed against AIG because AIG is not a proper party to the action.  Specifically, Defendants assert that AIG is not a party to the employment practices liability insurance policy ("EPL Policy") at issue, and Plaintiff has failed to set forth sufficient factual allegations to justify the piercing of AIG's corporate veil as the parent company of National Union.  I address these arguments in turn.

---

[1]Rule 12(b), entitled "How to Present Defenses," states in relevant part:

Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;
. . .
(6) failure to state a claim upon which relief can be granted . . . .

Fed. R. Civ. P. 12(b) (1), (6).

## I.   **FACTS**

The Court previously set forth a detailed recitation of the facts of this case in its Order dated August 4, 2010, denying Defendants' Motion to Transfer this case to Judge Stefan R. Underhill in the Bridgeport Division of this District, [Doc. #39], familiarity with which is assumed.  However, additional facts must be noted for the purposes of this motion.

Since the Court's ruling of August 4, 2010, denying transfer of this case, Plaintiff and Journal Register East have moved to reopen the Judgment in Tucker I, the underlying action of *Teri Tucker v. Journal Register East*, Doc. # 3:06-CV-307 (SRU).    To that end, they filed a Joint Motion to Reopen Case and Enter Judgment in Accordance with Stipulation on August 30, 2010.  Tucker I, Doc. #130.  The motion states that the parties, Tucker, Journal Register East, Plaintiff's former employer,[2] and its parent company, Journal Register Company, have "reached an agreement resolving the Proof of Claim, the Debtors' objections thereto and Tucker's right to receive a distribution" pursuant to the reorganization  Plan confirmed in the bankruptcy proceeding of debtor Journal Register Company and its affiliate debtor companies, including Journal Register East.  *Id.*, p. 5, ¶ 20; *see also In Re Journal Register Co., et al*, No. 09-10769 (ALG).

The Stipulation states that the debtors, including Journal Register East,  waive any protections afforded by the bankruptcy proceedings (*i.e.*, the automatic stay and/or discharge injunction arising under the confirmed reorganization plan).  Tucker I, Doc. #130-1, p. 5, ¶ 2.

---

[2]Journal Register East is a division of the Journal Register Company, which was doing business as "The New Haven Register," the newspaper for which Tucker held the position of Telemarketing Manager from August 21, 2000, until her discharge on October 16, 2003.   Tucker I, Doc. #1, ¶¶ 10-11.

Furthermore, the parties stipulate and request the Court's approval of a "Reduced Judgment," a reduction and entry of the judgment in favor of Tucker against the Journal Register East in the amount of $1 million  in compensatory damages and $2 million in punitive damages.[3]  *Id.*, p. 6, ¶ 3.  In addition, the Stipulation provides that the parties' post-trial motions "shall be deemed denied with prejudice."  *Id.*, p. 6, ¶ 4 (a)-(b).[4]

The Stipulation further states that the Journal Register Company and its subsidiaries "irrevocably assign and transfer to Tucker, . . . any and all of their claims and rights pursuant to and under the EPL Policy."  *Id.*, p. 7, ¶ 7.   Moreover, the Stipulation is declared "a public document and may be used by Tucker in the Coverage Action [Tucker II] and any related actions or attempts to obtain coverage and/or payment of the Judgment from National Union and any third party."  *Id.*, p. 8, ¶ 9.   In this Stipulation, Journal Register East thus waives its right to protection under the permanent discharge injunction to resolve Tucker's claim; and Tucker sets forth her intention to present evidence of the extent of damages she is owed in the present action through the Stipulation and Reduced Judgment.

---

[3]This is a reduced judgment in that on July 23, 2008, the jury in Tucker I returned a verdict in Tucker's favor on all counts in the total amount of $4 million – *i.e.*, $1 million in compensatory damages and $3 million in punitive damages.  Tucker I, Doc. #69

[4]These motions include Tucker's motions for pre-judgment and post-judgment interest, motion for attorney's fees, and supplemental motion for attorney's fees; and the Journal Register East's motions for judgment as a matter of law or in the alternative a new trial and motion for new trial.  *See* Tucker I, Doc. #75, 77, 82 -83, 86, 89, 107, 116.   On September 2, 2009, Judge Underhill denied the pending post-trial motions in Tucker I without prejudice to their renewal if and when the bankruptcy stay was lifted.  *Id*., Doc. 129 (denying Doc. # 82, 86, 89 107, 116).  Defendant's motions for summary judgment or a new trial were thus never decided upon their merits.  Judge Underhill ordered the case administratively closed, subject to being reopened upon termination the bankruptcy stay.

## II.   STANDARD OF REVIEW

### A.   Rule 12(b)(1) - Lack of Subject Matter Jurisdiction

Under Fed. R. Civ. P. 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it."  *Marakova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000);  *accord  Nowak v. Ironworkers Local 6 Pension Fund*,  81 F.3d 1182, 1187 (2d Cir.1996).   It is generally the plaintiff's burden to prove by a preponderance of the evidence that subject matter jurisdiction exists.  *Marakova*, 201 F.3d at 113; *Aurecchione v. Schoolman Transp. System, Inc.*, 426 F.3d 635, 638 (2d Cir.2005).  When subject matter jurisdiction is challenged under Rule 12(b)(1), both "the movant and the pleader may use affidavits and other pleading materials to support and oppose such motions," without converting the motion to one for summary judgment. *Golnik  v. Amato*, 299 F. Supp. 2d 8, 13 (D. Conn. 2003) (internal citations omitted); *accord Makarova*, 201 F.3d at 113 ("under Rule 12(b)(1), a district court . . .  may refer to evidence outside the pleadings").

### B.   Rule  12(b)(6) -  Failure to State A Claim

The standards for dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) are "substantively identical."  *Kroposki v. F.A.A.*, No. 3:08CV01519 (AWT),  2009 WL 2710223, at *1 (D. Conn. Aug. 26, 2009) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir.2003) and *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 n. 3 (2d Cir.1999)).  On a motion to dismiss pursuant to Rule 12(b)(6), the court accepts all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor.  In order to survive a motion to dismiss, a

5

complaint must allege a plausible set of facts "sufficient to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *accord Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009). *See also Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC,* 595 F.3d 86, 91 (2d Cir. 2010).

The factual allegations necessary to survive a motion to dismiss must consist of more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555, and must tender more than "naked assertion[s] devoid of further factual enhancement," *Iqbal*, 129 S. Ct. at 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).[5]   Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Twombl*y, 550 U.S. at 555 (internal citations omitted).

In sum, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *accord Iqbal*, 129 S. Ct. at 1949 (in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'").   A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly,* 550 U.S. at 556).

