# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

TERI TUCKER,

               Plaintiff,

 v.

AMERICAN INTERNATIONAL GROUP,
INC.; NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA., A SUBSIDIARY OF
AMERICAN INTERNATIONAL GROUP,
INC.,

          Defendants.

3:09 - CV - 1499 (CSH)

## MEMORANDUM AND ORDER

HAIGHT, Senior District Judge:

## I.    INTRODUCTION

Plaintiff Teri Tucker ("plaintiff" or "Tucker") has brought the present action to recover damages from her former employer's insurers, American International Group, Inc. ("AIG") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively "defendants"), arising from her unlawful discharge in 2003, pursuant to an employment practices liability insurance policy (herein "EPL Policy").   In this action, she seeks to collect from defendant insurers the $4 million judgment in her favor in *Tucker v. Journal Register East*, Doc. # 3:06-CV-307 (SRU) (herein "*Tucker I*"),  the prior action against her former employer, Journal Register East.[1]

---

[1]A full discussion of the facts is set forth in this Court's prior rulings, familiarity with which is assumed.  Doc. #39, 44, 123.

1

Most recently, in compliance with the Court's Order (Doc. #123, dated 12/2/2011), plaintiff amended her Complaint to accurately reflect the current state of facts following her entry into a stipulated settlement of the underlying action, *Tucker I*.[2]   Doc. #126.  In addition to some minor changes of wording and additional facts regarding AIG letters respectively acknowledging and denying coverage of her claims, plaintiff has principally amended the facts set forth at paragraphs 70 to 73 to detail the settlement she entered with Journal Register in *Tucker I*. *Id*., p. 17 (¶¶ 70-73). In particular, she clarified that on January 5, 2011, her "unsecured claim in Journal Register's bankruptcy was reduced to $3 million in exchange for Journal Register's agreement to waive any objections to her claim in bankruptcy court." *Id.*, p. 17 (¶ 70).  She and Journal Register agreed that said compromise "would not affect in any way her rights to pursue collection of the $4 million judgment in the underlying case from the defendants." *Id*.  Furthermore, also on January 5, 2011, "Journal Register expressly assigned to Tucker all its rights against the defendants regarding Tucker's $4 million judgment in the underlying" action, *Tucker I*. *Id*. (¶ 71).  Journal Register "withdrew all post-trial motions pending in the underlying action . . . with prejudice and agreed 'to be forever barred from prosecuting said motions or seeking to affect the Judgment in any way, including through appeal.'" *Id*. (¶ 72).  Tucker concludes and alleges that in these circumstances, she "possesses a final judgment in the underlying action in the amount of $4 million and now stands

---

[2] On January 5, 2011, after filing the present action, plaintiff entered into a Stipulated Settlement Agreement with Journal Register in *Tucker I*.  *Tucker I*, Doc. #142-1 ("Stipulation and Compromise of Unsecured Claim").  Pursuant to that agreement, plaintiff received $109,457.00 in exchange for providing Journal Register with a specific and general release of her claims.  Moreover, as part of that agreement, Journal Register assigned all claims and rights under the EPL Policy to Tucker, including "any and all claims against National Union, AIG and/or any of their or [the insured's] brokers or agents." *Id.*, ¶ 7.  Journal Register expressly excluded any representation or warranty as to the viability of any claims or rights under the EPL Policy. *Id.*, ¶ 8.

in the shoes of the insured under the policies issued" to Journal Register.  *Id.* (¶ 73).

As to the five counts in her Amended Complaint, plaintiff once again included actions for: breach of contract; breach of the implied covenant of good faith and fair dealing; a statutory claim to  recover as a subrogee of the Journal Register Company under Connecticut's "direct action" statute, Conn. Gen. Stat. §38a-321;[3] violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat.  §42-110a, *et seq.,* and  "equitable estoppel."[4]  She has also once again included an action for the tort of bad faith, but now labels the claim as "the common law tort of *procedural* bad faith."  Doc. #126, p. 2 (emphasis added),  reflecting plaintiff's acknowledgment of

---

[3]Connecticut's "direct action" statute, Conn. Gen. Stat. § 38a-321, captioned, " Liability of insurer under liability policy," states in relevant part:

> Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or damage on account of the bodily injury or death by accident of any person, or damage to the property of any person, for which loss or damage such person, firm or corporation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty. . . .  **Upon the recovery of a final judgment** against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose **and if such judgment is not satisfied within thirty days** after the date when it was rendered, **such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer** to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment.

(Emphasis added).

[4]One notable amendment in plaintiff's "equitable estoppel" count is her specific allegation that the "defendants should be equitably estopped from denying coverage of Tucker's claims after waiting 4.3 years after Tucker's claim was first submitted to deny coverage, and only after a substantial adverse verdict."  Doc. #126, p. 24 (¶ 113).

the Court's ruling regarding Connecticut's likely recognition of such an independent tort in the insurance context.  Doc. #123, p. 11-14.[5]

## II.   STATUS HEARING ON JANUARY 19, 2012

On January 19, 2012, in response to Defendants' Motion to Bifurcate and Stay, or Alternatively for Protective Order and Motion for Rule 16(a) Conference (Doc. #88), this Court held a status hearing to discuss the pending discovery motions and any additional discovery disputes which may have arisen in the action.[6]  Counsel for plaintiff and defendants were present at the hearing.  Specifically, Attorney Jeffrey S. Bagnell appeared on behalf of plaintiff and Attorney Dennis O. Brown appeared on behalf of the defendants, National Union and AIG.[7]

---

[5]Also of note, plaintiff has fortified her contention that AIG is a proper party to this action (*i.e.*, properly subject to having its corporate veil pierced) by adding a paragraph at the beginning of her Amended Complaint in which she alleges that "AIG appointed the senior management and controlled the finances, policies and business practices of National Union such that National Union had no separate mind, will or existence of its own." Doc. #126, p. 4 (¶ 6).   She further alleges that "AIG exercised control over National Union . . . to  perpetrate unlawful acts, which were the proximate cause of injury to Tucker." *Id.*

[6]In this Memorandum, citations to the record ("Tr.") are to a  working, draft transcript of the January 19, 2012 hearing. The final transcript is being prepared and will be docketed.

[7]Attorney Scott R. Lucas appeared at the January 19, 2012 hearing on behalf of plaintiff, but did not speak on the record.  Also, Attorney Frank J. Silvestri, Jr. appeared briefly on behalf of non-party Marsh USA, Inc. ("Marsh") to inform the Court that both he, on behalf of Marsh, and Bagnell, on behalf of plaintiff, had agreed that they would like the Court to rule on plaintiff's Motion to Compel Inspection of Computer Records (Doc. #56) "on the papers" (*i.e.*, without argument). Draft Hearing Transcript ("Tr."), p. 20, l. 12-25. In the interest of full disclosure with respect to the relevant recusal statute, 28 U.S.C. § 455, the Court then informed Silvestri that Marsh is and has been the Court's personal insurance broker on various policies for many years. *Id.*, p. 21, l. 21 to p. 22, l. 6.  Moreover, although it is the Court's subjective position that such a fact has no bearing on the proceedings, as Marsh is not a party to the action, the Court sought the reactions of both plaintiff and Marsh to this disclosure.  *Id.*, p. 21, l. 21 to p. 23, l. 12.   Bagnell responded that plaintiff had no objections to the Court ruling on the pertinent motion.  *Id.*, p. 23, l. 4-5.  Silvestri, however, requested additional time, "until the close of

4

**A.      Stipulated March 1st Deadline for Completion of Discovery**

The Court queried the parties with respect to the proposed completion of discovery by March

1, 2012, as set forth in their jointly filed Stipulation, dated December 16, 2011.[8]  Doc. #127.

Specifically, the Court asked both Bagnell and Brown, "[I]s it your view that all discovery in the case

can be completed no later than March 1st, 2012?"   Each counsel responded in the affirmative.  Tr.

