**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TERI TUCKER,<br><br>              Plaintiff,<br><br>  v.<br><br>AMERICAN INTERNATIONAL GROUP,<br>INC.; NATIONAL UNION FIRE<br>INSURANCE COMPANY OF<br>PITTSBURGH, PA., A SUBSIDIARY OF<br>AMERICAN INTERNATIONAL GROUP,<br>INC.,<br><br>              Defendants. | 3:09 - CV - 1499 (CSH) |

**RULING ON DEFENDANTS' MOTION FOR RECONSIDERATION (DOC. #139)**

HAIGHT, Senior District Judge:

**I.       INTRODUCTION**

Plaintiff Teri Tucker ("plaintiff" or "Tucker") commenced the present action to recover damages from her former employer's insurers, American International Group, Inc. ("AIG") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively "defendants"), arising from her unlawful discharge in 2003, pursuant to an employment practices liability insurance policy (herein "EPL Policy").    In this action, she seeks to collect from defendant insurers the $4 million judgment in her favor in *Tucker v. Journal Register East*, Doc. # 3:06-CV-307 (SRU) (herein "*Tucker I*"),  the prior action against her former employer, Journal Register East.[1]

Pending before the Court is defendants' Motion for Reconsideration (Doc. #139) with respect

---

[1] A full discussion of the facts is set forth in this Court's prior rulings, familiarity with which is assumed.  Doc. #39, 44, 123.

1

to the Court's recent rulings on National Union's and AIG's Objections to Re-Notice of Depositions. Doc. #138, 138-1.  The Court notes at the outset that three days before the designated March 1 deadline for discovery, the parties continue to skirmish over the content of depositions.  Moreover, defendants contend within their present motion that the very objections upon which the Court recently ruled were originally served on plaintiff on May 6, 2011, but not addressed by plaintiff to the Court at the January 19, 2012 status conference.   The Court reminds the parties that at that conference, both counsel agreed that there were six outstanding discovery issues, most resolved prior to the conference and none pertaining to the extensive list of objections presently before the Court. Rather, both counsel averred at the January 19 hearing that they saw no reason that discovery could not be successfully completed prior to March 1, 2012.[2]   Upon inquiry by the Court, both counsel confirmed that, aside from a disagreement with respect to whether Attorney Bagnell should be deposed as a fact witness on settlement negotiations in the underlying action,  no impediments remained to the completion of discovery.  Yet, once again this case is plagued by discovery clashes between the parties.

In what it believed would be its last need to intervene to expedite discovery, the Court ruled on defendants' list of objections to the plaintiff's prospective deposition topics only to learn that such assistance has now engendered further dispute.  The Court is presented with defendants' motion for reconsideration on objections deemed unworthy by counsel of presentation to this Court on January

---

[2]Mr. Brown himself, as counsel for defendants, assured plaintiff and the Court that, after speaking briefly with plaintiff's counsel, Mr. Bagnell, before the hearing,  with respect to the "general objections" at issue, "we [the defendants] [wi]ll waive those, withdraw them, whatever needs to be done to clean up the record."  Draft transcript (1/19/2012 hearing)*, p. 39, l. 5-7. Furthermore, Brown later conceded that "withdrawing the general objections will take away a lot of the ambiguity or issues." *Id.*, p. 41, l. 17-20.   The Court naturally concluded that those general objections were withdrawn.

19, 2012.   Nonetheless, the Court considers those objections and rules on them herein.

## II.       STANDARD FOR RECONSIDERATION

Pursuant to Local Rule 7(c)(1) of this District, a motion for reconsideration "shall be accompanied by a memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court overlooked in the initial decision or order." D. Conn. L. Civ. R. 7(c)(1). Moreover, as the Second Circuit explained in *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995), "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *See also Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992), *cert. denied*, 506 U.S. 820 (1992) ("The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'") (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790); *Lo Sacco v. City of Middletown*, 822 F. Supp. 870, 876–77 (D. Conn.1993) ("[The function of a motion for reconsideration is to present the court with an opportunity to correct 'manifest errors of law or fact or to consider newly discovered evidence.'") (quoting *Bothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.1987)).

