**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TERI TUCKER, <br><br>              Plaintiff, <br> v. <br><br> AMERICAN INTERNATIONAL GROUP, INC.; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., A SUBSIDIARY OF AMERICAN INTERNATIONAL GROUP, INC., <br><br>              Defendants. | 3:09 - CV - 1499 (CSH) |

**RULING ON DEFENDANTS'  MOTION TO DISMISS COUNT THREE OF AMENDED COMPLAINT (DOC. #128), DEFENDANTS' MOTION TO STRIKE CERTAIN PORTIONS OF PLAINTIFF'S AMENDED COMPLAINT (DOC. #129) & PLAINTIFF'S MOTION FOR SANCTIONS UNDER FED. R. CIV. P. 37(b) &(c) (DOC. #144)**

**HAIGHT, Senior District Judge:**

## I.   BACKGROUND

Plaintiff Teri Tucker ("Plaintiff" or "Tucker") has brought this action to recover damages from her former employer's insurers, American International Group, Inc. ("AIG") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively "Defendants"), arising from her unlawful discharge in 2003, pursuant to an employment practices liability insurance policy  (herein "EPL Policy").    In this action, she seeks to collect from defendant insurers the $4 million judgment in her favor in *Tucker v. Journal Register East*, Doc. # 3:06-CV-307 (SRU) (herein

1

"*Tucker I*"),  the prior action against her former employer, Journal Register East ("JRE").[1]

The factual background of the case has been recounted in detail in a series of prior opinions by the Court, at 728 F.Supp.2d 114 (D.Conn. 2010), 745 F.Supp. 2d 53 (D.Conn. 2010), 2011 WL 6020851 (D.Conn. Dec. 2, 2011),  2012 WL 314866 (D.Conn. Jan. 31, 2012), 2012 WL 685461 (D.Conn. Mar. 2, 2012), and 281 F.R.D. 85 (D.Conn. 2012).  Familiarity is assumed with those opinions and the facts recounted in them.

In her Amended Complaint (Doc. #126), Tucker has included the following claims:  breach of contract; breach of the implied covenant of good faith and fair dealing; a claim to recover as a subrogee of JRE under Connecticut's direct action statute, Conn. Gen. Stat. § 38a-321;   violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat.  § 42-110a, *et seq.*; procedural bad faith (in handling Tucker's claim) in violation of Connecticut common law; and equitable estoppel (to prevent Defendants "from denying coverage of [her] claim after waiting 4.3 years after [that] claim was first submitted to deny coverage, and only after a substantial adverse verdict," Doc. #126, ¶ 113).

For purposes of the motions considered herein , the Court notes that when Plaintiff amended her Complaint, in compliance with the Court's Order (Doc. # 123), she supplemented the facts to accurately reflect the current state of events following her entry into a stipulated settlement of the underlying action, *Tucker I*.[2]  Doc. # 126 (Amended Complaint, filed 12/2/2011).  In addition to

---

[1]  JRE is a division of  the Journal Register Company ("Journal Register"), which does business as "The New Haven Register." *Tucker I,* Doc. # 1, p. 3 (¶ 9).

[2]  On January 5, 2011,  after  filing the present action, Plaintiff entered into a  Stipulated Settlement Agreement with JRE in *Tucker I. Tucker I,* Doc. # 142–1 ("Stipulation and Compromise of Unsecured Claim").  Pursuant to that agreement, JRE agreed to withdraw its post-trial motions and irrevocably waive its right to appeal the judgment.  *Id.*, ¶ 4.  Plaintiff received approximately

making some minor changes of language and inserting facts regarding AIG letters respectively acknowledging and denying coverage of her claims, Plaintiff has principally supplemented the facts in paragraphs 70 to 73 to describe the settlement she entered with JRE in *Tucker I.* *Id.*, p. 17 (¶¶ 70–73). In particular, she clarified that on January 5, 2011, her "unsecured claim in Journal Register's bankruptcy was reduced to $3 million in exchange for Journal Register's agreement to waive any objections to her claim in bankruptcy court."[3] *Id.*, p. 17 (¶ 70). She and Journal Register agreed that said compromise "would not affect in any way her rights to pursue collection of the $4 million judgment in the underlying case from the [D]efendants." *Id.* In addition, on January 5, 2011, "Journal Register expressly assigned to Tucker all its rights against the [D]efendants regarding Tucker's $4 million judgment in the underlying" action, *Tucker I. Id.* (¶ 71). "Journal Register withdrew all post-trial motions pending in the underlying action ... with prejudice and agreed 'to be forever barred from prosecuting said motions or seeking to affect the Judgment in any way, including through appeal.'"[4] *Id.* (¶ 72); *see also* Doc. #128-2, Ex. A ("Stipulation"), p. 5, at ¶ 4. Tucker

---

$109,457.00 from JRE's bankruptcy estate and an assignment from JRE (including its parent, Journal Register) of all claims and rights under the EPL Policy, including "any and all claims against National Union, AIG and/or any of their or [the insured's] brokers or agents." *Id.*, ¶ 7. JRE expressly excluded any representation or warranty as to the viability of any claims or rights under the EPL Policy. *Id.*, ¶ 8. Tucker provided JRE with a specific and general release of her claims. *Id.*, ¶ 10.

    [3] In the context of the settlement agreement, Plaintiff appears to refer to her former employer JRE's parent company, Journal Register Company, defining it as "a multi-media corporation which owns daily newspapers in various states, including the New Haven Register." Doc. #126, ¶ 7.

    [4] On January 5, 2011, *in Tucker I*, JRE and the Journal Register Company provided Judge Underhill with "notice that to the extent that [their] JNOV Motion and/or New trial Motion have not been denied with prejudice at this juncture they . . . voluntarily withdraw and abandon [them] with prejudice and agree to be forever barred from prosecuting said motions or seeking to affect the Judgment in any way, including through appeal." *Tucker I*, Doc. #142 ("Notice of Withdrawal of Motions"), p. 4, ¶2.

concludes and alleges that in these circumstances, she "possesses a final judgment in the underlying action in the amount of $4 million and now stands in the shoes of the insured under the policies issued to [t]he Journal Register." Doc. #126 (¶ 73).

Pending before the Court are the following motions: (1) Defendants' Motion to Dismiss Count Three (Doc. #128); (2) Defendants' Motion to Strike Certain Portions of Plaintiff's Amended Complaint (Doc. #129), and (3) Plaintiff's Motion for Sanctions under Fed. R. Civ. P. 37(b) and (c) (Doc. #144).[5]  The Court will resolve each motion in turn.

## II.   DISCUSSION

### A.   Defendants' Motion to Strike Count Three (Doc. #128)

#### 1.   Standard of Review – Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'" *Halebian v. Berv*, 644 F.3d 122, 130  (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir.2006) (emphasis omitted)).[6]   Put simply, in ruling on a Rule 12 (b)(6) motion, the court "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it."

---

[5]   Also pending before the Court is Defendants' Motion for Summary Judgment (Doc. #97), which will be resolved by separate order after completion of the parties' briefing.  *See* Doc. #150 (setting supplemental briefing schedule).

[6]   Rule 8 of the Federal Rules of Civil Procedure mandates that a complaint "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

*Global Network Commc'ns, Inc.* , 458 F.3d at 155.[7]

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).    The Second Circuit has adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal*.  *See Gibbons v. Malone*, 703 F.3d. 595, 599 (2d Cir.  2013) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.") (citing and quoting *Iqbal*, 556 U.S. at 678); *Absolute Activist Value Master Fund, Ltd. v. Ficeto*, 677 F.3d 60, 65  (2d Cir. 2012) (same).

In deciding whether to grant a Rule 12(b)(6) dismissal,  the court construes the complaint liberally, "accepting all well-pleaded factual allegations in the complaint as true and drawing all inferences in favor of the plaintiff."  *See Lopez v. Jet Blue Airways*,  662 F.3d 593, 596 (2d Cir. 2011)(citing *Twombly*, 550 U.S. at 555–56).  *See also  Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011);  *MLSMK Inv. Co. v. JP Morgan Chase & Co.*,651 F.3d 268, 273 (2d Cir. 2011); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).   "[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 663-64.  When "well-pleaded factual allegations" are present, "a court should assume their veracity and then

---

[7]    *Accord  Lopez v. Jet Blue Airways*,  662 F.3d 593, 596 (2d Cir.  2011) (the court's task in ruling on a Rule 12 (b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof") (quoting  *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000)).  *See also Festa v. Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir. 1990) (the "court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient'').

determine whether they plausibly give rise to an entitlement to relief." 556 U.S. at 664, 679. *Accord Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 58-59 (2d Cir. 2010). Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). *See also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir. 2011) (same). The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir.2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir.2008) (Sotomayor, J.) (internal quotation marks omitted)). In sum, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Rule 8 of the Federal Rules of Civil Procedure simply "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

"In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (citation omitted). The court's review is thus "limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint

by reference."[8] *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

In sum, a claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *accord Gibbons*, 703 F.3d at 599. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (brackets omitted). *See also Twombly*, 550 U.S. at 555 (to survive Rule 12(b)(6) motion, claim's factual allegations must raise "a right to relief above the speculative level on the assumption that all allegations in the complaint are true").

## 2.   <u>Summary or Parties' Arguments</u>

Defendants request that the Court dismiss Count Three of Plaintiff's Amended Complaint on the ground that Plaintiff is unable to state a viable claim under Connecticut's direct action statute, Conn. Gen. Stat. § 38a-321 (the "direct action statute") in that the claim for which Plaintiff seeks judgment has been settled.[9] Specifically, Plaintiff's Amended Complaint "incorporates by reference

---

[8]   "Although the general rule is that a district court may not look outside the complaint and the documents attached thereto in ruling on a Rule 12(b)[(6)] motion to dismiss, [the Second Circuit has] acknowledged that the court 'may also consider matters of which judicial notice may be taken.'" *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (quoting *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991)).

[9] Connecticut's "direct action" statute, Conn. Gen. Stat. § 38a-321, captioned, " Liability of insurer under liability policy," states in relevant part:

Each insurance company which issues a policy to any person, firm or corporation,

a Stipulated Settlement that Plaintiff negotiated with her former employer," JRE. Doc. #128, p. 3.