 In ruling on  a Rule 12 (b)(6) motion, "a district court must limit itself to facts stated in

---

[5]*See also Hayden v. Paterson*, 594 F.3d 150, 157 n. 4 (2d Cir. 2010) (allegations must be more than "mere conclusory statements")*; Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996) ("[w]hile the pleading standard is a liberal one, bald assertions and conclusions of  law will not suffice").

the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir.1993). The court may also consider "matters of which judicial notice may be taken" and documents of which plaintiff "had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

### III.    DISCUSSION

### A.    Whether Plaintiff has standing to sue under Connecticut's Direct Action Statute

Defendants' first ground for dismissal is that Plaintiff lacks standing to bring her action against them as insurers under Connecticut's Direct Action Statute, Conn. Gen. Stat. § 38a-321, because she has not obtained a "final judgment," as required by the terms of that statute. Defendants argue that a final judgment did not enter in Tucker I because the post-trial motions were not decided on the merits.  Moreover, Judge Underhill gave indications that the original verdict would likely be altered were he to rule on the merits of those motions.

The Connecticut legislature has provided injured parties a direct cause of action against the responsible party's insurer by statute under set circumstances.  Connecticut's Direct Action Statute dictates that once a final judgment is rendered against an insured for loss or damage covered by an insurance policy and the judgment remains unsatisfied for more than 30 days, the injured party is subrogated to the rights of the insured defendant  and may proceed with an action against the insurer to the same extent that the defendant could have enforced his claim against

that insurer.   Conn. Gen. Stat. 38a-321.[6]

The Connecticut Supreme Court has stated that the purpose of the statute is "to protect those injured by judgment proof insureds, by subrogating the injured party or judgment creditor to the rights of the assured against the insurer." *Brown v. Employer's Reinsurance Corp.*, 206 Conn. 668, 672, 539 A.2d 138 (Conn. 1988).  The injured party, who steps into the shoes of the insured, thus has the same rights as the insured  – *i.e.*, "obtains no different or greater rights against the insurer than the insured possesses and is equally subject to any defense the insurer may have against the assured under the policy."   206 Conn. at 673; *accord Barbarula ex rel. Estate of He v. Canal Ins. Co.*, 353 F. Supp. 2d 246, 256 (D. Conn. 2004).

The Connecticut Supreme Court set forth three requisites of a cause of action under this statute:   "(1) *that the plaintiff has recovered a final judgment*; (2) that the judgment is against a

_____

[6]Connecticut's Direct Action Statute, entitled "Liability of insurer under liability policy," provides:

> Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or damage on account of the bodily injury or death by accident of any person, or damage to the property of any person, for which loss or damage such person, firm or corporation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty. . . .  **Upon the recovery of a final judgment** against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose **and if such judgment is not satisfied within thirty days** after the date when it was rendered, **such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer** to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment.

Conn. Gen. Stat. § 38a-321 (emphasis added).

8

person who was insured by the defendant against liability on it; and (3) that the judgment remains unsatisfied." *Skeet v. Hartford Accident & Indemnity* Co., 142 Conn. 388, 393, 114 A.2d 681, 683 (Conn. 1955) (emphasis added)*; see also O'Donnell v. U.S. Fidelity & Guaranty Co.*, No. 090269, 6 Conn. L. Rptr. 111, 1992 WL 43612, at * 1 (Conn. Super. Ct. Mar. 3, 1992). Connecticut courts have thus consistently held that "the recovery of a final judgment is a necessary prerequisite to a cause of action under Section 38a-321." *O'Donnell*, 1992 WL 43612, at * 1; *accord Underwriters at Lloyds of London v. Lauretti's Pie[r]pont Tavern, LLC*, No. CV02078675, 2003 WL 948827, at *4 (Conn. Super. Ct. Feb. 26, 2003) ("§ 38a-321 permits a trial court to determine whether the plaintiff has a duty to indemnify the defendants only after there has been a final judgment in favor of the plaintiff in the underlying action; [t]o make such a determination before a final judgment would be premature"); *Kyle v. Aetna Life & Cas. Co.*, No. 324452, 1988 WL 1519147, at *2 (Conn. Super. Ct. April 22, 1988) ("third party claimant must allege and prove . . . that a final judgment has entered" against the insured); *see also DaCruz v. State Farm Fire & Cas. Co.*, 6 Conn. App. 507, 513, 794 A.2d 1117 (Conn. App. Ct. 2002) (in order for victim to bring direct action for indemnification against insurance company, victim "must first obtain a final judgment in the underlying tort action"), *rev'd on other grounds*, 268 Conn. 675, 846 A.2d 849 (Conn. 2004).

The Connecticut Direct Statute has been interpreted as not only enumerating the elements of a cause of action, but also providing "the basis upon which standing is conferred." *Gates v. Government Employees Co.*, No. CV65004852, 22008 WL 1971337, at *4 (Conn. Super. Ct. April 18, 2008); *accord Bepko v. St. Paul Fire and Marine Ins. Co.*, No. 3:04CV1996 (PCD), 2005 WL 3619253, at *1 (D. Conn. Nov. 10, 2005) (Section 38a-321 "provides the footing" on

which a judgment creditor may sue the judgment debtor's insured); *Peck v. Public Service Mut. Ins. Co.*, 114 F. Supp. 2d 51, 54-55 (D. Conn. 2000) ( plaintiff had standing via § 38a-321 against tortfeasor's insurer). A plaintiff must have standing to proceed with her claim in order for this Court to adjudicate it.

The key issue with respect to standing in this action is thus whether the judgment in Tucker I is a "final judgment" under Connecticut's Direct Action Statute. The statute does not further define the phrase. The Connecticut Supreme Court has not done so. Moreover, Connecticut courts have not addressed the question of whether a final judgment exists if pending post-trial motions are denied without prejudice (*e.g.*, when proceedings are stayed due to bankruptcy). Rather, they have noted that "[t]he phrase 'final judgment' has many different meanings depending upon the context in which it is used." *Town of Brookfield v. Greenridge, Inc.*, 35 Conn. Sup. 49, 393 A.3d 1316, 1316-17 (Conn. Super. Ct. 1977) (interpreting final judgment to allow prejudgment remedy while case on appeal).