P. 8, l. 10 (Bagnell: It is, your Honor."); *id.*, l. 14 (Brown: "Yes, your Honor.").

**B.      Six Outstanding Discovery Issues - Letter from Bagnell to Brown (dated
         12/20/2011)**

To delineate exactly what discovery must be accomplished by March 1st, for the purpose of

ordering such discovery "formally," the Court then inquired, "What do the parties both feel they need

---

business" on the following business day,  to respond so that he might discuss the matter with his
client (*i.e.*, "to make sure my client is in concurrence with my recommendation").  *Id.*, l. 8-12.
Thereafter, upon Silvestri's request, the Court excused him from the remainder of the hearing.
*Id.*, p. 24. l. 18-21.  By letter, dated January 20, 2012,  Silvestri informed the Court that he had
discussed the issue the Court had "raised regarding [the Court's dealings] with a Marsh-related
entity" and "Marsh has no objection to [the Court] ruling on the Motion to Compel."  Letter from
Silvestri to the Court, dated January 20, 2012.  The Court shall, therefore, rule on plaintiff's
motion to compel inspection of Marsh's computer records in a separate Order.

  [8]That Stipulation provided that "[t]he depositions, if any, of the parties' experts will take
place no later than March 1, 2012."  Doc. #127, ¶ 4.   The Court explained its focus on the March
1st date, observing that  the deposition of experts is generally the last phase of pre-trial discovery:

> I was encouraged by counsel's choice designation of the March 1st date in the
> context of depositions of expert witnesses, if any because, as we all recognize, in
> the ordinary course of events the depositions of expert witnesses . . .  are the very
> last thing that happens in pretrial discovery . . . .
>
> After all other discovery has been completed, then the experts know all about the
> case and can form their opinions, which not infrequently conflict.  But the factual
> discovery has been completed.

Tr., p. 7, l.14-24.

and are entitled to in discovery between today and the March 1st date"?  Tr., p. 8, l. 15 to p. 9, l. 19.

 Bagnell  responded by producing a letter that he sent to Brown on December 20, "which set forth

six remaining areas of discovery that we [plaintiff's counsel] feel that we need that we haven't

received." *Id.*, p. 9, l. 20 to p. 10, l. 1 (discussing Court Ex. #1, Letter from Bagnell to Brown, dated

Dec. 20, 2011).   In this letter, Bagnell set forth six "outstanding discovery issues" the parties must

resolve before the close of discovery.  Court Ex. #1, ¶¶ 1-6.

### 1.        AIG's Stipulation to Participate in Discovery as Party to the Action

With respect to issue number one, plaintiff demanded that AIG "no longer maintain a

position that they they're not a proper party" and acknowledge that "they need to respond in

whatever fashion they deem they can to the discovery we've previously served."[9]  Tr., p. 10, l. 24

to p. 11, l. 5.  With respect to that issue, Bagnell declared to the Court, without objection by Brown,

that counsel "have an agreement on that."  *Id.*, l. 6-7.

### 2.        Parties' Agreement to Come to Terms with Respect to Production of Documents Re:   Two Former Claims against Journal Register

Similarly, Bagnell proffered to the Court that the parties "have disposed of" the item listed

---

[9]It is plaintiff's assertion that throughout discovery in this case defendant AIG has refused
to respond adequately and/or objected to interrogatories and/or discovery requests on the grounds
that it is not a proper party to this action.   As the Court has noted in its previous Orders, the
matter of AIG being a proper party to this action has been litigated and the Court has explicitly
ruled.  *See* Doc. #44, p. 18-30 (concluding that AIG is a proper party to this action in that
plaintiff has alleged sufficient facts at the pleading stage to make a plausible claim that AIG
should be included in this action under the instrumentality test for piercing the corporate veil).
Thus, any further attempts by AIG to resist discovery and/or relitigate this matter will be strongly
disfavored.  *See* Doc. #123, p. 19 n. 21 ("defendants are instructed that a general refusal to
allow discovery regarding AIG is in direct conflict with the Court's ruling that AIG is properly
included as a defendant" and "[t]herefore, any future such refusals shall be viewed as obstructive
to the discovery process, causing undue delay and burden to plaintiff").

as number two, plaintiff's request for "claims filed for Journal Register Company's claims history." *Tr.,* p. 11, l. 8-20 (citing Ct. Ex. #1, ¶ 2).   Brown, however, countered by stating that the "only possible problem" he foresaw was that the claims files requested contained other former employees' personnel records and hence "social security numbers" and other personal information. *Id.,* p. 34, l. 14 to p. 35, l.8.  In the event that defendants must produce such documents, they request either an agreement from plaintiff or a confidentiality order from the Court so that defendants "can produce the complete claim file without exposing [themselves] to Mr. Higgins' [a former employee who sued Journal Register], for example claiming that [defendants] had somehow trampled his rights by producing personnel records in this case." *Id.*, p. 39, l. 25 to p. 40, l. 8.  The parties then concurred, with the Court's approval,  that either an agreement with plaintiff might be reached with  respect to confidentiality or an Order might be entered, if necessary, to rectify this problem. *See, e.g., Id.*, p. 40, l. 16-19 (the Court suggested that an agreement and/or  order is "just the way to handle" the confidentiality problem and explained that courts are often asked to examine personnel files in camera); *id*, l . 15 (Bagnell stated that "we [plaintiff's counsel] don't object to [an agreement on] confidentiality").

### 3. Confirmation by Defendants that They Possess No Written Claims Handling Procedures or Guidelines

As to outstanding discovery issue number three, at the hearing Bagnell requested that Brown, on behalf of defendants, "confirm the accuracy of [defendants'] discovery responses [by] stating that there are no written claims handling procedures or guidelines of any kind in their possession, custody, or control."   Tr., p. 12, l. 9 -21 (citing Ct. Ex. #1, ¶ 3).  Moreover, Bagnell argued that should such documents exist but defendants assert that they are covered by the attorney-client

privilege, defendants must provide "a privilege log identifying the relevant information regarding those documents." *Id.*, p. 12, l. 12-15 ( citing Ct. Ex. #1, ¶ 3).

In general, with respect to items number two, three, and five, as set forth both *supra* and *infra*, it is defendants' position that plaintiff has in her possession "everything that can be located that relates to Ms. Tucker or her claim." *Id.*, p. 38, l. 25 to p. 39, l. 3.  In other words, unless such documents are listed in the privilege log Brown turned over to Bagnell at the hearing, defendants have turned over all relevant documents plaintiff has requested.  On that apparent state of the record, the Court makes no further order in these areas.

### 4.      Stipulation that Defendants Turned Over the Requested  Privilege Log at the Hearing

With  respect  to  outstanding  discovery  item  number  4,  plaintiff  explicitly   requests  a "privilege log for all documents responsive to Tucker's previously served discovery requests."  Ct. Ex. #1, ¶ 4.  At the hearing, Bagnell conceded that such a privilege log  was produced by Brown that very day.  Tr., p. 16, l. 7-10 ("Mr. Brown supplied that to me today, so we have that now.").  Thus, Bagnell suggested that issue four "can be disposed of." *Id.*  (discussing Ct. Ex. #1, ¶ 4).  Brown also confirmed that he produced such a privilege log and turned it over specifically to Bagnell. *Id.*, p. 38, l. 25 to p. 39, l. 3.

### 5.      Stipulation that Defendants Do Not Possess Formal Training Manuals But Will  Further  Inquire  Into,  and  Produce  If  Found,  Documents Possessed by Witness Meghan McConville during Employment by AIG Domestic Claims, Inc.

Item number  5, related to and/or perhaps a subset of item number 3, relates to training materials of AIG and/or National Union.  In particular, plaintiff requests that defendants "produce

any of the claims handling training materials referenced by witness Meghan McConville during her deposition in Atlanta."[10] Ct. Ex. #1, ¶ 5.   As set forth, *supra,* defendants, through their counsel, declared at the hearing that no formal training materials exist and all relevant, non-privileged documents have been produced to Bagnell.[11]  Tr. p. 38, l. 25 to p. 39, l. 3.

Furthermore, Brown characterized the material sought as "CLE," referring to Continuing Legal Education, material which consisted of "hand-outs of  lawyers  or [outside] people" who taught the classes McConville attended. *Id.*, p. 42, l. 7-8.   Brown declared that these "booklets," "hand-outs," and "nice bound presentations" have not been found amongst the material that McConville left behind.  *Id.*, p. 42, l. 7-24, Moreover, "if we could find those, we'd provide them." *Id.*  Brown posited that the problem is that McConville's memory as to these items was not "entirely clear" so that, when her employment terminated,  the items may have been left behind as "stuff that could be thrown out."  *Id.*, p. 43, l. 6-8.   As the Court suggested, the parties could discuss the

---

[10]Plaintiff contends that witness Meghan McConville, a former employee of AIG Domestic Claims, Inc. and the  initial handler of Tucker's claims,  established that training manuals exist and that defendants are actually seeking to conceal these documents. Doc. #102-1, p. 2.  McConville testified at her deposition that during a year-long claims handling training program at AIG, she received hard copies of training materials at the meetings.  Doc. #102-10 (McConville depo. transcript), p. 28-29.  By the end of the program, she conceded that she probably had a "cabinetful" of them.  *Id.*   She was also sure that she was given training materials specifically on EPL claims.  *Id.*, p. 42.  She further specified that she had a "binder" of written training materials that was created during that training program.  *Id.*  She consulted these documents when she later handled various claims.  *Id.*, p. 12-13.