## III.      DISCUSSION

### A.      Rulings on Objections at Issue

In their Memorandum, defendants describe the specific "areas of subject matter addressed

in this motion" for reconsideration as follows:

**As to National Union**

8.   Resources shared by AIG and National Union, including administrative services, and office space.

ORDER:   Defendant's objection is overruled. The information sought is relevant to plaintiff's assertion that AIG is a proper party to this action (*i.e.*, piercing of its corporate veil). Fed. R. Civ. P. 26(b)(1); Fed. R. Evid. 401, 402.

12.   Revenue sharing with AIG.

ORDER:   Defendant's objection is overruled. The information sought is relevant to plaintiff's assertion that AIG is a proper party to this action (*i.e.*, piercing of its corporate veil). Fed. R. Civ. P. 26(b)(1); Fed. R. Evid. 401, 402.

13.   Any allegations of bad faith or reckless claims handling practices against National Union and/or its subsidiaries prompting any internal review of claims handling practices at any time from 2004 to the present.

ORDER:   Defendant's objection is overruled. The information sought relates to National Union's general business practices and is thus relevant to plaintiff's CUIPA claim. Fed. R. Civ. P. 26(b)(1); Fed. R. Evid. 401, 402.

**As to AIG**

11.   The capitalization of AIG subsidiaries.

ORDER:   Defendant's objection is sustained in part as to relevance. [Fed. R. Civ. P. 26(b)(1); Fed. R. Evid. 401, 402]. Plaintiff may, however, inquire as to capitalization of National Union.

16.   Resources shared by AIG and any of its subsidiaries, including administrative services, and office space.

ORDER:   Defendant's objection is sustained in part because Plaintiff's request is overly broad. [*See* Fed. R. Civ. P. 26(b)(2)(c)(iii).] Plaintiff may, however, inquire as to resources and office space shared by AIG, National Union, and other AIG entities involved in issuing the EPL policy or handling the claim at issue.

21.   Revenue sharing among AIG and its subsidiaries from 2004 to 2009.

4

ORDER:    Defendant's objection is sustained in part as to relevance. [Fed. R. Civ. P. 26(b)(1); Fed. R. Evid. 401, 402.]    Plaintiff may inquire as to revenue sharing among AIG, National Union, and any other AIG entity involved with issuing the EPL policy or handling the claim at issue.

22.    Any allegations of bad faith or reckless claims handling practices against AIG and/or any of its subsidiaries prompting any internal review of claims handling practices at any time from 2004 to the present.

ORDER:    Defendant's objection is overruled.  Plaintiff's request is relevant to her CUIPA claim. [Fed. R. Civ. P. 26(b)(1); Fed. R. Evid. 401, 402.]

Doc. #139, p. 3-4.

In sum, defendants base their motion for reconsideration on two subject areas: (1) questions regarding allegations of bad faith and reckless claims handling, which defendants argue are inadmissible to prove a CUTPA/CUIPA claim; and  (2) questions relating to shared resources, revenue and capitalization of National Union and AIG, which defendants claim should not be considered in the context of piercing the corporate veil of AIG  because of National Union's unique nature as a regulated insurance entity subject to capitalization  requirements.  As set forth below, the defendants have presented no newly discovered evidence or manifest error of law to alter the Court's prior rulings on their objections at issue.

**B.    Bad Faith and Reckless Claims Handling**

Defendants object to the Court's rulings that allow  plaintiff to seek information related to allegations of bad faith and reckless claims handling on the ground that "Connecticut state and federal decisions addressing the standard of proof for CUTPA/CUIPA claims operate to rule out Plaintiff's reliance on allegations in order to prove a 'general business practice' under CUIPA."[3]

_____

[3]Under CUIPA, Conn. Gen. Stat. § 38a-815, *et seq*., an insurer is prohibited from engaging in "a general business practice" of  unfair claims settlement, as detailed in Conn. Gen.