Moreover, that "Stipulated Settlement settled the judgment that Plaintiff recovered against Journal

Register" in the underlying action and "[f]or that reason, Plaintiff does not, and cannot allege to

possess an 'unsatisfied judgment' against Journal Register," which is "a necessary element for

Plaintiff to assert a claim under the Direct Action Statute against Journal Register's insurer,"

National Union. *Id.* Because Defendants contend that "Plaintiff's Amended Complaint is deficient

on its face," they request that Count Three be dismissed pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure. *Id.*

Plaintiff counters by arguing that she possesses a "final judgment" that "was not released as

part of the settlement of her unsecured claim in Journal Register's bankruptcy proceeding." Doc.

#131, p. 1. She contends, citing the Court's language in a previous ruling, that in addition to the

final judgment she has obtained in *Tucker I*, "she has also received an express assignment from [the

Journal Register] of all claims and rights under the EPL policy, including any and all claims against

---

insuring against loss or damage on account of the bodily injury or death by accident
of any person, or damage to the property of any person, for which loss or damage
such person, firm or corporation is legally responsible, shall, whenever a loss occurs
under such policy, become absolutely liable, and the payment of such loss shall not
depend upon the satisfaction by the assured of a final judgment against him for loss,
damage or death occasioned by such casualty. . . . **Upon the recovery of a final
judgment** against any person, firm or corporation by any person, including
administrators or executors, for loss or damage on account of bodily injury or death
or damage to property, if the defendant in such action was insured against such loss
or damage at the time when the right of action arose **and if such judgment is not
satisfied within thirty days** after the date when it was rendered, **such judgment
creditor shall be subrogated to all the rights of the defendant and shall have a
right of action against the insurer** to the same extent that the defendant in such
action could have enforced his claim against such insurer had such defendant paid
such judgment.

Conn. Gen. Stat. § 38a-321 (emphasis added).

National Union, AIG and/or an[y] o[f] their or [the insured's] brokers or agents."[10] *Id.* (citing *Tucker v. American International Group, Inc. et al. ("AIG")*, 2011 WL 6020851, at *8 (D. Conn. Dec. 2, 2011) (internal punctuation omitted)).[11]  Consequently, Tucker claims that she "did not 'settle her judgment' in the bankruptcy court," but rather "settled an unsecured claim against [the Journal Register's] bankruptcy estate" and "retained rights to sue the [D]efendants to recover her judgment from the EPL policy [the Journal Register] purchased." *Id.*, p. 1-2.  Put simply, Plaintiff construes her settlement in *Tucker I* as  settlement of an unsecured claim in JRE's bankruptcy estate, which

---

[10]  The Court concluded in its ruling on December 2, 2011 that Plaintiff had obtained a "final judgment" in *Tucker I* within the meaning of Conn. Gen. Stat. § 38a-321 based on the facts at hand.  2011 WL 6020851 *8 (n.19).  Namely, on July 29, 2008, judgment was entered on the jury's verdict in favor of Plaintiff for $4 million ($1 million compensatory damages and $3 million punitive damages). *Id.* (citing *Tucker I*, Doc. # 73).  Journal Register's post-verdict motions—motion for judgment as a matter of law and motion for new trial— had temporarily remained pending following March 24, 2009, when the proceedings in *Tucker I* were automatically stayed, pursuant to 11 U.S.C. § 362(a), after Journal Register and its parent company filed a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code.  Judge Underhill subsequently denied all post-trial motions without prejudice while the case remained closed. *Tucker I*, Doc. # 129.  Journal Register thereafter withdrew all post-trial motions with prejudice (Doc. # 142, p. 3) and entered into a final settlement agreement with Plaintiff, thereby resolving the action (Doc. # 142–1).  Moreover, Judge Underhill made his final rulings in the action, denying as moot Tucker's motion to reopen the case (Doc. # 130), Doc. # 144 (filed January 7, 2011), and finding as moot AIG's and National Union's Motion to Intervene (Doc. # 131), Doc. # 145 (filed 2/3/2011). *Tucker I* was thus fully resolved and closed.  2011 WL 6020851, at *8 n.19.

[11]  The context of the Court's statement was a discussion with respect to Defendants' request to bifurcate the action to first determine whether coverage exists under the EPL Policy. Plaintiff objected and the Court was persuaded that a ruling on the issue of coverage would not resolve her entire action because her tort claims of bad faith, as set forth at Counts Two and Five of her Complaint, would survive even in the absence of proven insurance coverage under Connecticut common law.  2011 WL 6020851, at *5.  *See United Technologies Corp. v. Amer. Home Assur. Co.*, 118 F. Supp. 2d 181, 188-89 (D. Conn. 2000) (concluding that the Connecticut Supreme Court would not limit the tort of bad faith in the insurance context to claims of unreasonable or wrongful denial of claims).  "The insurer duty of good faith is not triggered only when coverage is unquestioned." *Id.* at 188.

9

she interprets as no bar to proceeding against Defendants on the EPL Policy.

### 3.    Stipulated Settlement & Connecticut's Direct Action Statute, Conn. Gen. Stat. § 38a-321

Under Conn. Gen. Stat. § 38a-321, the Connecticut legislature created a direct cause of action for injured parties to sue the responsible party's insurer under delineated circumstances.  The Connecticut Supreme Court set forth three requisites of a cause of action under this statute: "(1) that the plaintiff has recovered a final judgment; (2) that the judgment is against a person who was insured by the defendant against liability on it; and (3) that the judgment remains unsatisfied." *Skut v. Hartford Accident & Indemnity Co.*, 142 Conn. 388, 393 (Conn.1955); *see also O'Donnell v. U.S. Fidelity & Guaranty Co.*, No. 090269, 6 Conn. L. Rptr. 111, 1992 WL 43612, at *1 (Conn.Super.Ct. Mar. 3, 1992). Once the injured party has obtained a "final judgment" against the insured for loss or damage covered by an insurance policy and judgment remains unsatisfied for more than 30 days, the injured party is subrogated to the rights of the insured defendant and may proceed with the action to the same extent that the defendant could have enforced his claim against the insurer.

Moreover, the Connecticut direct action statute has been interpreted as not only enumerating the elements of a cause of action, but also providing "the basis upon which standing is conferred." *Gates v. Government Employees Ins. Co.*, No. CV65004852, 2008 WL 1971337, at *4 (Conn.Super.Ct. April 18, 2008); *accord Bepko v. St. Paul Fire and Marine Ins. Co.*, No. 3:04CV1996 (PCD), 2005 WL 3619253, at *1 (D.Conn. Nov. 10, 2005).

In their motion to dismiss, Defendants assert that Plaintiff obtained a final judgment when she entered into the Stipulation with JRE on January 5, 2011.  Doc. #128, p. 18.  However, they argue that by providing JRE with a full release, making "a complete settlement of the original

judgment against Journal Register," Plaintiff has "fully compromised her original judgment and has waived any right to pursue it against Journal Register beyond her pro rata claim in Journal Register's bankruptcy based on compensatory damages." *Id.*, p. 15-16.  In sum, "[t]here is no unsatisfied judgment remaining on which a claim under the Direct Action Statute may be based." *Id.*, p. 16. In support, Defendants cite *Gates v. Government Employees Ins. Co.*, No. CV065004852, 2008 WL 1971337 (Conn.Super.Ct. April 18, 2008), as an example of a Connecticut case in which the court found that the plaintiff was not statutorily grieved under Conn. Gen. Stat. § 38a-321 because plaintiff's judgment against the insured in the underlying action had been fully paid and thus fully satisfied.

In *Gates*, the plaintiffs, the widow and estate of deceased motorist William Gates, brought a wrongful death action against motorist Jason Fillion for negligently causing the death of Gates in a motor vehicle accident. *Gates v. Fillion*, Superior Court, Judicial District of New Haven, Docket NO. CV 05400788.  Defendant Fillion accepted an Offer of Compromise filed by the plaintiffs and a judgment was entered.  Fillion, through his insurer, Government Employees Insurance Company ("Geico"), paid the full money judgment entered in *Gates I,* covering the entire amount owed to plaintiffs by Fillion for his liability in the death of William Gates. *Gates*, 2008 WL 1971337, at *3.

Prior to the clerk's filing of satisfaction of judgment in *Gates I*, plaintiffs filed a second action, *Gates II*, this time including Fillion, his parents, and insurer Geico as named defendants.  The Amended Complaint in *Gates II* ultimately included claims against Geico for, *inter alia*,  violation of its implied covenant of good faith and fair dealing and unfair claim settlement practices in violation of CUIPA and CUTPA.  Geico filed a motion to strike these claims on the ground that plaintiffs had no contractual relationship with Geico and hence no standing to pursue the claims.

The court concluded that "the plaintiffs [were] unable to avail themselves of classical aggrievement in connection with their common-law contractual claim," so then turned "to consider whether they [had] standing under the principals of statutory aggrievement," under Conn. Gen. Stat. § 38a-321. Because there was no "unsatisfied judgment" the court held that plaintiffs' actions against Geico could not proceed.   The court thus summarized:

> Geico paid to the plaintiffs the money judgment amount owed to Fillion for his liability in the death of William Gates, which the plaintiffs certified as having satisfied the terms of the judgment. Consequently, the plaintiffs are unable to meet the third element of the direct action statute [that the judgment remain unsatisfied], and are, therefore, without standing to bring their suit against Geico.

2008 WL 1971337, at *5.  Accordingly, the court had "no jurisdiction to hear these claims." *Id.*

*Gates*, however, is plainly distinguishable from the case at hand.  In *Gates*, plaintiffs received full payment from the insurer of the entire judgment owed due to the negligence of the insured.  The judgment was thus entirely satisfied.[12]  Here, under the Stipulation, Plaintiff Tucker received a relatively small payment from Journal Register's bankruptcy estate (in the amount of $109,457.00) and obtained  an explicit assignment of JRE's claims and  rights "pursuant to and under the EPL Policy . . . in any way connected with, or related to," the claim and judgment in *Tucker I.*  Doc. #128-2, p. 6( ¶ 7).[13]

---

[12] The plaintiffs' settlement in  *Gates*  did not include an express assignment of the insured's rights to plaintiffs to pursue their  claims against the insurer *Geico*.   Such a provision was unnecessary in light of Geico's full payment of the judgment.