In the context of appeals, the Connecticut Supreme Court has stated that "the test [for finality] lies, not in the nature of the judgment, but in its effect as concluding the rights of some or all of the parties."[7] *Banca Commerciale Italiana Trust Co. v. Westchester Artistic Works, Inc.*, 108 Conn. 304, 142 A. 838, 839 (Conn. 1928). Thus, if the parties' "rights are concluded, so that

---

[7]In determining whether a judgment is final for *res judicata* purposes, Connecticut courts have looked to factors also considered for purposes of finality on appeal. *Marone v. City of Waterbury*, 244 Conn. 1, 12, 707 A.2d 725 (Conn. 1998) ("While there is a distinction between finality for purposes of appeal and for purposes of res judicata, the two often overlap. . . . 'For res judicata purposes, a judgment is 'final' if no further judicial action by [the] court rendering judgment is required to determine [the] matter litigated.' Black's Law Dictionary (6th Ed.1990). A final award is '[o]ne which conclusively determines the matter submitted and leaves nothing to be done except to execute and carry out the terms of [the] award.' *Id.*").

further proceedings after the entry of the order or decree of the court cannot affect them, then the judgment is a final judgment from which an appeal lies." *Id.*; *accord Prevedini v. Mobil Oil Corp.*, 164 Conn. 287, 293, 320 A.2d 797 (Conn. 1973) ("test of a final judgment lies, not in the nature of the ruling, but its effect in concluding the rights of the party appealing; if his rights are concluded so that further proceedings after the ruling cannot affect them, there is a final judgment"); *see also Enfield Federal Savings & Loan Ass'n.*, 184 Conn. 569, 440 A.2d 220, 222 (Conn. 1981) (defining judgment as "final" when a case "has so far concluded the rights of the parties" that it would be unjust to allow them to be readjudicated).[8]

In the instant action, after the jury returned a verdict in Plaintiff's favor on all counts in the total amount of $4 million ($1 million in compensatory damages and $3 million in punitive damages), the Clerk of the Court proceeded to " promptly prepare, sign, and enter the judgment"

---

[8]Similarly, in federal court, "generally judgments are not final until both liability and damages are determined." 36 C.J.S. Federal Courts § 430. Thus, "[a] judgment is not considered final unless it disposes of all claims against all parties and "ends the litigation on the merits[,] ... leav[ing] nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945); *accord Transport Workers Union of America, Local 100, AFL-CIO v. New York City Transit Authority*, 505 F.3d 226 (2d Cir. 2007) (A "final" decision embodied in a final judgment "is one that conclusively determines the pending claims of all the parties to the litigation, leaving nothing for the court to do but execute its decision.") (quoting *Citizens Accord v. Town of Rochester*, 235 F.3d 126, 128 (2d Cir. 2000)); *Information Resources v. Dun and Bradstreet Corp*, 294 F.3d 447, 451 (2d Cir. 2002) ("A court's disposition of a claims is final if it ends the litigation of that claim on the merits and leaves nothing for the court to do but execute the judgment entered on that claim." ) (internal quotations omitted); *see also Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521 (5th Cir. 1996) ("A judgment is final when it terminates litigation on the merits and leaves the court with nothing to do except execute the judgment.") (internal quotations omitted).

Specifically with regard to finality for appeals, the Second Circuit has held that "[t]he timely filing of a postjudgment motion pursuant to Fed. R. Civ. P. 50(b) ... automatically affects the finality of the judgment. " *Weyant v. Okst*, 198 F.3d 311, 314-15 (2d Cir.1999) (internal quotations omitted). In that context, the pendency of a defendant's post-trial motions thus operates to suspend the finality of a district court's judgment. *Doe ex rel. A.N. v. East Haven Bd. of Educ.*, 430 F. Supp. 2d 54, 66 (D. Conn. 2006).

pursuant to Local R. Civ. P. 58 (b)(1)(A). [9]  Tucker I, Doc. #69.   Thereafter, defendant Journal

Register East filed post-trial motions, challenging both the verdict and its amount.[10]  *Id.*, Doc.

# 82, 89.  These motions were denied without prejudice and the case was administratively

closed[11] after the Journal Register Company and its affiliated debtors filed a voluntary petition

for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the Southern District of

New York and an automatic stay went into effect.   *Id.*, Doc. #129.  If bankruptcy had not

intervened and Judge Underhill had the opportunity to rule on these motions on the merits, it is

possible or, as Defendants contend, even likely that the verdict would have been overturned or

---

[9]The Clerk's action in entering such a judgment is automatic in this District in that it is taken "without the court's direction" under Local R. Civ. P. 58(b)(1).

[10]In Connecticut, in a civil jury case, "final judgment enters as a matter of course once a motion to set aside the verdict is denied."  *Smith v. Otis Elevator Co.*, 33 Conn. App. 99, 633 A.2d 731 (Conn. App. Ct. 1993).  *See also Pietrorazio v. Santopietro*, 185 Conn. 510, 512-13, 441 A.2d 163 (1981) (Connecticut Supreme Court has repeatedly held that "the acceptance of the jury verdict at the time it is rendered is deemed to constitute a final judgment ... **unless** a motion to set aside is later filed." ) (emphasis added).  Here the denial of the motion for new trial was without consideration of the merits (*i.e.*, without prejudice); thus finality remains in question.

[11]In general, the administrative closing of a case in itself does not suggest that there was a final judgment.  Rather, "[a]dministrative closings comprise a familiar . . . way in which courts remove cases from their active files without making any final adjudication."  *Penn West Associates, Inc. v. Cohen*, 371 F.3d 118, 127 (3d Cir. 2004); *see also In re Arbitration Between Philadelphia Elec. Co. v. Nuclear Elec. Ins. Ltd.*, 845 F. Supp. 1026, 1028 (S.D.N.Y. 1994) ( an administrative closing does not "bar a party from restoring the action to the Court's active calendar upon an appropriate application"); *Florida Ass'n. for Retarded Citizens v. Bush*, 246 F.3d 1296, 1298 (11th Cir.2001) ("Designating a case 'closed' does not prevent the court from reactivating a case either of its own accord or at the request of the parties."); *American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 715 (5th Cir.2002) (Dennis, J., concurring) ("[T]he administrative closure reflects nothing more than the federal courts' overarching concern with tidy dockets; it has no jurisdictional significance.").

the judgment reduced.[12]   Under such circumstances, it would seem inequitable to enforce that

verdict as a final judgment against the insurers in the present action.

For purposes of deciding the current Motion to Dismiss, however, the determination as to

whether the Tucker I judgment is final has become complicated by recent developments, namely

Plaintiff's current attempt to reopen that judgment and Defendants' request to intervene.  After

Defendants filed the present motion to dismiss Tucker II (the coverage action), the judgment in

Tucker I (the liability action) once again became the focus of the ongoing litigation.  Plaintiff and

Journal Register East filed a Joint Motion to Reopen Case and Enter Judgment in Accordance

with Stipulation on August 30, 2010.  Tucker I, Doc. #130.   In that motion and attached

Stipulation, the parties expressly requested Judge Underhill to  re-enter the judgment as a

"Reduced Judgment" and deem the post-trial motions denied with prejudice.  In response,

Defendants have filed a Motion to Intervene.  *Id.*, Doc. #131.  In so doing, they specifically

---

[12]Defendants cited numerous instances where Judge Underhill indicated that either *remittitur* or a new trial was likely in Tucker I.   For example, at a hearing on February 9, 2009, on pending post-trial motions, Judge Underhill plainly stated, "This verdict I think is not just too big, it's way too big."  Tucker I, Doc. #128, p. 46, l. 8-9.  He came to this conclusion because the verdict  "exceeds many wrongful death cases."  *Id.*, p. 44, l. 13.   He thus elaborated, "If you take Ms. Tucker's salary and look at her life expectancy, the verdict here is more than she would have gotten if she did [sic] been killed at the office."  *Id.,* l. 11-16   *See also* Judge Underhill's Ruling and Order (dated February 20, 2009) on plaintiff's motion for PJR (" With regard to damages, it is likely that Tucker will face the option of *remittitur* or a new trial.").   *Id*., Doc. #125, p. 2 n.3.