[11]Defendants have previously asserted that the documents in the possession of McConville are, in any event, her "personal property" and thus not properly subject to the discovery at issue because she is no longer employed by AIG.  *See* Doc. #103, p. 11 (Email from Brown to Bagnell, dated 7/15/2011, describing "handout materials that Meghan McConville collected at various types of educational and CLE programs she attended" as "personal papers" of a "departing employee[]" –  "[t]hose would have been considered her property and she would have been allowed to take them or toss them upon leaving").

adequacy of defendants' responses with respect to these documents and, if plaintiff determined that she is "deserving of a remedy," her counsel should apply to the Court on notice.  *Id.*, p. 44, l. 7-12.

6.      **Documents In Response to Subpoena Issued from S.D.N.Y. Bankruptcy Court**

With respect to the final outstanding discovery issue in plaintiff's letter, number 6,  plaintiff seeks agreement from defendants to provide documents that plaintiff sought in her production request of April 14, 2010 (document request #11) – *i.e.*, documents "which the defendants, in response to a bankruptcy subpoena issued from the bankruptcy court in the Southern District [of New York] refused to provide . . . on the grounds that they were confidential commercial proprietary records" created by former employees of AIG for the purpose of internal evaluation, review, and memorialization of events that occurred subsequent to May 24, 2004.  Tr., p. 16, l. 11 to p. 17, l. 13. Plaintiff's position, as expressed by Bagnell, is that such an objection, *i.e.*, that the documents are "commercial" or "proprietary,"   is "not a valid discovery objection."  *Id.*, p. 16, l. 19-20.

Nonetheless, Bagnell surmised that it is Brown's position that defendants "have in fact given you everything that there is including these documents that were previously withheld."  *Id.*, p. 17, l. 14-17.  Plaintiff is thus "simply looking for some clarification that that's the case, there is no discrete category here that is being withheld and I think we could clarify that" and "dispose of six as well." *Id.*, l. 17-20.   Although not responding directly to plaintiff's request for clarification on this issue, Brown did state that "[a]s far as confirming the accuracy of prior discovery, we'll be glad to do that."  *Id.*, p. 41, l. 17-18.

**7.** **Agreement by Defendants to Withdraw "Boiler Plate" General Objections**

Lastly, in addition to the six issues listed in the letter (Ct. Ex. #1), Bagnell requested at the hearing that "the existing discovery responses of the defendants be amended to withdraw . . . the 'boiler plate' voluminous general objections" to plaintiff's various production requests. Tr., p. 17, l. 25 to p. 18, l. 11. Bagnell described the objections as "going well beyond" the attorney-client and work product privileges but offered that, nonetheless, he had the "impression that Mr. Brown and I would be able to resolve [the voluminous objection issue] as well." *Id.*, p. 18, l. 7-11.

Brown confirmed to the Court that Bagnell's impression was correct. He explained that, after speaking briefly with Bagnell before the hearing, with respect to the "general objections" at issue, "we [the defendants] [wi]ll waive those, withdraw them, whatever needs to be done to clean up the record." *Id.*, p. 39, l. 5-7. Furthermore, Brown later conceded that "withdrawing the general objections will take away a lot of the ambiguity or issues." *Id.*, p. 41, l. 17-20. The Court considers that those general objections are now withdrawn.

**8.** **Only Remaining Deposition Dispute – Requested Deposition of Attorney Bagnell**

With respect to depositions, Bagnell clarified, on behalf of plaintiff, that he could "not say that there is any deposition right now that [plaintiff] need[s] to take or Mr. Brown has opposed taking." Tr., p. 19, l. 14-16. Thus, from plaintiff's perspective, there are no discovery issues remaining with respect to depositions. In other words, other than the depositions already scheduled, as set forth in the parties' joint Stipulation (Doc. #127), there are "no additional depositions presently contemplated by the plaintiff." *Id.*, p. 20, l. 2-8.

Having heard Bagnell's recitation of all outstanding issues, Brown, on behalf of defendants, asserted that the "only issue that we really have unresolved on our side" is the desire to take Bagnell's deposition on the settlement negotiations that occurred with respect to the underlying action before Judge Underhill, *Tucker I. Id.*, p. 25, l. 5 to p. 29, l. 24.   *See also id.*, p. 37, l. 18-19 ("I'm telling you the only unresolved issue we have on our side."); p. 38, l. 20-21 ("It's the only issue we had left unresolved, your Honor.").

Brown explained, upon the Court's prompting, that it is defendants' position that defendants had the contractual right to associate in the defense of the insured Journal Register in the underlying action.  Such association included the right to engage in settlement negotiations.  *Id.*, p. 26, l. 14 to p. 29, l. 21.  Defendants thus argue that by failing to inform defendants of – and thus failing to provide an opportunity to participate in –  the alleged settlement negotiations in the underlying action, Journal Register waived its right to recover under the EPL Policy.[12]  Defendants further assert that because plaintiff stands in the shoes of the insured, she possesses only those rights to recovery that Journal Register itself would have.  *Id.*, p. 28, l. 17-23.  Under this theory of waiver, defendants maintain that Tucker possesses no right to recover.  *Id.*  Hence, defendants press discovery of the settlement negotiations as crucial.

Brown further asserted that Bagnell's testimony is necessary because "Ms. Tucker was deposed and . . . her basic testimony was that she had not approved such [settlement] discussions and

---

[12]*See also* Doc. #121, p. 2 ("Specifically, it is Defendants' position that Journal Register, the insured under the relevant policy of insurance, waived insurance coverage for Tucker's employment claims against it by breaching its contractual obligations to permit National Union to associate in the defense [against] the Tucker claim, and specifically, by failing to keep National Union informed of developments in Tucker's dispute with Journal Register, including offers to settle that were made to Journal Register by Tucker during the course of the dispute.").

would not have been aware of them if they did occur."[13]  *Id.*, p. 25,  l. 19-21.  Brown alleged that

such testimony conflicts directly with various statements regarding settlement negotiations by

Journal Register's former counsel, Wiggin & Dana partners Lawrence Peikes and Peter LeFeber, and

accordingly creates a genuine issue of material fact that could prevent defendants from obtaining

summary judgment on the waiver issue.  *Id.*, p. 35, l. 13-18.  Defendants have consequently "sought

to depose Mr. Bagnell . . . about the events of the underlying case and the settlement discussions

which may or may not have occurred."[14]  *Id.*, p. 25, l. 13-18.

Bagnell, on the other hand, objected to having his deposition taken, "squarely disput[ing] Mr.

Brown's contention that this is even a material fact." "  *Id.*,  p. 46, l. 19-23.  Bagnell argued that the

EPL Policy "did not require the Journal-Register to invite the insurers here to participate in

settlement discussions."  *Id.*   He further declared that he does not believe that settlement

negotiations are material to the major issue in the case, "which is liability, because . . . this was a no

---

[13]In Defendants' Motion to Compel Supplemental Discovery Responses (Doc. #120),
Brown points to Tucker's response to an interrogatory that  she did "not recall that there were any
substantive settlement discussions in [her] case against the New Haven Register."  Doc. #121, p.
2 (quoting Doc. #121-2, p. 2).  Defendants claim that such a  response is patently false because
"subsequent discovery revealed that there had been extensive settlement communications
throughout the life of Tucker's dispute with Journal Register."  Doc. #121, p. 4.  For example,
the law firm of Wiggin & Dana, which represented Journal Register during the underlying action,
produced documents with "references to at least six distinct settlement offers" between 2004 and
2008.  *Id.*   Moreover, Attorney Lawrence Peikes of Wiggin & Dana "specifically recalled
[during his deposition by defendants] receiving settlement offers through Attorney Bagnell for
$500,000 (although he was 'not 100 per cent sure' of the number)."  *Id.*, p. 6.