Doc. #139, p. 5.   In support, defendants cite Conn. Gen. Stat. § 38a-816 (6) and *Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 850-51 (1994) for the  proposition that "[i]n order to prove a CUIPA violation based on the handling of an insurance claim, a plaintiff must prove that the defendant insurer committed or performed the acts in question with such frequency as to constitute a general business practice."[4]  Doc. #139, p. 5.  Moreover, defendants contend that "[m]ere allegations of bad faith claims handling are not sufficient to establish that an insurer 'committed or performed' the acts in question."  *Id.* (citing *Craig v. Colonial Penn, Ins. Co.*, 335 F. Supp. 2d 296, 308-09 (D. Conn. 2004) (court rejected plaintiffs' argument that decisions in two other lawsuits against the defendant insurance company established general business practice of improper claims handling).   Defendants further assert that courts within the Second Circuit have stricken references to other lawsuits from pleadings where the other lawsuits were not resolved on their merits.  Doc. #139, p. 6 (citing *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009)).

Defendants' cited cases, however, are inapposite.  In *Craig v. Colonial Penn Ins. Co.*,  335 F. Supp. 2d 296 (D. Conn. 2004), the court was asked to rule on defendant insurer's  motion for summary judgment in which defendant argued that decisions in two lawsuits against it failed to establish  as matter of law that it engaged in a general practice of improper claims handling.   The

---

Stat. § 38a-816 (6).  *See* n.4, *infra.*

[4]Conn. Gen. Stat. § 38a-816 (6) enumerates the various business practices which comprise "[u]nfair claim settlement practices."  Those practices include, *inter alia*, "failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies;" "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;" and "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."  Conn. Gen. Stat. § 38a-816 (6).

*Craig* court examined the proffered lawsuits to determine that neither case provided sufficient evidence that defendant engaged in a general business practice of unfair claims settlement. The court thus granted summary judgment for the defendant.[5]

Specifically, the *Craig* court found that in the first cited case regarding improper claims handling, *McGeouch v. Colonial Penn Ins.*, No. C-92-343-L, 1994 WL 260684 (D.N.H. April 7, 1994), the court "finds no wrongdoing and merely denies the insurer's motion for summary judgment given the factual disputes in the case." 335 F. Supp.2d at 308-09  (citing *McGeouch*, 1994 WL 260684, at * 2) ("The actual cause of the damage [and thus whether it was covered by the insurance policy] presents a genuine issue of material fact that must be resolved at trial.")).   As to the second cited case,  *Eveleno v. Colonial Penn Ins.*, 188 Misc.2d 454, 728 N.Y.S.2d 907 (2001), the *Craig* court stated that *Eveleno* found "a violation of a New York statute requiring a response by the insurer within 15 days after receipt of proof of loss-a statutory violation that [was] not at issue here."  335 F. Supp.2d at 309 (citing  *Eveleno*, 188 Misc.2d at 456, 728 N.Y.S.2d 907).  In sum, the underlying facts of the two cited lawsuits relating to improper claims handling provided no factual assistance in *Craig* –  the first case because there was no factual determination of wrongdoing by defendant and the second case because it involved wrongdoing that was not at issue in *Craig*.