[13]  In her Amended Complaint,  Plaintiff clarified  that  on  January 5, 2011, as part of the Stipulation settling *Tucker I*, her "unsecured claim in Journal Register's bankruptcy was reduced to $3 million in exchange for Journal Register's agreement to waive any objections to her claim in bankruptcy court." Doc. #126, p. 17 (¶ 70).   "The parties agreed that the compromise of her unsecured claim would not affect in any way her rights to pursue collection of the $4 million judgment in the underlying case from the defendants."  *Id.*

In *Black v. Goodwin, Loomis and Britton, Inc.,* 239 Conn. 144 (1996), the Connecticut Supreme Court addressed the issue of "whether, in connection with a stipulated settlement between an injured party and an insured, the insured may assign to the injured party all rights that it may have against its insurer in exchange for the injured party's agreement to seek satisfaction of the judgment solely under the assignment." 239 Conn. at 154. Although the court's analysis discussed this issue in terms of public policy, *Black* also cited Connecticut's direct action statute in a footnote, suggesting that the statute was a viable path to pursue such claims against the insurers. This footnote effectively suggested, by implication, that when an injured party settles its claims against the insured by releasing the insured in return for the rights to pursue its claims against its insurers, a direct action against the insurer is not precluded. Although not spelled out by the court, by implication, such a settlement agreement would not create a "satisfied" judgment.

In *Black*, the plaintiff administrator of the estate of the deceased DeWitt C. Black brought a wrongful death action against White, Wheeler and Company ("White"). White's insurer, Maryland Casualty Company ("Maryland Casualty"), denied coverage and refused to defend White in the action. The plaintiff and White subsequently stipulated to a judgment whereby White assigned to the plaintiff any rights it might have against Maryland Casualty in return for the plaintiff's agreement to seek satisfaction of the judgment solely from Maryland Casualty. The plaintiff then instituted an action against Maryland Casualty. At the conclusion of trial, the jury returned a verdict in favor of the plaintiff and the trial court rendered the verdict accordingly. Maryland Casualty appealed, claiming that the stipulated judgment between White and the plaintiff was contrary to public policy and thus unenforceable.

The Supreme Court transferred the case from the Appellate Court. In affirming the trial

13

court's ruling, the Supreme Court (Palmer, J.) held that the stipulated judgment between plaintiff and the injured party was enforceable following the insurer's breach of contractual duty to defend. Justice Palmer addressed Maryland Casualty's argument "that White's assignment of rights in favor of the plaintiff was not effective because the plaintiff had released White from liability and, accordingly, White had incurred no payment obligation requiring indemnification." 239 Conn. at 155.  "In other words, Maryland Casualty claim[ed] that if 'there [was] no obligation of White . . . under the judgment, there [was]  no obligation to indemnify White . . . from it.'" *Id.*  The court concluded that "[t]his claim is without merit."  *Id.*

The policy Maryland Casualty had issued to White provided that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Id.* at 156.  "Thus, the insurance policy [was] plainly one of liability rather than indemnity." *Id*.  The court further noted in a corresponding footnote "that the plaintiff's claim under § 38a-321 does not depend on the assignment of rights under the stipulation because, under that statutory provision, the insurer is liable whether its contract is one of liability or indemnity." *Id.* at 156 n.13.  In that footnote, the court also explicitly cited Conn. Gen. Stat. § 38a-321 for the proposition that the "insurer is absolutely liable whenever there is a loss under the policy, and payment of such loss shall not 'depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty.'" *Id.* at 156.  Moreover,  "[t]he [insurer], after breaking the contract by its unqualified refusal to defend, should not thereafter be permitted to seek the protection of that contract in avoidance of its indemnity provisions." *Id.* (quoting *Missionaries of Co. of Mary, Inc. v. Aetna Cas. & Sur. Co*., 155 Conn. 104, 114 (1967)).

Thereafter, in *Steinhoff v. Travelers Indem. Co. of Illinois*, No. 558937, 2002 WL 1573353 (Conn.Super.Ct. June 18, 2002), the Connecticut Superior court applied *Black* to hold that the right to bring a direct action against the insurer under § 38a-321 survives a stipulation between the injured party and insured in settlement of all claims, suggesting once again by implication that such a stipulation does not satisfy a judgment and/or bar recovery under the direct action statute. In *Steinhoff*, plaintiffs purchased a home from the Woodwards, who were represented in that sale by the realtor Buffum & Rossin Realty, Inc. ("Buffum") and Walter Geswell, Jr. ("Geswell"), an agent in Buffum's employ.  Plaintiffs sued the Woodwards, Buffum and Geswell, claiming among other things, that negligent misrepresentations had been made to them concerning lead paint contamination with respect to the house. 2002 WL 1573353, at *1.

Buffum and Geswell  presented a claim for plaintiff's damages to Travelers Insurance Company of Illinois ("Travelers"), their insurer at the time of the sale, and Travelers denied coverage. Thereafter, plaintiffs obtained a judgment against the defendant insureds in the amount of $78,780 pursuant to a stipulated agreement. *Id.*  Travelers refused to pay the damage award of $78,780. *Id.*

Plaintiffs then brought an action directly against Travelers and its affiliate and/or parent Gulf Insurance Co. ("Gulf"), pursuant to Conn. Gen. Stat.§ 38a-321, alleging that  "[b]y refusing to defend said claim and pay said damages the Travelers breached the contract of insurance with the insureds and the plaintiffs are subrogated to all the rights of the Insureds pursuant to said contract in accordance with C.G.S. § 38a-321."  *Id*. at *1 (quoting Amended Complaint at ¶ 9).

Travelers and Gulf filed a motion to strike (*i.e.*, dismiss) the complaint in the direct action, arguing that the "direct action statute (§ 38a-321) does not permit this action because of the nature

and effect of the particular stipulation in this case." *Id*. at *1.   In particular, the insurers argued:

> [W]here before judgment enters on a stipulated judgment the plaintiff covenants not to execute the stipulated judgment against the insured, the insured is effectively released from liability to the plaintiff and in turn the insured has no viable statutory or contractual claim against the insurer." Thus, the right to bring a direct action against the insurer under [§ 38a-321] is eliminated.

*Id*. at *3.   The Court quoted the Connecticut Supreme Court's ruling in  *Black* to reject that argument, as follows:

> Maryland Casualty further claims that White's assignment of rights in favor of the plaintiff was not effective because plaintiff had released White from liability and, accordingly, White had incurred no payment obligation requiring indemnification. In other words, Maryland Casualty claims if there is no obligation of White . . . under the judgment, there is no obligation to indemnify White ... from it. **This claim is without merit**.

*Id.*, at * 3 (quoting *Black*, 239 Conn. at 155)(emphasis added).   The *Steinhoff* court also quoted *Black*'s observation that "the plaintiff's claim under § 38-321 does not depend on the assignment of rights under the stipulation because, under that statutory provision, the insurer is liable whether its contract is one of liability or indemnity."  2002 WL 1573353 at *3 (quoting *Black*, 239 Conn. at 156 n.13). "Companies can use whatever language they want in their policies but: 'In accord with general principles governing the incorporation of statutory terms into the contract of insurance, a provision of the statute authorizing a direct action must be read into, and form part of every contract to which it is applicable whether the contract is oral or written and *whether the policy be considered as an indemnity policy or a liability policy*.' "  2002 WL 1573353, at *3 (quoting Couch on Insurance 3d, Vol. 7, § 104:24, p. 104-43)(emphasis added)).  Put simply, the court chose to follow the *Black* decision, "where the court adopted the 'majority view' that stipulated judgments can form the basis of a so-called direct action against the insurer."  *Id*. at *4.

The *Steinhoff* court summarized as follows:

> What all of this leads to is a conclusion that says even if the insurer does not concede it has a duty to provide coverage and in fact has decided not to defend that does not mean that where the plaintiff claimant and the insured have settled and entered into a stipulation like the one before the court no direct action against the insurer will be allowed per *Black* under the direct action statute (§ 38-321). It just means that the issue of coverage will be litigated in the direct action suit just as the insurer has a right to raise the issue of fraud and collusion and the reasonableness of the settlement.

2002 WL 1573353, at *4.  The court in *Steinhoff* thus ultimately held that "for the foregoing reasons," the insurers' motion to strike plaintiff's amended complaint under the direct action statute, § 38a-321, "is denied." *Id.*, at *7.

In accordance with  the *Black* and *Steinhoff* decisions, this Court holds that a stipulated judgment may form the basis of an action under Connecticut's direct action statute, Conn. Gen. Stat. §38a-321.  An injured party, such as Tucker, may settle her claims against the insured (as in *Tucker I*) and thereafter seek recovery for the settled judgment (in *Tucker II*) via Connecticut's direct action statute.  Nothing in the *Black* and *Steinhoff* opinions leads this Court to find that a settlement releasing the insured in return for an assignment of its rights against the insurer creates a "satisfied" judgment that would bar recovery under the direct action statute, Conn. Gen. Stat. § 38a-321. Rather, logic suggests the opposite – namely, that the plaintiff's agreement to pursue the insurers by separate action evidences that the unpaid damages owed under the judgment remain unsatisfied, as in Tucker's case.[14]

---

[14] In general, "[a] satisfaction of judgment is the discharge of an obligation under a judgment by payment of the amount due."   47 Am. Jur. 2d Judgments § 804.  Moreover, by usual definition, "a satisfaction of a judgment is the final act and end of a proceeding . . . [which] extinguishes the claim and ends the controversy." *Id.* § 806. "[I]f a judgment creditor accepts money *in complete satisfaction and release of his judgment*, that judgment has no further force or authority." *Id.* (emphasis added).  In the case in suit, Plaintiff accepted a partial or lesser payment and secured the right to further pursue the judgment against the insurers.

17

This holding does not in any way suggest that an injured party is entitled to duplicate recovery under § 38a-321. For example, Plaintiff would not be able to seek to recover the $4 million in damages, as described in the Stipulation in *Tucker I*, in a direct action claim against the insurers if she had already received payment of the same from JRE.[15] *See, e.g., Gates*, 2008 WL 1971337, at *5.