Judge Underhill was also troubled by plaintiff's counsel's arguably improper suggestion during closing argument that multi-million dollar verdicts were given in sexual harassment cases, since the Judge did not consider Tucker I to be a sexual harassment case.  *Id.*, Doc. #128, p. 69, l. 16-20.

object to Tucker's attempt "to reopen this case and enter an improper stipulated final judgment in the amount of $3 million, which Tucker in turn plans to enforce against non-party National Union in a related coverage action ("Tucker II") despite, *inter alia*, that the proposed judgment would circumvent *remittitur* and would violate Title VII's statutory cap on damages." *Id.*, Doc. #132. In effect, Defendants seek to intervene and prevent Tucker from gaining what they believe would be an inequitable "final judgment."

I conclude that, in these rather convoluted circumstances, the issue of whether a final judgment has entered in Tucker I is not presently ripe for determination. The very judgment whose finality must be assessed in this action is the subject of litigation to reopen and replace it in Tucker I. I will thus deny without prejudice Defendants' current Motion to Dismiss Tucker II with respect to the argument regarding the lack of finality of the Tucker I judgment. Defendants may, however, renew their motion to dismiss on the grounds that no final judgment exists in Tucker I after Judge Underhill rules on the pending Joint Motion to Reopen.

**B.     Whether Plaintiff's action against the defendant insurers may proceed in light of the limited scope of relief from the automatic stay awarded by the Bankruptcy Court**

Defendants argue that, pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiff has failed to state a claim upon which relief may be granted because "Plaintiff's causes of action in this lawsuit are outside the scope of the very limited relief from the Journal Register's automatic bankruptcy stay that was restricted to determining whether her unsecured claim in the bankruptcy court was subject to insurance coverage." Doc. #19, p. 2, para. 1; p. 18-20. They claim that in failing to "name the Journal Register - the only party protected by the bankruptcy stay" in this action,

14

"Plaintiff's lawsuit has violated the automatic stay." *Id.*, p. 19-20.   In making such an assertion, Defendants demonstrate their belief that any action against them is void (*i.e.*, in violation of the automatic stay)  if it does not also include Journal Register East as a defendant. In so concluding, Defendants misapprehend the meaning and scope of Bankruptcy Judge Gropper's ruling in lifting the automatic stay.

### 1.   Lifting of the stay clearly contemplated litigation against the insurers to determine the scope of insurance coverage

In his Memorandum  approving the Stipulation of the Journal Register Company and Plaintiff to lift the automatic stay in bankruptcy,  Judge Gropper expressly  lifted the stay for the purpose of allowing Plaintiff to "proceed against the Insurer to establish insurance coverage." *See In Re Journal Register Co., et al*, No. 09-10769 (ALG), Memorandum of Judge Allan L. Gropper (June 22, 2009), p. 2, para. 2.   He thus approved the Stipulation, delineating the "sole purpose" of lifting the stay to permit Tucker "to pursue the Claims against National Union and the EPL Policy to the limits of the EPL Policy."  *Id.*; Stipulation for Relief from Stay, p. 3 (at ¶ 1).

Judge Gropper further noted that the only remaining question was  "whether there should also be leave, at this time, [for the insurer] to proceed with the motion for a new trial and judgment n.o.v. [in Tucker I]."  Memorandum of Judge Gropper,  pp. 2-3.   He concluded that such leave would not be given at that time because the insurer had "not established on this record than an insurer that has disclaimed coverage can force the insured to seek to overturn a verdict before the issue of coverage has been determined."  *Id.*, p. 3, para. 1. Judge Gropper did not, however, believe that it would "be unfair to permit the parties, who have agreed to limited relief,

to proceed first on the insurance coverage issue." *Id.*

He then clarified that, in any event, "[t]he [automatic] stay does not ordinarily protect third parties." *Id.*   Because the insurers are third parties to the bankruptcy proceeding (*i.e.*, not debtors),  it was proper for Plaintiff to bring an action against the insurers to determine the existence of any relevant coverage.  Moreover, such an action would have been proper whether or not the stay had been lifted.[13]

> 2.    **Neither the automatic stay nor the permanent discharge injunction is designed to protect a debtor's liability insurers**
>
> > a.    **The automatic stay under § 362(a)  was not designed to protect third parties**

Under Section 362(a) of the Bankruptcy Code, the automatic stay arises upon the filing of a bankruptcy petition and automatically stays the commencement and continuation of judicial proceedings against the debtor or the debtor's property.  11 U.S.C. 362(a).[14]   *See, e.g.,  In re*

---

[13]Defendants concede this point when they state, "Plaintiff did not need relief from the stay to pursue claims against Defendants alone, the stay only concerns actions against the debtor."  Doc. #19, p. 18, para. 1

[14]Section 362 of the Bankruptcy Code is captioned "Automatic stay" and states in relevant part:

(a)  Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, . . . operates as a stay, applicable to all entities, of--

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; . . ."

11 U.S.C. § 362(a) (1).

*Enron Corp.*, 306 B.R. 465, 475 (Bankr. S.D.N.Y. 2004).

The stay is designed to fulfill two principal purposes:  (1) to  provide the debtor with a "breathing spell" from its creditors and (2) to enable "the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas."  *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 989 (2d Cir. 1990).

It is well settled that the automatic stay ordinarily applies only to the debtor.  *Teachers Ins. & Annuity Ass'n. v. Butler*, 803 F.2d 61, 65 (2d Cir.1986);  *Trustees of Sickness and Accident Fund of Local One-L v. Philips Winson, Inc.*, No. 00Civ9554 (MHD), 2005 WL 273017, at *2 (S.D.N.Y. Feb. 3, 2005);  *In Re Heating Oil Partners*, No. 3:08-CV-1976 (CSH), 2009 WL 5110838, at * 6 (D. Conn. Dec. 17, 2009).  *See also* 3 Collier on Bankruptcy § 362.03(3)(d) (15th ed. 2002).   Judge Gropper correctly informed the parties that the automatic stay does not ordinarily protect third parties such as the insurers in the present case.[15]

### b.    The permanent discharge injunction under § 524(a) does not discharge liability of third parties such as insurers

Similarly, the permanent discharge injunction, which arises upon the entry or effective date of the Confirmation Order,  approving the debtor's proposed reorganization plan, is

---

[15]The Second Circuit has held that courts may apply the automatic stay to non-debtors in limited circumstances "when a claim against a non-debtor will have an immediate adverse economic consequence for the debtor's estate," such as when "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant." *Queenie, Ltd. v. Nygard International*, 321 F.3d 282, 287 (2d Cir. 2003).  That narrow exception does not, however, apply in this case.  The insurers and the debtor do not possess a common identity; nor would any  liability of the insurers arising under the EPL Policy have an effect on the debtor's estate.

designed to protect only the debtor.  11 U.S.C. § 524(a).   That injunction bars actions or

proceedings against the debtor on any pre-petition debt or claim that was covered by the

reorganization plan.[16]  In contrast, it allows a creditor to seek recovery from "any other entity"

who may be liable on behalf of the debtor.  11 U.S.C. § 524(e).[17]

   The Second Circuit has clarified that the protection of the debtor arising under section

524(a)  "does not extend to other parties."  *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992).