[14]The Court clarified that Brown's conclusion with respect to summary judgment is only
valid if the conflicting evidence creates a *genuine* issue of material fact..  Tr., p. 36, l. 6 to p. 37,
l. 16 (quoting language of Fed. R. Civ. P. 56).  Moreover, the Court explained that it is the
Court's duty to make such decisions with respect to how "genuine" an issue of material fact truly
is.  *Id.*, p. 36, l. 22 to p. 37, l. 5.

duty to defend policy." *Id.*, p. 47, l. 6-10.

## III.   <u>DISCUSSION</u>

The Court herein memorializes its findings based on the parties' statements during the status hearing on January 19, 2012.  Moreover, the Court shall set forth its resulting rulings.  First, in recognition of the parties' joint Stipulation (Doc. #127) and counsels' confirming statements at the hearing, **the Court hereby ORDERS all parties to complete discovery on or before March 1, 2012.**  In light of the completion of discovery by March 1, the Court directs plaintiff to file her response to defendants' Motion for Summary Judgment (Doc. #97) on or before **March 16, 2012.**  Defendants shall file their reply to plaintiff's response, if any, on or before **March 26, 2012.**

Next, in light of counsel's various representations, as set forth *supra* (in Section II. A., B. herein), the Court rules on the following Motions.

### A.   <u>Plaintiff's Motion to Compel and For Attorney's Fees and Costs (re:  plaintiff's discovery requests of March 26 and April 6, 2010 and defendants' responses of June 4, 2010) (Doc. #52)</u>

Plaintiff's first Motion to Compel broadly states that "each defendant has : (i) "asserted and maintained wholesale objections to most of [her] discovery requests;" (ii) "withheld responsive discovery material; (iii) failed to verify any discovery responses; (iv) failed to organize and label limited discovery material that has been produced in accordance with the requirements of Fed. R. Civ. P. 26;" (v) refused to provide a privilege log, as required by Local Civil Rule 26(e) for those documents which it claims to be privileged; and (vi) ignored [her] requests to comply fully with its discovery obligations." Doc. #52, p. 1.  Tucker thus requests an order "compelling proper responses and privilege logs in compliance with D. Conn. L. Civ. R. 26(e)" and fees and costs related to her

14

motion.  *Id.*

Upon representations by counsel, all issues addressed in this motion have been or will shortly be resolved among the parties.  Specifically, defendants have agreed to participate fully in discovery as a party, Tr., p. 10, l. 24 to p. 11, l. 7, and to waive all "boiler plate" objections, *id.*,p. 39, l. 5-7.[15] Defendants have further agreed to clarify that they have produced all relevant discovery materials, *id.*, p. 38, l. 25 to p. 39, l. 3; p. 41, l. 17-18, and have turned over the requested privilege log at the hearing, *id.*, p. 16, l. 7-10; i*d.*, p. 38, l. 25 to p. 39, l. 3.    In light of the parties' resolution of the matters set forth therein, Plaintiff's Motion to Compel and For Attorney's Fees and Costs (Doc. #52) is DENIED as moot.[16]

**B.      Plaintiff's Motion for Default or, In the Alternative, Other Sanctions under Fed. R. Civ. P. 37(c) (Doc. #102)**

Plaintiff has filed a general motion for sanctions for defendants' "continued discovery abuses."  Doc. #102, p. 1.[17]  She claims defendants have provided "false discovery responses," failed to produce requested items, and failed to comply with the previous order of this Court that discovery from AIG  was proper.  *Id.*  She specifically requests "an award of fees and costs incurred in

---

[15]Brown thus stated, on behalf of defendants, with respect to the "general objections" at issue, "we [the defendants] [wi]ll waive those, withdraw them, whatever needs to be done to clean up the record." Tr., p. 39, l. 5-7.

[16]The Court notes that in listing the six remaining outstanding discovery issues, Bagnell made no mention of defendants' alleged  failure to properly verify, label, or organize their discovery responses.  Ct. Ex. #1, ¶¶ 1-6.  Accordingly, the Court considers these issues to have been resolved and/or become moot.

[17]Plaintiff initially filed this motion and her supporting memorandum as Doc. #99.  She refiled the motion as Doc. #102 and her supporting memorandum as Doc. #102-1.  Doc. #99 was thus terminated by the Clerk.

bringing" this motion.  *Id.*  She also requests  an entry of default or alternatively, an order to compel immediate good faith compliance and a jury instruction that jurors may make an adverse inference from defendants' failure to timely produce (1) "highly relevant claims handling documents" and (2) "an integral copy of internal claims file documents." *Id.*, p. 1-2.

Plaintiff asserts that defendants have failed to produce the claims handling documents she seeks because defendants consider them "personal property" of former AIG employees. *Id.*, p. 2. Plaintiff finds this statement by defendants to be "absurd" and lacking in credibility. *Id.* She also complains that defendants have failed to amend their discovery requests in response to the Court's holding that AIG is a proper party to this action. *Id.*

A primary focus of plaintiff's motion is defendants' alleged failure to produce the requested documents in her June 4 and July 14, 2010 document requests for "[a]ll guidelines or documents or writings of any kind regarding or referencing claims processing procedures, and/or claims investigation procedures for any claims made under the EPL  policy at issue in this case."  Doc. #102-1 (describing Doc. #102-3, production request #3).   Defendants have responded that such documents do not exist.    Doc. #102-3,  p. 19-20 ("there are no such claims adjusting protocols") & p. 18 ("there are no such claims handling manuals to produce"). *See also* Doc. #109 (Defendants' Reply Memo), p. 3-7 (II.A. "National Union Does Not Possess Written Claims Handling Protocols").

 Plaintiff, however, contends that witness Meghan McConville, a former employee of AIG Domestic Claims, Inc. and the  initial handler of Tucker's claims,  established that they do exist and that defendants are actually seeking to conceal the documents.[18]  Doc. #102-1, p. 2.

---

[18]McConville testified at her deposition that during a year-long claims handling training program at AIG, she received hard copies of training materials at the meetings.  Doc. #102-10 (McConville depo. transcript), p. 28-29.  By the end of the program, she conceded that she

At the January 19, 2012 status hearing, this issue of the alleged training documents once held by deposition witness McConville was explicitly addressed and resolved.  In reference to item number 5 on the parties' list of six outstanding discovery issues (Ct. Ex. #1), Brown characterized the material sought as "CLE," referring to Continuing Legal Education, material which consisted of "hand-outs of lawyers or [outside] people" who taught the classes McConville attended and explained that these materials have not been found amongst the material that McConville left behind. *Tr.*, p. 42, l. 7-24, He further agreed that defendants will produce such materials if they are found. *Id.*  Moreover the parties agreed to  discuss the adequacy of defendants' responses with respect to these documents and, if plaintiff determines that she is "deserving of a remedy," her counsel may seek the Court's intervention.

With respect to all written claims handling manuals and guidelines, defendants have asserted that plaintiff has in her possession "everything that can be located that relates to Ms. Tucker or her claim." *Tr.*, p. 38, l. 25 to p. 39, l. 3.  Specifically, unless particular documents are listed in the privilege log Brown turned over to Bagnell at the hearing, defendants have turned over all relevant documents plaintiff has requested.  Accordingly, Plaintiff's Motion for Default or, In the Alternative, Other Sanctions under Fed. R. Civ. P. 37(c) (Doc. #102) is DENIED without prejudice.  Plaintiff may only renew this motion in the event that defendants fail to make a good faith production of any responsive documents they may later locate or obtain (conduct the Court does not anticipate).

---

probably had a "cabinetful" of them.  *Id.*   She was also sure that she was given training materials specifically on EPL claims.  *Id.*, p. 42.  She further specified that she had a "binder" of written training materials that was created during that training program.  *Id.*  She consulted these documents when she later handled various claims.  *Id.*, p. 12-13.

C.      **Motion for Protective Order - Deposition of John Q. Doyle (Doc. #75)**

Defendants filed a motion to bar plaintiff from taking the deposition of John Q. Doyle, on the grounds that such a deposition "serves no purpose other than harassment of a senior executive with no knowledge of the facts and circumstances of the underlying dispute." Doc. #75 & #76, p. 1. Doyle is President and CEO of Chartis U.S., Inc., which is owned by Chartis, Inc., which in turn is owned by AIUH LLC, which is finally owned by AIG, the publicly traded corporation and defendant in this action. Chartis U.S., Inc. is the direct parent of National Union so that Doyle is also National Union's President and CEO. Defendants maintain that Doyle has had "no involvement in handling individual claims such as those of Plaintiff Tucker and has no knowledge relevant to this lawsuit." Doc. #76, p. 1.