Furthermore, the Court notes that the *Craig* case dealt with evidence for purposes of summary judgment, which is by its nature more stringent than the standard of "relevance" imposed

---

[5]The *Craig* court in *dictum* pointed out the plaintiffs' failure, prior to the close of discovery,  to follow through on their initial requests for copies "of all similar [claims handling] complaints against [defendant insurer] filed with the Connecticut Department of Insurance over the past three years."  335 F. Supp. 2d at 309.  In so doing, the court left open the prospect that such information might have assisted plaintiffs in obtaining the necessary proof of a pattern of unfair claims settlement practices by defendant to prevent the present outcome (*i.e.*,  the granting of defendant's summary judgment motion).

during discovery.  The case at bar remains in the discovery phase in which parties are given a broad scope to inquire  "regarding any nonprivileged matter that is relevant to any party's claim or defense."[6]  Fed. R. Civ. P. 26(b)(1).  For purposes of discovery (*i.e.*, as opposed to undisputed facts necessary for summary judgment or facts admissible at trial), " [r]elevant information *need not be admissible* at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  *Id.*  (emphasis added).  Evidence of complaints of bad faith handling of insurance claims may not be sufficient, standing alone, to  establish whether National Union or AIG engaged in general practices of improper claims handling; and the Court has not intimated otherwise. Nonetheless, plaintiff  may seek evidence of such complaints as a  reasonably calculated starting point to obtain evidence of defendants' actual practices.[7]   It logically follows that where there are numerous, similar complaints of unfair practices, one may, upon further investigation, compile the necessary facts to determine whether such practices occurred.

_____

[6]Federal Rule of Civil Procedure 26(b) sets forth the permissible "scope of discovery" in broad terms, as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense — including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

 Fed. R. Civ. P. 26(b)(1).

[7]If upon further investigation, plaintiff determines that the discovered allegations of bad faith or reckless claims handling turn out to be false, she is duty bound not to present meritless claims at trial.  If, however, such allegations prove fruitful (*e.g.*, resulting in cites to cases adjudicated successfully on the merits), such allegations may yield proof.

In *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009), also cited by defendants, the district court granted defendant's motion to strike plaintiff's references in its third amended complaint to defendant's commission or performance of tortious activities because the lawsuits referenced as proof were not "resolved on the merits." 642 F. Supp. 2d at 403.   In fact, "neither complaint resulted in an adjudication on the merits or legally permissible findings of fact." *Id.* (internal quotations and citation omitted).  Absent adjudication on the merits, those lawsuits comprised allegations rather than factual matter.  Accordingly, the court in *RSM Prod. Corp*. struck those allegations from the complaint as "immaterial" pursuant to Fed.R.Civ.P. 12(f).[8]

The Court acknowledges that it is hornbook law that unproven, non-adjudicated allegations are not evidence.  In the case at bar, however, plaintiff has neither moved for summary judgment based on allegations nor contended that other non-adjudicated lawsuits comprise evidence of defendants' wrongdoing.  Rather, she seeks to investigate other insured's allegations of bad faith and/or reckless claims handling in an effort to establish sufficient evidence to prevail on her CUIPA claim.

---

[8]Similarly, *Impulsive Music v. Pomodoro Grill, Inc.,* 08cv6293, 2008 U.S. Dist. LEXIS 94148, at *8 (W.D.N.Y. Nov. 19, 2008), another case cited by defendants, is inapposite.  In that case, plaintiffs brought an action for copyright infringement against defendants.  Defendants filed a motion to strike portions of the plaintiffs' complaint as "irrelevant and immaterial as well as impertinent and scandalous." *Id*., at * 4.  The paragraph at issue  alleged the existence of a "virtually identical infringement action" against one of the defendants. *Id*., at *5.  The court ruled to strike the cited paragraph because its "inclusion would be prejudicial to the defendants and has no bearing on the current litigation."    In such a copyright case, prior alleged acts of infringement by one of the defendants, even if proven, would not be relevant to the present action and would thus only serve to prejudice the named defendant.   In a CUIPA case, however, because general business practices are at the core of the action, other instances of unfair claims handling, if proven, are relevant.