Nor does this holding confer upon Plaintiff any greater or lesser rights than the insured JRE would have to recover under EPL Policy. Under the direct action statute, the injured party "steps into the shoes" of the insured and thus has the same rights as that party. *See Brown v. Employer's Reinsurance Corp.*, 206 Conn. 668, 673 (1988) (under Connecticut's direct action statute, the injured party "obtains no different or greater rights against the insurer than the insured possesses and is equally subject to any defense the insurer may have against the assured under the policy.").

It thus follows that the insurer is entitled to assert all appropriate defenses in such a direct action claim. "[T]he mere fact that a statute authorizes the injured person to bring a direct action does not permit recovery where the accident or injury is not within the coverage of the policy." *Steinhoff*, 2002 WL 1573353, at *4 (quoting Couch on Insurance 3d, Vol. 7, § 106.10, p. 106-21). "This is a universally accepted proposition." *Steinhoff*, 2002 WL 1573353, at *4. "Although the insured can make such settlements as his (sic) interests require, such a settlement is not conclusive upon the insurer which still has a right to be heard on the question of policy coverage or the

---

[15] It also remains an unresolved issue as to whether, in light of Plaintiff's receipt of $109,457.00 in damages from JRE, any damages Plaintiff might later recover from the Defendants should be offset by that amount, thereby avoiding overlap of recovery. That question is not the focus of the current motion so the Court does not reach it.

possibility of fraud."[16] *Id.* (quoting  Insurance Law and Practice, Appleman, Rev. Vol. 7C, § 4690, p. 235).  *See also Black*, 239 Conn. at 155 ("the right of the insurer to challenge the settlement entered into by its insured on grounds of fraud, collusion or unreasonableness provides it with ample opportunity to contest the propriety of such a settlement").

As the court in *Steinhoff* explained, "the coverage question is a separate question both analytically and  as a policy issue from the separate consideration of whether abstractly speaking § 38a-321 actions should be allowed where there has been a stipulation by an insured assigning the claim against it to the plaintiff claimants who can then proceed under the statute against the insurer." 2002 WL 1573353, at *4. "In other words, it is a truism guaranteed by the insurer's right to due process that: The claimant, in a direct action (against the insurer) has no superior right to compensation such that recovery should be allowed for a loss which is not caused by a risk which the insurer and insured agreed to have covered by the policy." *Id.* (quoting  Couch on  Insurance 3d,  Vol.  7, § 106.10, p. 106-21).

In the case in suit, per the Stipulation, Plaintiff recovered a small percentage of the original judgment from JRE's bankruptcy estate and preserved her right to pursue the original *Tucker I* "Judgment" ($4 million)  against the defendant insurers, obtaining an explicit assignment to pursue JRE's rights under the EPL Policy.  Doc. #128-2, p. 6-7 (¶7); Doc. #126, ¶¶ 71, 73.  Under Connecticut's common law, interpreting the application of Conn. Gen. Stat. § 38a-321, this kind of settlement neither fully "satisfied" the judgment in *Tucker I* nor barred Plaintiff's  direct action

---

[16]Such defenses might include whether the settlement agreement between the plaintiff and the insured was "reasonable" under the circumstances or entered into via collusion or fraud. Moreover, a stipulated settlement might be unenforceable if not supported by consideration.

against Defendants in *Tucker II.*[17]

As set forth, *supra*, under Connecticut law, this Court follows Connecticut's "majority view" that a stipulated judgment "can form the basis of a so-called direct action against the insurer" under Conn. Gen. Stat.§ 38a-321. *Steinhoff*, 2002 WL 1573353, at *4 (citing *Black*, 239 Conn. at 154 and collecting cases). Plaintiff's direct action claim may proceed as unsatisfied to the extent that the total amount of damages comprising the Judgment have not been paid. "[A]ccepting all well-pleaded factual allegations in the [amended] complaint as true and drawing all inferences in favor of the plaintiff," the Court finds that Plaintiff's claim under the Conn. Gen. Stat. § 38a-321 suffices to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S .at 678 (quoting *Twombly*, 550 U.S. at 570). The Court will deny Defendants' motion to dismiss Count Three of Plaintiff's Amended Complaint. Defendants may assert any appropriate defenses to the direct action claim, such as lack of coverage under the EPL Policy and/or unreasonableness of the settlement.

## B.   Defendants' Motion to Strike Certain Portions of Plaintiff's Amended Complaint (Doc. #129)

### 1.   Standard for Motion to Strike

Pursuant to Federal Rule 12(f) of Civil Procedure, "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). The court may act *sua sponte* or "upon a motion by a party either before responding to the pleading, or, if a

---

[17] Unlike in *Gates,* 2008 WL 1971337, at *3, where the insurer itself paid the entire judgment owed due to the negligence of its insured, here (1) the insurers have disclaimed coverage and (2) JRE paid a small percentage of the *Tucker I* judgment and assigned its rights to pursue the insurers under the EPL policy. In such circumstances, the *Tucker I* Judgment has not been fully satisfied under Connecticut law.

response is not allowed, within 21 days after being served with the pleading."[18] *Id.*  Whether to grant or deny a motion to strike is vested in the trial court's sound discretion. *Hollander v. Amer. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir.1999), *cert. denied*, 528 U.S. 965 (1999), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000)); *Impulsive Music v. Pomodoro Grill, Inc.*, No. 08-CV-6293, 2008 WL 4998474, at *2  (W.D.N.Y. Nov. 19, 2008).

In general, "these motions [to strike] are viewed unfavorably and rarely granted."  *Lord v. Int'l Marine Ins. Services*,  No. 3:08–CV–1299 (JCH),  2012 WL 45440, at *2 (D.Conn. Jan. 9, 2012) (citing *Rodriguez v. Bear Stearns Cos.*, Inc., No. 07–cv–1816(JCH), 2009 WL 995865, at *10 (D.Conn. Apr. 14, 2009)). *See also Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 938 (2d Cir.1984) (motion to strike "for legal insufficiency is not favored"), *vacated on other grounds*, 478 U.S. 1015 (1986); *Schramm v. Krischell*, 84 F.R.D. 294, 299 (D.Conn.1979) ("[i]f there is any doubt as to the possibility of relevance, a judge should err on the side of denying a Rule 12(f) motion"); *Hathaway Motors, Inc. v. Gen. Motors Corp.*, 19 F.R.D. 359, 360 (D.Conn.1955) ("Motions to strike . . . are in disfavor"); *O'Brien v. Wisniewski*, No. 13:10-CV-120 (CSH), 2012 WL 1118076, at *2 (D.Conn. April 03, 2012) (motions to strike under Fed.R.Civ.P. 12(f) are "generally disfavored").  *Accord RSM Production Corp. v. Fridman*,  643 F.Supp.2d 382, 394 (S.D.N.Y. 2009) ( "[M]otions to strike are viewed with disfavor and infrequently granted."), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).

"In deciding whether to [grant] a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United*

---

[18]  Defendants filed their motion to strike within 21 days after Plaintiff filed her Amended Complaint.  *See* Doc. #126, 129 (filed 12/9/2011 & 12/30/2011, respectively).

*Corp.*, 551 F.2d 887, 893 (1976).  "Usually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided." *Id.* "And ordinarily neither a district court nor an appellate court should decide to strike a portion of the complaint – on the grounds that the material could not possibly be relevant – on the sterile field of the pleadings alone." *Id.* "[I]f the motion is granted at all, the complaint should be pruned with care."[19] *Id.* at 894.  *See also Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir.2001)  (in resolving motions to strike, courts use "a scalpel, not a butcher knife").

"The party moving to strike bears a heavy burden" to establish the basis for the motion," *Impulsive Music*, 2008 WL 4998474, at *2  — *i.e.*, that no evidence in support of the allegation would be admissible, *Lipsky*, 551 F.2d at 893.  Thus, "[t]o prevail in such a motion, defendants must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Impulsive Music*, 2008 WL 4998474, at *2 (citing *Roe v. City of New York*, 151 F.Supp.2d 495, 510 (S.D.N.Y. 2001) (internal quotation omitted)). "Inappropriately hyperbolic allegations, ill-conceived attempts at levity, and other similar manifestations of bad judgment in drafting pleadings, by themselves, fall short of the threshold that Rule 12(f) contemplates." *Saylavee LLC v. Hockler*, 228 F.R.D. 425, 426 (D.Conn. 2005).

---

[19]  As the Second Circuit articulated in *Lipsky*:

> The Federal Rules of Civil Procedure have long departed from the era when lawyers were bedeviled by intricate pleading rules and when lawsuits were won or lost on the pleadings alone. Thus the courts should not tamper with the pleadings unless there is a strong reason for so doing.

551 F.2d at 893.

With respect to a motion to strike "scandalous" material, "a scandalous allegation" has been described as "one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Cabble v. Rollieson*, No. 04-CV-9413, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006) (citing *Khalid Bin Talal v. E.F. Hutton & Co., Inc.*, 720 F.Supp. 671, 686 (N.D.Ill. 1989)). "Even where matter in a pleading is relevant to the controversy, it nonetheless may be stricken if it is scandalous or set out in 'needless detail.'" *Cabble*, 2006 WL 464078, at *11 (citing *Gleason v. Chain Service Rest.*, 300 F.Supp. 1241, 1257 (S.D.N.Y.1969)). *See, e.g., Urashka v. Griffin Hosp.*, 841 F.Supp. 468, 476-77 (D.Conn. 1994) (giving notice to parties that if litigation proceeded, court would strike as scandalous and immaterial allegations regarding assistant director's derogatory sexual references (comments regarding penis of male employee and "little tush" of female volunteer) where action was based on age discrimination against plaintiff).