Rather, the language and the legislative history of subsections (a) and (e) of § 524 reveal "that

Congress sought to free the debtor of his personal obligations **while ensuring that no one else**

**reaps a similar benefit**."  *Id.*  (emphasis added).   The court then cited "[n]umerous courts,

[who when] confronted with a tort claimant who seeks to proceed against a discharged debtor

only for the purpose of recovering against an insurer, . . . relied on §§ 524(a) and 524(e) and the

fresh start policy in concluding that the discharge injunction does not bar such a suit."  956 F.2d

---

[16]   11 U.S.C. § 524(a), captioned, "Effect of discharge,"  provides:

§ 524. Effect of discharge

(a) A discharge in a case under this title--

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under . . . this title, whether or not discharge of such debt is waived . . .

[17]11 U.S.C. § 524(e) states:

(e)  Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor **does not affect the liability of any other entity** on, or the property of any other entity for, such debt.

(Emphasis added).

at 33.

For example, in *In re Jet Florida Systems, Inc.,* 883 F.2d 970, 971  (11th Cir. 1989),  the Eleventh Circuit affirmed *per curiam* the "well-reasoned opinion rendered . . . in the district court," holding that an insurer of a debtor is not protected from liability under section 524.  The district court noted, in it is opinion appended by the Eleventh Circuit, that:

> [T]he provisions of 524(a) apply only with respect to the *personal liability* of the debtor. When it is necessary to commence or continue a suit against a debtor in order, for example, *to establish liability of another*, perhaps a surety, such suit would not be barred. Section 524(e) was intended for the benefit of the debtor but was not meant to affect the liability of third parties or *to prevent establishing such liability* through whatever means required.
>
> 3 R. Babitt, A. Herzog, R. Mabey, H. Novikoff, & M. Sheinfeld, Collier on Bankruptcy ¶ 524.01 at 524-16 (15th ed.1987) (emphasis added). Certainly, the obligation of an insurer can be viewed as such a secondary liability under the provisions of section 524(e).

883 F.2d at 973 (emphasis in original).

"Far from holding that insurers should be protected from liability," courts have "reasoned that the insurance company should not be entitled to gain a benefit that was not intended or in any way computed within the rate charged for its policy." *In Jet Florida Systems* , 883 F.2d at 975, citing *In re Mann*, 58 B.R. 953, 957-58 (Bankr. W.D. Va.1986) ("[w]ere we to not permit the state court action to proceed, the insurance company would in effect escape potential liability and be unjustly enriched"), and  *In re Glen-Bern Industries, Inc.*, 6 C.B.C. 100, 103 (Bankr. D. Mass.1975) (discharge is personal to the debtor and does not to accrue to benefit of third parties who may have liability based on the bankrupt's liability)).[18]  These cases are persuasive.

---

[18]*See also Lightowler v. Continental Ins. Co.*, 255 Conn. 639, 645, 769 A.2d 49  (Conn. 2001) ("11 U.S.C. § 524(e) expressly provides that the relief accorded the debtor under the provisions of § 524 does not extend to other parties," such as insurers); *In re Bracy*, 449 F. Supp.

In sum, the insurers in the present case are not and have never been shielded from liability under the automatic stay or the permanent discharge injunction of the Bankruptcy Code. 11 U.S.C. §§ 362(a), 524(a), (e).   Plaintiff may establish liability against them through whatever means are required.   Moreover, in lifting the automatic stay, Judge Gropper made it amply clear that the insurers were subject to litigation on the issue of whether they owed coverage for damages arising from Plaintiff's termination.   Defendants' argument that Plaintiff's action in Tucker II should be dismissed as outside the scope of Judge Gropper's order fails.

**C.**   **Whether AIG is a proper party to this action**

Lastly, Defendants contend that, pursuant to Fed. R. Civ. P. 12(b)(6),  Plaintiff's Complaint should be dismissed against AIG because the Complaint fails to set forth a valid claim against that party.   Specifically, Defendants argue that (1) AIG was not a party to the EPL Policy, the insurance contract at issue, and (2) AIG may not be sued as the parent company of National Union because Plaintiff has failed to set forth the requisite extraordinary facts to justify this Court in piercing the corporate veil.

Plaintiff counters that AIG is a proper party to the action, pointing to three key factors: (1) "the name AIG . . . was on the policy at issue," (2) "a division of AIG accepted the notice of Tucker's claim in June 2004," and (3) "an AIG division disclaimed coverage [under the EPL Policy] in August 2008."   Doc. #37, p. 20, Part. 4.   Plaintiff maintains that, "[a]t the pleading stage," such "factual allegations of injury resulting from the defendant's conduct may suffice"

---

70, 71 (D. Mont.1978) ( if an insurance company is liable to a plaintiff as a matter of state law in a personal injury action, subsequent discharge of the insured in bankruptcy does not alter the insurance company's obligation); *Johnson v. Bondurant*, 187 Kan. 637, 641, 359 P.2d 861 (1961) (liability of an insurer "is not altered by the discharge of the bankrupt").

because, on a motion to dismiss, the Court must "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992).   Plaintiff further argues that, by including AIG as a defendant, she does not request this Court to pierce the corporate veil.  Doc. #37, p. 23, para. 3. Rather, she has "simply named AIG the corporation as co-defendant."  *Id.*

### 1.      Plaintiff's allegations

Plaintiff has alleged that "AIG is a holding company which, through its subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad."[19]  Doc. #1, p. 3, ¶ 6.  Its "primary activities include both general insurance and life insurance and retirement services operations."  *Id.*   Plaintiff states that National Union is "a subsidiary and member company" of AIG and was a principal business unit in one of AIG's operating segments during 2008.  *Id.* ¶¶ 5-6.