Plaintiff bases her need to take Doyle's deposition on statements he made in an interview with an insurance industry publication in June 2009 concerning company branding in the marketplace. Doc. #76-2. Specifically, she states that the deposition "will be limited to exploring the validity of the claim you have repeatedly asserted that AIG, Inc. is not a proper defendant, but some other AIG entities. . . . Mr. Doyle was interviewed in 2009 and is reported to have made statements that AIG, Inc. *controlled policies and practices of its subsidiaries.*" *Id.*, Ex. A (emphasis added).

When explicitly queried at the January 19 hearing, however, the parties concurred that the only remaining outstanding discovery issue with respect to depositions is defendants' request to depose Bagnell. Tr., p. 19, l. 14-16; p. 25, l. 5 to p. 29, l. 24; p. 37, l. 18-19; p. 38, l. 20-2. Whether Doyle's deposition has been taken or the parties have agreed that it should not, in light of the January 19, 2012 status hearing, the motion to compel said deposition is rendered moot. Accordingly,

18

defendants' Motion for a Protective Order (Doc. # 75) with respect to the requested deposition of

John Q. Doyle  is DENIED as moot.[19]

### D.    Defendants' Motion for Protective Order and to Quash and/or Modify (Doc. #101)

Defendants have moved, pursuant to Fed. R. Civ. P. 26 and 45, for a protective order

prohibiting Tucker from  seeking discovery related to her "procedural bad faith" claim and an order

to  modify or quash any deposition subpoenas relating to such a claim.[20] Doc. #101.   Specifically,

defendants assert that plaintiff's claim "pursuant to a 2003 National Union insurance policy taken

out by her former employer . . . is not covered by the National Union policy which Tucker has made

the subject of this lawsuit." *Id.*, p. 1.   According to defendants, Tucker seeks to sue National Union

pursuant to a "claims first made" policy which took effect on January 12, 2004, "for a claim she first

made on November 3, 2003." *Id.*, p. 2.   Defendants further assert that when "Tucker made a direct

settlement with her former employer," Journal Register, there was a general release of liability and

---

[19]At the January 19 hearing, Bagnell expressly stated that the parties "have an agreement" that AIG will fully participate in discovery (*i.e.*, no longer object on the basis that AIG is not a proper party to the action). Tr., p. 10, l. 6-7.

[20]The depositions at issue include that of "Japhet Boutin, a former employee [of National Union] (who sent out a disclaimer of coverage letter to National Union's insured for Tucker's claim which cited, among other things, the insured's failure to give notice of federal litigation being filed until after a jury verdict had been returned against it in Tucker's favor) and Barry Aranowitz (a supervisory employee who had no direct involvement in Tucker's claim)." Doc. #101, p. 1 n. 1.  Per the recently filed joint Stipulation of the parties, the deposition of Aranowitz is scheduled for February 7, 2012.  Doc. #127, ¶ 1.  Boutin is not mentioned in the Stipulation so it is possible that his deposition has already been taken.

The Court notes, however, that defendants previously moved in the U.S. District Court for the District of New Jersey (U.S. Magistrate J. Mark Falk) to quash the subpoenas of Aranowitz and Boutin, and both motions  were denied. *Tucker v. American International Group, et al.*, No. 11-cv-2800 (WJM).

thus her "action should have been withdrawn, period." *Id.* Lastly, defendants argue that "procedural bad faith" is not recognized under Connecticut law.[21] *Id.*, p. 4. Thus, defendants conclude, Tucker should not "be permitted to harass [defendants'] former and current employees, to support a fishing expedition into a claim not even recognized under Connecticut law." *Id.*

Plaintiff argues that defendants are simply attempting to ignore this Court's recent ruling on Defendants' Motion to Bifurcate. Doc. #123. In that Ruling the Court found that, although the Connecticut Supreme Court had not yet spoken on the issue of an independent tort of "procedural bad faith," the District of Connecticut has predicted that the Connecticut Supreme Court would not limit the tort of bad faith in the insurance context to claims of unreasonable or wrongful denial of claims. *Id.*, p. 12-14 (citing Julia K. Ulrich, Esq. of Edwards Angell Palmer & Dodge LLP: "When Actions Speak Louder than Words: Procedural Bad Faith in the Absence of Coverage,"published in martindale.com Legal Library on Mar. 24, 2009; and Judge Arterton's opinion in *United Technologies Corp. v. Am. Home Assurance* Co., 118 F. Supp. 2d 181, 188-89 (D.Conn. 2000), *mod. after recon. on other grounds*, 237 F. Supp. 2d 168 (D. Conn. 2001)). In other words, Connecticut courts would indeed recognize an independent tort of "procedural bad faith" in the insurance context.

---

[21]Defendants thus summarize the bases for their motion as follows:

 This proceeding does raise some legitimate and interesting legal issues, such as: whether there was coverage under the policy in the first instance; whether the settlement of Tucker's claims precludes standing under Connecticut law; and whether Tucker's settlement and general release of her former employer – the insured – extinguishes whatever claims she might have as subrogee of her former employer to pursue claims against National Union. Procedural bad faith, however, is not a legitimate claim in Connecticut and discovery related to it is outside the scope of Rule 26.

Doc. #101, p. 4.

Consequently, plaintiffs conclude that defendants' motion for protective order should be denied.

Plaintiffs further contend that defendants are acting in direct contravention to "the recent ruling of a federal judge in New Jersey denying motions to quash the subpoenas of Japhet Boutin and Barry Aranowitz in response to the same, invalid "bifurcation claims." Doc. #106, p. 2.   As stated *supra* (at n. 20 herein), defendants previously moved to quash the subpoenas of Aranowitz and Boutin in the U.S. District Court for the District of New Jersey (U.S. Magistrate Judge Mark Falk). Both motions were denied.[22]   *Tucker v. American International Group, et al.*, No. 11-cv-2800 (WJM).  Plaintiff maintains that under principles of comity, this Court should also deny defendants' present motion.  Doc. #106, p. 2-3.

Defendants  reply, objecting to plaintiff's "rendition of informal statements supposedly made" by Magistrate Judge Falk during the August 5, 2011 teleconference.  Doc. #111, p. 1.  They describe Judge Falk as "express[ing] frustration that he was again being asked to intercede in regard to a case pending in the District of Connecticut."  *Id.*, p. 2.  Defendants report that Judge Falk " plainly stated he would not interfere in issues more properly controlled by the Judge handling the 'substantive case.'"  *Id.*  Defendants also contest "Tucker's suggestion to this Court . . . that Judge Falk had invited a Motion for Contempt."  *Id.*, p. 3.  Rather, they emphasize that Judge Falk "did not make any rulings on the substance of Defendants' motions to quash" and merely noted that "the subpoenas have been modified on consent of the parties to change the locations and dates of the

---

[22]According to plaintiff, upon learning of defendants' present motion for protective order, Magistrate Judge Falk "ordered counsel to participate in an immediate telephone conference on August 5, 2011." Doc. #106, p. 2.  Plaintiff alleges that in that discussion, the magistrate judge invited a motion for contempt if questioning of Boutin or Aranowitz were interfered with . . . while simultaneously expressing incredulity that the defendants were seeking to limit discovery on a count stated in a complaint."  *Id.*  According to plaintiff, the magistrate judge then noted that "defendants' conduct smacked of 'gamesmanship.'" *Id.*

depositions." *Id*. (referring to New Jersey Order, Ex. B).

In ruling on this Motion, the Court must consider that the parties have declared in open Court, on January 19, 2012, that they have no further outstanding issues with respect to depositions other than the deposition of Bagnell.  Thus, the identities of other  proposed deponents and the subject areas of their testimony are no longer in dispute.  On that basis alone, the Court sees fit to DENY  Defendants' Motion for Protective Order and to Quash and/or to Quash (Doc. #101).