C.      **Evidence regarding Piercing the Corporate Veil**

Defendants object to plaintiff's questions regarding "[r]esources shared by AIG and National Union, including administrative services, and office space;" "[r]evenue sharing [of National Union] with AIG;" the capitalization of National Union; and resources and revenue shared by AIG, National Union, and other AIG entities involved in issuing the EPL policy or handling the claim at issue. *See* Doc. #139, p. 3-4. Defendants concede that, under the "identity test" for piercing the corporate veil, the Connecticut Supreme Court has examined a number of factors relating to corporate dominance which include, *inter alia*, such factors as: "inadequate capitalization," "common office space, address and phones;" "whether the corporations are treated as independent profit centers;" and "whether the corporation in question had property that was used by other of the corporations as if it were its own." Doc. #139, p. 8 (quoting *Naples v. Keystone Bldg. & Development Corp.*, 295 Conn. 214, 233 (2010)). On its face, *Naples* lists capitalization and resource and revenue sharing as properly considered facts when assessing whether to pierce the corporate veil.[9]

Nonetheless, defendants argue that such factors should not be examined with respect to National Union because it is "a heavily regulated commercial insurance carrier, licensed to issue insurance in many states and subject thereby to extensive regulatory regimes that impose capital,

---

[9]Defendants concede that control or domination of a company over its subsidiary is the key factor under the "instrumentality test" of piercing the corporate veil. Doc. #139, p. 7 (citing *Naples v. Keystone Bldg. & Development Corp.*, 295 Conn. 214, 232 (2010) ("instrumentality rule" requires control and completion domination of finances, policy, and business practice with respect to transaction at issue; use of control to commit fraud or wrong that violated plaintiff's rights, and control must be proximate cause of plaintiff's injury). In sum, under the instrumentality test, there must be such domination over the controlled corporation that it has "no separate mind, will or existence of its own and is but a business conduit for its principal." Doc. #139, p. 8 (quoting *Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc.*, 187 Conn. 544, 556-57 (1982)).

minimum surplus, reserve, and related requirements" on it.   Doc. #139, p.9 (citing Conn. Gen. Stat. § 38a-76 ("[e]ach insurance company transacting business in this state shall, at all times, maintain reserves equal in amount to its liability under all its policy contracts").[10]   Following that argument to its natural conclusion, defendants broadly suggest to the Court that it should rely on the heavily regulated nature of the insurance industry to dismiss any consideration of the *Naples* factors with respect to piercing the corporate veil of an insurer.[11]   Yet, defendants present no law to support such a broad proposition.   Rather, they quote extensively from a 2008 Brigham Young University Law Review article by Professor Douglas Smith to suggest that insurance "[re]gulators monitor corporations operating within the industry to ensure that they observe corporate formalities" and "[a]ccordingly, the rationale behind the veil piercing doctrines simply does not apply."   Doc. #139, p. 9-10 (citing Douglas G. Smith, *Piercing the Corporate Veil in Regulated Industries*, BYU  L. Rev., 2008 No. 4, p. 4-5).

While Professor Smith's conclusion posits an interesting academic theory, in actuality even corporations that are monitored may at some point violate relevant regulations, violations which regulators fail to prevent and which injure third parties.   The regulation of an industry, standing

---

[10]With respect to financial auditing, defendants also cite Conn. Gen. Stat. § 38a-54, captioned "Audited reports" ("[e]ach domestic insurance company . . . doing business in this state shall have an annual audit conducted by an independent certified public accountant and shall annually file an audited financial report with the commissioner").

[11]Such reasoning, carried to its logical conclusion, would yield the untenable result that courts may not consider the merits of any claim where compliance with state or federal regulation would be inconsistent with wrongdoing.  For example, if a hospital were charged with failing to provide a medically safe environment, the court might preclude discovery with respect to any hospital conditions regulated by the state or federal government.  This Court declines to endorse such a concept.  Furthermore, the Court notes that compliance at one point in time does not equate with compliance at all relevant times.  Thus, compliance when monitored would not rule out violation at a later time.