### 2.   Substance of Defendants' Motion to Strike

Defendants move pursuant to Fed. R. Civ. P. 12(f) "for an order striking certain portions of Plaintiff Teri Tucker's . . . Amended Complaint as immaterial and scandalous." Doc. #129, p. 1. Specifically, Defendants accuse Plaintiff of "deviat[ing] from a recitation of allegations germane to her claims" so as to "include a variety of scandalous and immaterial accusations about the general nature of Defendants' business." *Id.* Such allegations include "references to unidentified ranking systems for insurance carriers," "supposed testimony of anonymous former personnel of Defendants," "scandalous general accusations that do not even include the pretext of a foundation," and "references to allegations against Defendants, or related companies, in other lawsuits in other courts that have not been reduced to a judgment." *Id.* Defendants assert that because "[n]one of

23

these allegations are material to any of Plaintiff's claims, . . .   their only purpose is to prejudice

Defendants." *Id.*

Defendants list the  specific allegations at issue in their supporting brief as follows:

54.   AIG-related cases involving allegations or findings of untimely coverage
determinations, abandonment of the insured, pretextual reasons for denying
coverage, fraud, and failure to investigate include the following, among
hundreds of others:

*Acacia Research Corp. v. National Union Fire Ins. Co. of Pittsburgh,
PA*, No. SACV 05-501 PSG (MLGx), 2008 WL 4179206 (C.D. Cal.
Feb. 8, 2008) (failure to investigate, abandonment of the insured);

*United Technologies Corp. v. American Home Assurance Company*,
118 F.Supp.2d 181 (D. Conn. 2000) (bad faith delay in deciding
coverage);

*White et al. v. American General Life Insurance Company*,
2:08CV00978 (S.D. West Va.) (pretextual reason for denying
coverage);

*Penford Corporation and Penford Products Co. v. National Union
Fire Insurance Company of Pittsburgh, Pa., and Ace American
Insurance Company*, (09-CV-0013) (N.D. Iowa) (bad faith delay and
denial of insurance benefits);

*Lexington Insurance Company v. Devaney*, 50 F.3d 15 (9th Cir. 1995)
(use of cover letter to attempt to evade coverage);

*St. Paul Fire and Marine Ins. V. Lexington Ins. Co.*, 2006 WL
1295408 (S.D. Fla. April 4, 2006) (abandonment of insured);

*Handy & Harman v. AIG, Inc.*, 2008 WL 3999964 (N.Y. Sup. Ct.
N.Y. County Aug. 25, 2008) (claim of bad faith refusal of coverage,
clams file passed from adjuster to adjuster, reliance on inapplicable
endorsement for denial of coverage);

*Vincenzo v. AIG Ins. Servs., Inc.*, No. 1:07-cv-00026 (N.D. W. Va.
Sept. 21, 2007) (allegations of bad faith denial of coverage);

*Wal-Mart Stores Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004)
(allegations of fraud in sale of policies);

*In the Matter of American Home Assurance Company, AIG Casualty Company, Commerce and Industry Insurance Company, Granite State Insurance Company, Illinois National Insurance Company, National Union Fire Insurance Company of Pittsburgh PA, New Hampshire Insurance Company, The Insurance Company of the State of Pennsylvania.* State of Oregon, Department of Consumer and Business Services, Case No. INS 07-05-006 (June 28, 2007) (State of Oregon fined AIG entities $5 million for failure to timely process claims among other misconduct).

55.    In a report released in July 2008, AIG was ranked third among the ten worst insurance companies in the United States for claims handling abuses and other financial improprieties. The report noted that AIG has always focused "on taking in more money in premiums than it pays out in claims. To do that, the company has had to be extremely parsimonious about the claims it pays."

…

57.    Former AIG claims supervisors have alleged in other litigation that AIG and its wholly-owned subsidiaries have used a variety of stratagems to deny or delay claims, including locking checks in a safe until claimants complained, delaying payment of attorney fees until they were a year old, disposing of important correspondence during routine "pizza parties," routinely fighting claimants for years in court over mundane claims, defending claims solely to delay payment, and obstructing the discovery process.
…

59.    In accordance with this practice, losses in excess of $1 million frequently trigger a refusal by AIG or National Union to pay and litigation, regardless of how legitimate the claim is.

…

61.    AIG, moreover, has been recently charged with bad faith conduct relating to its business practices. In 2006, for example, AIG paid $1.6 billion to settle charges of artificially inflating loss reserves to improve the appearance of its financial health through two sham transactions with General Re Corp. of Stamford, Connecticut. Loss reserves are the amount of money an insured needs in reserve to pay its policyholders' claims. In or around January 2008, it entered into a $12.5 million settlement with the attorneys general of nine states including the District of Columbia to resolve charges of bid-rigging and commission-related kickbacks to brokers, including Marsh.

Doc. #129, p. 5-6 (quoting Doc. #126 (Amended Complaint), at ¶¶ 54-55, 57, 59, 61).

Defendants characterize the "foregoing paragraphs" as "involv[ing], in the main, allegations about Defendants that have not resulted in judgment (¶¶ 54, 55, 57, and 59), allegations of conduct completely unrelated to any in Plaintiff's six claims against Defendants (¶¶ 54, 57, and 61), and anonymous, prejudicial allegations of scandalous business practices with no foundation or explanation as to their source (¶¶ 55, 57 and 59)." Doc. #129, p. 7.

Defendants emphasize that the offending paragraphs "have no bearing on Plaintiff's claims regarding National Union's handling of a single employment practices claim." *Id.*, p. 8. In particular, paragraph 54 lists a string of cases that "do not involve final judgments, do not involve Connecticut insureds, do not involve employment practices liability insurance and in many cases do not involve Defendants." *Id.* In fact, they contend, only four of the ten cases listed involve either of the Defendants, and those four are either distinguishable from the present case on the facts or resulted in a favorable outcome for the insurer.[20] *Id.*

As to paragraph 55, Defendants argue that the allegations contained therein come "from an unidentified report regarding AIG's "ranking." *Id.*, p. 9. Moreover, "[t]here are no allegations that the undisclosed report was related to any judicial finding of wrongdoing by Defendants." *Id.* Similarly, Defendants characterize paragraph 57 as stating "allegations of unidentified claims handlers in unidentified 'other litigation' that AIG, as well as other companies that are not AIG, engaged in various practices." *Id.* at p. 9. Defendants once again state that "[t]here is no allegation

---

[20] Plaintiff asserts that "[c]ontrary to what the defendants claim, all the cases cited in paragraph 54 involve the defendants or wholly-owned subsidiaries of defendant AIG." Doc. #133, p. 3 n.1. Plaintiff also suggests that Defendants have not been forthcoming in providing information about these cases in the discovery process. The outcome of this skirmish between the parties remains unknown, but is most likely unresolved.

that such litigation resulted in any judicial findings of wrongdoing by Defendants." *Id.*

Defendants characterize paragraph 59 as "potentially libelous" in that it "implies that AIG frequently refuses to pay claims in excess of $1 million regardless of merit." *Id.* Defendants argue that this allegation "does not identify a single instance of judicial fact-finding that Defendants refused to pay a meritorious claim and that such refusal was triggered by the size of the claim." *Id.*

Finally, with respect to paragraph 61, Defendants maintain that it "is wholly unrelated to Plaintiff's claims" because "it alleges that AIG settled charges concerning artificial inflation of loss reserves, bid-rigging, and commission-related kickbacks." *Id.* Defendant contends that Plaintiff has "couche[d]" these allegations "as involving 'bad faith,' but there is absolutely no relationship between those alleged activities and Plaintiff's cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing." *Id.* In support, Defendants cite *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), in which the Second Circuit "held that references to a complaint in a separate action against the defendant by the Securities and Exchange Commission ('SEC') were properly stricken from the complaint in the action pending before it." *Id.* Defendants point out that because the "SEC's complaint was resolved via a consent judgment rather than a full adjudication on the merits . . . it could not be used as evidence in any subsequent action." *Id.* (quoting and citing *Lipsky*, 551 F.2d at 894 ("Since it is clear that the SEC [] consent judgment, itself, can have no possible bearing on the [plaintiff's] action, the SEC complaint which preceded the consent judgment is also immaterial, for the purposes of Rule 12(f)")).

Defendants cite cases in which courts struck references to claims "that were never resolved on the merits" so "did not result in any findings of law or fact," *RSM Prod. Corp. v. Fridman*, 643 F.Supp.2d 382, 403 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010). *See also Impulsive*

*Music v. Pomodoro Grill*, Inc., No. 08-CV-6293, 2008 WL 4998474, at * 2-3 (W.D.N.Y. Nov. 19, 2008) (striking a reference to a case "virtually identical" to the case that was before the court that had not been resolved on its merits").

Lastly, Defendants assert that "[c]ourts of this Circuit have also stricken allegations where the complaints alleged conduct of the defendants that was not precisely related to the conduct complained of." Doc. #129, p. 10. As an example, Defendants cited *Smith v. AVSC Int'l, Inc.*, 148 F.Supp.2d 302 (S.D.N.Y. 2001), in which the plaintiff employee alleged that his employer discriminated against him based on age and gender and retaliated against him for reporting alleged misconduct to company managers and an independent auditor. The court ruled that "specific allegations about [the employer's] behavior toward other employees who were not also [the same age and gender as plaintiff] are not relevant to any of [plaintiff's] claims" and thus struck the allegations from the complaint. 148 F.Supp.2d at 317. *See also Kounitz v. Slaatten*, 901 F.Supp. 650, 658 (S.D.N.Y. 1995) (defendant's "alleged use of profanity and professional demands on her staff ha[d] no bearing on whether [plaintiff] Kounitz was discriminated against on the basis of her gender" and accordingly, because the allegations were "immaterial and impertinent as well as inflammatory and scandalous, the Defendants' motion to strike them from the complaint [was] granted.").

### 3.   **Plaintiff's Objections**

Plaintiff objects to Defendants' Motion to Strike (Doc. #129) on three grounds. First, Rule 12(f) motions to strike are "highly disfavored." Doc. #133, p. 1. Specifically, the "Second Circuit has cautioned that a Rule 12(f) motion should not be granted 'unless it can be shown that no evidence in support of the allegation would be admissible." *Id.* (citing, *inter alia, Lipsky*, 551 F.2d

at 893).  Put simply, the court "should not tamper with the pleadings unless there is a strong reason

for doing so."  *Id.*, p. 2 (quoting *Lipsky*, 551 F.2d at 887).