With respect to the insurance policy at issue, Plaintiff alleges that both AIG and National Union sold the EPL Policy to the Journal Register Company in 2004.  *Id.*, p. 4,  ¶ 7.   She states that the "Policy was entitled 'AIG Executive Liability.'" *Id.* ¶ 8.   She further points to the September 3, 2008 cover letter accompanying the EPL Policy and quotes the following statement by AIG :  "Congratulations on purchasing your employment practices liability insurance policy from the member companies of American International Group, Inc. (AIG)[,] one of the premier

---

[19]A holding company is "[a] company formed to control other companies, usu[ally] confining its role to owning stock and supervising management."  Black's Dictionary (8th ed. 2004).   Even "100% stock ownership and commonality of [officers and directors] are not alone sufficient to establish [that a holding company has] an alter ego relationship" with its subsidiary.  *Hersey v. Lonrho, Inc.*, 73 Conn. App. 78, 88, 807 A.2d 1009, 1016 (Conn. App. Ct. 2002) (internal quotations and citations omitted).

writers of commercial insurance." *Id.,* p. 4, ¶ 10; Doc. #1-2, para. 1.  She also cites the letter's

language, reassuring the Journal Register Company that it can have 'the confidence of knowing

that your claims will be handled by a professional team of claims analysts and defended by our

panel counsel, which is . . . available to you at preferred AIG rates."    Doc. #1, p. 4-5, ¶ 11; *Id.*,

Doc. #1-2,  para. 2.

      Later in her pleading, Plaintiff describes the dealings between the Journal Register

Company and AIG regarding the claim at issue in Tucker I.   She states that on May 13, 2004, the

Journal Register Company "provided written notice to National Union and AIG , through

representative Keith Tinley of AIG Claim Technical Services, of an employment-related

retaliation claim" that she had filed with the Connecticut Commission on Human Rights and

Opportunities (CCHRO) and the United States Equal Employment Opportunity Commission

(EEOC).  Doc. #1, p. 6, ¶¶ 19-20.   Moreover, she maintains that AIG was the entity that then

"assigned the claim file number" to the case on June 1, 2004.  *Id.*, ¶ 22.

      With respect to the alleged mishandling of the claim and the ultimate outright refusal to

honor it, Plaintiff states that "AIG and National Union failed to reasonably investigate the claim,

make a definitive coverage determination, and communicate with the insured.  *Id.*, p. 7,  ¶ 26.

Plaintiff contends that in March of 2005, it was AIG who "unilaterally closed National Union's

file on Tucker's claim."  *Id.* ¶ 28.   Finally, Plaintiff states that, in a letter dated "August 18,

2008, AIG denied coverage of Tucker's claim," basing "its declination solely on Clause 8" of the

EPL Policy because Journal Register had "failed to advise" it of Tucker's litigation in Tucker I

until after the jury had returned an adverse verdict.  *Id.*, p. 9, ¶ 40.   Plaintiff disputes that AIG

and National Union were not given proper notice and thus alleges that AIG's denial of coverage

was made in bad faith.

Accepting all allegations contained in the Complaint as true and drawing all reasonable inferences in favor of the Plaintiff, as is incumbent on this Court in ruling on a Rule 12 (b)(6) motion, the Court must decide whether Plaintiff has set forth a plausible claim that (1) AIG was a party to the EPL Policy at issue and/or (2) AIG so totally controlled and dominated National Union in its dealings with the Journal Register Company with respect to the EPL Policy that this Court is justified in piercing the corporate veil.  It is appropriate for the Court to consider that alternative theory of liability, although as noted Plaintiff does not press it in her briefs.

### 2.    Whether AIG is a party to the EPL Policy

Before determining whether AIG is a proper defendant in this action under the theory of piercing the corporate veil, the Court first addresses the question of whether AIG is actually a party to the EPL Policy and thus subject to suit in this action.  Examining the language within the four corners of the policy, the Court concludes that AIG is not an insurer on the policy.

Under Connecticut law, the issue of whether AIG is a party to the EPL Policy is a question of law.[20]  *Auto Glass Exp., Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 975 A.2d 1266 (Conn. 2009)  ("[C]onstruction of a contract of insurance presents a question of law for the

_____

[20]In Connecticut, insurance policies are construed according to general rules of contract interpretation.   They are thus "enforced in accordance with the parties' intent, as derived from the plain and ordinary meaning of the policy's terms."  *Allstate Ins. Co. v. Quito*, No. 3:06cv1671 (PCD), 2007 WL 2221163, at *3  (D. Conn. Aug. 2, 2007) (citing *Ohio Cas. Ins. Co. v. Dentek, Inc.*, 283 F. Supp. 2d 655, 659 (D. Conn. 2003)).   The primary rule is that "the Court must read the policy language as a layman, rather than [as] an experienced underwriter" and should not "torture words to import ambiguity" where none exists.  *Jurrius v. Maccabees Mut. Life Ins. Co.*, 587 F. Supp. 1301, 1305 (D. Conn. 1984).

court).  The Court must examine the policy on its face to determine the intent of the parties and

whether the contract language is ambiguous.  *Accord Hugo Boss Fashions, Inc. v. Federal Ins.*

*Co.*,  252 F.3d 608, 616-17 (2d Cir. 2001) (citing *Board  of Managers. of Yardarm Condominium*

*II v. Federal  Insurance Co.*, 669 N.Y.S.2d 332, 332, 247 A.D.2d 499 (N.Y. App. Div. 1998))

("[t]he question of whether an insurance policy is ambiguous is a matter of law to be determined

by the court").[21]

In interpreting an insurance contract, the Second Circuit has held that "[a]n 'ambiguous'

word or phrase is one capable of more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated agreement

and who is cognizant of the customs, practices, usages and terminology as generally understood

in the particular trade or business." *Hugo Boss*, 252 F.3d at 617  (citing *Walk-In Med. Centers,*

*Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987)).

The Second Circuit has explained that, conversely,  "[c]ontract language is not

ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the

purport of the [contract] itself, and concerning which there is no reasonable basis for a difference

of opinion." *Hugo Boss*, 252 F.3d at 617 (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889

F.2d 1274, 1277 (2d Cir.1989)).

---

[21]*See also Connecticut Ins. Guaranty Assn. v. Fontaine*, 278 Conn. 779, 784-85, 900 A.2d
18 (Conn. 2006) ("The [i]nterpretation of an insurance policy ... involves a determination of the
intent of the parties as expressed by the language of the policy ... [including] what coverage the ...
[insured] expected to receive and what the [insurer] was to provide, as disclosed by the
provisions of the policy.... [A] contract of insurance must be viewed in its entirety, and the intent
of the parties for entering it derived from the four corners of the policy ... [giving the] words ...
[of the policy] their natural and ordinary meaning ... [and construing] any ambiguity in the terms
... in favor of the  insured") (internal quotation marks omitted.).

If the language of the contract is ambiguous in that it is  reasonably susceptible to both parties' interpretations, the Court must resolve "any ambiguity . . . in favor of the insured." *Liberty Mutual Ins. Co. v. Lone Star Industries, Inc.*, 290 Conn. 767, 796, 967 A.2d 1(Conn. 2009).  Therefore, if the EPL Policy's language is ambiguous, the Court must construe the ambiguity in favor of the insured.[22]

 The Court must examine the four corners of the EPL Policy to determine whether it would be reasonable for one to believe that AIG is an "insurer" within the terms of that policy. At the outset, it is evident that the policy lists only "National Union Fire Insurance Company of Pittsburgh, Pa." as the "insurer."  Doc. #1-2, p. 4, Item. 8.  The policy specifies that "[t]his policy is issued **only by the insurance company indicated below**" and specifies, "National Union Fire Insurance Company of Pittsburgh, Pa." as that insurer. *Id.* (emphasis added).   Nowhere else in the policy is the "insurer" defined.  Furthermore, the policy provides that it is "signed on the Declarations Page by its [the insurer's] President, a Secretary, and a duly authorized representative of the Insurer"  (albeit without reference to "National Union" under the individual signatures).  *Id.* p. 6.