The Court further notes, however, that it has indeed already made a finding in its most recent Order (Doc. #123) that the District of Connecticut has concluded that the Connecticut Supreme Court would recognize an independent tort of procedural bad faith in the insurance context.  Doc. #123, p. 13-14. Thus, regardless of any argument on comity (*i.e.*, whether in  New Jersey Magistrate Judge Falk denied the motions to quash on their substantive merits or as a result of the parties' consent to take the depositions at a later time), in light of this Court's prior Order (Doc. #123), the motion is DENIED.   Plaintiff may pursue relevant evidence on the manner in which  the insurers handled the investigation and denial of her claim.

**E.      Defendants' Motion to Compel Deposition of Jeffrey Bagnell (Doc. #108), Plaintiff's Motion to Quash (Doc. #115), and  Defendants' Motion to Compel Supplemental Discovery Responses (Doc. #120)**

In sum, these three motions, described more fully below, relate to defendants' requests to take the deposition of plaintiff's counsel, Jeffrey Bagnell, and/or to require plaintiff to supplement her discovery responses as to the settlement negotiations which allegedly took place during the underlying action, *Tucker I*.  As set forth *supra*, the parties remain diametrically opposed with respect to whether evidence of said settlement negotiations is material and relevant to this action. Defendants insist that it is, arguing that the insured had a contractual duty under the EPL Policy to

22

inform the defendant insurers of any such settlement negotiations in the underlying action so that defendants could have participated in such negotiations.  *Tr.*, p. 26, l. 14 to p. 29, l. 21.   Because the Journal Register, as insured, allegedly failed to so inform the insurers, defendants maintain that Journal Register waived its right to recover under the contract.  *Id.*   Furthermore, defendants argue that because plaintiff has stepped into the shoes of Journal Register, she has no right to recover.  *Id.*, p. 28, l. 17-23.  Plaintiff counters, arguing that settlement negotiations are not material to the central issue in this case, liability of the insurers.  *Id.*, p. 46, l. 19-23. She claims that under the policy, Journal Register had no duty to inform the insurers of the negotiations, especially since the EPL Policy includes "no duty to defend." *Id.*, p. 47, l. 6-10.

The Court must thus decide the one "unresolved issue" left open by  the January 19, 2012 hearing:  are the alleged settlement negotiations in *Tucker I* relevant to the claims in this action?  If so, the Court may then decide whether Bagnell should testify by deposition and/or provide another form of discovery response regarding settlement negotiations in the underlying action.

### 1. Duty to Inform Insurers of Settlement Negotiations under the EPL Policy

Defendants assert that Journal Register had an affirmative duty under the relevant policy of insurance to allow National Union to "effectively associate in . . . the negotiation of any settlement of any Claim."  Doc. #121, p. 9 (quoting EPL Policy, policy no. 625-57-93).   Plaintiff, however, contests that interpretation of the EPL Policy and points to the fact that the insurer has no duty to defend.[23]  Tr.*, * p. 47, l. 6-10. The Court must, therefore, examine the language of the relevant policy

---

[23]Clause 8 of the EPL Policy, captioned "Defense Costs, Settlements, Judgments (Including the Advancement of Defense Costs)," states, in pertinent part:

to determine its proper meaning and effect.

## 2.    Choice of Law

A federal court sitting in diversity applies the forum state's conflict of law rules to determine which state's substantive law governs the dispute. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 496 (1941). For issues of contract interpretation, Connecticut applies the test set forth in the Restatement (Second) of Conflicts of Law ("Restatement") § 188, which, absent an effective choice of law by the parties, applies the law of the state with the "most significant relationship" to the transaction and the parties. [24]   *Reichold Chems. Inc. v. Hartford Accident and Indem. Co.,* 252 Conn. 774, 781 (2000) (a/k/a "*Reichold II*").

With respect to liability insurance contracts in particular, Connecticut recognizes a rebuttable presumption in favor of the state "where the insured risk is located." *Reichold II*, 252 Conn. at 782 (citing § 193 of the Restatement (Second), recognizing the rebuttable presumption in favor of applying law of state "which the parties understood was to be the principal location of the insured

---

The Insurer does not assume any duty to defend. The Insureds shall defend and contest any Claim made against them.

Doc. #1-2, p. 14 (¶ 8). The Court notes that the EPL Policy also provides, "[n]otwithstanding the preceding paragraph, the Named Entity [Journal Register Company], on behalf of all Insureds, shall have the right to tender the defense of the Claim to the Insurer." *Id.*, p. 29 (amended provision in ¶ 7, "Defense Provisions").

[24]Section 188 lists five relevant contacts to be considered when determining which state has the "most significant relationship" to the contract: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) Conflicts of Laws § 188 (2)(e). Section 188 also incorporates by reference seven more generalized choice-of-law principles.

risk"). *See also Lumbermens Mut. Cas. Co. v. Dillon Co. Inc.*, No. 3:98-cv-2013 (EBB), 2000 WL 1336498, at *2-3 (D. Conn. 2000) (applying *Reichold II* to hold "'most significant interest' test mandates that, in the absence of *extraordinary* circumstances, the law of the state where the principal insured risk is located will apply").

Under the present EPL Policy, there is no express "choice of law" provision and thus no direction as to which state's substantive law shall apply in a dispute relating to the contract.[25] From the nature of the contract, relating to employment liability, however, it was contemplated that the principal insured risk would be located in the states where the insured had employees.[26] The risk in the present case was located at the business of the New Haven Register in Connecticut. Thus, for purposes of the Court's discussion herein, the Court shall apply the law of the State of Connecticut to this liability insurance policy.[27]

---

[25]The only dispute resolution referenced in the EPL Policy pertains to alternative dispute resolution under the provisions regarding "Dispute Resolution Process," which lists a number of possible locations for arbitration but makes no reference to federal litigation. Doc. #1-2, p. 19 (¶ 17); p. 32 (¶ 9) (amendment).

[26]According to the allegations in the Amended Complaint, "[f]rom at least 2003 to 2008, AIG sold employment practices liability insurance ("EPLI") policies to Journal Register Company ("Journal Register"), a multi-media corporation which owns daily newspapers in various states, including the New Haven Register." Doc. #126, p. 4 (¶ 7).

[27]The Court acknowledges that the parties have not briefed the issue of "choice of law" with respect to interpretation of the EPL Policy and that additional factors set forth in the Restatement § 188 may favor other locations: the place where the contract was entered into and executed (which appears to be the offices of Marsh USA, Inc., in New York) and/or the location where the defendants are located (both National Union and AIG were incorporated in Delaware and have principal places of business in New York). However, were the court to apply, for example, New York state law to the contract's interpretation, under New York law, as in Connecticut, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *IDT Corp. v. Tyco Grp., S.A.R.L.*, 13 N.Y.3d 209, 890 N.Y.S.2d 401, 918 N.E.2d 913, 916 (2009).

3.    **Construction of EPL  Policy under Connecticut Law**

In Connecticut, insurance policies are construed according to general rules of contract interpretation.   They are thus "enforced in accordance with the parties' intent, as derived from the plain and ordinary meaning of the policy's terms."  *Allstate Ins. Co. v. Quito*, No. 3:06cv1671 (PCD), 2007 WL 2221163, at *3  (D. Conn. 2007) (citing *Ohio Cas. Ins. Co. v. Dentek, Inc.*, 283 F. Supp.  2d 655, 659 (D. Conn. 2003)).  *See also Cunninghame v. Equitable Life Assurance Society of the United States*, 652 F.2d 306, 308 (2d Cir.1981) ("If the terms of the policy are clear and unambiguous, then the language must be given its natural and ordinary meaning.")   The primary rule is that "the Court must read the policy language as a layman, rather than [as] an experienced underwriter" and should not "torture words to import ambiguity" where none exists. *Jurrius v. Maccabees Mut. Life Ins. Co.*, 587 F. Supp. 1301, 1305 (D.Conn. 1984).

"[I]nsurance policies must be construed as a whole, taking all of their relevant provisions together." *Jurrius*, 587 F. Supp. at 1304 (citing *Firestine v. Poverman*, 388 F. Supp. 948, 951 (D.Conn.1975)). Furthermore, the intent of the parties is to be gleaned from the four corners of the policy, *Leathermode Sportswear, Inc. v. Liberty Mutual Insurance Company*, 150 Conn. 63, 66, 186 (1962), rather than "an extraneous intent the court may believe was in the minds of the parties," *Lyon v. Aetna Casualty & Surety Co.*, 140 Conn. 304, 311(1953). *Accord Taylor v. Mucci*, 288 Conn. 379, 383 (2008) ("If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . Under those circumstances, the policy is to be given effect according to its terms.") (internal

---

The Court also recognizes that, although making no specific reference to "choice of law" in their various memoranda, all parties have cited Connecticut case law, suggesting that they consent to the application of Connecticut law.

quotations and citations omitted).