11

alone, does not immunize its members from liability under the laws of tort or contract, including the piercing of corporate veils when appropriate.  The defendants at bar do not cite, nor has the Court's research discovered, any precedent within this Circuit or the Connecticut courts that supports a categorical exemption of insurers from the established analysis of factors for piercing the corporate veil and imposition of liability if the veil is pierced.  Rather, as Professor Smith states in the later portions of his article, even when courts have "reject[ed] attempts to pierce the corporate veils of entities operating in the insurance industry":

> [T]hese decisions are utterly devoid of any theoretical analysis regarding the inappropriateness of applying alter ego principles in such regulated industries. *Rather, they typically involve a standard application of the multi-factoral analysis that is applied in any other case*.

Doc. #139-2, p. 31 (Douglas G. Smith, *Piercing the Corporate Veil in Regulated Industries*, BYU L. Rev., 2008 No. 4, at p. 30 (emphasis added)).  "The inappropriateness of applying alter ego principles in such regulated industries" sums up the author's theory, to which the First Amendment entitles him, but the contrary court decisions he dismisses have, in this Court's opinion, gotten it right.

Absent statutory or precedential authority to preclude analysis of the requisite factors for piercing the corporate veil of insurers, the Court finds the factors of capitalization, shared resources, and shared revenue among AIG, National Union and any other AIG entity involved in handling the claim in this case to be relevant considerations in this action.  Having so stated, the Court does not negate National Union's right to provide evidence of corporate compliance with regulations on capitalization as one form of proof that AIG's corporate veil should not be pierced.   In sum, capitalization and  shared offices, resources, and profits remain viable areas of questioning with

respect to the "identity test" of piercing the corporate veil.  *See, e.g.*,  *Naples v. Keystone Building & Development Corp.*, 295 Conn. 214, 233 (2010).

IV.    **CONCLUSION**

As set forth above, defendants have failed to present newly discovered evidence or manifest error of law to support their motion for reconsideration.   First, with respect to the issue of bad faith or reckless claims handling, they point to cases that are inapposite to the issue of "relevance" for purposes of discovery.  Defendants fail to contemplate that areas of inquiry that may not constitute "relevant" proof at trial (*e.g.*, allegations in nonadjudicated cases) are permissible during discovery if they are reasonably calculated to lead to evidence that will be admissible at trial.  Fed. R. Civ. P. 26(b)(1).  Because complaints of bad faith or reckless claims handling might reasonably lead to evidence of general business practices by National Union and/or AIG, the Court will allow plaintiff's inquiry into their existence during the discovery phase.

Second, with respect to piercing the corporate veil, defendants argue that resources, revenue sharing, and particularly capitalization of National Union are improper areas of inquiry by plaintiff because National Union is heavily regulated by state law as an insurance carrier.   Defendants cite to Conn. Gen. Stat. §§ 38a-76 and 38a-54 to suggest that National Union must, by state law, maintain proper capitalization to cover its liability under all its policy contracts.  Defendants, however, cite no authority, either in statute or case precedent, to establish that insurers are *per se* exempt from examination with respect to the theory of piercing the corporate veil.  Rather, they rely on the opinion of a commentator to suggest that the law should be changed to abolish veil piercing of regulated industries.  That opinion does not constitute authority for this Court to exempt National

13

Union from examination on plaintiff's claim that AIG's corporate veil should be pierced. Furthermore, that very commentator cited expressly conceded later in the same article that courts continue to apply the standard application of the multi-factoral analysis even when they ultimately conclude that piercing is not warranted.

In sum, in the absence of any controlling decision or data that the Court overlooked — *i.e.*, any matters that might reasonably alter the Court's conclusion with respect to its prior rulings, defendants' Motion for Reconsideration (Doc. #139) is DENIED.

It is SO ORDERED.

Dated: New Haven, Connecticut
        March 2, 2012

                              */s/Charles S. Haight, Jr.*
                              Charles S. Haight, Jr.
                              Senior United States District Judge

14