Second, Plaintiff declares that "the particular allegations of which the [D]efendants complain

are in fact necessary to plead Tucker's claim properly under the Connecticut Unfair Insurance

Practices Act (CUIPA)."  *Id.,* p. 1.  According to Plaintiff, to plead such a claim, she must "set forth

other instances of alleged unfair conduct in detail" and show that the "instances occur with such

frequency to constitute a regular business practice."  *Id.*, p. 1-2.  In the absence of such allegations,

her CUIPA claim would be subject to dismissal for failure to state a claim under Federal Rule

12(b)(6) of Civil Procedure.[21]  *Id.*, p. 3.  Plaintiff argues that under Connecticut law, "CUIPA claims

will not lie where the allegations in a complaint pertain to a single instance of misconduct."  *Id.*, p.

4.  Plaintiff thus cites *Royal Indem. Co. v. King*, 532 F.Supp.2d 404, 411 (D.Conn. 2008), *aff'd sub.*

*nom*. *Arrowood Indem. Co. v. King*, 699 F.3d 735 (2d Cir. 2012), to establish that in bringing a

CUIPA claim under Conn. Gen. Stat. § 38a-816, a plaintiff must show that the insurer was

---

[21] Plaintiff quotes pertinent language in *Guillory v. Allstate Ins. Co.*, 476 F.Supp.2d 171 (D.Conn. 2007), in which the court denied the defendant insurer's motion to dismiss plaintiff's CUTPA claim (based on CUIPA) as follows:

> Defendant further urges the Court to dismiss plaintiff's claim because insurance practices cited by plaintiff are only "unfair" under CUTPA when "[c]ommitt[ed] or perform[ed] with such frequency as to indicate a general business practice," Conn. Gen. Stat. § 38a-816(6). Although plaintiff has not pled any frequency with which the defendant engaged in the insurance practices he complains of, this is a proper area for discovery, particularly as such information may only be in defendant's possession, not plaintiff's. Whether plaintiff can develop evidence that Allstate's general business practice mirrors that employed with him will be determined on a fully developed record after discovery.

476 F.Supp.2d at 175-76.

"committing or performing" the unfair act "with such frequency as to indicate a general business practice."[22]  Doc. #133, p. 4.

Tucker concludes that her "allegations of similar bad faith or unfair trade or business practices in her Complaint (and Amended Complaint) are therefore wholly justified and necessary in view of the case law" on CUIPA, upon which her CUTPA claim is premised.  *Id.  See also* Doc. #126, Count Four, ¶¶ 102-106.   Therefore, Defendants' characterization of these allegations as "immaterial" and "scandalous" is "invalid."  Doc. #133, p. 4.  Plaintiff thus argues that Defendants have failed to meet their burden of showing that no evidence in support of these allegations would be admissible at trial.  *Id.*, p. 5.

Third, Plaintiff argues that Defendants should be estopped from moving to strike at this time because all of the language they wish stricken appeared more than 2 years ago in Plaintiff's original Complaint.  Doc. #133, p. 2.  "The defendants did not move to strike these allegations at that time,

---

[22]  Specifically, in support of her argument, Plaintiff quotes as follows:

The CUIPA statute defines "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." Conn. Gen. Stat. § 38a-816. The Kings [insureds] allege that Royal [the indemnity insurer] violated section 38a-816(6)(d), which defines as an "unfair" insurance practice "refusing to pay claims without conducting a reasonable investigation based upon all available information." *Id.* In addition to proving that Royal engaged in that unfair practice, the Kings are also required to show, under section 38a-816(6), that Royal was "committing or performing" that unfair act "with such frequency as to indicate a general business practice...." *Id.* "In requiring proof that the *insurer has engaged in unfair claim settlement practices with such frequency as to indicate a general business practice*, the legislature has manifested a clear intent to exempt from coverage under CUIPA isolated instances of insurer misconduct." *Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 849, 643 A.2d 1282 (1994) (internal quotations omitted).

*Royal Indem. Co.,* 532 F.Supp. 2d at 411 (emphasis added).

and should be estopped from doing so now." *Id.*  Plaintiff thus urges the Court to construe the Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination" of this action.  *Id.* (quoting Fed. R. Civ. P. 1).  Moreover, Tucker suggests that estopping Defendants from "engaging in pre-Answer motion practice more than two years into the case" is within the Court's "inherent power to control its docket and prevent undue delays" in the disposition of this case.  *Id.*, p. 5 (quoting *Boudwin v. Graystone Ins. Co., Ltd.*, 756 F.2d 399, 400 (5th Cir. 1985)).  In sum, Plaintiff requests that Defendants' motion to strike be denied in its entirety.

### 4.    <u>Analysis</u>

 At the outset, the Court has decided, in the interests of fairness, not to estop the Defendants from making this motion to strike.  Although the Court would normally look with disfavor on a pre-Answer motion more than two years into the proceedings, the circumstance of this fiercely contested case distinguish it from the norm.  Counsel have been admonished repeatedly for their constant skirmishing and *ad hominems*, all of which have resulted in an endless barrage of lengthy motions, with both sides accusing the other of delaying tactics.

More importantly, once an amended complaint has been filed, it supersedes the original complaint; and Defendants filed their motion to strike within the requisite 21 days after being served with Plaintiff's Amended Complaint.  Fed.R.Civ.P. 12(f)(2).  Because the motion is timely within the Federal Rules, the Court will allow it to proceed.

In deciding whether to grant Defendant's motion to strike, the Court will examine the paragraphs at issue to determine whether, with respect to any of the allegations contained therein, "it can be shown that no evidence in support of the allegation would be admissible." *Lipsky.*, 551 F.2d at 893.  The Court will also examine the particular language contained in the paragraphs to

determine whether it is "scandalous," unnecessarily impugning the Defendants' character or "repulsive. " Absent either finding the motion will be denied.

The Court finds as to each paragraph as follows:

### a.   Paragraph 54

With respect to paragraph 54, the Court notes at the outset that Count Four in Plaintiff's Amended Complaint sets forth a CUTPA claim which is explicitly based on Defendants' alleged violation of CUIPA.  Doc. #126, ¶¶ 102-106.  Under Connecticut law, one may violate the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq*., by violating the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-815, *et seq*.  Consequently, a plaintiff may, as Tucker asserts with respect to Count Four of her Amended Complaint, base a CUTPA claim upon a defendant insurer's violation of CUIPA.  *See Western World Ins. Co. v. Architectural Builders of Westport, LLC*, 520 F.Supp.2d 408, 411 (D.Conn. 2007)("[T]here is no doubt that violations of CUIPA may be alleged as a basis for a CUTPA claim.") (citing *Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 847-5 ,(1994); *Mead v. Burns*, 199 Conn. 651, 662 (1986)).

 "In order to sustain a CUIPA cause of action under CUTPA, a plaintiff must allege conduct that is proscribed by CUIPA."  *Western World Ins*. Co. 520 F.Supp.2d at 411 (citing *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 625 (2006)).[23]  A CUTPA violation premised on CUIPA thus

---

[23] Plaintiff alleges that Defendants violated the following provisions of CUIPA, Conn. Gen. Stat. § 38a–816(6),which lists "unfair claim settlement practices" giving rise to a general business practice: "(A) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (B) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; (C) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (D) refusing to pay claims without conducting a reasonable investigation based upon all

requires allegations of sufficient facts to demonstrate a general business practice.   Specifically, "[f]or a plaintiff to maintain a cause of action under CUTPA against an insurance carrier based upon alleged unfair claim settlement practices, in accordance with CUIPA, the plaintiff must plead facts indicating that such practices were committed 'with such frequency as to indicate a general business practice.'" *Starview Ventures, LLC v. Acadia Ins*., No. CV065003463S, 2006 WL 3069664, at *3 (Conn. Super. Ct. Oct. 17, 2006) (quoting *Lees*, 229 Conn. at 850).

Because Plaintiff  must allege unfair settlement practices committed or performed by the Defendants with such frequency as to indicate a general business practice, the general allegations she describes in her list of "other cases" in paragraph 54 are relevant in substance.  The Court must, therefore, examine Defendants' other arguments to strike theses cases.

First,  the Court recognizes that references to claims "that were never resolved on the merits" do "not result in any findings of law or fact," *RSM Prod. Corp.*, 643 F.Supp.2d at 403.  In other words, an action that has not been decided on its merits does not result in any finding of wrongdoing on the part of the parties and is thus not admissible evidence of the facts alleged therein. According to Defendants, Paragraph 54 lists a string of cases that "in general, do not involve final judgments," but Defendants fail to specify to which, be it any or all,  cases they  refer.  Doc. #129, p. 8. Moreover, in her allegations Plaintiff does not indicate which cases have been fully resolved, but

---

available information; (E) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (F) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; . . .  (M) failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; [and] (N) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." *See* Doc.#126, ¶¶ 103-04 (quoting and citing Conn. Gen. Stat. §38a–816(6)(a)-(f), (m), & (n)).

rather lists the  cases according to the kinds of  allegations made against the insurer(s).   To the extent that the basis for the motion to strike is vague, it will be denied without prejudice as to the finality of judgments.   Having brought the motion, the Defendants have the burden to present the basis thereof in sufficient detail for the Court to make the necessary determinations.   They must indicate which cases have not been fully resolved.[24]

With regard to the parties involved in the cases listed, there is a factual dispute on the face of the briefs between Plaintiff and Defendants as to whether all of the cases involve the Defendants or wholly-owned subsidiaries of defendant AIG.   Plaintiff contends they do, Doc. #133, p. 3 n.1.; Defendants assert they do not, Doc. #129, p. 8.    Plaintiff has suggested that Defendants have not cooperated in clarifying this issue. Doc. #133, p. 3 n.1.   Defendants now seek to clarify the matter upon counsel's representation to the Court, specifying that "only four of the ten cases" listed "appear to involve either of the Defendants" – *i.e.*, *Acacia, Penford, Handy, and Matter of America Home Assurance Company*).   Doc. #129, p. 8.    This representation, however, is made by counsel in the briefs, as opposed to by sworn affidavit.    Absent proof that the remaining 6 cases do not involve Defendants and therefore may not be admissible as to their general business practices, the Court will refrain from striking those six cases to which Defendants object.