Upon examining the face of the policy, it is clear that National Union is the sole insurer named on the EPL Policy.   Plaintiff, however,  points to the fact that "the name AIG . . . was on the policy at issue."  Doc. #37, p. 20, Part 4.  Moreover, she states that "the policy at issue was entitled 'AIG Executive Liability'" and the accompanying cover letter was written by Lucy Ann

---

[22]The Court notes that in the instant case, the insured, the Journal Register Company, is not a party to this action.  Therefore, its beliefs with regard to interpretation of the EPL Policy's language are not part of the pleadings or record.  Moreover, whether it would consider it advantageous to have AIG as a party to the policy is also not known.

Galioto as "Senior Vice President, AIG Executive Liability."  *Id.*, p. 21, para. 2.   The Court

notes, however, that the heading on the policy of "AIG Executive Liability" is in fact followed by

the line, "Insurance provided by the following **member** of American International Group" (Doc.

#1-2, p. 3) (emphasis added); and the letter from Ms. Galioto similarly states, "Congratulations

on purchasing your employment practices liability insurance policy from the **member companies**

of American International Group, Inc." (Doc. #1-2, p. 1) (emphasis added).  Thus, from a close

reading of those two items, one discerns that the insurer is a **member company** of AIG, *i.e.*, the

subsidiary National Union, and not AIG itself.[23]

A contract with a subsidiary does not in and of itself create a contract with the parent

company.   Rather, "it is a fundamental principle of corporate law that the parent corporation and

its subsidiary are treated as separate and distinct legal persons even though the parent owns all

the shares in the subsidiary and the two enterprises have identical directors and officers."  *SFA*

*Folio Collections, Inc. v. Bannon*,  217 Conn. 220, 232, 585 A.2d 666 (Conn. 1991), *cert. denied*,

501 U.S. 1223 (1991).   "Such control, after all, is no more than a normal consequence of

controlling share ownership."  *Id.*; *accord Hersey v. Lonrho, Inc.*, 73 Conn.App. 78, 83, 807

A.2d 1009 (Conn. App. Ct. 2002); *see also* P. Blumberg, *The Law of Corporate Groups*,

Procedural Law § 1.01.1, p. 1 (1983) (traditionally, the law has viewed the parent and subsidiary

corporation as separate legal entities, with separate rights and obligations).  The Court will thus

turn to the issue raised by Defendants as to whether AIG is a proper co-defendant through

---

[23]The Court notes that any possible confusion arising about the identity of the insured is
not the result of the contract's actual language, but rather from outside evidence, such as
accompanying documents (the congratulatory letter) and AIG's conduct in administering the
policy.  Such parol evidence is not considered when construing the terms of an insurance policy
as a question of law.

piercing its corporate veil.

### 3.    Whether Plaintiff's allegations suffice to pierce AIG's corporate veil

AIG is not a party/insurer by the terms of the EPL Policy.   The Court will thus determine whether Plaintiff's allegations provide an adequate basis for AIG to be included as a defendant in this action through piercing of its corporate veil.  As set forth below, Plaintiff has pled sufficient facts to make a plausible claim that  piercing AIG's corporate veil is warranted under the instrumentality rule.

### a.    Piercing the corporate veil under Connecticut Law

Courts generally treat a parent corporation and its subsidiaries as separate and distinct legal entities.  *SFA Folio Collections, Inc.*, 217 Conn. at 230-31.   "[P]iercing the corporate veil is equitable in nature and courts should only pierce the corporate veil under 'exceptional circumstances.'" *Angelo Tomasso, Inc., v. Armor Construction & Paving, Inc.*,  187 Conn. 544, 553-54,  447 A.2d 406 (Conn. 1982).[24]   *See also  United Electrical Contractors, Inc. v. Progress Builders, Inc.*, 26 Conn. App. 749, 755, 603 A. 2d 1190 (Conn. App. Ct. 1992) ("A court may pierce the corporate veil only under exceptional circumstances. . . .").

In Connecticut, courts  "disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor."

---

[24]A federal court sitting in diversity applies the substantive law of the forum state on outcome determinative issues.  *Thrift Drug, Inc. v. Universal Prescription Adm'rs* 131 F.3d 95, 97  (2d Cir. 1997);  *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994).   The Court thus concurs with the parties that it shall apply the law of Connecticut to determine whether it is proper to pierce the corporate veil of AIG in this case.

*Naples v. Keystone Building and Development Corp*., 295 Conn. 214, 231, 990 A.2d 326 (Conn.

2010).  The Connecticut Supreme Court has employed two separate tests for piercing the

corporate veil: (1) the "instrumentality" test; and (2) the "identity" test.  *Angelo Tomasso, Inc.*,

187 Conn. at 553; *see also Naples,* 295 Conn. at 231-33.

    To prevail under the instrumentality test, the plaintiff must prove three elements:   (1)

control by the parent of the finances, policies and business practices relating to the transaction at

issue to such an extent that the subsidiary "had at the time no separate mind, will or existence of

its own"; (2) that the parent exercised that control over the subsidiary in order to commit a

fraudulent, wrongful, or otherwise unlawful act; and (3) the control and breach of duty must have

proximately caused the plaintiff's injury.

    Alternatively, under the "identity rule," the plaintiff must demonstrate "that there was

such a unity of interest and ownership that the independence of the corporations had in effect

ceased or had never begun." *Angelo Tomasso,* 187 Conn. at 552-54.  Therefore, "an adherence to

the fiction of separate identity would serve only to defeat justice and equity by permitting the

economic entity to escape liability arising out of an operation conducted by one corporation for

the benefit of the whole enterprise."  187 Conn. at 554.[25]    "Whether the circumstances of a

---

    [25]To determine whether a parent corporation has an identity of interest with its subsidiary
under the test, courts examine factors such as: "(1) the absence of corporate formalities;
(2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for
personal rather than corporate purposes; (4) overlapping ownership, officers, directors,
personnel; (5) common office space, address, phones; (6) the amount of business discretion by
the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's
length; (8) whether the corporations are treated as independent profit centers; (9) payment or
guarantee of debts of the dominated corporation; and (10) whether the corporation in question
had property that was used by other of the corporations as if it were its own."  *Naples,* 295 Conn.
at 233 (citing *Litchfield Asset Management Corp. v. Howell*, 70 Conn.App. 133, 152-53, 799
A.2d 298 (Conn. App. Ct. 2002), *cert. denied*, 261 Conn. 911, 806 A.2d 49 (2002)).  *Accord*

particular case justify the piercing of the corporate veil "presents a question of fact." *Naples*, 295

Conn. at 234; *see also Hale Propeller, L.L.C. v. Ryan Marine Prod. Pty., Ltd.*, 98 F. Supp.2d

260, 264 (D. Conn. 2000) ("The veil-piercing inquiry is necessarily fact-specific. ").