The relevant language with respect to settlement negotiations appears in Clause 8 of the policy, captioned "Defense Costs, Settlements, Judgments, (Including the Advancement of Defense Costs)." That clause provides, in relevant part:

> The Insurer shall have the right to effectively associate with the Company [Journal Register Company] in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

Doc. #1-2 (EPL Policy), p. 15, para. 3.

On its face, that language clearly provides that the defendant insurers, National Union and AIG, had the right to associate with the insured on any claim which one would reasonably believe could involve them. Thus, defendants had the right to associate with Journal Register in the defense of Tucker's claim, which appeared "reasonably likely to involve them." Furthermore, that right to associate specifically included association in "negotiating a settlement." Moreover, with respect to this right to participate in negotiations, defendant insurers were entitled to Journal Register's "full cooperation" and "such information" as may they "may reasonably require." In sum, because the language of Clause 8 is clear and unambiguous on its face, the intention of the parties may be deduced in accordance with its natural and ordinary meaning.[28]

---

[28]The Court further notes that the relevant portion of Clause 8 does not conflict with the prior language contained therein, specifying that "[t]he insurer does not assume a duty to defend." Doc. #1-2, p. 14 (¶ 8). Although the insurer does not have the duty to defend, it nonetheless reserved the right to "associate" with the insured in its defense, including in the settlement of the claim. *Id.*, p. 15, para. 3. The Court finds no inherent conflict between these clauses. An insurer need not have the duty to defend an action to retain the right to participate or associate in that defense or negotiation of a settlement, a right inherent in an insurer's duty to indemnify.

Although Clause 8 does not set forth specific penalties in the event that Journal Register should breach such a provision, Clause 18 states, "no action shall lie against the insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy." Doc. #1-2, p. 20 (¶ 18). In order to enforce the terms of the policy, the insured must be in "full compliance" with the policy's terms.

Within the context of this discovery dispute, defendants have not fully briefed their legal arguments regarding "breach of contract" or "waiver." Nonetheless, where it is clear from the policy that the parties intended to provide the defendant insurers with the right to associate in settlement negotiations, those negotiations fall within the broad scope of relevance under Fed. R. Civ. P. 26.[29] The Court thus concludes that settlement discussions are relevant as to whether Journal Register complied with all provisions of the EPL Policy.

4.  **Requested Deposition of Attorney Bagnell - Defendants' Motion to Compel Deposition of Jeffrey Bagnell (Doc. #108) and Plaintiff's Motion to Quash (Doc. #115)**

Defendants have moved for an order to compel "Attorney Jeffrey Bagnell, counsel for plaintiff Teri Tucker ("Tucker"), to appear for a deposition and give testimony regarding the events underlying this proceeding." Doc. #108, p. 1. As set forth *supra*, defendants contend that as

---

[29]Rule 26(b)(1) of the Federal Rules of Civil Procedure sets forth the scope and limitations of permissible discovery. Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party in the action. Moreover, "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). *See Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir.1991); *Allied-Signal, Inc. v. Allegheny Ludlum Corp.*, 132 F.R.D. 134, 136 (D.Conn. 1990); *Morse/Diesel, Inc. Fidelity & Deposit Co. of Maryland*, 122 F.R.D. 447, 449 (S.D.N.Y.1988).

counsel for Tucker in the action of *Tucker v. Journal Register East*, 06-cv-307 (SRU), "he is in possession of knowledge regarding events that are directly relevant to the insurance coverage issues at the heart of the present lawsuit." *Id.*   Specifically, defendants would like to question Bagnell regarding his knowledge of plaintiff's settlement negotiations with Journal Register during the underlying action. Doc. #110, p. 2.

Plaintiff has responded by filing a Motion to Quash the subpoena to depose Bagnell. Doc. #115.   She bases her motion to quash on the following:

- there is a policy in federal courts disfavoring the deposition of opposing counsel;

- defendants have already obtained evidence of all settlement negotiations between counsel through alternative discovery;

- Journal Register was not required to settle the underlying case or inform the defendants of settlement negotiations; and

- defendants are estopped from complaining about missed settlement opportunities because they failed to monitor or investigate Tucker's claim, never communicated with Journal Register directly about Tucker's claim, and closed the file only 10 months after being notified of her claim.

Doc. #115, p. 1.

The Court's conclusion regarding the relevance of the topic of settlement discussions in the underlying action, Fed. R. Civ. P. 26, does not end its analysis in determining whether Attorney Bagnell should be deposed in this action.  As the Court expressed at the January 19 hearing, courts are understandably "leery of turning trial counsel in the case before them into subpoenaed witnesses, because too often it is an effort to harass and intimidate and make trouble for a party by going after the lawyer."[30] Tr., p. 30, l. 9-12.  *See also United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185

---

[30] Pursuant to the Connecticut Rules of Professional Conduct, Rule 3.7 ("Lawyer As Witness"), "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to

(2d Cir. 1991) ("depositions of opposing counsel are disfavored").

The Second Circuit has taken what it terms a "flexible approach" with respect to attorney depositions, "taking into account all relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship." *In Re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 76 (2d Cir. 2003). Such facts to be considered "may include the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." 350 F.3d at 72.

In the present action, as both sides to this controversy acknowledge, there has been considerable testimony from other witnesses, both in depositions and discovery responses, regarding the issue of settlement negotiations. In his brief on the Motion to Quash, Bagnell asserted that defendants already possess written communications between counsel in the underlying action that reflect and/or refer to settlement negotiations in *Tucker I*. Doc. #116, p. 7. In fact, both Tucker and Journal Register's former counsel, Wiggin & Dana partner Lawrence Peikes, were deposed and testified about settlement negotiations. *Id.* Moreover, both Brown and Bagnell have conceded that there are less disruptive means of gaining the information from Bagnell regarding his personal

---

become a witness unless: (1) The testimony relates to an uncontested issue; (2) The testimony relates to the nature and value of legal services rendered in the case; or (3) Disqualification of the lawyer would work substantial hardship on the client."

Moreover, Local Rule of Civil Procedure 83.13 ("Prohibition on Counsel as a Witness") requires a lawyer to withdraw from representing a client if he learns or if it is obvious that he "ought to be called as a witness on behalf of the client." Local Rule 83.13(b).

knowledge of the alleged settlement negotiations at issue.[31]

In light of (1) the quantity of materials defendants have already gathered (through depositions, interrogatories and production requests) with respect to settlement negotiations in *Tucker I* and (2) the "flexible approach" taken by the Second Circuit with respect to lawyer depositions, "taking into account  all relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship," *In Re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 76 (2d Cir. 2003), defendants' Motion to Compel (Doc. #108) is DENIED without prejudice and plaintiff's Motion to Quash is GRANTED (Doc. #115).  Defendants may not depose Attorney Bagnell.  Their need for his testimony is difficult to discern.  The proffered policy defense depends upon two factual propositions: (1) During the trial of Tucker's case against the Journal Register before Judge Underhill, a possible settlement was discussed between Tucker's attorney and Journal Register's attorneys; and (2) the defendant insurers were not advised of those overtures or given an opportunity to participate in settlement discussions.  The first fact may be shown to the jury at a trial of this action by testimony of the Wiggin & Dana attorneys, and the second by testimony of the insurers' employees.  Plaintiff having succeeded in blocking Bagnell's deposition, Bagnell would be precluded from giving contrary testimony on the subject at the trial.

---

[31]Brown, as defendant's counsel, proffered what he considered an acceptable alternative to deposing Bagnell at the January 19, 2012, hearing:

> I think the least intrusive thing would be to instruct Mr. Bagnell to respond to the interrogatory asking for identification in relation of the settlement discussions that occurred, so I at least have his version of the facts . . . .

Tr. p. 50, l. 10-14.  Bagnell himself stated at the hearing, "I'm happy to supplement the interrogatory [on settlement negotiations] to state what has already been stated several times in these depositions [of Attorney Peikes ]," with the caveat, however, that Bagnell does not agree with the "exact substance" of Peikes's testimony.  *Id.*, p. 51, l. 10-13.