With respect to the four cases listed which indisputably relate to  Defendants, the Court has reviewed them and will strike two based on lack of relevance to the action at hand.   The first  case, *Matter of American Home Assurance Company*, involved allegations dissimilar to those being litigated with respect to the present EPL Policy:  alleged violations of Oregon's administrative rules

---

[24]  For example,  it may  be that a cited opinion does not fully resolve a matter, but allows it to later proceed to trial for a final judgment.   From reviewing the cases cited, the Court has no indication of any later procedural history in these cases.

related to the processing of workers' compensation claims.[25]  Doc. #129-9.  The second case, *Penford*, ruled in favor of the insurer, essentially absolving it of the wrongdoing alleged.  *See* Doc. #129-6 (Order dismissing case against defendant National Union with prejudice and granting it "costs of this action").  The cases *Matter of American Home Assurance Company* and *Penford* shall be stricken from paragraph 54.

Of the remaining cases, *Acacia*, although focused on a Directors and Officers' insurance policy issued to a California corporation, includes allegations of unfair settlement practices, such as those at issue: improper and unreasonable withholding of the benefits owed under the policy.  In that case, the court ultimately found in favor of the plaintiffs, awarding $31,070,981.62 plus $310,492.99, including the costs of settlement in the underlying action, plaintiffs' defense costs, and prejudgment interest.  *Acadia Research Corp. v. National Union Fire Ins. Co. of Pittsburgh*, No. CV 05-501 PSG, 2008 U.S. Dist. LEXIS 96955, at *16 (C.D. Cal. Feb. 8, 2008) (Doc. #129-5).   Although not squarely on point, the Court finds that there may be some potentially admissible evidence regarding the insurer's general business practices.

In *Handy,* the last of the four cases, the court granted the insurer's motion to dismiss the bad faith claim but denied the motion with respect to plaintiff's breach of contract claim.  If this claim has been resolved in favor of plaintiff, the allegations regarding failure to properly investigate and/or bad faith denial of the claim may potentially show  "other instances of alleged unfair conduct in detail" and constitute "instances occur[ring] with such frequency [as] to constitute a regular business practice."  Doc. #133, p. 4 (quoting *Royal Indem. Co.*, 532 F.Supp.2d at 411).  Absent a showing that

---

[25]  The  Court  abbreviates  the  names  of  the  cases referenced in paragraph 54 by the first party's name in the action.  The entire case names may be viewed in the Amended Complaint itself, at Doc. #126, ¶ 54.

*Handy* remains unresolved (void of legal findings of fact), this case will not be stricken from the list at this time.

As to the remaining six cases in the list, the Court will not reach the issue of factual relevance until receiving confirmation from Defendants as to whether the cases even involve them. If the cases do not involve Defendants, they are irrelevant, regardless of the allegations contained therein. If they do involve Defendants, the Court will address factual relevancy.

A Plaintiff may include allegations in her complaint, using the "upon information and belief" standard of Rule 11.[26]  Defendants, in moving for the disfavored remedy of striking allegations from a complaint, must substantiate the basis to strike within the papers supporting the motion. As to the remaining six cases, the Court will deny the motion to strike without prejudice to renewal should Defendants verify that these cases in fact do not relate to them.

   **b.**     <u>**Paragraph 55**</u>

The allegations in paragraph 55, regarding "a report released in July 2008," appear to contain inadmissible "hearsay" in that the contents of the report are offered for the truth of the matters stated. *See* Fed. R. Evid. 801, 802 (an out of court statement offered "to prove the truth of the matter asserted" is inadmissible).  Plaintiff contends that the report indicates, for example, that "AIG was

---

[26] Rule 11 articulates that, "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

   . . .
   (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

Fed. R. Civ. P. 11(b)(3).

ranked third among the ten worst insurance companies in the United States for claims handling

abuses and other financial improprieties." Doc. #126, ¶ 55. Depending on whether the conclusions

in the report are based on facts contained therein, which include the Defendants' general practices

of claims settlement, the report may contain relevant facts.

Nonetheless, the report constitutes inadmissible hearsay unless an exception to the hearsay

rule applies. *Bonenfant v. Kewer*, 3:05cv01508 (PCD), 2007 WL 2492030, at *2 (D.Conn. Aug. 30,

2007) (citing *Merry Charters, LLC v. Town of Stonington*, 342 F.Supp.2d 69, 75 (D.Conn. 2004).

*See* Fed. R. Evid. 803 (listing exceptions to the hearsay rule).  For example, if the report is a "record

or statement of a public office," containing "factual findings from a legally authorized investigation,"

the report would be admissible.  *Id.* 803(8).  Similarly, if the report is a "market report," *id.* 803(17),

or "a treatise, periodical, or pamphlet" and the statements contained therein are relied on by  an

expert witness on direct examination, *id*. 803(18), the report may fall within an exception to the

hearsay rule.

Because the Court can conceive of possible circumstances in which the report might be

admissible, paragraph 55 will not be stricken on this record.  *See Lipsky*, 551 F.2d at 893 (motion

to strike should be denied unless "no evidence in support of the allegation would be admissible").

Nonetheless, absent an applicable exception to the hearsay rule, Plaintiff will not be able to have this

report admitted at trial.   She simply cannot refer to an unidentified report to allege the truth of its

contents.

### c.      Paragraphs 57 & 59

In  Paragraph 57,  Plaintiff alleges that "[f]ormer AIG claims supervisors have alleged in

other litigation that AIG and its wholly-owned subsidiaries have used a variety of stratagems to deny

or delay claims." Doc. #126, ¶ 57.   It is unclear whether Plaintiff's allegations are based on hearsay or sworn testimony or affidavits  by the claims supervisors regarding conduct by AIG.   On the grounds that Plaintiff may conceivably present admissible evidence of these  allegations at trial, the Court will allow them to stand as potentially relevant to Plaintiff's CUTPA claim (as it is  based on an alleged general practice of unfair settlement of claims under CUIPA).

Similarly, paragraph 59 suggests that a practice exists in which "losses in excess of $1 million frequently trigger a refusal by AIG or National Union to pay and litigation, regardless of how legitimate the claim is."  Doc. #126, ¶ 59.  Such a generalization is not evidence or admissible as a statement in and of itself.   Defendants may rest assured, and Plaintiff is admonished,  that even if allowed to make such broad allegations regarding Defendants' practices "on information and belief" at the pleading stage, Plaintiff must be prepared to *prove* any facts necessary to substantiate her claims.  Otherwise, such allegations will be rendered meritless , albeit not likely "libelous," as Defendants suggest.[27]   Plaintiff has conceded that she must present evidence of unfair business practices to prevail under CUIPA, and thus CUTPA, – *i.e.*, *she  will be left to her proof* at trial. Based on the Second Circuit's narrow standard with respect to motions to strike, the Court will allow the allegations to stand with the foregoing admonitions to Plaintiff.

---

[27] With respect to allegedly libelous statements, "[i]t  is  well settled that communications uttered or published in the course of judicial  proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy... The effect of an absolute privilege is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously. . . ." *Wolinsky v. Standard Oil of Connecticut*, 712 F.Supp.2d 46, 58-59 (D.Conn. 2010) (citations omitted).  "The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements."  *Lega Siciliana Social Club, Inc. v. St. Germaine*, 77 Conn.App. 846, 856 (2003) (citations omitted), *cert. denied*, 267 Conn. 901 (2003). "Thus, the privilege applies to statements made in pleadings or other documents prepared in connection with a court proceeding."  77 Conn.App. at 856  (internal quotations omitted).

### d. **Paragraph 61**

The Court will grant the Defendants' request to strike paragraph 61. That paragraph contains allegations regarding "artificially inflating loss reserves to improve the appearance of [AIG's] financial health" and "bid-rigging and commission-related kickbacks to brokers," neither of which are relevant to this action. Doc. #126, ¶ 61. To allow such irrelevant allegations to remain would unduly prejudice Defendants.

Lastly, the Court finds that none of the language contained in the foregoing paragraphs is "scandalous" as that term has been interpreted in the context of a Rule 12(f) motion to strike. *See*, e.g., *Cabble*, , 2006 WL 464078, at *11. Although Plaintiff's allegations may ultimately prove over-stated or baseless, none of the words she has chosen rise to the level of being "repulsive" or of detracting from the dignity of the Court. Granted, these paragraphs contain negative allegations regarding Defendants' business conduct. A certain degree of negativity of thought and expression is inherent in the nature of this action. In sum, none of the language contained in the allegations remaining shall be stricken as scandalous.

## C. **Plaintiff's Motion for Sanctions under Fed. R. Civ. P. 37(b) & (c)**

### 1. **Standard – Motion for Sanctions - Fed. R. Civ. P. 37**

Pursuant to Federal Rule 37(b) of Civil Procedure, a district court has discretion to impose sanctions, as follows:

> If a party . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
>
> > (I) directing that the matters embraced in the order or other designated

facts be taken as established for purposes of the action, as the
prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing
designated claims or defenses, or from introducing designated matters
in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except
an order to submit to a physical or mental examination.

Fed. R. Civ. P.  37(b)(2)(A)(i)-(vii).

Moreover, under Rule 37(b)(2)(C), "[i]nstead of or in addition to the orders above, the court

must order the disobedient party, the attorney advising that party, or both to pay the reasonable

expenses, including attorney's fees, caused by the failure, unless the failure was substantially

justified or other circumstances make an award of expenses unjust."  *Id.* 37(c).

"The predicate for imposition of sanctions pursuant to Rule 37(b) is failure to obey a lawful

order from this court." *Call Center Technologies v. Grand Adventures Tour & Travel Publishing

Corp.*, No. 3:03CV1036(DJS),  2007 WL 2439401, at *4 (D.Conn. Aug. 24, 2007).   "Provided that

there is a clearly articulated order of the court requiring specified discovery, the district court has the

authority to impose Rule 37(b) sanctions for noncompliance with that order." *Daval Steel Products,

a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir.1991).

"Sanctions pursuant to Rule 37 are intended: (1) to prevent a given party from benefiting

from its failure to comply with discovery orders, (2) to specifically deter that party from continued

40

violation of current and future discovery orders, and (3) to generally deter similar misbehavior by parties in other cases." *In re SageCrest II, LLC*, 444 B.R. 20, 23 (D.Conn. 2011) (citing *Update Art v. Modiin Publishing*, 843 F.2d 67, 71 (2d Cir.1988)).