### b. <u>Sufficiency of Plaintiff's allegations</u>

In the present case, Plaintiff has set forth sufficient facts to make a plausible claim that

AIG's corporate veil should be pierced under the instrumentality test.   Specifically, Plaintiff has

alleged that AIG engaged in conduct that suggests it may have controlled the policies and/or

business practices relating to the transaction at issue.  Namely, AIG and National Union sold the

EPL Policy to Journal Register Company (Doc. #1, p. 4,  ¶ 7), wrote the cover letter

accompanying the policy (*Id.*, p. 4, ¶ 10, Doc. #1-2, p. 1-2), administered the policy (*e.g.*,

accepting notice of the claim, assigning a case number) (Doc. #1, p. 6, ¶¶ 19-20, 22), and

eventually rejected the claim (*Id.*, p. 9, ¶ 40) .   Taking all of these allegations as true and

drawing all reasonable inferences in favor of Plaintiff, it  is plausible that AIG stepped into the

role of insurer under the policy, such that National Union appeared to have no separate mind or

will of its own with respect to the policy's administration.[26]

Furthermore, AIG allegedly committed the wrongful act that proximately caused

Plaintiff's damages in this case.  Specifically, Plaintiff has alleged that AIG wrongfully and

unilaterally closed the claim file pertaining to her employment retaliation claim in March of 2005

---

*William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d
Cir.1991)); *see also Hale Propeller, L.L.C. v. Ryan Marine Prod. Pty., Ltd.*, 98 F. Supp.2d 260,
264-65 (D. Conn. 2000).

[26]In fact, Plaintiff makes no specific suggestion that National Union took any actions on
its own with respect to the sale and administration of the EPL Policy.

(Doc. #1, p. 7,  ¶ 28) and ultimately rejected that claim in writing in its letter of August 18, 2008 (Doc. #1, p.8,  ¶ 39).  Such conduct by AIG, from sale of the policy through rejection of the claim, shows that AIG may have been the true actor and insurer on the policy or as Plaintiff contends, the "key player in the mishandling of Tucker's claim from beginning to end."  Doc. #37, p. 23, para. 2.  Under these exceptional circumstances, if proven true, it would be inequitable to allow AIG to hide behind its member company, National Union, merely on the basis of  National Union's signature on the EPL Policy.[27]  Although hesitant to pierce the corporate veil in all but exceptional cases, the Court concludes that, at the pleading stage, AIG may be included as a defendant in this action.

IV.     **CONCLUSION**

Pursuant to Fed. R. Civ. P. 12(b)(1) and(b)(6), Defendants, National Union and AIG, have moved this Court to dismiss Plaintiff's Complaint on the grounds that each of the counts falls outside the subject matter jurisdiction of the Court and/or fails to state a claim upon which relief may be granted.  For the reasons set forth herein, I deny the motion.  First, the issue of whether Plaintiff has obtained a "final judgment" against Journal Register East in Tucker I, which is a prerequisite for her action under Connecticut's Direct Action Statute, Conn. Gen. Stat. § 32a-321, is not ripe for adjudication at this time.   The parties are currently engaged in litigation in Tucker I to determine whether a substitute Reduced Judgment will be entered in that case.  I

---

[27]The Court notes that Plaintiff has not set forth sufficient facts to support piercing AIG's corporate veil under the identity test (*e.g.*, an absence of corporate formalities between AIG and National Union; inadequate capitalization of either company; use of Nation Union's funds or property by AIG as if it were its own; overlapping leadership and/or common offices of the corporations; or domination of National Union's business discretion by AIG).  Such facts regarding unity of ownership and interest may, however, be disclosed during discovery.

thus DENY Defendants' motion WITHOUT PREJUDICE to renewal upon Judge Underhill's

ruling on Plaintiff's Joint Motion to Reopen Case and Enter Judgment in Accordance with

Stipulation.  Tucker I, Doc. #130.

Second, Defendants' motion to dismiss this action as outside the scope of Bankruptcy

Judge Gropper's ruling to lift the automatic stay is DENIED.  Judge Gropper clearly

contemplated that Plaintiff would proceed against the insurers for the purpose of determining

insurance coverage of her damages.  Furthermore, neither the automatic stay nor the permanent

discharge injunction of the Bankruptcy Code was designed to protect third parties such as

insurers.  11 U.S.C. §§ 362(a), 524(a), (e).

Third, Defendants' motion to dismiss on the grounds that AIG is not a proper party to this

action is DENIED.   Although AIG is not an insurer on the EPL Policy by its terms, Plaintiff has

alleged sufficient facts at the pleading stage to make a plausible claim that AIG should be

included in this action under the instrumentality test for piercing the corporate veil.  Specifically,

she has alleged that AIG had control of the business practices relating to the EPL Policy at issue:

AIG and National Union both sold the EPL Policy to the Journal Register Company (Doc. #1,

p. 4,  ¶ 7); AIG wrote the accompanying congratulatory cover letter to the policy (Doc. #1,  p. 4,

¶ 10; Doc. #1-2, para. 1. ); and AIG employees administered the policy (Doc. #1, p. 6, ¶¶ 19-20,

22, 28).  Furthermore, she has alleged that AIG was the entity that wrongfully closed the claim

file pertaining to her employment retaliation claim in March of 2005 (Doc. #1, p. 7, ¶ 28) and

ultimately rejected that claim in writing in its letter of August 18, 2008 (Doc. #1, p.8, ¶ 39).  In

sum, Plaintiff claims that AIG committed the wrongful act that proximately caused her damages

in this case.   If proven, Plaintiff's allegations create adequate grounds for AIG's inclusion in this

action as co-defendant.

For all of the foregoing reasons, Defendants' Motion to Dismiss the Plaintiff's Complaint (Doc. #18) is DENIED WITHOUT PREJUDICE as to their first argument that Plaintiff lacks standing to sue under Connecticut's Direct Action Statute. Defendants' motion is DENIED WITH PREJUDICE with respect to their claims that (1) this action lies outside the scope of Bankruptcy Judge Gropper's order lifting the automatic stay and (2) AIG is an improper party.[28]

It is So Ordered.

Dated: New Haven, Connecticut
September 30, 2010

 _/s/Charles S. Haight, Jr._
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[28]As stated *supra*, Defendants may, however, move for summary judgment with respect to AIG as a party in this action should discovery reveal that AIG lacked the requisite control over National Union and the transaction and administration of the EPL Policy to warrant piercing AIG's corporate veil.