That ruling is subject to one *caveat*.  Defendants will be granted leave to request that plaintiff supplement her interrogatory responses on the topic of Bagnell's  participation in settlement negotiations in *Tucker I*, with the understanding that Bagnell's knowledge of the facts will be imputed to her.[32]

### 5.   Defendants' Motion to Compel Supplemental Discovery Responses (Doc. #120)

Pursuant to Fed. R. Civ. P. 37(a), defendants move the Court for an order compelling plaintiff "to supplement her responses to Defendants' discovery requests by providing a full and truthful account of all settlement negotiations between Tucker and her former employer, Journal Register Company" that occurred during the pendency of her underlying action.[33]  Doc. #120, p.1.  Defendants also request that plaintiff produce "any documents regarding such [settlement] communications."  *Id.*

Defendants focus on Tucker's  responses to their discovery requests  regarding the settlement negotiations to reveal the alleged deficiency of such responses.  In particular, when asked to describe any settlement communications and produce any settlement-related documents, Tucker stated that

---

[32]"Generally, 'the acts of an attorney are imputed to a client when they are performed in the furtherance of the business for which the attorney has been retained.'"*Allen v. Nissley*, 184 Conn. 539, 542-43 (1981).  Defendants have thus argued that "[b]y improperly failing to impute to Tucker his own knowledge of settlement efforts undertaken on her behalf, Attorney Bagnell has used himself as a shield to prevent his client from providing a full disclosure."  Doc. #119, p. 11.

[33]Pursuant to Fed. R. Civ. P. 37(a), a party may move for an order to compel disclosure or discovery if "a party fails to answer an interrogatory submitted under Rule 33;" or "a party fails to respond that inspection will be permitted – or fails to permit inspection – as requested under Rule 34."  Fed. R. Civ. P. 37 (a)(3)(B)(iii)-(iv).   Moreover, for purposes of this Rule, "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond."  *Id.* (a)(4).

she did "not recall that there were any substantive settlement discussions in [her] case against the New Haven Register." *Id.* (quoting Doc. #121-2, p. 2).

Defendants claim that such a  response is patently false because "subsequent discovery revealed that there had been extensive settlement communications throughout the life of Tucker's dispute with Journal Register." Doc. #121, p. 4.  For example, the law firm of Wiggin & Dana, which represented Journal Register during the underlying action, produced documents with "references to at least six distinct settlement offers" between 2004 and 2008.  *Id.*   Moreover, Attorney Lawrence Peikes of Wiggin & Dana "specifically recalled [during his deposition by defendants] receiving settlement offers through Attorney Bagnell for $500,000 (although he was 'not 100 per cent sure' of the number)." [34] *Id.*, p. 6.

It is obvious to the Court that through this motion, defendants seek the same information they have sought in moving the Court to compel the deposition of plaintiff's counsel, Bagnell:  namely information regarding the alleged settlement negotiations in *Tucker I*.  The Court, having found the settlement negotiations relevant to the case at bar, hereby GRANTS defendant's Motion to Compel Supplemental Discovery Responses  (Doc. #120).   Because plaintiff and her attorney are principal and agent as a matter of law,  *United States v. International Brotherhood of Teamsters*, 986 F.2d 15, 20 (2d Cir.1993),  she is imputed with the knowledge of the facts he gained in acting on her behalf

---

[34]Defendants further argue that "Tucker's response is disingenuous and completely contradicted by the history of settlement negotiations documented in [defendants'] memorandum, including testimony of attorneys who negotiated with Tucker's attorneys, as well as emails that were sent to Tucker's attorneys (but never disclosed to Tucker herself)."  Doc. #121, p. 11. Moreover, even if she is "genuinely ignorant of these well-documented settlement discussions," she must be "deemed to have complete knowledge within the possession of her attorneys" because "the acts of an attorney are imputed to a client when they are performed in the furtherance of the business for which the attorney has been retained."  *Id.,* p. 11-12 (quoting *Allen v. Nissley,* 184 Conn. 539, 542-43 (1981)).

in the settlement negotiations.  *See, e.g., Veal v. Geraci,* 23 F.3d 722, 725 (2d Cir.1994) (concluding that appellant's civil rights action was time-barred because counsel's knowledge of a tainted line-up was imputed to the client despite client's lack of actual knowledge); *Dandorph v. Fahnestock & Co.*, 462 F. Supp. 961, 964 (D. Conn. 1979) (for purposes of the statute of limitations, "notwithstanding plaintiff's statement in her affidavit that Attorney Grossman "did not . . . mention" to her that she had "a possible claim for 'churning,' ", the knowledge of her attorney is imputed to her so that she knew or reasonably should have known of the situation").[35]  Thus, in supplementing her responses, plaintiff shall include the facts regarding her attorney's participation in any settlement negotiations on her behalf in the underlying action.  Should defendants later determine that plaintiff's supplemental responses to the interrogatories and/or production request are once again notably inadequate or deficient, defendants may renew their motion to compel the deposition of Bagnell.

## IV.   <u>CONCLUSION</u>

Through this Order the Court has memorialized the substance of the status hearing  it conducted on January 19, 2012.  In so doing, the Court hereby ORDERS that all parties must

---

[35]It is well established that "[t]he relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal." *United States v. International Brotherhood of Teamsters*, 986 F.2d 15, 20 (2d Cir.1993); *see also  McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 853 (3d Cir.1996)("the attorney-client relationship is an agent-principal relationship").  Thus, information an attorney receives during the scope of his representation of a client will be imputed onto that client even if the client does not have actual knowledge of that information. *See, e.g., Veal v. Geraci,* 23 F.3d 722, 725 (2d Cir.1994); *Dandorph v. Fahnestock & Co.*, 462 F. Supp. 961, 964 (D.Conn. 1979); *Allen v. Nissley,* 184 Conn. 539, 542-43 (1981)*; Kaeding v. W.R. Grace & Co.*, 961 P.2d 1256, 1261 (Mont.1998) ("knowledge of facts by an attorney is knowledge by the client, regardless of whether the attorney actually communicated the information to the client.").  *See also* 7 Am. Jur. 2d Attorneys at Law § 153 ("Notice or knowledge of an attorney, acquired during the time he or she is acting within the scope of his or her employment, is imputed to the client. In the context of an enduring attorney-client relationship, knowledge acquired by the attorney is imputed to the client as a matter of law.").

complete discovery on or before **March 1, 2012.**   Moreover, in light of the completion of discovery by March 1, the Court directs plaintiff to file her  response to defendants' Motion for Summary Judgment (Doc. #97) on or before **March 16, 2012.**   Defendants shall file their reply to plaintiff's response, if any, on or before **March 26, 2012.**

Furthermore, in light of the representations and stipulations of counsel at the January 19 hearing, the Court rules on the following motions:

- Plaintiff's Motion to Compel and For Attorney's Fees and Costs (Doc. #52) is DENIED as moot.

- Plaintiff's Motion for Default or, In the Alternative, Other Sanctions under Fed. R. Civ. P. 37(c) (Doc. #102) is DENIED without prejudice.  Plaintiff may only renew this motion in the unanticipated event that defendants fails to make a good faith production of any responsive documents they may later locate or obtain.

- Defendants' Motion for a Protective Order regarding the deposition of John Q. Doyle (Doc. #75 )  is DENIED as moot.

- Defendants' Motion for A Protective Order and to Quash and/or  Modify (Doc. #101) is DENIED.

- Defendants Motion to Compel the Deposition of Jeffrey Bagnell (Doc. #108) is DENIED without prejudice and Plaintiff's Motion to Quash (Doc. #115) is GRANTED.   Noting the quantity of previous discovery on the subject of settlement negotiations and the disinclination of courts to order depositions of counsel in a proceeding, which would turn such counsel into fact witnesses, the Court denies defendants' request to depose Bagnell.

- Defendants' Motion to Compel Supplemental Discovery Responses (Doc. #120) is GRANTED.  Plaintiff shall supplement her discovery responses on the topic of settlement negotiations in *Tucker I*, with the understanding that her attorney's knowledge of settlement negotiations he conducted on her behalf will be imputed to her.  Should these responses be patently inadequate and deficient, defendants may  refile their motion to compel the deposition of Bagnell.

The Court will rule on the remaining pending motions in this action by separate Order.

It is SO ORDERED.

Dated: New Haven, Connecticut
       January 31, 2012

                              */s/Charles S. Haight, Jr.*
                              Charles S. Haight, Jr.
                              Senior United States District Judge