"[A]lthough the decision to impose sanctions . . . is uniquely within the province of a district court, . . . any such decision [must be] made with restraint and discretion." *Mantell v. Chassman,* Nos. 11–4799 (L), 12–1101(con), 2013 WL 616379, at * 1 (2d Cir. Feb. 20, 2013) (citing *Salovaara v. Eckert*, 222 F.3d 19, 27 (2d Cir.2000) (internal quotation marks omitted)).

### 2.      Summary of Parties' Arguments

Plaintiff moves for "appropriate relief arising from the defendants['] . . . failure to comply with this Court's discovery order ("Order") dated January 31, 2012." Doc. #144, p. 1 (referring to Order at Doc. #134). Specifically, Plaintiff asserts that Defendants have failed to "withdraw objections and provide amended and complete discovery responses pursuant to this Court's finding that [AIG] was a proper party and could not continue to refuse to respond to outstanding discovery." *Id.* As relief, Plaintiff seeks an order from the Court "deeming AIG a proper party in this case through trial, informing the jury of its failure to comply, and other sanctions as the Court may deem appropriate." *Id.* Tucker seeks "similar relief against National Union," including "informing the jury of the failure to comply" with the Court's discovery order." *Id.* Lastly, Tucker seeks an award of fees and costs incurred in bringing the motion. *Id.*

Defendants oppose imposition of sanctions upon them, arguing that they read "no part of the Court's Order . . . as requir[ing] that Defendants re-submit their prior written discovery responses to Plaintiff with the general objections removed." Doc. #146, p. 1. Rather, Defendants interpreted the Court's Order to deem Defendants' "general objections to be withdrawn." *Id.* (Citing Doc. #134,

p. 11). Moreover, Defendants regarded their discovery responses (identified as "issue number one," Doc. #134, p. 6) as "accurate following the withdrawal of general objections because the responses specify AIG's lack of knowledge and documents with regard to each request." Doc. #146, p. 1.

Defendants represent that, during depositions subsequent to issuance of the Order, their counsel did ultimately agree to "draft and serve the revised responses in order to clean up the record prior to trial." *Id.*, p 1-2. On April 2, 2012, Defendants served the requested revised discovery responses on Tucker with the general objections removed. *Id.*, p. 2.

In sum, Defendants argue that they were never in violation of the Court's Order, as they perceived their obligations as fulfilled by the Court's pronouncement that the general objections were withdrawn. To accommodate Tucker's counsel, they subsequently agreed to serve revised responses and have done so. Accordingly, they conclude that no sanctions are warranted.

### 3.    <u>Application of Rule 37</u>

With respect to the facts as presented by counsel, Defendants' counsel, Dennis O. Brown, represents that he did not believe that he was obligated to serve revised discovery responses pursuant to the Court's Order (Doc. #134). The pertinent section of that Order states:

> **7. Agreement by Defendants to Withdraw "Boiler Plate" General Objections**
> Lastly, in addition to the six issues listed in the letter (Ct.Ex.# 1), Bagnell requested at the hearing that "the existing discovery responses of the defendants be amended to withdraw ... the 'boiler plate' voluminous general objections" to plaintiff's various production requests. Tr., p. 17, l. 25 to p. 18, l. 11. Bagnell described the objections as "going well beyond" the attorney-client and work product privileges but offered that, nonetheless, he had the "impression that Mr. Brown and I would be able to resolve [the voluminous objection issue] as well." *Id.*, p. 18, l. 7–11.
>
> Brown confirmed to the Court that Bagnell's impression was correct. He explained that, after speaking briefly with Bagnell before the hearing, with respect to the "general objections" at issue, "we [the defendants] [wi]ll waive those, withdraw them, whatever needs to be done to clean up the record." *Id.*, p. 39, l. 5–7.

Furthermore, Brown later conceded that "withdrawing the general objections will take away a lot of the ambiguity or issues." *Id.*, p. 41, l. 17–20. The Court considers that those general objections are now withdrawn.

*Tucker v. AIG*, No. 3:09-CV-1499 (CSH), 2012 WL 314866, at *4 (D.Conn. Jan. 31, 2012).  In so ordering, the Court acknowledged AIG's agreement with regard to the "general objections at issue that AIG would waive, withdraw, or do "whatever needs to be done to clean up the record."  *Id.*

The Court contemplated, and Plaintiff's counsel, Jeffrey S. Bagnell, understandably expected that thereafter Brown would do what was necessary "to clean up the record" – namely, file revised discovery responses reflecting the parties' agreement at the hearing.   When Brown failed to do so, even after requests from Bagnell, Plaintiff filed the present motion for sanctions.  *See* Doc. #144-3 (email from Bagnell to Brown, 2/23/2012, asking Brown, "[C]an you update me on National Union and AIG's responses to the written discovery previously served as we agreed at the conference[?]").

For the Court's purposes, as the overseer of discovery, the Court already deemed the general objections to be "withdrawn."  After all, discovery materials do not become part of the court record until filed onto the docket (*e.g.*, through summary judgment or at trial).  The Court expected that, pursuant to  its Order, Brown would fulfill his representations and revise or "clean up" the prior discovery requests.

After Plaintiff filed her motion for sanctions, Brown quickly agreed to revise Defendants' discovery responses as "an accommodation"  to Bagnell, all the while professing that he need not do so subject to the Court's Order. Doc. #146, p. 2.  He subsequently prepared those revised responses and turned them over to Plaintiff one day before filing Defendants' objection to this motion.

One would think that, in the words of "the Bard," "All is well that ends well."  Plaintiff has

received the requested revised responses.  Nonetheless, Plaintiff did not withdraw her motion for sanctions against the Defendants, which leaves the Court to surmise that she believes herself entitled to some relief, at least for bringing the motion itself.

Were the Court less inclined to a positive view of human nature, the Court might agree. Brown may have become more accommodating in revising the discovery responses as a result of Plaintiff's request for sanctions.  On the other hand, Plaintiff could have withdrawn her motion or at least confirmed for the Court her receipt of the requested discovery responses, thereby rendering proper assistance to the Court with respect to  the status of relevant facts regarding her motion.

Sanctions are not  required where "the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(c).   Under the present circumstances, the Court exercises its discretion to deny Plaintiff's motion for sanctions.  The predicate for imposing sanctions under Rule 37(b) is failure to obey a lawful court order and Defendants' counsel represents that he did not realize he was failing to obey an order.   Perhaps he required a more clearly articulated direction to revise his discovery responses, even though he had orally represented to the Court that he would do "whatever needs to be done to clean up the record." Nonetheless, Defendants have not benefitted from their counsel's brief  failure  to comply nor will a lack of sanctions suggest that none will  be imposed for future non-compliance.

With respect to Plaintiff's request for a court order deeming AIG a proper party in this case, the Court has previously held "Plaintiff has set forth sufficient facts to make a plausible claim that AIG's corporate veil should be pierced under the instrumentality test." *Tucker v. AIG*, 745 F.Supp. 2d 53, 70 (D.Conn. 2010).  "If proven, Plaintiff's allegations create adequate grounds for AIG's inclusion in this action as co-defendant."  *Id.* at 72.   Having ruled on this matter, any additional

44

order would be superfluous and redundant.[28]  Exercising proper judicial restraint, the Court does not repeat rulings or rule upon matters not before it.

Not for the first time, or indeed the second,  the Court finds itself admonishing the attorneys for all parties for constant skirmishing, sharp litigation practices, *ad hominems*, and the like. Counsel are once again advised that, in the interests of their clients, they should focus their efforts to cooperate fully and expeditiously to complete these proceedings.  Attorneys' engaging in peevish, antagonistic tactics neither has nor will accomplish anything of value for a client.

 Plaintiff's Motion for Sanctions (Doc. #144) will be denied.

## III.   **CONCLUSION**

Defendants' Motion to Dismiss Count Three of Plaintiff's Amended Complaint (Doc. #128) under Fed. R. Civ. P. 12(b)(6) is DENIED.  Connecticut law follows the  "majority view" that a stipulated judgment "can form the basis of a so-called direct action against the insurer" under Conn. Gen. Stat.§ 38a-321. *Steinhoff*, 2002 WL 1573353, at *4 (citing *Black*, 239 Conn. at 154 and collecting cases).   By implication, such a stipulated judgment does not constitute a "satisfied" judgment and thus Plaintiff's direct action claim in Count Three may proceed.

---

[28]  In fact, Defendants' counsel stipulated to the fact that AIG is a proper party at the hearing before this Court on January 19, 2012.  On that occasion, the following interchange took place on the record:

> [P]laintiff demanded that AIG "no longer maintain a position that they they're not a proper party" and acknowledge that "they need to respond in whatever fashion they deem they can to the discovery we've previously served." Tr., p. 10, l. 24 to p. 11, l. 5. With respect to that issue, Bagnell declared to the Court, without objection by Brown, that counsel "have an agreement on that." *Id.*, 1. 6–7.

*Tucker v. AIG*, 2012 WL 314866, at *2.

Defendants' Motion to Strike certain portions of Plaintiff's Amended Complaint (Doc. #129) under Fed. R. Civ. P. 12(f) is GRANTED IN PART AND DENIED IN PART.  With respect to paragraph 54, the  motion is GRANTED as to the sub-paragraphs relating to the *Penford* and *In the Matter of American Home Assurance Company* cases,  DENIED with respect to the *Acacia* and *Handy* cases, and DENIED WITHOUT PREJUDICE as to the remaining six cases listed. The motion to strike is also  DENIED as to paragraphs 55, 57, 59 and GRANTED as to paragraph 61.

Plaintiff's Motion for Sanctions (Doc. #144) is DENIED.  Defendants misperceived the meaning of the Court's Order (Doc. #134), which obligated them to draft and serve revised discovery responses – *i.e.*, in their counsel's words, to "clean [them] up." *Tucker v. AIG*, 2012 WL 314866, at *4.  Because there has been no proven wilful failure to comply, and Plaintiff has been given the revised responses sought,  the Court DENIES the motion with the admonition that neither counsel shall engage in further antagonistic or delaying tactics in this case.

The foregoing is SO ORDERED.

Dated: New Haven, Connecticut
       March 28, 2013


                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge

46