## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

TERI TUCKER,

                Plaintiff,

   v.

AMERICAN INTERNATIONAL GROUP,
INC.; NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA., A SUBSIDIARY OF
AMERICAN INTERNATIONAL GROUP,
INC.,

             Defendants.

3:09 - CV - 1499 (CSH)

JANUARY 28, 2015

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Plaintiff Teri Tucker brings this diversity action on an insurance policy issued by the Defendant insurance companies. After extensive discovery, the Defendants move for summary judgment.

## I.   INTRODUCTION

Plaintiff seeks damages from her former employer's insurers, Defendants American International Group, Inc. ("AIG") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively "Defendants"), arising from her unlawful discharge by that former employer in 2003. Plaintiff's suit is based upon an employment practices liability insurance policy

issued by Defendants to that employer (herein "2004 Policy" or "the Policy").[1]   Specifically, she

seeks to collect from Defendants the $4 million judgment entered in her favor in *Tucker v. Journal*

*Register East*, No. 3:06-CV-307 (SRU) (herein "*Tucker I*"), an earlier action Plaintiff filed against

her former employer, newspaper publisher Journal Register East.[2]   The instant action, in which

Plaintiff confronts the Journal Register's insurers, will be referred to as "*Tucker II*."

Pending before the Court is Defendants' Motion for Summary Judgment [Doc. 97] as to all

counts of Plaintiff's Amended Complaint [Doc. 126].  This Ruling resolves that motion.

The factual background of the case has been repeatedly recounted in detail in a series of prior

opinions by the Court, including 728 F.Supp.2d 114 (D.Conn. 2010), 745 F.Supp.2d 53 (D.Conn.

2010), 2011 WL 6020851 (D.Conn. Dec. 2, 2011),  2012 WL 314866 (D.Conn. Jan. 31, 2012), 2012

WL 685461 (D.Conn. Mar. 2, 2012), 281 F.R.D. 85 (D.Conn. 2012), and 936 F.Supp.2d 1 (D.Conn.

2013).  Familiarity is assumed regarding the facts recounted within those opinions.  However, for

purposes of the pending summary judgment motion, the Court sets forth the following relevant facts,

as established by the record – *i.e.*, pleadings, affidavits, and exhibits – including those newly

presented on summary judgment.

## II.  FACTS

In August 2000, Plaintiff Teri Tucker was hired to supervise the telemarketing department

---

[1]  For purposes of clarity the 2004 Policy bears policy number 729-15-02 and contains the effective dates of January 12, 2004 through January 12, 2005.  *See* Doc. 154-2 & 154-3 ("Employment Practices Liability Insurance Policy," provided by National Union as a "member of American International Group, Inc.").

[2]   Journal Register East is a division of the Journal Register Company, which does business as "The New Haven Register." *Tucker I,* Doc. 1, p. 3 (¶ 9).

of the New Haven Register, LLC, a company wholly-owned by Journal Register East, Inc., whose ultimate parent company is Journal Register Company ("Journal Register").[3]   On October 16, 2003, she was discharged for alleged misconduct, misuse of the telephone in accepting collect calls. Tucker alleged that Journal Register actually  discharged her in retaliation for opposing sexually harassing behavior by a subordinate employee and for refusing to testify falsely in her employer's defense to a sexual harassment complaint regarding the subordinate's behavior.

On November 3, 2003, Tucker's then counsel, Stephen P. Horner, sent a letter (herein "November 3, 2003 Letter") to Kevin Walsh, publisher of the New Haven Register, in which Horner alleged, on behalf of Tucker, that she had been wrongfully discharged and retaliated against in violation of Connecticut's discrimination statutes (Conn. Gen. Stat. § 46a-60), Title VII of the Civil Rights Act, and public policy.   Doc. 154-9, Ex. H, p. 2.   The letter further asserted that Journal Register had  "financial exposure for such violations," which "include[d] the following: (a) reinstatement of [Tucker], or front pay; (b) payment of all lost back wages to [Tucker]; (c) reimbursement for lost fringe benefits; (d) payment of [Tucker's] attorney's fees; and (e) punitive damages." *Id.*, p. 4.  Horner also advised Walsh that if Walsh had "interest in resolving [Tucker's] claims," he should contact Horner  "within two weeks of the date of this letter;" otherwise, if Horner and Walsh were "unable to resolve this matter, [Tucker] ha[d] authorized [Horner] to file administrative complaints with [the] CHRO and EEOC." *Id.*   The letter concluded with the statement that "[i]n exchange for a severance package," Tucker would be willing to "provide a full release of liability and agree to maintain the terms of the agreement as fully confidential." *Id.*, p. 4-5.

---

[3]   Throughout this Ruling, the  Court will  refer collectively to the New Haven Register, Journal Register East and Journal Register Company as the "Journal Register."

As set forth below, Defendants assert that the November 3, 2003 Letter was a "demand letter" which served notice to Journal Register of a claim made against it pursuant to the 2004 Policy.  Plaintiff disagrees with that characterization of the letter.[4]

Tucker filed a Complaint with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunities Commission ("EEOC") on or about March 2, 2004. Doc.100-2, Ex. B, ¶¶ 19-20.[5]   On May 13, 2004, Journal Register's broker, Marsh, sent a letter to Keith Zinsley of AIG's Claim Technical Services, Inc., notifying AIG "[o]n behalf of the Insured [Journal Register], and in accordance with the reporting provisions of the [2004] policy, . . . of a claim which has been made against the Insured" by Tucker.  Doc. 100-17, Ex. Q.   The letter cited and appended the March 2004 CHRO Complaint by Tucker.  *Id*.

AIG acknowledged receipt of Tucker's  claim on June 1, 2004 and made a full and express

---

[4]     Journal Register produced a "Litigation Report" maintained in its files on the Tucker Claim. That report notes that: "On 11-3-03 the Register received a letter from her attorney who is claiming discrimination and wrongful discharge on behalf of Mr. [sic] Tucker." With respect to the "Date Insurance Carrier [was] Notified," the entry "N/A" appears.  Doc. 154-11, Ex. J ("Litigation Report," p. JRC-00001).  Journal Register's Director of Human Resources gathered "responses" to the statements made in the November 3, 2003 Letter. *See* Doc. 154-12, Ex. K (Robert Lee Response to statements made in the [November 3, 2003 Letter], JRC-00676-683).

On November 13, 2003, Robert Lee faxed records that were gathered in connection with Tucker's termination to Journal Register's General Counsel, Marc Goldfarb.  Doc. 154-13, Ex. L (JRC-00521-534).  When deposed, Journal Register's outside counsel, Peter Lefeber of Wiggin and Dana, did not specifically recall seeing the November 3, 2003 Letter but remembered working with Goldfarb.  Lefeber  also recalled that the letter had been received before Tucker filed a charge with the CHRO. Doc. 100-13, Ex. M (excerpt of Lefeber Deposition), p. 14, l. 8-17  ("I don't deny that I saw it. I do recall Mr. Horner [Tucker's counsel] asserting claims on behalf of Ms. Tucker before he actually filed a discrimination charge with the CHRO.").

[5]    Shortly thereafter, Tucker's attorney wrote to the General Counsel of Journal Register's corporate parent offering to settle Tucker's claim for $95,000.  Doc. 100, ¶ 17; Doc. 100-13, Ex. M, (Lefeber Deposition), p. 18;  Doc. 143-15, ¶ 17.

reservation of rights to Journal Register's broker. Doc. 154, ¶ 41; Doc. 154-24, Ex. W (letter from Meghan McConville, AIG, to Douglas S. Worth, Marsh USA, acknowledging submission of Tucker's claim and reserving all "rights, privileges, and defenses under the policy and available at law or in equity"). At that time, Meghan McConville, in AIG's Corporate D&O Claims Department, instructed Journal Register's insurance broker, Douglas Worth of Marsh USA, Inc., to notify her of "any significant events including, litigation, mediation, arbitration, withdrawal, or settlement within the retention." *Id.* Four years later, Journal Register, through Marsh, contacted AIG on July 22, 2008, to advise that the "matter [was] now in suit" and "had already proceeded to a jury trial." Doc. 154, ¶ 42; Doc. 154-25, Ex. X, p. 9 ("General Note" on Claim Number 371-031428-001 (Claimant Teri Tucker) by Brian Conlin, AIG, dated July 25, 2008).[6] AIG issued a denial of coverage on August 18, 2008. Doc. 154, ¶ 43; Doc. 154-26, Ex. Y (August 18, 2008 letter from Japhet Boutin, AIG Domestic Claims, Inc., to Ed Yocum, Esq., General Counsel for Journal Register Company).

On February 28, 2006, Plaintiff filed her claim against Journal Register in *Tucker I* in this District, No. 3:06-CV-307 (SRU). On July 23, 2008 the jury found in her favor on all counts and awarded her $1 million in compensatory damages and $3 million in punitive damages. *Tucker I*, Doc. 69. The jury also found that Tucker was entitled to economic damages in an amount to be determined by the court. *Id.* On July 29, 2008, Judge Underhill entered judgment on the verdict in the amount of $4 million. *Id.*, Doc. 73.

Post-trial, Tucker sought a prejudgment remedy "(PJR")" to secure recovery of the judgment.

---

[6]  Conlin's "General Note" [Doc. 154-25] also indicated that he contacted Larry Peikes of Wiggin and Dana on 7/24/2008 and Attorney Peikes confirmed that he represented the defendant Journal Register in Tucker's action in U.S. District Court and the matter had already been "tried by a jury beginning on 7/21/2008 and [the] jury [had] returned a verdict of $1 million in compensatory damages and $3 million in punitives."

*Id.*, Doc. 75–77. In addition, she filed motions for preliminary injunction, disclosure of assets, and prejudgment and post judgment interest. *Id.*, Doc. 77 & 107. In Tucker's memorandum in support of a PJR, her counsel noted that "[w]hile there are limitations on the amount of punitive damages under Title VII, the likely final judgment ... remains substantial." *Id.*, Doc. 76, p. 4, para. 1.4

Defendant Journal Register opposed Plaintiff's post-trial motions and also filed, *inter alia*, motions to stay execution of the judgment and for a new trial. *Id.*, Doc. 83 & 89. On February 20, 2009, Judge Underhill granted Tucker's motion for a PJR in the amount of $500,000 and her motion for disclosure of assets to satisfy the PJR. *Id.*, Doc. 129. He specifically found that probable cause existed that a judgment of $500,000 would ultimately be entered for Tucker and that the defendant was not adequately secured by insurance. Judge Underhill, however, denied Tucker's motion to preliminarily enjoin the defendant from disposing of its assets, finding that Tucker had failed to show the existence of "irreparable harm" if the injunction were not granted. *Id.*

On February 21, 2009, Journal Register filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the Southern District of New York. *In re Journal Register Co., et al.*, No. 09-10769(ALG) (Bankr. S.D.N.Y.2009). Pursuant to § 362 of the Bankruptcy Code, an automatic stay went into effect, thereby barring continuation of judicial proceedings against the debtor and its affiliated debtors to recover claims arising prior to the bankruptcy filing.[7]

Plaintiff commenced the present action ("*Tucker II*") on September 23, 2009 against insurers

---

[7]  In March of 2009, during the pendency of the bankruptcy action, Tucker's legal counsel wrote to Journal Register's General Counsel and included a statement that Journal Register's concern that it had "blown [insurance] coverage" was something they could "work on together." Doc. 100-22 (email from Jed Horwitt, Esq., counsel for Tucker, to Shaunna D. Jones, Wilkie Farr & Gallagher LLP, Mar. 11, 2009).

National Union and AIG as the underwriters of the $5 million 2004 Policy issued to Journal Register, under which Plaintiff seeks to recover the $4 million judgment she recovered against Journal Register in her jury trial before Judge Underhill in *Tucker I*.  Specifically, pursuant to her Amended Complaint, Plaintiff seeks compensatory and punitive damages "caused by the defendant insurers' failure to satisfy" the judgment in her favor and "against their insured, Journal Register Company." *Tucker II*, Doc. 126, p. 1 (¶ 1).  As set forth below, Plaintiff alleged that after obtaining the judgment in *Tucker I*, she became a "subrogee and intended third party beneficiary under the policy . . . who possesses contractual and statutory rights to take legal action directly against the defendants to satisfy her judgment." *Id.*

On January 5, 2011, Plaintiff's unsecured claim in Journal Register's bankruptcy was reduced to $3 million in exchange for Journal Register's agreement to waive any objections to her claim in bankruptcy court. Doc. 126, p. 17 (¶ 70). With respect to *Tucker I*, Plaintiff and Journal Register entered into a Stipulated Settlement Agreement (*Tucker I*, Doc. 142-1) in which she agreed to accept $109,457.00 in exchange for providing Journal Register with a specific and general release of her claims. Moreover, as part of that agreement, Journal Register assigned all claims and rights under the 2004 Policy to Tucker, including "any and all claims against National Union, AIG and/or their or [the insured's] brokers or agents." *Tucker I*, Doc. 142-1, ¶ 7.  Journal Register expressly excluded any representation or warranty as to the viability of any claims or rights under the 2004 Policy. *Id.*, ¶ 8.

"Journal Register withdrew all post-trial motions pending in the underlying action [*Tucker I*] . . . with prejudice and agreed 'to be forever barred from prosecuting said motions or seeking to affect the Judgment in any way, including through appeal.'" *Tucker II*,  Doc. 126, ¶ 72; *see also* Doc.

7

128-2, Ex. A ("Stipulation," dated January 5, 2011), p. 5, at ¶ 4. Tucker concluded that in these circumstances, she "possesses a final judgment in the underlying action in the amount of $4 million and now stands in the shoes of the insured under the policies issued to [t]he Journal Register." Doc. 126, ¶ 73.

In this highly contested and vigorously litigated action of *Tucker II*, Defendants move the Court for summary judgment [Doc. 97], requesting the Court to enter "judgment in their favor on all counts" of the Amended Complaint.[8]  The Court resolves the motion in this Ruling.

### III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants initially moved this Court for summary judgment "in their favor on all counts contained in Plaintiff Teri Tucker's [original] Complaint." Doc. 97.  As set forth *supra*, Plaintiff filed an Amended Complaint [Doc. 126] per this Court's Order [Doc. 123].  Thereafter, Defendants filed supplemental papers, renewing their motion for summary judgment and modifying it to address the currently operative Amended Complaint.   Plaintiff filed opposition papers to Defendants' summary judgment motion, both in original and renewed form.

At present, Defendants seek judgment with respect to each of Plaintiffs' claims, including the following Counts: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) recovery as a subrogee of Journal Register under Connecticut's direct action statute, Conn. Gen. Stat. § 38a-321; (4) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"),

---

[8]  Although Plaintiff filed her Amended Complaint [Doc. 126] after Defendants filed their Motion for Summary Judgment [Doc. 97], Defendants confirmed, upon the Court's inquiry, that they would like the Court to construe their motion and supporting briefs to address the superseding Amended Complaint [Doc. 126].   Defendants thereafter filed a Supplemental Brief [Doc. 153], further supporting their motion,  with the Court's leave.  Plaintiff responded with her Supplemental Memorandum in Opposition [Doc. 155].

Conn. Gen. Stat.  § 42-110a, *et seq.*; (5) procedural bad faith ("in the handling Tucker's claim in violation of the common law of Connecticut"); and (6) equitable estoppel (to estop Defendants from "denying coverage of Tucker's claim after waiting 4.3 years after Tucker's claim was first submitted to deny coverage, and only after a substantial adverse verdict").  Defendants' overriding argument on summary judgment is that Tucker "has sued for recovery pursuant to a 2004 claims first made insurance policy that does not apply to her underlying claim."  Doc. 98, p. 1.  Specifically, Defendants argue that "Tucker's claim was first made on November 3, 2003," but "[t]he policy at issue became effective on January 12, 2004."  *Id.*  Defendants maintain that under such reasoning, if Tucker's claim against Defendants is not covered by the Policy, all of her dependent causes of action fail.

### A.        Standard for Summary Judgment

Pursuant to Federal Rule 56(a) of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See also  Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Pippins v. KPMG, LLP*, 759 F.3d 235, 239 (2d Cir. 2014).  "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright,* 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," *Sousa v. Roque,* 578 F.3d 164, 169 (2d Cir.2009) (quoting Fed. R. Civ. P. 56*). See also Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (same).

An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based upon it. *Liberty Lobby*, 477 U.S. at 248.  *See also  Benn v. Kissane,* 510 F. App'x 34, 36  (2d Cir. 2013) ("A genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'") (quoting *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009) (citation and internal quotation marks omitted)), *cert. denied*, __ U.S. __, 134 S.Ct. 78 (2013);  *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) ("A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor.") (citation omitted).  *"*[U]nsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citations omitted), *cert. denied*, 540 U.S. 811 (2003).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009). Once that burden is satisfied –  for example, by presenting documentary evidence and/or sworn affidavits –  the non-moving party must present sufficient evident to demonstrate that a reasonable fact-finder could find genuine issues of fact.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Furthermore, the nonmoving party "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (citations and internal quotation marks omitted).  The "mere of existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [him]." *Dawson v. County of Westchester*, 373 F.3d 265,

272 (2d Cir. 2004) (quoting *Liberty Lobby*, 477 U.S. at 252). *See also BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (to defeat summary judgment, "conclusory allegations or denials" will not suffice).

In ruling on a motion for summary judgment, the district court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Donnelly v. Greenburgh Cent. School Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (citation and internal quotation marks omitted). Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *accord Donnelly*, 691 F.3d at 141. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. New York Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting *Liberty Lobby*, 477 U.S. at 249).

B.    **Count One: Breach of Contract**

1.    **Defendants' Argument**

With respect to her breach of contract claim in Count One, Plaintiff alleges that Defendants' "failure to provide coverage for Tucker's claim and [to] pay Tucker's judgment is a breach of its contract with its insured, which has been the proximate cause of substantial compensatory and actual damages to Tucker." Doc. 126, ¶ 87. In moving to dismiss this claim on summary judgment, as set forth *supra*, Defendants assert that Tucker's judgment, as secured in *Tucker I*, falls outside the specified coverage of the 2004 Policy and, accordingly, Defendants' failure to pay Tucker's judgment

11

does not constitute of a breach of that policy.

With respect to Count One, Defendants emphasize that in Plaintiff's original Complaint [Doc. 1], she  " judicially admitted that the 2004 Policy 'provides coverage for the Journal Register, and its subsidiaries, on claims first made between January 12, 2004 to January 12, 2005." Doc. 98, p. 4 (quoting Doc. 1, p. 4, ¶ 9).  In support of said factual admission, Defendants cite *Ferreira v. Pringle*, 255 Conn. 330, 345 (2001), holding that "[f]actual allegations contained in pleadings upon which the case is tried are considered judicial admissions and hence irrefutable." Doc. 98, p. 4.

Defendants further argue that Tucker first made a "claim" within the meaning of the 2004 Policy when her "retained legal counsel [ Stephen P. Horner] . . . sent a factually detailed demand letter to Mr. Kevin Walsh, publisher of the New Haven Register, on November 3, 2003," alleging wrongful discharge and retaliation in violation of the Civil Rights Act of 1964 (Title VII),[9] CUTPA and public  policy.[10]  Doc. 153, p. 7,   In that letter [Doc. 154-9], Horner asserted, on behalf of Tucker, that Journal Register's "financial exposure for such violations include[d] the following: (a) reinstatement of [Tucker], or front pay; (b) payment of all lost back wages to [Tucker]; (c) reimbursement for lost fringe benefits; (d) payment of [Tucker's] attorney's fees; and (e) punitive damages." *Id.*, p. 4.  Horner also  instructed Walsh to contact him regarding Tucker's claims "within two weeks of the date of this letter;" otherwise, if Horner and Walsh were "unable to resolve this

---

[9]   In  the November 3, 2003 Letter, Tucker's counsel wrote "Title VII of the Civil Rights Act of *1965*." Doc. 154-9, p. 2 (emphasis added).  The actual year of the statute is 1964.

[10]   Thereafter, on March 2, 2004, Plaintiff filed a  Complaint with CHRO and EEOC. On May 4, 2004, her attorney followed up with a written settlement demand addressed to Journal Register's General Counsel, seeking $95,000 in exchange for a release of her claims.  Journal Register's insurance broker sent National Union notice of Tucker's administrative filings on May 13, 2004.  Doc. 100 (Defendants' Statement of Facts), ¶ 18.

matter, [Tucker] ha[d] authorized [Horner] to file administrative complaints with [the] CHRO and EEOC." *Id.* The letter concluded with the statement that "[i]n exchange for a severance package," Tucker would be willing to "provide a full release of liability and agree to maintain the terms of the agreement as fully confidential." *Id.*, p. 5.

Defendants stress that pursuant to the 2004 Policy, coverage was "generally limited to liability for *only those claims that* [were] *first made against the insureds during the policy period* and reported in writing to the insurer pursuant to the [Policy's] terms." Doc. 153, p. 8 (quoting Doc. 100-2 (2004 Policy, "Notice" in preamble), p. 30, para. 1) (emphasis in original). The "Policy Period," as explicitly defined, was from "January 12, 2004 to January 12, 2005." Doc. 153, p. 8 (quoting Doc. 100-2, p. 30 ("Declarations," Item 3). Moreover, the 2004 Policy specified that it would "pay the Loss of each and every Insured arising from a Claim first made against such Insured during the Policy Period . . . and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Employment Practices Violation." Doc. 153, p. 8 (quoting Doc. 100-2, p. 34 ("Insuring Agreements," ¶ 1)). Under the Policy's listed definitions, a "claim" included, *inter alia*, "a written demand for monetary or non-monetary relief." Doc. 153, p. 9 (quoting Doc. 100-2, p. 34, ¶ 2(b)).[11] Furthermore, the policy elaborated that "[a] Claim shall be considered to have been first

---

[11] Under the 2004 Policy, a "claim" also included:

a civil, criminal, administrative or arbitration proceeding for monetary or non-monetary relief which is commenced by:

(i)    service of a complaint or similar pleading; or
(ii)   return of an indictment (in the case of a criminal proceeding); or
(iii)  receipt of a filing of a notice of charges.

Doc. 100-2, p. 34 ("Definitions," ¶ 2 (b)(2)).

made against an Insured *when written notice of such Claim is received by any Insured,* by the Company on behalf of any Insured or by the Insurer, whichever comes first."  Doc. 153, p. 8-9 (quoting Doc. 100-2, p.  40, (Section 7 at Endorsement No. 8)) (emphasis added).

Defendants also stress that pursuant to Section 18 of the Policy, with respect to actions against National Union, as the "insurer," "no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy . . . " Doc. 100, p. 9-10 , ¶ 38 (citing Doc. 100-2, p. 47 (¶ 18, "Action Against Insurer")).  Defendants further point to an email sent by Tucker's counsel on March 11, 2009 in the Journal Register East bankruptcy proceedings when he was  "seeking a copy of the 2004 Policy and agreement to obtain relief from the [bankruptcy] stay to pursue Journal Register's  claim for coverage against National Union."  Doc. 100, p. 11, ¶ 40.    In that email, Tucker's counsel, Jed Horwitt, wrote to Journal Register's counsel:  "We understand that there are coverage issues and I assume the client may be concerned about having blown coverage.  That is something we can work on together." Doc. 100-22 (email from Jed Horwitt, Esq., counsel for Tucker, to Shaunna D. Jones, Wilkie Farr & Gallagher LLP, Mar. 11, 2009).

In sum, according to Defendants, Tucker "sued for recovery pursuant to a 2004 *claims first made* insurance policy that does not apply to her underlying claim."  Doc. 98, p. 1.  She allegedly first made her claim on November 3, 2003, but the policy at issue became effective on January 12, 2004.  *Id.*  Therefore, Defendants maintain that her claim, having predated the applicable policy period, fell outside of it.  *Id.; see also* Doc. 153 (Defendants' Supplemental Memo), p. 9-19.

2.    **Plaintiff's Argument**

Plaintiff responds that her claim should not be precluded because the "November 2003 letter does not satisfy the narrow definition of 'Claim' in the Policy." Doc. 143, p. 1.  She emphasizes that the 2004 Policy defines a "claim" as "[a] written demand for monetary or non-monetary relief," Doc. 143-1, § 2(b), and   distinguishes such language from that of Conn. Gen. Stat. § 38a-327-1(a), defining "claim" to include "[w]ritten notice of any action or omission of the insured, or of any incident, alleged to have caused injury that the insured is legally obligated to pay, whether or not constituting a legal complaint." Doc. 143, p. 16-17. In making such a distinction, she contends that Defendants "indirectly prompt the Court to import the definition of 'claim' from an extraneous source;" and in so doing, "they violate the settled principles of insurance contract construction." *Id.*, p. 1.

In arguing that the November 3, 2003 Letter [Doc. 154-9] does not constitute a claim, she concedes that the letter was "obviously . . . from an attorney," but points out that "it contains no 'demand for monetary or equitable relief,' which is what is required be the unambiguous language of section 2(b) of the Policy." Doc. 143, p. 15.  "[I]nstead," she claims, the letter merely "offers or proposes to release Tucker's claims in exchange for severance." *Id.*   "[I]t does not demand any amount of money or equitable relief such as reinstatement" and "invites a discussion of settlement." *Id.*  In sum, Plaintiff contends that the letter was a "proposal" rather than a "demand." *Id.*, p. 23.[12]

In further support of her argument, Plaintiff cites a Fourth Circuit case, *SNL Financial, LC v. Philadelphia Indemnity Insurance Company*, 455 F. App'x 363 (4th Cir. 2011), which Plaintiff

---

[12] Plaintiff repeats her argument  that  the  November 3, 2003  Letter does not constitute a "claim" within the meaning of the Policy in her Supplemental Memorandum in Opposition to Defendants' summary judgment motion.  Doc. 155, p. 2.

contends "strongly supports [her] position that the November 2003 letter was not a 'claim' as defined by the [2004] policy." Doc. 155, p. 3. Specifically, Plaintiff asserts that the Court in *SNL* found that "two letters from an attorney discussing 'certain discriminatory conduct'" made no demand for money or equitable relief and therefore were not "claims" within the meaning of the relevant policy. *Id.*, p. 4.

Tucker asserts that her claim was actually first made when her counsel "filed her CHRO/EEOC charge in May 2004 and the Journal Register gave notice of it." Doc. 155, p. 2. That administrative filing occurred during the 2004 Policy Period; and Defendants acknowledged notice of her claim on June 1, 2004. *Id.*

Alternatively, Plaintiff argues that even if the Court finds that the November 3, 2003 Letter constituted a "claim," her action should not be precluded because Defendants should not be allowed to "play 'gotcha' by claiming that they should have first heard about Tucker's potential claim in November 2003, instead of May 2004 (while never complaining about this fact for seven years after receiving notice)." Doc. 155-1, p. 20.

Tucker points to the fact that "Journal Register continued to renew the Policy with National Union every year from 2000 through 2008." *Id.*, p. 20. She asserts that "[c]ourts have recognized that successive renewals of an insurance policy make an insurer's claims of late notice much less persuasive on claims which span, or are claimed to span, the renewal dates of two given policy years." *Id.* (citing *Cast Steel Products, Inc. v. Admiral Ins. Co.*, 348 F.3d 1298, 1304 (11th Cir. 2003)) (holding that it is "illogical and inequitable to deny coverage to the insured who chooses to renew its claims-made policy for successive years with the same insurer" – especially where the claim was made "mere hours after expiration" of one policy and during the period when the next

policy became effective)), *cert. denied*, 541 U.S. 1071 (2004)).

Lastly, Plaintiff argues that Defendants should be estopped from now claiming "late notice" because they have twice previously affirmed that the 2004 Policy was the correct policy under which to adjust Tucker's claims, especially when they were in receipt of the November 3, 2003 Letter long before making their statements that the claim is not covered.[13]  Doc. 155-1, p. 24.

### 3.  **Analysis**

Pursuant to Connecticut law, "[i]t is the function of the court to construe the provisions of the contract of insurance." *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 351 (2001) (citation and internal quotation marks omitted).  Moreover, "[a]n insurance contract is interpreted under ordinary common-law contract principles," and courts must "give effect to the intent of the parties as expressed in the clear language of the contract." *MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011) (quoting *Morgan Stanley Grp., Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)); *accord Griswold v. Union Labor Life Ins. Co.*, 186 Conn. 507, 442 A.2d 920, 923 (Conn. 1982).  When a contract's terms are  unambiguous, the plain meaning of those terms will control. *Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co.*, 259 Conn. 527, 545 (2002).  "If the words in the policy are  plain and unambiguous . . . the language, from which the intention of the parties is to be

---

[13]   Plaintiff makes much of the fact that National Union referenced the 2004 Policy as the applicable policy on repeated occasions, including during Journal Register's bankruptcy proceeding. Doc. 143, p. 10, 26; Doc. 143-2, Ex. 3, p.3.  However, an insurer's statement that a policy may be the relevant policy is not equivalent to an admission of liability on a particular claim and/or that no defenses exist to that claim.  The parties do not dispute that Journal Register first notified Defendants of Tucker's claim in May of 2004.  Because all of the policies between Journal Register and Defendants were claims made policies with 30-day notice provisions, given the May 2004 date on which notice was given to the insurers (after the 2003 Policy expired), the 2004 Policy was the only one under which Journal Register might recover.

deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." *Id.* (citation omitted). *See also Jurrius v. Maccabees Mut. Life Ins. Co.*, 587 F.Supp. 1301, 1304-05 (D.Conn. 1984) ( 1984) ("insurance policies must be construed as a whole, taking all of their relevant provisions together," reading "the policy language as a layman," without "tortur[ing] words to import ambiguity" where none exists) (citations and internal quotation marks omitted).

Moreover, "[e]ach and every sentence, clause, and word of a contract of insurance should be given operative effect. Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction. . . ." *Buell Indus., Inc.,* 259 Conn. at 539 (citation and internal quotation marks omitted); *accord Downs v. Nat'l Cas. Co.*, 146 Conn. 490, 495 (1959) (in interpreting an insurance contract, the Court has a duty to give each provision "effect, if possible" so that "no word or clause [should be] eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it").

In addition, an insurance policy "must be read pursuant to the law existing when [the insurance contract was] entered into . . . because it is presumed that the parties bargained with each other on the basis of existing law." *Aetna Cas. & Sur. Co. v. Lighty*, 3 Conn. App. 697, 701 (1985) (citations omitted).[14]

---

[14] In that regard, Defendants emphasize that, in their view, the 2004 Policy's definition of "Claim" comports with the definition of "Claim" that appeared in the Connecticut Insurance Department Regulations when the 2004 Policy was created. Doc. 153, p. 11-12; *see also* Conn. Agencies Regs. § 38a- 327-1(a)(2009) (defining "Claim" as "written notice of any act or omission of the insured, or of any incident, alleged to have caused injury or damage that the insured is legally

Perhaps most importantly with respect to this case, when interpreting insurance contracts, federal courts have consistently recognized the fundamental distinction between "claims made" and "occurrence" policies.  With respect to this distinction, the United States Supreme Court noted that "[i]n place of [the] traditional 'occurrence' trigger of coverage," insurers may desire "a 'claims made' trigger, obligating the insurer to pay or defend only those claims made during the policy period." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 771 (1993).   "Such a policy has the distinct advantage for the insurer that when the policy period ends without a claim having been made, the insurer can be certain that the policy will not expose it to any further liability." *Id.*

In *Checkrite Ltd., Inc. v. Illinois Nat'l Ins. Co.,* 95 F.Supp.2d 180, 191 (S.D.N.Y. 2000), Judge Sweet elaborated usefully upon the distinction between "claims made" and "occurrence" policies:

> The nature of a claims-made policy is that it protects the insured for claims made against it and reported to the insurer within the policy period or, if applicable, the extended reporting period. Thus, an insured under a claims made policy knows in advance that there is an applicable date that cuts off claims. This is in contrast to an 'occurrence' policy, which protects the insured from liability for acts committed during the policy period regardless of when claims arise based on those acts.
>
> The existence of a cut-off date is integral to a claims-made policy, as it is a distinct characteristic of such a policy that directly relates to rate setting. The insurer is afforded greater certainty in computing premiums, since it does not need to be concerned with the risk of claims filed long after the policy period has ended, and as a result the insured may benefit from lower premiums.

This Court offered the same analysis in *Amer. Home Assur. Co. v. Abrams*, 69 F.Supp. 2d 339, 346 (D.Conn. 1999) (Goettel, J.) ("The essence of a claims-made policy is notice to the carrier within the

---

obligated to pay, whether or not constituting a legal complaint.").  In Defendants' view, under such a definition, Tucker's November 3, 2003 Letter would constitute a "claim." Doc. 153, p. 12.  The Court, however, examines the specific definition of "claim" within the policy at issue.

policy period. Such a policy has the distinct advantage for the insurer of providing certainty that, when the policy period ends without a claim having been made, the insurer will be exposed to no further liability. The insurer can better set 'reserves' for potential losses.") (internal citation omitted).

In a "claims made" policy, the insurer's limited obligation to cover only those claims made during the policy period is "material" to the parties' agreement – in fact, "the essence of the insurance agreement which permits insurers to rationally estimate appropriate reserves and thus allow lower rates on insurance." *ITC Invs., Inc. v. Emp'rs Reinsurance Corp.,* No. CV98115128, 2000 WL 1996233, at *14 (Conn. Super. Ct. Dec. 11, 2000). It thus follows that "[c]laims made policies are generally cheaper; the insurer trades a reduced coverage period and the ability to 'close the book on an account' in exchange for lower payments." *Bepko v. St. Paul Fire & Marine Ins.* Co., No. 3:04–CV1996 (PCD), 2006 WL 2331076, at *8 (D.Conn. Aug.10, 2006). "Claims made policies can be especially useful in more complicated insurance situations where damages may not appear for some time." *Id.* Moreover, "Connecticut has no statute prohibiting or limiting claims made policies." *Id.* [15]

Connecticut courts have enforced the plain language of claims first made policies to hold there is no coverage when the claim is made before the operative date of the policy. *ITC Invs.*, 2000 WL 1996233, at *12; *City of New London v. Gen. Star Indem. Co.*, No. 532435, 1995 WL 684792, at *2-3 (Conn. Super. Ct. Nov. 13, 1995) (denying coverage for employee's claim made one month

---

[15]    Claims made policies enable insurance companies to "calculate risks and premiums with greater exactitude since the insurer's exposure ends at a fixed point," which "may result in lower rates for the insured." *Zuckerman v. Nat'l Union Fire Ins. Co.*, 100 N.J. 304, 313 (1985).

before effective date of claims first made policy).[16]   The sole issue in such cases is whether the claim was "first made" during the effective policy period, so that the insurer need not prove resulting prejudice from the timing of the claim.   Put simply, if the claim falls outside the policy period, coverage is precluded.   Under such circumstances, "[c]overage is not being denied because of failure to give prompt notice of a claim withing the policy period.   Coverage is being denied because the claim was made before the effective date of the policy which is a predicate to any issue of notice of the claims under this type of policy."   *ITC Invs.*,   2000 WL 1996233, at *12.

In *ITC Investments, Inc. v. Employers Reinsurance Corporation*, a Connecticut court summarized, as follows:

> The court has read scores of cases involving claims made policies and brief descriptions of hundreds in ALR articles, Am. Jur. sections and various commentaries. The court could not find any case where, it having been posited that a claim was made before the effective date of the policy period – as the court has concluded here – coverage was allowed or the matter even discussed on the basis of some notion that the insurer should still cover the claim because it would not be prejudiced in its ability to contest it. Why is that? The simple answer is that would be converting a "claims made" policy into an "occurrence" policy and the insured not having bargained for such coverage or paid the premium is not entitled to it.

2000 WL 1996233, at *14.

Moreover, the "only roughly analogous problem arises in  cases where in claims made

---

[16]  In *City of New London*, the court explained as follows:

> The NOTICE filed by Jetmore was "notice of a claim" within the meaning of . . . the insurance contract.  Therefore, since this NOTICE was a filed by Jetmore on June 1, 1993, *one month before the effective date of the policy*, and since this NOTICE was a "claim" within the meaning of the terms of the policy, the defendant is not obligated to indemnify the plaintiff nor provide legal services to it in regards to the civil action subsequently filed by him.

1995 WL 684792, at *3.  The Court thus concluded "the defendant was not obligated to provide any coverage." *Id.*, at *1.

policies the act of negligence for example occurs during the policy period or a retroactive period, a claim or suit is brought within the policy period but the claim is not reported to the insurer until after the effective date of the policy period." *ITC Invs.,* 2000 WL 1996233, at *14.   Under those circumstances, the insured often argues that coverage should exist due to the "so-called notice/prejudice rule to the effect that the breach of a policy provision by an insured cannot provide a valid defense to the insurer unless the insurer substantially was prejudiced by the breach." *Id.* (citing *Burns v. Int'l Ins. Co.,* 929 F.2d 1422, 1424 (9th Cir. 1991)).   However, "[t]he *Burns* court and every other court this writer could find have held that *the so-called notice/prejudice rule does not apply to claims made policies* in this situation." *ITC Invs.,* 2000 WL 1996233, at *14 (emphasis added) (collecting cases). "The application of the prejudice rule here would negate the purpose of the claims made policy by creating insurance coverage for which the parties did not contract." *ITC Invs.*, 2000 WL 1996233, at *14 (quoting *Brumfield v. Shelton*, 831 F.Supp. 562, 566 (E.D. La. 1993)).

In the case at bar, the 2004 Policy is, as Defendants assert, a "claims made" policy on its face. Pursuant to section 1, outlining the "Insuring Agreements," the parties agreed that the 2004 "policy shall pay the Loss of each and every Insured arising from *a Claim first made* against such Insured during this Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Employment Practices Violation."[17] Doc. 100-2,

---

[17]   Under the Discovery clause, if the insurer cancels or fails to renew the Policy, the insured "shall have the right to a period of either one, two or three years following the date of cancellation or nonrenewal upon payment [of the premium]. . . in which to give the Insurer written notice of Claims first made against the Insureds during [the] applicable Discovery Period for any Employment Practices Violation occurring prior to the end of the Policy Period and otherwise covered by this policy." Doc. 100-3, p. 43. This clause does not apply in the case at bar, where Defendants did not cancel or fail to renew Journal Register's 2004 Policy and the alleged violation

p. 34 (emphasis added).  Consistent with those Insuring Agreements, under section 5, the "Limit of

Liability" under the policy is defined as the "limit of the Insurer's liability for all Loss arising out of

*all Claims first made* against the Insureds during the Policy Period."  Doc. 100-2, p. 40 (emphasis

added).  The "Policy Period" is clearly delineated as "From: January 12, 2004 To:  January 12, 2005."

*Id*. (Item 3 of "Declarations"), p. 30.    Those dates appear throughout the Policy, denoting its

effective dates.

A "Claim," for the purposes of this Policy, is explicitly defined by the Policy itself, which

provides in pertinent part:

> 2.  DEFINITIONS . . . .
>
>> (b)  "claim" means:
>>
>>> (1) a written demand for monetary or non-monetary relief
>>> (including any request to toll or waive any statute of
>>> limitations); . . .

*Id*. at p. 34.  Such "[a] Claim shall be considered to have been *first made* against the Insured when

written notice of such Claim is received by any Insured, by the Company on behalf of any Insured

or by the Insurer, whichever comes first."  *Id.* (section 7), p.  40 (emphasis added).

The Court finds that the relevant terms of the 2004 Policy are plain and unambiguous.  The

language of these provisions, from which the intention of the parties is to be deduced, must be

accorded its natural and ordinary meaning.  The Court must therefore  give effect to the intent of the

parties as expressed in the language of the policy.  I find that it is clear from the terms of the

aforementioned sections that the parties intended to create a "claims made first" policy.  In sum, the

Defendants agreed to cover liability under the 2004 Policy only if a claim was first made against the

was not "otherwise covered" by the Policy in that it occurred outside the policy period.

insured Journal Register during the policy period of January 12, 2004 to January 12, 2005.  Any claim made before January 12, 2004 would  fall outside the policy.

Furthermore, under the Policy, as Defendants assert, one instance when a claim was "first made" was when the Insured received a written notice of  a demand for monetary or non-monetary relief.  A layman's interpretation of demand would be a request for something.  A claim under the policy would thus include, for example, a demand letter from a party seeking recovery against the Insured.

In the case at bar, on  November 3, 2003, when Tucker's then-attorney, Stephen Horner, penned a letter to Kevin Walsh, in his capacity as "Publisher, New Haven Register," that letter contained multiple characteristics of a "demand" letter in that it clearly set forth an urgent request.  Specifically, the letter  detailed Tucker's  alleged claims against her employer in written form and requested a severance package, "[i]n exchange [for which she would] provide a full release of liability" for the claims. *See* Doc. 154-9, p. 4-5.  In essence, that letter constituted "a written demand for monetary or non-monetary relief"  – a "claim" as that term is defined in the 2004 Policy. *See* Doc. 100-2 (2004 Policy), p. 34.

The Court has duly considered  Plaintiff's argument that the November 3, 2003 Letter is not a "claim," as defined by the 2004 Policy because no "demand" for monetary or equitable  relief was made.  However, the Court is unpersuaded by that argument.  In the common parlance of a layman, a "demand" is "a forceful statement in which [one] say[s] that something must be done [for] or given to" that person. *See*   http://www.merriam-webster.com/dictionary/demand.   Other common definitions of "demand" include "to ask for with proper authority; claim as a right," and "to inquire"

or "ask for peremptorily or urgently."[18] *See* www.dictionary.com.  Clearly, in the case at bar, in the

November 3, 2003 Letter, Plaintiff's attorney set forth Tucker's legal position and essentially

demanded, by implication, payment of a severance package to avoid administrative action, which

Horner declared he was "authorized" by his client to file after two weeks.   There can be no other

reasonable interpretation of that letter.[19]

Construing the language of the 2004 Policy "in accordance with the parties' intent, as derived

from the plain and ordinary meaning of the policy's terms," *Allstate Ins. Co. v. Quito*, No.

3:06cv1671 (PCD), 2007 WL 2221163, at *3 (D.Conn. Aug. 2, 2007), the Court concludes that the

November 3, 2003 Letter constituted a "claim" under the Policy.[20] That letter was in written form,

listed all of the ways in which Tucker's employer was allegedly subject to "financial exposure" for

its actions, provided a two-week period within which the Journal Register could contact her attorney

to "resolve the matter" or otherwise be subject to CCHRO and EEOC claims, and finally specified

Plaintiff's chosen means of resolution:  a "severance package."  Although the word "demand" was

not explicitly used, there can be no mistake that Plaintiff, through her counsel, imposed a two-week

_____

[18]   At law, a "demand" is defined as "[t]he assertion of a legal or procedural right."
Black's Law Dictionary (9th ed. 2009).  Moreover, a "demand letter" is "[a] letter by which one party
explains its legal position in a dispute and requests that the recipient take some action (such as
paying money owed), or else risk being sued."  *Id.*

[19]   Plaintiff also suggests that the November 3, 2003 Letter did not constitute a claim, as
did the letter in *City of New London*, 1995 WL 684792, because the letter was not entitled "Notice
of Intent to Sue."  Such a label is not, however, determinative or necessary where the content of the
letter indicates the intention to sue should the recipient fail to comply with the stated demands – *i.e.*,
to agree  to pay a monetary severance package within two weeks.

[20]   Plaintiff's  arguments  regarding the "*contra proferentem* doctrine" are moot in that the
Court does not find the definition of "claim" in the 2004 Policy to be "ambiguous in relation to the
November 2003 letter" – "*i.e.*, susceptible of 'two equally responsible interpretations.'" Doc. 143, p.
22.

period within which her employer could agree to provide an acceptable "severance package" or else she would file administrative claims.[21]

In interpreting whether a letter constitutes a demand, and thus a "claim," in the insurance context, courts have repeatedly recognized that a letter need not expressly demand payment to constitute a "demand letter." *See, e.g., Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1393, 78 Cal. Rptr. 3d 264 ( 2008) (letter to employer constituted a claim under liability insurance policy because although that letter "did not expressly demand payment or refer to any specific amount, its meaning was clear that, absent some form of negotiated compensation, [employee] would commence a lawsuit"); *Richardson Electronics, Ltd. v. Federal Ins. Co.*, 120 F. Supp. 2d 698, 701 (N.D. Ill. 2000) ("A claim is a demand for something due. A demand for money is not required for a claim").

Furthermore, Plaintiff's supplemental authority of *SNL Financial, LC v. Philadelphia Indemnity Insurance Company*, 455 F. App'x 363, 368 (4th Cir. 2011), is factually distinguishable from the present case.   SNL Financial, LC ("SNL") contracted with Philadelphia Indemnity

---

[21] Plaintiff also argues that her request for severance cannot be a demand because she was already entitled to severance as a telemarketing employee and Journal Register's telemarketing department was outsourced in 2006.  Doc. 143, p. 19.  Had she continued working at the New Haven Register until the outsourcing, "Tucker would have received severance." *Id.*  Kevin Walsh, publisher of the New Haven Register, in fact "testified in the underlying case that severance . . . was paid to employees who lost their positions as a result of outsourcing."  *Id.*, n.12.  Plaintiff was, however, terminated in 2003 so that at the time Horner wrote the November 3, 2003 Letter, the telemarketing employees had not lost their jobs due to outsourcing or become entitled to severance.

Furthermore, a legal demand, by its very nature, is made for something to which one claims entitlement by right.  Severance is, by definition, "[m]oney (apart from back wages or salary) paid by an employer to a dismissed employee . . . in exchange for a release of any claims that the employee might have against the employer."  Black's Law Dictionary (9th ed. 2009).  In mentioning "severance" as the requested resolution, Plaintiff's counsel, Horner, is suggesting that there must be money paid to release Tucker's alleged claims.

Insurance Company ("Philadelphia") to cover losses SNL sustained for "claims" involving employment actions during the stated policy period of August 1, 2007 to August 1, 2008. The policy was a claims made policy and defined "claim" as: "1. a written demand for monetary or non-monetary relief; [ or] 2. a judicial or civil proceeding commenced by the service of a complaint or similar pleading." *SNL Fin., LC*, 455 F. App'x at 365. The policy was renewed by SNL and Philadelphia for August 1, 2008 to August 1, 2009.

In January 2008, SNL received two letters from an attorney, Schwartz, representing a former employee, Greenberg, whom SNL had discharged. In those letters, Schwartz "request[ed] to meet with SNL representatives" to "pursue a possible amicable resolution of the issues" that "occurred during the course of [Greenberg's] employment with [SNL], including its [sic] termination." *Id.* "In neither of his two letters did Schwartz threaten litigation or make a demand, monetary or otherwise, that SNL resolve any potential lawsuit." *Id.* at 365-66.

On October 3, 2008, Greenberg filed a complaint against SNL in a New York state court, asserting causes of action for age and employment discrimination. SNL received a copy of the complaint by mail on October 20, 2008, and notified Philadelphia of the complaint on October 27, 2008. After receiving said notice, Philadelphia sent a letter to SNL disclaiming any duty to defend SNL against Greenberg's lawsuit, and declining to pay for either SNL's defense or for any damages assessed against it. Philadelphia based its decision on SNL's alleged failure to provide Philadelphia with timely notice of Greenberg's "claim" under the 2007 policy and SNL's alleged failure to disclose the existence of pending litigation when the 2007 policy was renewed in August 2008. *Id.* at 366.

SNL then filed a declaratory judgment action against Philadelphia in Virginia state court; and the action was removed to the United States District Court for the Western District of Virginia. The

parties filed cross motions for summary judgment.  The court granted SNL's motion and denied Philadelphia's motion.  *Id.* at 367.

On appeal to the Fourth Circuit, Philadelphia argued, *inter alia*, that the district court erred by concluding that SNL did not receive notice of a "claim" when it received Schwartz's two letters requesting a meeting to discuss Greenberg's grievances in January 2008.  *Id.*  Philadelphia asserted that Greenberg's claim was first made when SNL received those letters and thus Philadelphia was entitled to notice of the claim within the terms of the 2007 policy – "as soon as practicable," but "no later than 60 days after the expiration date of the policy."  *Id.* at 365.

The Fourth Circuit affirmed the district court's ruling in favor of SNL, as follows:

> [W]e disagree [with Philadelphia] that Schwartz's letters in January 2008 contained "written demand[s] for monetary or non-monetary relief." In these letters written on Greenberg's behalf, Schwartz: 1) refers to "certain discriminatory conduct" that purportedly occurred during Greenberg's employment with SNL; 2) states a "desire" to meet with SNL's representatives to "discuss" the issues, with a "hope" of arriving at an "amicable resolution"; and 3) requests that a SNL representative contact Schwartz to arrange such a meeting. These statements do not include a "demand" for any relief, either monetary or non-monetary. Therefore, we conclude that neither letter sent by Schwartz in January 2008 contained a "claim," as that term is defined in the policy.

*Id.* at 366.[22]

---

[22] In the *SNL* case, in addition to the letters by Greenberg's counsel, there was also a draft, unsigned complaint by Schwartz on behalf of Greenberg, which SNL's counsel, Gibbons, requested to see upon learning about its existence.  Schwartz "refused to send Gibbons a copy of the draft complaint, and declined Gibbons' request that Schwartz 'present [him] with a demand that [Gibbons] would take to' SNL."  455 F. App'x 363, 366.  Schwartz later allowed a friend of Gibbons to come to his office and review the draft complaint.   The Fourth Circuit held  that, like the two attorney letters,  the unsigned complaint did not constitute a written demand for monetary or non-monetary relief  because "[t]he draft complaint was unsigned, and Schwartz had refused to transmit a copy of the draft to SNL." *Id.* at 368. "Most significantly, however, Schwartz had refused [Gibbons's friend] Clark's request that Schwartz make a demand, explaining that he was not prepared to do so because Schwartz was waiting for a report from Greenberg's doctor. Schwartz's statement to Clark thus expressly disavowed any suggestion that the unsigned draft complaint was intended as a 'written demand for

In the case at bar, as discussed *supra*, the November 3, 2003 Letter was more direct and accusatory in tone than the SNL letters.  Attorney Horner stated outright that he had "met with [his] client regarding the circumstances leading up to her recent discharge" and concluded that her discharge "was in violation of the law." Doc. 154-9, p. 2.  He thus listed the "claims" she could pursue.  *Id.*  Specifically, Journal Register had "financial exposure" for a list of "violations" from its  treatment of Tucker, including its "outrageous and pretextual act of discharging [her] because her testimony would not help the Company's defense" in an unrelated sexual harassment matter.  *Id.*, p. 4.  Horner stated that if he did not hear from Journal Register "within two weeks of the date of this letter," he was authorized to "file administrative complaints with the CHRO and EEOC." *Id.*  Horner concluded by specifying that "a severance package" would suffice for Tucker to "provide a full release of liability" and "to maintain the terms of the agreement as fully confidential."  *Id.* at 4-5.  All in all, the message was clear – agree within two weeks to a severance package or face administrative action.  Unlike in *SNL*, this letter was not a mere overture or attempt to discuss issues during Tucker's employment.  It was a thinly veiled ultimatum, a prelude to litigation.[23]

Furthermore, because the  letter was delivered to the New Haven Register, a subdivision of the insured Journal Register, on November 3, 2003, it constituted a claim "first made" on that date

---

monetary or non-monetary relief.'" *Id.*  In other words, unless a demand is presented by the claimant, the existence of a draft demand cannot be viewed as a claim.

[23]  The Court notes that, when interpreting  the nature, character or purpose of a particular communication, one may not always be able to state a hard-line rule as to, for example, what language is necessary to constitute a "demand."  As Justice Stewart famously remarked, concurring in *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) that a particular movie was not "obscene": "I shall not today attempt further to define the kinds of material I understand be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so.  But I know it when I see it."  In the case at bar, after reading the November 3, 2003 letter of Plaintiff's attorney to her then employer, I am compelled to say that I know a demand when I see it.

– *i.e.*, a written notice of a claim   "received by any Insured, by the Company, on behalf of any Insured or be the Insurer, whichever comes first."[24]  Doc. 100-2, p. 40.  As in factually similar cases, the November 3, 2003 Letter was intended to warn Journal Register, the insured,  that Tucker claimed she was entitled to damages and/or other relief and intended to file an action to recover unless Journal Register complied with her request for severance.  Put simply, the letter issued an ultimatum – provide the monetary relief sought or face litigation.  Journal Register received clear notice of a claim in that  letter; and such a demand was the type of claim contemplated by the policy. *See, e.g., City of New London*, 1995 WL 684792, at *3.

Because that claim was first made in November 2003 – before the effective "Policy Period" – on the face of the 2004 Policy, Defendants are not obligated to indemnify Tucker with respect to the judgment she obtained in *Tucker I*.  There is no provision for coverage of claims outside of the Policy Period.

With respect to Plaintiff's argument that her claim against the insurers should be allowed because "Journal Register continued to renew the [EPL]Policy with National Union every year from 2000 through 2008," Doc. 143, p. 20, each individual policy, although a renewal, had its own Policy Period within which claims could be filed.  Had Plaintiff  provided notice of her November 2003 claim to the Defendants within the specified notice period of the 2003 Policy, that claim might have been covered by that policy.[25]  Once the 2003 Policy (and any specified grace period) terminated, the

---

[24]     At the top of the November 3, 2003 Letter, Horner indicated that his letter was sent to Walsh "By regular mail and Email: kwalsh@journalregister.com."  Because email is delivered instantaneously, or at the worst within minutes, Walsh would have had access to the letter on the date it was sent – "November 3, 2003."

[25]     Journal Register's broker provided Defendants with notice of Plaintiff's claim in May of 2004, four months after the notice period for the 2003 Policy closed.

insurers were entitled to rest assured that claims from prior years were no longer covered after the reporting period ended. Otherwise, unknown "claims first made" months or years before the renewal policy would result in "gotcha" coverage by the insurers, who had relied on the "claims first made" provisions to calculate the risks they would be undertaking with each policy. With that understanding, they calculated policy premiums.[26]

Similarly, Plaintiff's equitable argument regarding late notice misses the mark. In that argument, Plaintiff focuses on the fact that Journal Register renewed its Employment Practices Liability Policy with Defendants over a period of successive years. She thus asserts that "[c]ourts have recognized that successive renewals of an insurance policy make an insurer's claims of late notice much less persuasive on claims which span, or are claimed to span, the renewal dates of two given policy years." Doc. 143, p. 20. In support, Plaintiff cites *Cast Steel Products, Inc. v. Admiral Insurance Company*, 348 F.3d 1298, 1304 (11th Cir. 2003). However, the court's holding in *Cast Steel Products* pertained to *extension of a notice period* for a claim, which the Court found existed through ambiguous policy terms. In that case, the insured brought a declaratory judgment action against the insurer, seeking a declaration that the insured's claims-made professional liability policies covered a defective product claim that accrued at the conclusion of one policy period but was not reported until the start of the renewal policy period. The insurer received summary judgment from the district court because the claim was not made and reported during the same policy year; but the Court of Appeals for the Eleventh Circuit reversed, holding that there was ambiguity in the particular

---

[26] Otherwise, if renewing a claims first made policy every year expanded the policy period to cover all previous policy years, the rate of the premiums would certainly increase substantially from one year to the next as the policy period would effectively double, triple, quadruple, etc. Such a practice would destroy the insurer's intention behind making a claims first made policy – to be able to limit its liability to specified term of coverage.

policies as to whether a 30-day extension of the reporting period – in effect if the policy was not renewed or canceled – also existed if the policy was renewed. Consistent with established common law in the applicable state of Florida, the court construed the ambiguity in the insurance policy "in favor of the insured so as to not deny coverage." 348 F.3d at 1300. The insured would thus receive coverage *under the expired policy.*[27]

In the case at bar, Plaintiff seeks recovery under the 2004 Policy, not the expired 2003 Policy.[28] Under the 2004 Policy, no ambiguity exists regarding the requisite reporting period. In the 2004 Policy, notice of a claim may be given "anytime during the Policy Period or during the Discovery Period (if applicable)" or "within 30 days after the end of the Policy Period or the Discovery Period (if applicable), *as long as such Claim is reported no later than 30 days after the date such Claim was first made* against the Insured." Doc. 100-2, p. 41 (emphasis added).

Even assuming *arguendo* that the 2003 Policy contained the same notice provisions as the 2004 Policy, the latest an insured could provide notice to the insurer under such a policy was 30 days

---

[27]   In *Cast Steel Products,* the Court held that the language of the insurance policies at issue was "ambiguous" as to whether coverage extended from one renewal policy to the next in a "seamless" fashion, 348 F.3d at 1301. In particular, the series of renewal policies in that case allowed the insured 30 days to provide notice of a claim after the expiration of each policy in the event the insured chose to cancel or not renew the policy; but the policies made no mention of the existence of the 30-day extended reporting period if renewal occurred, which gave the impression that coverage under the policies was seamless in renewal situations. Where, the Plaintiff's "claim was reported to [the Insurer] *mere hours after* the expiration of the [relevant] Policy, and during a time period in which the [next] Policy had become effective," the court interpreted the contract's ambiguous terms in favor of the insured to recognize an implied 30-day extended reporting period to allow the claim to proceed. *Id.* at 1304 (emphasis added). Nonetheless, the *Cast Steel Products* court made clear that its holding regarding a grace period was appropriate "particularly in the scenario we are faced with here" – where the reporting period terms were ambiguous – and not with respect to all claims made policies where renewals occur. *Id.*

[28]   *See, e.g.,* Doc. 155, n. 2 ("it is correct that Tucker's claim lies under the 2004 renewal of the EPLI policy"). *See also* n. 33 herein, *infra*.

after the claim had first been made.[29]  Interpreting such extended notice provisions in Tucker's favor, Journal Register would have had no more than 30 days after November 3, 2003 – until December 3, 2003 – to report Tucker's claims to National Union and/or AIG.

As Plaintiff concedes, Journal Register first gave Defendants notice of Tucker's claim in May of 2004, when "Tucker filed her CHRO/EEOC charge in May 2004 and the Journal Register gave notice of it."  Doc. 155, p. 2.[30]  At that time, the Journal Register, through its insurance broker Marsh USA, Inc., provided AIG with notice of the claim by mentioning Tucker's March 2004 CHRO Complaint and the 2004 Policy (No. 729-15-12).  Doc. 100-17, p. 2 (letter from Marsh broker, Douglas S. Worth, to Keith Zinsley, AIG Claim Technical Services, dated May 13, 2004).  At that point, the  2004 Policy had already been in effect for four months – since January 12, 2004 – and more than six months had elapsed since Tucker's then-attorney, Horner, sent the November 3, 2003 Letter to Journal Register – *i.e,* since the claim was first made.  Doc. 100, ¶ 18; Doc. 100-2, Ex. B. (¶¶ 19-20).  The May 2004 notice of the claim to National Union was late under the 2003 Policy, occurring well after its expiration and more than 30 days after the November 3, 2003 Letter.

Unlike in *Cast Steel Products*, where the insured sought extension of an expired policy

---

[29]    As set forth *supra,* under the 2004 Policy, notice of a claim  "shall"  be given to the insurer at "anytime during the Policy Period" or "within 30 days after the end of the Policy Period . . . as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured."  Doc. 100-2, p. 40-41 (¶ 7).   The parties have not focused on the terms of the 2003 Policy, but it is possible, and perhaps even likely, that it mirrored the 2004 Policy with respect to its notice provisions.

Nonetheless, Tucker herself has made no suggestions that her claim is covered by any extended reporting period provided by a 2003 policy.  Rather, she repeatedly states that she is seeking relief under the 2004 Policy.

[30] *See also* Doc. 143, p. 4 ("It is not disputed that Journal Register gave notice of Tucker's CHRO and EEOC charge of discrimination against Journal Register in May 2004.").

during which claims had been made, Plaintiff seeks recovery under a policy that did not yet exist at the time her claim was made.  The ruling of *Cast Steel Products*, which is in any event not binding upon this Court, is inapposite.  Tucker has consistently asserted that the 2004 Policy is the relevant policy for coverage of her claim.  That claim, however, was first made *before* the 2004 Policy became effective on January 12, 2004.  Under such circumstances, her claim fails.  The  parties contracted for the claims first made  coverage provided in the 2004 Policy; and the insured is entitled to no more and no less coverage.

Lastly, with respect to Plaintiff's argument that  Defendants should be estopped from now claiming "late notice," the Court finds that the equitable arguments of estoppel and waiver do not bear on such a claims first made policy.  "The requirement that claims be reported within a specified time period is 'the trigger for coverage' under a claims-made policy, not a defense to existing coverage, and cannot be waived."  *Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co.*, 95 F.Supp. 2d 180, 190 (S.D.N.Y. 2000) (citing *Calocerinos & Spina Consulting Eng'rs, P.C. v. Prudential Reinsurance Co.*, 856 F.Supp. 775, 780 (W.D.N.Y.1994)).  "[W]here the issue is the existence or nonexistence of coverage (*e.g.*, the insuring clause and exclusions), the doctrine of waiver is simply inapplicable."  *Checkrite Ltd.,* 95 F.Supp. 2d at 190  (quoting *Calocerinos*, 856 F.Supp. at 780).

Furthermore, even if, assuming *arguendo,* estoppel were applicable in this context, "estoppel always requires proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury." *Union Carbide Corp. v. Danbury*, 257 Conn. 865, 873 (2001) (internal quotation marks omitted.).  Here, Defendants argue that "[b]efore this lawsuit was filed

neither Tucker [n]or Journal Register ever disclosed that her claim was first made in 2003."  Doc. 153, p. 2; *see also id.*, p. 7;  Doc. 154-10, Ex. I (Affidavit of Elizabeth M. Mahoney, attesting to fact that "[i]n response to a subpoena issued by EAPD [law firm Edwards Angell Palmer & Dodge, LLP] on behalf of the defendants, Journal Register East Inc. produced business records").  Consequently, Defendants argue that prior to *Tucker II*,  they did not know Tucker's claim was first made in 2003 and thus fell outside the coverage of the 2004 Policy.

Plaintiff, on the other hand, argues that Defendants are incorrect as to when they learned of the November 3, 2003 Letter.  She asserts that "it is indisputable that AIG had notice of the letter no later than September 3, 2008;" and that it is likely, based on facsimile transmission stamps, that AIG actually received the November 3, 2003 Letter as an enclosure with the May 13, 2004 letter from Marsh to AIG, notifying AIG of Tucker's claim.  Doc. 143, p. 24-25.

Despite this factual dispute between the parties as to when Defendants obtained the November 3, 2003 Letter, there is no indication in the record that Defendants intentionally misled Tucker to believe her claim was covered under the 2004 Policy.   Moreover, there is no indication that Defendants' erroneous affirmation that the 2004 Policy was the applicable policy caused Tucker to change her position.  Rather, her position has always been, as it is today, that her claim is covered by the 2004 Policy.[31]

---

[31]   Plaintiff also points out that Journal Register repeatedly represented to Tucker in its Initial Disclosures in *Tucker I* (No. 3:06-CV-307) that "it had . . . insurance against which Tucker could recover if her claims were successful."  Doc 143, p. 11 (citing Doc. 143-6, Ex. 16).  An insured's statements to an eventual subrogee regarding viability of coverage are not, however, binding on the insurers.  In fact, the Stipulation into which Plaintiff and Journal Register entered in *Tucker I* explicitly excluded any representation or warranty as to the viability of any claims or rights under the 2004 Policy, referenced in the preamble of the Stipulation (para. 4) as "Employment Practices Liability Policy No. 729-15-02."  *See Tucker I*, Doc. 142-1, ¶ 8.

Moreover, "[i]t is the burden of the person claiming the estoppel to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge." *Prudential Prop. & Cas. Ins. Co. v. Anderson*, 101 Conn.App. 438, 447 (2007) (citation and internal quotation marks omitted)*, cert. denied*, 283 Conn. 911 (2007).  In the case at bar, the plain language of the 2004 Policy was accessible to Journal Register and thereafter to Tucker's counsel.  With due diligence, Tucker and/or her counsel could have ascertained that it was a "claims made" policy with a set policy period.[32]  In light of the November 3, 2003 Letter drafted by her own counsel, Tucker could have determined when her claim was first made.  Instead she continued to assert that the 2004 Policy covers her claim despite its unambiguous provisions regarding the policy period.  She cannot then claim that Defendants are estopped from asserting these provisions because she had "no convenient means of acquiring that knowledge."

---

[32] As Defendants argue, the record reflects the possibility that Tucker's counsel was aware that there was an issue as to whether the 2004 Policy covered Tucker's claim when, before commencing this action and shortly after Journal Register filed for bankruptcy, Tucker's counsel wrote to Journal Register's General Counsel:  "We understand that there are coverage issues and I assume the client may be concerned about having *blown coverage*.  That is something we can work on together."  Doc. 100-22 (email from Jed Horwitt, Esq. to Shaunna Jones of Wilkie, Farr & Gallagher, dated March 11, 2009) (emphasis added).

Plaintiff refutes Defendants' interpretation of that email, arguing that "[a]t the time [Tucker's bankruptcy counsel] authored this email in March 2009, he had just been retained and was brand new to the case. He had virtually no information about the status or validity of Tucker's claim, including whether there was an policy, whether it covered punitive damages, whether notice had been given, or whether the premiums had been maintained."  Doc. 143, p. 32-33.  *See also* Doc. 143-14 (Affidavit of Jed Horwitt), p. 3 (¶ 6) ("[O]n March 11, 2009, neither my firm nor I held any opinion regarding the enforceability of insurance coverage under the EPLI Policy - or even knowledge of what coverage issues in the case were, let alone a conclusion that coverage had been 'blown.' I was concerned, based on Mr. Peikes' in-court statements that there was an issue with the coverage and AIG's denial of coverage, that the Journal Register itself might have concerns that it had 'blown' coverage.").

With respect to waiver, that term is defined as "the intentional relinquishment or abandonment of a known right or privilege." *Rosado v. Bridgeport Roman Catholic Diocesan Corp.*, 292 Conn. 1, 57-58 (2009).  As set forth *supra*, insurers cannot waive their  "claims made" provisions because the necessity to file one's claim in a claims made policy is the "triggering event" to coverage, not merely a term of the policy.  *Checkrite Ltd., Inc.*, 95 F.Supp. 2d at 190.

Finally, in general, it is well established that waiver and estoppel "are not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom." 1 A.L.R.3d 1139, at § 2[a] (Orig. pub. 1965). "The theory underlying this rule seems to be that the company should not be required by waiver and estoppel to pay a loss for which it charged no premium, and the principle has been announced in scores of cases involving almost every conceivable type of policy or coverage provision thereof." *Id.* Coverage for claims made outside the policy period is not included in a claims made policy and hence no premium has been charged for such claims.  *See, e.g., Cambridge Mut. Fire Ins. Co. v. Sakon*, 132 Conn.App. 370, 383-84 (2011) ("In the insurance context . . . it has been recognized that a contract, under the guise of waiver, [may not] be reformed to create a liability for a condition specifically excluded by the specific terms of the policy. . . . This limitation on the applicability of waiver to an insurance contract recognizes that because waiver requires the relinquishment of a known, and therefore existing, right within the insurance contract, a party cannot create through waiver coverage for a claim that the parties expressly had excluded from that contract." ) (citing *Heyman Assocs. No. 1 v. Ins. Co. of Pennsylvania*, 231 Conn. 756, 777 (1995)).

Plaintiff asserts that Defendants were dilatory in failing to detect and/or state that the 2004 Policy was not the correct policy under which to adjust Tucker's claims.  Nonetheless, there is no

evidence that the Defendants intentionally sought to mislead Tucker with respect to her claims. As set forth, *supra*, Tucker's counsel, who obtained possession of the 2004 Policy could have read its terms and taken notice of its "claims made" character and applicable policy period. Tucker cannot therefore claim that she relied on the Defendants' reading of the 2004 Policy to her detriment. Rather, she relied on her counsel to interpret the contract and the evidence and to take the appropriate legal action, if any.

Tucker's judgment in *Tucker I* falls outside the coverage of the 2004 Policy, under which she seeks recovery.[33] Accordingly, Defendants' failure to pay that judgment does not, as a matter of law, constitute a breach of the 2004 Policy with Journal Register. Summary judgment will be entered for Defendants as to Count One, breach of contract.

## C.    <u>Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Under Connecticut law, "[i]t is axiomatic that the duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.,* 281 Conn. 227, 240 (2007). As the Connecticut Supreme Court articulated:

> [E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.

---

[33] As Defendants note in their Supplemental Memorandum [Doc. 153], Tucker indicated repeatedly in the pleadings that she seeks recovery under the 2004 Policy, to which she also refers as "the Policy." *See* Doc. 153, p. 5; Doc. 126 (Amended Complaint), ¶¶ 35, 47-50, 80, 82, 93, 99, 104, 110, 114.

*Renaissance Mgmt. Co.*, 281 Conn. at 240 (citation and internal quotation marks omitted).

To establish a valid "bad faith" claim, a party must prove: "(1) two parties entered into a contract from which the plaintiff reasonably expected a benefit, (2) the defendant's actions denied or obstructed the plaintiff's expected benefit of the bargain, and (3) the injurious actions were the product of the defendant's bad faith." *Royal Indem. Co. v. King*, 532 F. Supp. 2d 404, 414 (D. Conn. 2008) (quoting *Owen v. Georgia-Pacific Corp.*, 389 F.Supp.2d 382, 393 (D.Conn.2005), *aff'd sub nom.*, *Arrowood Indem. Co. v. King*, 699 F.3d 735 (2d Cir. 2012).   "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *De La Concha of Hartford, Inc.*, 269 Conn. 424, 433 (2004) (citation, internal quotation marks, and ellipsis omitted).

Recently the Connecticut Supreme Court further clarified that "because the covenant of good faith and fair dealing only requires that neither party to a contract do anything that will injure the right of the other to receive the benefits of the agreement, it is not implicated by conduct that does not impair contractual rights." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 795 (2013) (citation, internal quotation marks, and brackets omitted).   In so holding, the Connecticut Supreme Court reasoned that "[t]he covenant of good faith and fair dealing presupposes *the terms and purpose of the contract* are agreed upon by the parties and that what is in dispute is a party's *discretionary application or interpretation of a contract term*." *Id.* (citation omitted) (emphasis in original).   "Because bad faith actions require the denial of benefits under the policy, [the court] must analyze the plaintiffs' proposed cause of action based on the actual terms of the insuring agreement."

*Id.* at 796.  Unless there is an alleged failure to provide a contractually mandated benefit, there is no

viable bad faith claim.  *Id.*  Put simply, "[t]he implied duty of good faith and fair dealing is 'a purely

instrumental duty intended to protect insureds' rights to receive their policy benefits." *Id.* at 796-97

(quoting D. Richmond, "Bad Insurance Bad Faith Law," 39 Tort Trial & Ins. Prac. L.J. 1, 18 (2003)).

  In sum, "[a] bad faith cause of action not tied to duties under the insurance policy must

therefore fail as a matter of law." *Capstone*, 308 Conn. at 797; *see also Heyse v. Case*, 114

Conn.App. 640, 652 (2009) (no bad faith liability when defendant did not "[impair the plaintiff's]

right to enforce any benefits to which she was entitled under [the] policy"), *cert. denied*, 293 Conn.

905 (2009).

  In the case at bar, with respect to Count Two, Plaintiff has alleged the following: the "Journal

Register Company and the defendants entered into a contract which conferred a benefit on the

Journal Register Company;" the "defendants acted in such a way as to injure the Journal Register's

benefits under the Policy;" the "defendants['] acts and omissions in its [sic] handling of Tucker's

claim, *i.e.,* its [sic] failure to investigate, failure to make a timely coverage determination for more

than four years, and failure to pay, were intentional, willful, and reckless, were without any

reasonable justification, and were undertaken in bad faith to avoid responsibility for paying any

amount on her claim, after just having accepted a $220,000 premium and an additional premium for

punitive damages coverage." Doc. 126, ¶¶ 89-91.  Tucker further alleges that she "has a contractual

right to sue the defendants under the terms of the Policy;" and that she "is a subrogee and an intended

third party beneficiary of the Policy." *Id.*, ¶¶ 92-93.

  As set forth in Part III.B.3., *supra*, Tucker's contract claim falls outside the 2004 Policy.

Therefore, the portion of her claim regarding Defendants' "failure to pay" must necessarily fail.  As

Tucker herself notes, her contractual right to sue Defendants arises under the terms of the 2004 Policy and as a subrogee of Journal Register.  Accordingly, she has no greater rights than Journal Register to recover for Defendants' failure to pay.  *See Connecticut Sav. Bank of New Haven v. First Nat. Bank & Trust Co. of New Haven*, 138 Conn. 298, 305 (1951) ("A subrogee can obtain no greater rights against a third person than its subrogor had."); *see also Southland Corp. v. Self*, 36 Conn.Supp. 317, 319 ( Conn. Super. Ct. 1980) ("An insurer, as subrogee or assignee of claims of its insured, stands in the insured's shoes and is subject to any and all defenses which are available against the insured had he brought suit in his own name."); *accord Allstate Ins. Co. v. Appell*, 39 Conn. Supp. 85, 86-87 (Conn. Super. Ct. 1983).

Tucker's claim was first made via the November 3, 2003 Letter that her then-counsel Horner sent to Journal Register.  Doc. 154-9, Ex. H, p. 2.  Consequently, her claim is not encompassed by the 2004 Policy.  There is no genuine issue of material fact as to whether Defendants have acted in bad faith in failing to pay her claim.  They cannot be liable for lack of payment on a claim not covered by the policy so there has been no substantive bad faith.

As to Tucker's allegations regarding failure to investigate and failure to make a timely coverage determination, neither investigation nor the timing of payment are express terms in the 2004 Policy. These alleged duties do not arise under any specific  provisions under the Policy.

In particular, with respect to investigation, the Connecticut Supreme Court directly held that, as in "the majority of jurisdictions to consider the matter," Connecticut law "would also disallow independent actions for bad faith investigation."[34]  *Capstone*, 308 Conn. at 799.  Put simply there

---

[34]  In *Capstone*, the District Court for the Northern District of Alabama certified three questions to the Connecticut Supreme Court, the second of which was: "Can an insurer's bad faith conduct in investigating an insurance claim provide a basis for a cause of action for bad faith under

must be a violation of "express duties" under the contract for a party to maintain a bad faith cause of action.[35]  Therefore, "[u]nless the alleged failure to investigate led to the denial of a contractually mandated benefit," a plaintiff has "not raised a viable bad faith claim."[36]  *Id.* at 796.

The Courts of this District have recognized the impact of the Connecticut Supreme Court's holding in *Capstone*. In *Country Club of Fairfield, Inc. v. New Hampshire Ins.* Co., No. 3:13-CV-00509 (VLB), 2014 WL 3895923, at *7 (D. Conn. Aug. 8, 2014), Judge Bryant, considering the question of "whether claims handling misconduct not involving wrongful withholding of payment due under an insurance policy may constitute bad faith," observed that "it is unclear to this Court whether such a claim may be maintained in light of the Connecticut Supreme

---

Connecticut law?"  *Capstone,* 308 Conn.  at 764.  The Connecticut Supreme Court responded that under the "plain language of the insurance policy," it would not recognize a cause of action based on "the insurer's failure to conduct a discretionary investigation." *Id.*

[35]   This holding essentially eliminates the  possibility of  "procedural bad faith," as  it was previously contemplated by this District in   *United Technologies Corp. v. American. Home Assurance*, 118 F.Supp.2d 181 (D.Conn. 2011).

[36]   In  *Capstone*, the Connecticut Supreme Court clarified, however, that failure to properly investigate a claim may comprise evidence of bad faith in the event that said failure *led to violation of a contractual duty – i.e.*,  the wrongful denial of a claim.  308 Conn. at 801. The court explained as follows:

> [A]n insurer's failure to conduct an adequate investigation of a claim . . . when accompanied by other evidence, reflecting an improper motive, properly may be considered as evidence of . . . bad faith. As a technical matter, failure to investigate a claim is not a cause of action in itself. Rather, it is evidence of bad faith, which may entitle an insured to additional damages, beyond the recovery of the benefits due under the insurance policy, if the insurer denies the claim. That is, failure to investigate is evidence of an unreasonable denial of a claim. Consequently, although not actionable separate from the bad faith denial of a substantive benefit, an insurer's investigation will often be key evidence in a bad faith cause of action.

*Id.* (citations and internal quotation marks omitted).

Court's decision in *Capstone.*" *See also Ridley v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 3:11 CV 1713 (WWE), 2014 WL 3687739, at *2-3 (D. Conn. July 22, 2014) (recognizing that "[a] bad faith cause of action not tied to duties under the insurance policy must . . . fail as a matter of law") (quoting *Capstone*, 308 Conn. at 797); *Chorches v. Stewart Title Guar. Co.*, No. 3:13-CV-01182 (JAM), 2014 WL 4494240, at *5 (D. Conn. Sept. 10, 2014) ("the underlying covenant of good faith and fair dealing in a contractual relationship 'is not implicated by conduct that does not impair contractual rights;'" therefore, "because plaintiff has failed to show that [the insured] did not receive any benefits to which he was entitled under the title policy, his bad faith claim fails by equal measure") (citing and quoting *Capstone*, 308 Conn. at 795) (emphasis added).

In the case at bar, there is no genuine dispute regarding the material facts with respect to Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  There are no contractual terms set forth  in the 2004 Policy regarding method and/or timing of investigation of claims, communication by the insurer to the insured, or how/when the insurer must close the file on an insurance claim.  Accordingly, absent breach of a duty *under the contract* (*e.g.*, wrongful denial of a covered claim), there can be no viable bad faith claim based on deficient conduct in any of these areas.  The underlying covenant of good faith and fair dealing in a contractual relationship simply "is not implicated by conduct that does not impair contractual rights," *Capstone*, 308 Conn. at 795. Plaintiff's claim in Count Two must be dismissed.[37]

---

[37]     Although Plaintiff alleges in Count Two that "Defendants acted in such  a  way as to injure Journal Register's benefits under the Policy," she has not and cannot demonstrate that Defendants have "avoid[ed] responsibility for paying . . . her claim," Doc. 126, ¶¶ 90-91, where her claim falls outside the policy.  Her other allegations, regarding "failure to investigate" and "failure to make a timely coverage determination," are not sufficient to independently sustain "bad faith" causes of action under *Capstone*.

**D**.      **Count Three: Claim as Subrogee under Connecticut's Direct Action Statute, Conn.
Gen. Stat. § 38a-321**

In Count Three, Plaintiff seeks to recover under Connecticut's direct action statute, Conn.

Gen. Stat. § 38a-321, stepping into the shoes of Journal Register as subrogee and judgment creditor

in the underlying action against Journal Register. Doc. 126, ¶¶ 97-100. Plaintiff further alleges that

"[t]he defendants' failure to pay the judgment has been the proximate cause of substantial

compensatory and actual damages to [her]." *Id.*, ¶ 101.

Even if Tucker is a judgment creditor subrogated to Journal Register's rights against

Defendants, the direct action statute does not confer upon Tucker any greater or lesser rights than

the insured Journal Register would have to recover under the 2004 Policy. As this Court has

previously stated, under the direct action statute, the injured party "steps into the shoes" of the

insured and thus has the same rights as that party. *See Brown v. Employer's Reinsurance Corp.*, 206

Conn. 668, 673  (1988) (under Connecticut's direct action statute, the injured party "obtains no

different or greater rights against the insurer than the insured possesses and is equally subject to any

defense the insurer may have against the assured under the policy.") (collecting cases).

Here, damages arising from Tucker's alleged wrongful termination are not covered by the

2004 Policy, as a consequence of the timing of when her claim was first made. That lack of coverage

precludes Tucker's subrogation claim. Confronted by a subrogee, the Defendant insurers are entitled

to assert all defenses that would be available to them in defending a direct action brought against

them by an insured. "[T]he mere fact that a statute authorizes the injured person to bring a direct

action does not permit recovery where the accident or injury is not within the coverage of the policy."

*Steinhoff v. Travelers Indem. Co. of Illinois,* No. 558937, 2002 WL 1573353, at *4 (Conn. Super.

Ct. June 18, 2002) (quoting Couch on Insurance 3d, Vol. 7, § 106.10, p. 106-21). "This is a

universally accepted proposition." *Steinhoff*, 2002 WL 1573353, at *4. "Although the insured can make such settlements as his (sic) interests require, such a settlement is not conclusive upon the insurer which still has a right to be heard on the question of policy coverage . . . ." *Id.* (quoting John A. Appleman, *Insurance Law and Practice*, Rev. Vol. 7C, § 4690, p. 235).

As the court in *Steinhoff* explained, "the coverage question is a separate question both analytically and  as a policy issue from the separate consideration of whether abstractly speaking § 38a-321 actions should be allowed where there has been a stipulation by an insured assigning the claim against it to the plaintiff claimants who can then proceed under the statute against the insurer." 2002 WL 1573353, at *4. "In other words, it is a truism guaranteed by the insurer's right to due process that: The claimant, in a direct action (against the insurer) has no superior right to compensation such that recovery should be allowed for a loss which is not caused by a risk which the insurer and insured agreed to have covered by the policy." *Id.* (quoting Couch on Insurance 3d,  Vol. 7, § 106.10, p. 106-21).

In the absence of coverage under the 2004 Policy, the insured, Journal Register, would not be able to recover from its insurers for any payment the insued incurred as the result of Tucker's claim.  Tucker, as subrogee, has no greater rights than Journal Register to recover from the Defendant insurers.  Accordingly, Tucker's claim pursuant to Connecticut's direct action statute must fail.

### E.    Count Four:  Violation of Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.*

In Count Four of the Amended Complaint, Plaintiff alleges violations of numerous subsections of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-

816(6), by way of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110a, *et seq.* Specifically, Plaintiff alleges that the Defendants' "acts and omissions" in handling her claim violated CUIPA in that Defendants "failed to properly investigate the facts surrounding Tucker's claim, failed to conduct a timely or thorough investigation of the facts, failed to make any coverage determination for more than four years, and only after an adverse jury verdict against its insured . . . [and] outright refused to even participate in the alternative dispute resolution procedures specified in the Policy itself." Doc. 126, ¶¶ 103-04. Tucker further asserts that she "may bring a private right of action against the defendants for the identified CUIPA violations pursuant to the Connecticut Unfair Trade Practices Act." *Id.*, ¶105. Lastly, she alleges that Defendants' CUIPA violations "have been the proximate cause of substantial compensatory and actual damages to [her], entitling her to recover treble and other punitive damages, in addition to satisfaction of her judgment." *Id.*, ¶ 106.

In the world of private litigation, the CUTPA and CUIPA statutes have a significant but not entirely understood interaction. CUTPA prohibits the use of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b. CUIPA defines "unfair methods of competition" as applied to the insurance trade. Conn. Gen.Stat. § 38a-815. "Connecticut courts generally do not recognize a private cause of action under CUIPA;" however, "violations of CUIPA may be alleged as a basis for a CUTPA claim." *Royal Indem. Co. v. King*, 532 F.Supp. 2d 404, 410 (D. Conn. 2008)(quoting *Bepko v. St. Paul Fire & Marine Ins. Co.*, No. 3:04 CV 01996 (PCD), 2005 WL 3619253, at *3 (D. Conn. Nov. 10, 2005)), *aff'd sub nom., Arrowood Indem. Co. v. King*, 699 F.3d 735 (2d Cir. 2012).

In other words, a plaintiff may assert a private cause of action based on a substantive

violation of CUIPA through CUTPA's enforcement provision. *See, e.g.*, *Belz v. Peerless Ins. Co.*, No. 3:13–CV–01315 (JCH), __ F.Supp.2d __, 2014 WL4364914, at *5 (D.Conn. Sept. 2, 2014)*; Karas v. Liberty Ins. Corp.*, No. 3:13CV01836 (SRU), 2014 WL 3579524, at *4 (D. Conn. July 21, 2014) (citing *McCulloch v. Hartford Life and Acc. Ins. Co.*, 363 F.Supp.2d 169, 181 (D.Conn. 2005) and *Mead v. Burns*, 199 Conn. 651, 663 (1986)).[38] *See also Bepko*, 2005 WL 3619253, *3 ("[J]ust as CUTPA is dependent on CUIPA for substantive content, CUIPA is dependent on CUTPA for enforcement by private parties.") (citation and internal quotation marks omitted); *O&G Indus., Inc. v. Travelers Prop. Cas. Corp.*, No. CV010084433S, 2001 WL 1178709, at *1 (Conn. Super. Ct. Sept. 7, 2001) (a "plaintiff may not bring a cause of action under CUTPA based on conduct which does not also violate CUIPA where the alleged misconduct is related to the insurance industry")(citation omitted).[39]

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat.§ 42-110b(a). The statute creates a private cause of action for "any person who suffers any ascertainable

---

[38] Connecticut's Supreme Court has expressly recognized "the existence of a private cause of action under CUTPA to enforce alleged CUIPA violations." *Mead v. Burns*, 199 Conn. 651, 663 (1986).

[39]   "Whether a CUIPA violation is a private cause of action in and of itself separate from CUTPA has not been decided by [Connecticut's] appellate courts." *Riether v. Mesa Underwriters Specialty Ins. Co.*, No. CV146046729S, 2014 WL 4413584, at *3 (Conn. Super. Ct. July 30, 2014). Therefore, "[w]hether CUIPA allows a private cause of action independent of CUTPA remains an open question." *H & L Chevrolet v. Berkley Ins. Co.*, 110 Conn.App. 428, 441 n. 7 (2008). Because Tucker has expressly alleged a CUIPA violation through CUTPA in Count Four, this Court will not not address whether CUIPA by itself provides a private cause of action for individual claimants.

loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice. . ." Conn. Gen. Stat. § 42–110g(a). "[T]o prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, 'as a result of' this act, the plaintiff suffered an injury." *Royal Indem. Co.*, 532 F. Supp. 2d at 411 (quoting *Abrahams v. Young & Rubicam*, 240 Conn. 300, 306 (1997)). "The language 'as a result of' requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff." *Abrahams*, 240 Conn. at 306.

The CUIPA statute defines "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." Conn. Gen. Stat. § 38a–816. In addition to proving a particular violation under the defined "unfair" practices in CUIPA, a plaintiff must show, with respect to "[u]nfair claim settlement practices," that Defendants were "committing or performing" said unfair practices "with such frequency as to indicate a general business practice. . . ." Conn. Gen. Stat. § 38a-816(6).[40]   Therefore, "[t]he plaintiff must show more than a single act of insurance misconduct; isolated instances of unfair settlement practices are not sufficient to establish a claim. *Karas*, 2014 WL 3579524, at *4.  *See also Royal Indem. Co.*, 532 F.Supp.2d at 411 ("In requiring proof that the insurer has engaged in unfair claim settlement practices with such frequency as to indicate a general business practice, the legislature has manifested a clear intent to exempt from coverage under CUIPA isolated instances of insurer misconduct.")(quoting *Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 849 (1994)); *Exantus v. Metro. Prop. & Cas. Ins. Co.*, 582 F. Supp. 2d 239,

---

[40]  *See also  Davis v. Globe Life and Acc. Ins. Co.*, No. 3:12–CV–01583 (VLB), 2013 WL 5436907, at *6 (D.Conn. Sept. 27, 2013) ("Unfair claim settlement practices constitute a CUIPA violation when they are '[c]ommitt[ed] or perform[ed] with such frequency as to indicate a general business practice.'") (quoting Conn. Gen. Stat. § 38a-816(6)).

249-50 (D. Conn. 2008) (granting summary judgment for defendant insurer on CUIPA/CUTPA claim because even assuming *arguendo* the defendant insurer "committed unfair business practices with respect to [the plaintiff's] claim, there is no evidence in the record suggesting that [the insurer] ha[d] committed similar violations with respect to other claims"  – *i.e.*, no evidence "sufficient enough to establish a claim under CUIPA as a matter of law").

In the case at bar, Tucker alleges that "[t]he defendants, by their actions, have violated subsections (a), (b), (c), (d), (e), (f), (g),(m) and (n) of Section 38a-816 of CUIPA."[41]   Doc. 126, ¶ 104. Those provisions include:    "(a) [m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (b) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; (c) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (d) refusing to pay claims without conducting a reasonable investigation based upon all available information; (e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (f) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;" "(m) failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions

---

[41]  Connecticut General Statute § 38a-816 consists of 22 subsections and various subparts. As the late District Judge Dorsey once noted, "[e]ach subsection pertains to specific and unique behavior that, if proven, would amount to individual violations of the statute." *Bepko,* 2005 WL 3619253, at *4.

of the insurance policy coverage;" and "(n) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." Each of these allegations relates to Defendants' conduct in handling, investigating and settling Tucker's claim.[42]

With respect to an alleged "business practice," *i.e.*, similar unlawful conduct with respect to other insurance claimants, Plaintiff asserts the following:

> [Defendants'] acts and omissions . . . are part of a pattern and regular business practice of AIG and its subsidiaries of accepting millions of dollars in premiums, but failing to investigate or properly administer claims; closing claims files without determining coverage or communicating with the insured (a practice known as "parking" claims); attempting to impose extra-contractual obligations on insureds through letters in order to fabricate grounds to deny coverage; delaying or refusing to make coverage determinations for months, or even years, thereby enriching itself financially while misleading insureds into believing that claims are covered; attempting to shift responsibility for claims away from itself and onto its insureds;

---

[42]    With respect to the level of specificity required in pleading a "general business practice," one Connecticut Superior Court noted:

> "A split of authority exists regarding the degree of specificity required when pleading a general business practice under CUIPA to survive a motion to strike." *Wirth v. Progressive Casualty Ins. Co.*, Superior Court, judicial district of New Britain, Docket No. CV 09 5012844 (February 14, 2010, Swienton, J.) (49 Conn. L. Rptr. 211, 212); *see Afifi v. Standard Fire Ins. Co.*, Superior Court, judicial district of New Haven, Docket No. CV 11 6017083 (October 21, 2011, Zoarski, J.T.R.) (acknowledging split). "One line of cases ... requires that the plaintiff plead specific facts to demonstrate acts of insurer misconduct that go beyond the plaintiff's immediate claim . . . . However, other Superior Courts have held, essentially, that as long as the plaintiff alleges that the insurer misconduct involves other insureds, pleading specific instances of such misconduct is not required." (Citations omitted.) *Wirth v. Progressive Casualty Ins. Co., supra*, 212–13.

*Katz v. Hartford Fin. Servs. Grp., Inc.*, No. CV116020408S, 2012 WL 2149405, at *3 (Conn. Super. Ct. May 11, 2012).

In the case at bar, Defendants do not address the specificity of the CUIPA allegations in their summary judgment motion so the Court will not address this issue.

and refusing to honor alternative dispute resolution terms in its policies, forcing insureds or claimants to either (i) sue and incur burdensome costs and attorney's fees, or (ii) drop legitimate claims to avoid costs and fees.

Doc. 126 (Amended Complaint), p. 2.

In support of these allegations, Plaintiff lists ten legal actions against AIG and/or its subsidiaries in which she alleges there were "allegations or findings of untimely coverage determinations, abandonment of the insured, pretextual reasons for denying coverage, fraud, and failure to investigate." *Id.*, ¶ 54.   She also asserts that "[f]ormer AIG claims supervisors have alleged in other litigation that AIG and its wholly-owned subsidiaries have used a variety of stratagems to deny or delay claims, including locking checks in a safe until claimants complained, delaying payment of attorney fees until they were a year old, disposing of important correspondence during routine 'pizza parties,' routinely fighting claimants for years in court over mundane claims, defending claims solely to delay payment, and obstructing the discovery process." *Id.*, ¶ 54.

As I will demonstrate *infra*, these statutory claims on behalf of Plaintiff Tucker are not adequately addressed by the briefs of counsel on this motion for summary judgment.  Much of the discussion in this sub-Part III.E. is based upon the Court's independent research.

I begin the present analysis with the observation that although the insurance claim Tucker asserts against the Defendant insurers,  while she stands in the shoes of the insured Journal Register, fails because the claim falls outside the coverage of the 2004 Policy, that is not determinative on the viability of Tucker's claims under CUIPA by way of CUTPA.  In *Lees v. Middlesex Ins. Co.*, 219 Conn. 644, 653 (1991), the Connecticut Supreme Court stated  that in a CUIPA/CUTPA action, the insurer's duty arises not from the terms of the private insurance agreement, but from the statutory duty not to engage in unfair business practices.  The *Lees* court reasoned:

51

In an action on an insurance policy, the conduct giving rise to the insurer's liability is a failure to pay out the policy proceeds when the insurer is contractually bound to do so. The factual inquiry focuses on the nature of the loss, the coverage of the policy and whether the parties have complied with all of the terms of the policy. In a CUIPA and CUTPA claim, however, the insurer's liability is ordinarily based on its conduct in settling or failing to settle the insured's claim and on its claims settlement policies in general. The *factual inquiry focuses*, not on the nature of the loss and the terms of the insurance contract, but *on the conduct of the insurer*. Furthermore, in an action "on [the] policy," the insurer's duty to comply with the policy provisions stems from the private insurance agreement and is contractual in nature. In a CUIPA and CUTPA claim, the *insurer's duty stems* not from the private insurance agreement but *from a duty imposed by statute.*

219 Conn. at 653 (emphasis added).

To state a valid claim under CUIPA/CUTPA, a plaintiff must allege: (1) that the insurer engaged in an unfair insurance practice as defined under CUIPA, and (2) that he or she was proximately harmed by the insurer's procedural bad faith. *Royal Indem. Co.*, 532 F. Supp. 2d at 413 (D. Conn. 2008). Tucker has pled both such factors. For example, she alleges that Defendants failed to investigate her claim. In particular, she asserts that AIG failed to contact Journal Register to gather information and placed the claim on "inactive" status within 90 days after Douglas Worth of Marsh, USA, wrote to Keith Zinsley of AIG, on May 13, 2004, informing AIG that Tucker had filed a CHRO complaint. Doc. 143, p. 5; Doc., 143-2, Ex. 2, p. 5 (Response 5.) Plaintiff further asserts that "[t]here are no notes in the claim file showing that Meghan McConville, or any other AIG employee, ever placed any phone calls, requested any documents, attempted to schedule any interviews, sent any follow up letters, made any coverage determination, or made any other attempts to contact the insured before the file was closed in March 2005." Doc. 143, p. 5-6; Doc. 143-7, -8, & -12, Exs. 7, 8, & 12. In sum, she asserts that there remain genuine issues as to whether Defendants' conduct in handling Tucker's claim constituted unfair insurance practices under

CUIPA/CUTPA.[43]

Plaintiff further asserts that Defendants' "violations of CUIPA have been the proximate cause of substantial and actual damages to Tucker." Doc. 126, p. 23 (¶ 106). For example, throughout her complaint, she alleges that she incurred "attorneys' fees and costs" in pursuing payment and/or settlement under the 2004 Policy.

The Court has held *supra* that there is no contractual coverage for Tucker's claim under the 2004 Policy. However, the Connecticut Supreme Court has repeatedly held that adherence with contract terms is not the general focus of CUIPA/CUTPA. *See, e.g.*, *Heyman Associates No. 1 v. Ins. Co. of State of Pa.*, 231 Conn. 756, 790 (1995) ("We have previously recognized that CUTPA and CUIPA claims both 'ordinarily involve different factual inquiries' and that 'the duties ordinarily associated with them derive from different sources' than claims that rely instead on an underlying insurance contract.") (quoting *Lees v. Middlesex Ins. Co.*, 219 Conn. 644, 653 (1991)).[44] The insurer's liability is based on its conduct in settling or failing to settle insureds' claim and on the insurer's claims settlement policies in general.[45]

---

[43] The parties also dispute whether Defendants customarily engage in a general practice of mishandling investigations and/or settlement of insureds' claims.

[44] *See also Alsharabi v. State Farm Ins. Co.*, No. 51 79 95, 1992 WL 98154, at *1 (Conn. Super. Ct. Apr. 29, 1992) ("Plaintiff's CUIPA and CUTPA claims arise, not from the insurance contract, but rather from the alleged violation by the defendant-insurer of a duty imposed upon it by the Connecticut legislature.").

[45] The Court notes that there have been two unpublished opinions by Connecticut Superior Courts dismissing CUTPA/CUIPA claims where the defendant had no liability under the policy at issue. *See Rancourt v. Allstate Ins. Co.*, No. CV065001222, 2008 WL 5255560, at *3 (Conn. Super. Ct. Dec. 1, 2008) ("since the defendant had no obligation to pay under the policy, the defendant could not have violated CUIPA or CUTPA"); *Wright v. State Farm Mutual Auto. Ins.*, No. CV 960561270, 1997 Conn. Super. LEXIS 3122, at *10 (Conn. Super. Ct. Nov. 18, 1997) ("Having no obligation to pay under the policy, [the insurance company] could not have violated CUIPA or

On the subject of Tucker's CUIPA/CUTPA claim against these Defendant insurance companies, the briefs of counsel are strangely silent. The briefs for Defendants in support of summary judgment make no specific argument addressed to Plaintiff's Count Four with respect to CUIPA/CUTPA. Defendants' briefs say instead that all of Plaintiff's claims should be dismissed because "Tucker's claim predates the 2004 Policy" and thus falls outside the policy coverage. *See* Doc. 155, p. 5-19.[46] That argument focuses solely upon the terms of the insurance contract. It has nothing to do with the insurers' conduct. The argument is an insufficient response to a CUIPA/CUTPA claim under *Lees v. Middlesex Ins. Co.* and its progeny. "In a CUIPA and CUTPA claim, the insurer's duty stems not from the private insurance agreement but from a duty imposed by statute." *Lees*, 219 Conn. at 653.

Plaintiff, for her part, does not include in either of her briefs opposing summary judgment any discussion of her CUIPA/CUTPA claim.

Faced with this unanimity of silence in the briefs of counsel, the Court could reasonably infer that Plaintiff, having asserted statutory claims under CUIPA and CUPTA in her Amended Complaint but saying nothing about them in her briefs opposing summary judgment, has abandoned those claims. However, the Court refrains from drawing that inference on this rather puzzling record, and has instead submitted these claims to its own preliminary analysis, including a review of the language contained in the specific subsections of Plaintiff's CUIPA/CUTPA claim.

---

CUTPA"). These broad-brushed rulings, however, conflict with the *Lees v. Middlesex,* 219 Conn. 644 (1991). Until the Connecticut Supreme Court states otherwise, the focus of a CUIPA/CUTPA claim is on the alleged conduct of the insurer and not the actual terms of the contract, or the plaintiff's ability to recover under it.

[46]   Defendants also make general arguments for summary judgment based on Tucker's settlement of her claims with Journal Register in *Tucker I.* Those claims will be addressed *infra*.

That analysis suggests that Plaintiff may well have abandoned, or that there is no basis for, the following claims, under Conn. Gen. Stat. § 38a-816(6), for the reasons stated:

(A)    Plaintiff has failed to provide evidence to show that the insurers' purposefully "[m]isrepresent[ed] pertinent facts or insurance policy provisions relating to coverages at issue;"[47]

(F)    no evidence has demonstrated that Defendants failed to "attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims *in which liability ha[d] become reasonably clear*" because liability never became "reasonably clear" given the explicit claims first made language in the 2004 Policy;[48]

(G)    there is no proof that the insurers "compelled [Plaintiff] to institute litigation to recover *amounts due under an insurance policy*" where, based on the plain language of the 2004 Policy and the delineated policy period, no such amounts were due; and

(M)    the insurers could not have "fail[ed] to promptly settle claims, *where liability ha[d] become reasonably clear . . .*" because liability never became reasonably clear.

*See* Doc. 126, p. 22 (¶ 103) (quoting Conn. Gen. Stat. § 38a-816 (6) (A), (F), (G), & (M)) (emphasis

---

[47]    *See, e.g.*, *Volpe v. Paul Revere Life Ins. Co.*, No. 3:98 CV 972(CFD), 2001 WL 1011955, at * (D.Conn. Aug. 29, 2001) ("'[R]egardless of whether there is a misrepresentation that induces or tends to induce' an insured to purchase and maintain an insurance policy, CUIPA permits recovery only if the insured establishes that a defendant insurer made a purposeful misrepresentation.") (quoting *Heyman Assocs. No. 1 v. Ins. Co. of Penn.*, 231 Conn. 756 (1995) (interpreting CUIPA, Conn. Gen.Stat. § 38a–816(1)).

[48]    With respect to unfair insurance practices statutes, as one commentator opined, "[t]he requirement that the insurer settle when the insured's liability is 'reasonably clear' means that the existence of liability has to be substantially certain." 2 Insurance Claims and Disputes § 9:35 (6th ed. updated March 2014)*. See also, e.g., Bohn v. Vermont Mut. Ins.*, 922 F.Supp.2d 138, 146-47 (D.Mass. 2013) (under similar Massachusetts law regarding unfair and deceptive practices in insurance, court held "[l]iability is reasonably clear if a reasonable person, with knowledge of the relevant facts and law, would probably have concluded that the insurer was liable to the plaintiff.") Logically speaking, liability cannot be substantially certain where it plainly does not exist on the explicit "claims first made" terms of the contract.

added).

Plaintiff's claims regarding the other subsections of § 38a-816(6) – (B), (C), (D), (E), and (N) – may stand upon a different footing.  These unfair settlement practices claims refer to "failing to acknowledge and act with reasonable promptness upon communications," "failing to adopt or implement reasonable standards for the prompt investigation of claims," "refusing to pay claims without conducting a reasonable investigation based upon all available information," "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed," and "failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim."  In their briefs supporting summary judgment, Defendants have cited no authority for dismissal of these claims under CUIPA/CUTPA.[49]  In her briefs opposing summary judgment, Plaintiff has cited no authority in defense of them.

Given the failure of the briefs of all parties to discuss Plaintiff's statutory claims in any meaningful way, the Court will deny without prejudice Defendants' motion for summary judgment on Count Four.   To allow the parties to clarify their positions on the alleged CUIPA/CUTPA claims, the Court will require them to make further submissions.  Specifically, Plaintiff will be directed to file and serve a letter addressing which, if all or any, claims in Count Four she intends to pursue.  Then Defendant will be allowed, if so advised, to move for summary judgment on any

_____

[49]  The Court notes that subsections (B) and (C) of Conn. Gen. Stat. § 38a-816(6) refer to "claims arising under insurance policies."  The CUIPA statute, designed to ensure fair practices in insurance settlement, encompasses those claims ultimately denied as well as those meriting compensation.  The issue is whether the insurer met its statutory duties of conduct in handling those claims and handling the claims of others, as a general business practice.  Therefore, although Tucker's claim ultimately fell outside the coverage of the 2004 Policy, the broad remedial nature of § 38a-816(6) would likely encompass her claim as potentially arising under the Policy at issue.

such remaining claim(s).  The parties are advised that the discussion in this sub-Part of the Ruling expresses the Court's preliminary views with respect to certain elements of the statutory claims.  The Court, however, expresses no view or position with respect to the final outcome should Defendants renew their motion for summary judgment on Count Four.

**F.**    **Count Five: Procedural Bad Faith**

In Count Five of the Amended Complaint, Plaintiff alleges that Defendants, "[b]y their willful, negligent, malicious, and reckless actions, . . . have engaged in procedural bad faith in the handling of Tucker's claim in violation of the common law of Connecticut."  Doc. 126, ¶ 108. Specifically, she alleges, that Defendants "took over four years before disclaiming coverage," "did so only after a substantial adverse verdict," "failed to properly investigate [her] claim, and closed her file without making any coverage determination and without ever communicating with the insured, within months of accepting a $220,000 premium."  *Id.*  Tucker also asserts that for a period of more than four years – "between June 2004 and August 2008" – the Defendants acted "to mislead and deceive Journal Register into believing that any loss arising from Tucker's claim would be covered."

Because Tucker became "subrogated to the rights of the insured [Journal Register] under the Policy" as a result of the *Tucker I* settlement, Plaintiff argues that she may "assert all causes of action which the defendants' insured could have asserted against the defendants relating to the Policy, including the tort of bad faith."  *Id.*, at ¶ 110.  Plaintiff seeks to recover her "substantial compensatory and actual damages resulting from the defendants' procedural bad faith conduct in its handling of her claim." *Id.*, ¶ 111.

In an earlier Ruling in this case, I noted that the Connecticut Supreme Court had "not yet spoken on the issue of an independent tort of 'procedural bad faith," but this Court had predicted in

at least one case that the Connecticut Supreme Court would not limit the tort of bad faith in the insurance context to claims of unreasonable or wrongful denial of claims. *See* discussion in *Tucker v. Am. Int'l Group*, 2012 WL 314866, at *8 (D.Conn. Jan. 31, 2012).[50]   However, in light of the Connecticut Supreme Court's subsequent ruling in *Capstone Building Corporation v. American Motorists Insurance Company*, 308 Conn. 760, 793-803 (2013), it is now clear that Connecticut will not recognize an independent tort of "procedural bad faith" in the insurance context.

All of Plaintiff's allegations under this heading address perceived failures in Defendants' handling of her claim against the Journal Register.  None of these alleged deficiencies involve denial of an express benefit under the 2004 Policy.  Therefore, for the reasons discussed in full in Part III.C., *supra*, Plaintiff's claim for procedural bad faith is not viable and must be dismissed.

## G.    Count Six: Equitable Estoppel

In Count Six of the Amended Complaint, Plaintiff asserts that the Defendants should be "equitably estopped from denying coverage of Tucker's claim after waiting 4.3 years after Tucker's claim was first submitted to deny coverage, and only after a substantial adverse verdict."  Doc. 126, ¶ 113.  She also alleges that "[e]stoppel is further appropriate given that the [D]efendants never communicated their decision to close the file to their insured, Journal Register" and "[t]his omission was severely prejudicial because it created a reasonable belief on the part of Journal Register that any loss it incurred as a result of the Tucker claim above its deductible would in fact be covered by

---

[50] In making its observation, this Court cited such authority as *United Technologies Corp. v. Am. Home Assurance Co.*, 118 F.Supp.2d 181, 188–89 (D.Conn.2000), *mod. after recon. on other grounds*, 237 F.Supp.2d 168 (D.Conn.2001); and Julia K. Ulrich, Esq. of Edwards Angell Palmer & Dodge LLP: "When Actions Speak Louder than Words: Procedural Bad Faith in the Absence of Coverage," published in martindale.com Legal Library on Mar. 24, 2009.

the Policy." *Id.*, ¶ 114.  According to Plaintiff, "[t]his belief was evidenced by Journal Register's Fed. R. Civ. P. 26(a) disclosure of the Policy in the underlying litigation as providing coverage for Tucker's claim." *Id.*

Defendants have argued for a summary dismissal of Plaintiff's estoppel claim, pointing to the "fundamental precept of insurance law that estoppel generally cannot be relied on to create coverage under an insurance policy where none exists."  Doc. 153, p. 24 (citing, *inter alia, 10 Elliott Square Court Corp. v. Mountain Valley Indem. Co.,* 634 F.3d 112, 122 (2d Cir. 2010) and collecting cases). Defendants recognize that there are rare exceptions to this principle (*e.g.*, if refusal to create coverage would sanction fraud), but maintain that no such conditions apply in this action.  Doc. 153, p. 24 (citing *Essex Ins. Co. v. Zota*, 466 F.3d 981, 985 (11th Cir. 2006)).  Because there is no coverage for Plaintiff's claim under the 2004  Policy, Defendants conclude that "Tucker cannot now rely on the doctrine of estoppel to create or extend the coverage available under the claims-made-and-reported Policy." *Id.*, p. 24-25.

Furthermore, Defendants dispute the factual bases upon which Tucker seeks recovery by equitable estoppel. *Id.*, p. 25.  In particular, with respect to her statement that National Union "failed to disclaim coverage for 4.3 years," Doc. 143, p. 27, Defendants assert that "the uncontroverted evidence establishes that National Union denied coverage to Journal Register within one month of being asked by Journal Register to provide indemnity for the Tucker verdict."  Doc. 153, p. 25. Defendants point out that, "[a]s Tucker has admitted, the 2004 Policy expressly did not create a duty to defend;" and thus, "no duty to indemnify could arise until there was a settlement or a judgment to be satisfied." *Id.  See also* Doc. 154-26, Ex. Y (August 18, 2008 letter from Japhet Boutin, AIG Domestic Claims, Inc., to Ed Yocum, Esq., General Counsel for Journal Register Company) ("The

purpose of this letter is to: . . . advise you that based on the information provided to National Union, coverage is not available for the Insured in the above-referenced matter under the Policy . . . .").

In support of their argument for dismissal, Defendants offer the following facts. National Union, via its parent company AIG, acknowledged receipt of Tucker's claim against Journal Register on June 1, 2004 and made a full and express reservation of rights to Journal Register's broker. Doc. 154, ¶ 41; Doc. 154-24, Ex. W (letter from Meghan McConville, AIG, to Douglas Worth, Marsh USA, acknowledging submission of claim and reserving all "rights, privileges, and defenses under the policy and available at law or in equity"). At that time, Meghan McConville, in AIG's Corporate D&O Claims Department, notified Journal Register's insurance broker, Douglas Worth of Marsh USA, Inc. to notify her of "any significant events including, litigation." *Id.* Four years later, Journal Register, through Marsh, contacted AIG on July 22, 2008, to advise that the "matter [was] now in suit" and "had already proceeded to a jury trial." Doc. 154, ¶ 42; Doc. 154-25, Ex. X, p. 9 ("General Note" on Claim Number 371-031428 (Claimant Teri Tucker) by Brian Conlin, AIG, dated July 25, 2008). AIG "issued its denial of coverage within one month of being asked to provide coverage for the verdict obtained by Tucker." Doc. 154, ¶ 43; Doc. 154-26, Ex. Y (August 18, 2008 letter from Japhet Boutin, AIG Domestic Claims, Inc., to Ed Yocum, Esq., General Counsel for Journal Register Company).[51]

---

[51] In that letter, Boutin of AIG provided Journal Register with at least one reason why coverage of Tucker's claim was precluded:

> [T]he Insured [Journal Register] failed to advise National Union of the litigation until after it had received an adverse jury verdict. National Union had no knowledge of the lawsuit, and did not have an opportunity [to] effectively associate in the defense of the claim. Moreover, the insured did not advise National Union of any settlement opportunities. In fact, based on conversations with the Insured, there appears to have been many opportunities to settle prior to judgment, which opportunities were not

Defendants point to this one-month period to argue that they have caused no four-year delay. In applying the standard set forth in *Allcity Insurance Company v. 601 Crown Street Realty Corporation,* 264 A.D.2d 315, 317, 693 N.Y.S.2d 141, 142 (App. Div. 1999), the case cited by Tucker regarding timeliness of an insurance disclaimer, whether a claimer is untimely is "measured from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage."  Doc. 153, p. 25 (discussing *Allcity Ins. Co.*, 264 A.D.2d at 317 (citation and internal quotation marks omitted)).  It is Defendants' position that  National Union first learned of the grounds for disclaimer on July 22, 2008, upon learning of the adverse jury verdict in *Tucker I*,  and disclaimed coverage on August 18, 2008 –  within one month.[52]  Doc. 153, p. 25.

_____

discussed with National Union.

Doc. 154-26, Ex. Y, p. 4.

Citing Clause 8 of the 2004 Policy for its provision that the Insurer "shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim," Boutin concluded that "this matter is not afforded coverage under the Policy as the Insured has breached its obligations under [Clause 8 of] the contract." *Id.*, p. 3-4.

Plaintiff argues that Defendants have waived any coverage defense based on Clause 8 of the Policy, the "cooperation clause," by failing to investigate Tucker's claim and failing to make any diligent effort to associate in defense against that claim.  In support, she cites, *inter alia*, *Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co.*, 249 Conn. 36, 58 (1999) for the proposition  that "disclosure pursuant to the cooperation clauses possibly could be required only if and when the insurance company participates 'in the defense' of the underlying cases."

Defendants counter with the assertion that they did not have the opportunity to participate in the *Tucker I* litigation because they only learned of its existence after the jury verdict.  Clearly this issue is in dispute.  However, even assuming *arguendo* that Plaintiff is correct that Defendants' initial basis for breach of the Policy is invalid or even waived, Clause 8 is not the sole or ultimate basis for Defendants' disclaimer of coverage in this action, which is the claims made first terms of the Policy.

[52]Defendants also, of course, now disclaim coverage in this action based on the November 3, 2003 Letter discussed *supra.*  Plaintiff asserts that, based on the transmission stamps appearing on this letter, "AIG had notice of the letter no later than September 3, 2008" and likely "much

In response, Tucker asserts that "the defendants conflate the Court's inherent power to estop the defendants from denying coverage (judicial estoppel) with the insurance law doctrine which holds that coverage cannot be created 'by estoppel.'" Doc. 155, p. 9.  Tucker claims that the latter doctrine "is not at issue in [her] case." *Id.*  She then specifies that she "is claiming the Court should judicially estop the defendants from denying coverage after waiting 4.3 years to disclaim coverage." *Id.*  She distinguishes situations "where an insurance policy never provided coverage for the type of claims being asserted " or "the claimant is not even a policyholder," from judicial estoppel, under which the court may estop Defendants from disclaiming coverage "for a claim covered by the policy at issue more than four years after receiving notice of it." *Id.*, p. 10.  Tucker asserts that, under those circumstances, an untimely disclaimer "can constitute a waiver or estoppel of policy defenses." *Id.* (citations omitted).

Plaintiff may characterize her claim as she chooses.  I accept her recently expressed intention to assert a claim of judicial estoppel, as opposed to estoppel to create unintended coverage under the policy.  But the characterization avails Plaintiff nothing.  This case is not one in which judicial estoppel would be appropriate.

The Second Circuit explained in *Simon v. Safelite Glass Corporation*, 128 F.3d 68, 71 (2d Cir. 1997), that "[j]udicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding." *See also Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037-38 (2d Cir.1993), *cert. denied*, 510 U.S. 992 (1993).  "It is a rarely used doctrine designed to protect the court, not a party, from a party's chicanery." *In re Venture*

---

earlier." Doc. 143, p. 23-24.  The date of Defendant's actual receipt or possession of the letter remains in dispute.

*Mortg. Fund, L.P.*, 245 B.R. 460, 472 (S.D.N.Y. Bankr. 2000) (quoting *Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, Ltd., 840 F.Supp. 211 (E.D.N.Y.1994)), *aff'd*, 282 F.3d 185 (2d Cir. 2002).

"[J]udicial estoppel serves interests different from those served by equitable estoppel, which is designed 'to ensure fairness in the relationship between parties.'" *Simon*, 128 F.3d at 71 (citing *Bates*, 997 F.2d at 1037).  Judicial estoppel is invoked "as a means to 'preserve the sanctity of the oath' or to 'protect judicial integrity by avoiding the risk of inconsistent results in two proceedings.'" *Simon*, 128 F.3d at 71  (quoting *Bates*, 997 F.2d at 1038).  Therefore, for a court to employ judicial estoppel,  "there must be a true inconsistency between the statements in the two proceedings" so that "[i]f the statements can be reconciled there is no occasion to apply an estoppel." *Simon*, 128 F.3d at 72-73 (citing *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir.1996).  *See also  In re Brody*, 3 F.3d 35, 39 (2d Cir.1993)("doctrine [of judicial estoppel] applies only when the party has taken an inconsistent position in a prior proceeding").  Moreover, the doctrine does not apply if the initial statement of the party against whom estoppel is asserted "was the result of a good faith mistake or unintentional error." *Simon*, 128 F.3d at 73.

Recently, in *Adelphia  Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110 (2d Cir. 2014), the Second Circuit confirmed that although "the exact criteria for invoking judicial estoppel will vary based on 'specific factual contexts,' . . . courts have uniformly recognized that its purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  748 F.3d at 116 (citing *New Hampshire v. Maine,* 532 U.S. 742, 749-51 (2001)).   The Second Circuit then articulated the "several factors [which] typically inform the decision whether to apply the doctrine in a particular case":

63

First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.[53]

748 F.3d at 116.[54]

In *Adelphia Recovery Trust* , the Second Circuit then clarified that "[i]n enumerating these factors," it did "not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id.*

In the case at bar, Plaintiff does not request the Court to invoke judicial estoppel to uphold the sanctity of an oath in court or to avoid inconsistent results in legal proceedings. Rather, she asks the Court to estop the Defendants from denying coverage under the 2004 Policy after she allegedly waited 4.3 years before Defendants disclaimed coverage. She argues that "in the Journal Register's bankruptcy proceeding, counsel for National Union affirmatively represented on April 10, 2009 that the 2004 policy (No. 729-15-02) was the policy [under] which National Union might be liable to pay

---

[53] As to this third factor regarding "an unfair advantage," the Second Circuit noted that "we have not always required this element in all circumstances," emphasizing that the application of the judicial estoppel doctrine depends heavily on the particular facts before the court. 748 F.3d at 116.

[54] *See also DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 103 (2d Cir. 2010) ("Typically, judicial estoppel will apply if: 1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel. We further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain.") (citation and internal quotation marks omitted); *Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (party invoking judicial estoppel must show that "(1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment.").

on Tucker's claim."[55]  Doc. 143, p. 25-26, Doc. 143-3, Ex. 3, p. 2.

Examining the relevant factors set forth in *Adelphia Recovery Trust*,  there is no indication that Defendants made a "clearly inconsistent statement"  – *i.e.*, that National Union  ever stated in words or substance that Tucker's claim was *actually covered* or that Defendants in fact had liability for said claim under the 2004 Policy.[56]  Rather, both Defendants and Plaintiff agree in this action that the 2004 Policy is the relevant insurance policy: so that if there were liability for Tucker's claim, it would be under that policy, and no other.  Furthermore, there is no proof that any representation by National Union was falsely made ("chicanery" upon the court) or that any such representation was adopted by the bankruptcy court, leading to  an unfair advantage in National Union's  favor.

Therefore, accepting Plaintiff's factual allegations as true for purposes of the motion, there is no indication that:  (1) Defendants took an inconsistent position in prior legal proceedings as to liability (as opposed to potential coverage) under the 2004 Policy; (2) any prior court or tribunal was affirmatively misled; or (3) Defendants gained any particular unfair advantage by making said statements about potential coverage.  In sum, Plaintiff has failed to demonstrate the several factors

---

[55]  Plaintiff  also points to an occasion during this action, on June 4, 2010, when National Union admitted "that it has previously provided to the Plaintiff a copy of the insurance policy at issue by letter dated April 10, 2009, from its file."  Doc. 143, p. 26-27; Doc. 143-2, Ex. 2 ("Response to Requests for Admissions" to National Union).  In so doing, National Union concurred with Plaintiff that the 2004 Policy was the "policy at issue" with respect to Tucker's potential claim.  That statement does not equate with an admission of liability under the Policy.

[56]  In other words,  Defendants may  have stated  in  the bankruptcy proceeding  that  if there was any coverage for Tucker's claim, it would be under the 2004 Policy (due to the May 2004 reporting date).  Defendants did not, however, stipulate that there was in fact coverage (*i.e.*, liability on their part) for Tucker's  claim.  In fact, by February of 2009, when Journal Register filed its Chapter 11 bankruptcy petition, Defendants had already sent a letter to Journal Register disclaiming coverage based on Clause 8 of the 2004 Policy.  *See* Doc. 154-26, Ex. Y (August 18, 2008 letter from Japhet Boutin, AIG Domestic Claims, Inc., to Ed Yocum, Esq., General Counsel for Journal Register Company).

necessary to support a holding of judicial estoppel. There is no evidence that the judicial process must be protected – that is, that the "impact" of any inconsistent results "on judicial integrity is certain," *Adelphia Recovery Trust*, 748 F.3d at 116.

Alternatively, the theory of equitable estoppel is inapplicable on these facts. In the context of Connecticut insurance law, it is well established that insurance contracts cannot be created by estoppel. "That doctrine cannot be invoked . . . to create a primary liability of the insurer for which all elements of a binding contract are necessary." *Masonicare Corp. v. Marsh USA, Inc.*, No. CV030821900S, 2005 WL 941412, at *2 (Conn. Super. Ct. Mar. 16, 2005) (citing *Linemaster Switch Corp. v. Aetna Life & Cas. Corp.*, No. CV91-0396432S, 1995 WL 462270 (Conn. Super. Ct. July 25, 1995)). It follows that one cannot employ the principle of estoppel to convert a claims made policy into an occurrence policy – that being Plaintiff's objective in the case at bar.

To succeed on the theory of equitable estoppel, a plaintiff must prove two requisite elements: "the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury." *Union Carbide Corp. v. Danbury*, 257 Conn. 865, 873 (2001) (internal quotation marks omitted.); *see also Stovall v. First Unum Life Ins. Co.*, 20 F. App'x 47, 50 (2d Cir. 2001) ( "The elements of equitable estoppel are (1) material representation, (2) reliance and (3) damage.") (citation and internal quotation marks omitted). The proof in this case negates those elements. As set forth in Part III.B.3, *supra*, there is no evidence that Defendants purposely made a false indication in the bankruptcy proceedings when they stated that the 2004 Policy was the policy under which National Union might be liable to pay on Tucker's claim. Rather, Defendants have always maintained that the 2004 Policy is the relevant

66

policy with respect to Tucker's claim.  From the time the claim was reported in May 2004, the 2004 Policy was the only potential policy applicable to the claim, given the Policy's "claims made first" and 30-day notice provisions.

With respect to coverage, Defendants have alleged that they only learned that Tucker's claim clearly fell outside the policy period when they obtained the November 3, 2003 Letter during discovery in this action (*i.e.*, after this action commenced).  Defendants maintain that prior to said discovery, they believed that the claim was first made on May 13, 2004, when Journal Register's broker, Marsh, "provided National Union notice of the Tucker claim [by] citing Tucker's March 2004 CHRO Complaint," Doc. 100, ¶ 18; Doc. 100-2 & -17, Ex. B & Q.  If, as Defendants assert, they had no knowledge of when the claim was first made until discovery in this action, it was unintentional error or a good faith mistake if they ever suggested or implied there was coverage under the 2004 Policy.[57]

Moreover, adopting Plaintiff's version of the facts for summary judgment, assuming that Defendants knew of the November 3, 2003 Letter in May 2004, there is no evidence that Tucker was ever  induced by any statements by Defendants to change her position with respect to seeking

---

[57]  In their Supplemental Memorandum in support of summary judgment [Doc. 153, p. 7], Defendants declared:

> When discovery was conducted in this case, Journal Register disclosed that Tucker had retained legal counsel who sent a factually detailed demand letter to Mr. Kevin Walsh, publisher of the New Haven Register, on November 3, 2003 (the "2003 Demand Letter"), alleging wrongful discharge and retaliation in violation of the Civil Rights Act of 1964, the Connecticut Fair Employment Practices Act and public policy. [SOF ¶ 8.]

*See also* Doc. 154, ¶ 8; Doc. 154-9, Ex. H (November 3, 2003 letter); Doc. 154-10, Ex. I (Affidavit of Elizabeth M. Mahoney, attesting to fact that "[i]n response to a subpoena issued by [attorneys] EAPD on behalf of the defendants, Journal Register East Inc. produced business records").

recovery from Defendants.  Rather, she has consistently pressed her claim for coverage under the 2004 Policy, regardless of Defendants' position with respect to coverage, or when or in what form that position was expressed.

Furthermore, and in any event, prior to discovery in this action, whether the date the claim was first made was unknown to Defendants, Journal Register and Tucker both had access to and/or knowledge of the contents of the 2004 Policy.  Neither needed to rely on the other to have knowledge of the Policy's claims first made terms.   Both believed, perhaps in light of the May 2004 report of Tucker's claim, that if any policy covered that claim it was the 2004 Policy.  An insured, such as Journal Register, bears the responsibility of knowing the contents of its own insurance policy and/or whether or not it has received notice of a claim upon it.  By standing in the shoes of Journal Register, as assignee or subrogee on the policy, Tucker also bore the responsibility of reading the Policy's terms, including its "claims first made" restriction.  Lack of knowledge regarding a policy's terms is not grounds for expanding coverage through equitable estoppel.  *See, e.g., Paese v. Hartford Life and Acc. Ins. Co.*, 449 F.3d 435, 447 (2d Cir. 2006) ("A party claiming equitable estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that *reliance must have been reasonable* in that *the party claiming the estoppel did not know nor should it have known* that its adversary's conduct was misleading.") (emphasis added) (citation and internal quotation marks omitted).

Finally, with respect to delay, which is grounds for equitable estoppel *under New York state law,* as opposed to Connecticut law, the evidence presented to the Court establishes that National Union reserved its rights within a few weeks after receipt of Journal Register's May 13, 2004 notice of Tucker's claim and  denied coverage to Journal Register within one month of being asked by

Journal Register to provide indemnity for the Tucker verdict.[58]  *See* Doc. 154-24, Ex. W (June 1, 2004 letter from Meghan McConville, AIG,  to Douglas S. Worth, Marsh USA, acknowledging submission of Tucker's claim and reserving all "rights, privileges, and defenses under the policy and available at law or in equity"); Doc. 153, p. 25.  The 2004 Policy did not include a duty to defend so that the duty to indemnify arose once there was a judgment to be satisfied.[59]  Upon being informed of the judgment in *Tucker I*, Defendants disclaimed coverage within a month, albeit on the grounds of Clause 8.  *See* Doc. 154-26, Ex. Y (August 18, 2008 letter from Japhet Boutin, AIG Domestic Claims, Inc., to Ed Yocum, Esq., General Counsel for Journal Register Company) ("The purpose of this letter is to: . . . advise you that based on the information provided to National Union, coverage is not available for the Insured in the above-referenced matter under the Policy . . . .").  Under such circumstances, express reservation of rights occurred within one month of notice of the claim and disclaimer occurred within one month of potential liability to pay.  No  extensive delay gave rise to reliance by Plaintiff.  Plaintiff then and now asserts coverage under the 2004 Policy.

Traditionally, "estoppel results from something which the law treats as an admission of so

---

[58]  *See, e.g., Schneider v. Canal Ins. Co.*, 210 F.3d 355 (unpublished), 2000 WL 427495, at *2 (2d Cir. April 20, 2000) ("New York courts have permitted an insured to benefit from the doctrine of equitable estoppel where the insurer assumes the defense of the insured without disclaiming coverage or reserving its rights");  *Allcity Insurance Company v. 601 Crown Street Realty Corporation,* 264 A.D.2d 315, 317, 693 N.Y.S.2d 141, 142 (App. Div. 1999) (under New York law, disclaimer may be untimely, "as measured from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage") (citation and internal quotation marks omitted).  New York state law is not, in any event, binding on this Court or applicable to this action.

[59]  *See* Doc. 100-2 (2004 Policy), p. 41 (¶ 8) ("The Insurer does not assume any duty to defend.  The Insureds shall defend and contest any Claim made against them."); p. 47 (¶ 18) ("Any person or organization . . . who has secured [a] judgment [against the insured] or written agreement [settling an action against the insured] shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.").

high and conclusive a nature that the party making it is not allowed to aver against it or offer evidence to controvert it." *Columbia Ins. Co. of New Jersey v. Mart Waterman*, 11 F.2d 216, 218-19 (2d Cir. 1926). Here, there has been no such crucial admission by Defendants. The only admission presented by Plaintiff is Defendants' statement that the 2004 Policy was the one under which National Union *may have* liability on Tucker's claim.

Resolving all ambiguities and drawing all permissible factual inferences in favor of Tucker, as the party against whom summary judgment is sought, there is no genuine dispute as to any material fact that Defendants are entitled to judgment on Count Six as a matter of law. There is no evidence that Defendants made inconsistent statements in a prior legal proceeding which led to a favorable outcome in that proceeding and impacted the court's integrity – no grounds for judicial estoppel. Furthermore, there is no evidence that Defendants misrepresented that Tucker's claim was actually covered by the 2004 Policy and/or that any statements by Defendants regarding coverage or lack thereof changed Plaintiff's position with respect to seeking recovery under the 2004 Policy. The facts presented demonstrate that Tucker consistently asserted that the 2004 Policy covers her claim, both before and after Defendants (1) disclaimed coverage in August of 2008 (for failure to provide an opportunity to effectively associate regarding claim's defense) and (2) disclaimed coverage again on the basis of the "claims first made" policy restrictions in their pending summary judgment motion. There is no genuine dispute with respect to material facts regarding equitable estoppel. Summary judgment will enter for Defendants on Count Six.

## H.   **Remaining General Arguments for Summary Judgment**

Finally, in support of their motion for summary judgment, Defendants renew two previously asserted arguments. In particular, Defendants maintain that (1) Tucker's settlement with Journal

Register, including a "general release of the Judgment in the Underlying Federal Lawsuit" in *Tucker I,* precludes her claim, Doc. 153, p. 20-21; and (2) AIG is merely National Union's "corporate parent," "had no involvement with Journal Register's coverage or Tucker's claim," and is thus not a proper defendant in this action, Doc. 153, p. 3.

The Court has addressed these issues in full in prior opinions and continues to find that these arguments lack merit. *See Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 13 (D. Conn. 2013) ("An injured party, such as Tucker, may settle her claims against the insured (as in *Tucker I* ) and thereafter seek recovery for the settled judgment (in *Tucker II* ) via Connecticut's direct action statute."); *id.*, No. 3:09-CV-1499 CSH, 2011 WL 602851, at *8 (D.Conn. Dec. 2, 2011) (finding that in addition to the final judgment she has obtained in *Tucker I*, Tucker "also received an express assignment from [the Journal Register] of all claims and rights under the [2004] policy, including any and all claims against National Union, AIG and/or an[y] o[f] their or [the insured's] brokers or agents"); *id.*, 745 F.Supp.2d 53, 66- 71 (D.Conn. 2010) (discussion regarding whether AIG is a proper party); *id.*, No. 3:09-CV-1499 CSH, 2011 WL 6020851, at *8 n.21 (D. Conn. Dec. 2, 2011) (confirming prior holding that AIG is a proper party).   Following the well-established rule of the case, the Court finds no grounds to disturb those prior rulings.

The Court assumes the parties' familiarity with its prior rulings and the well-established principle that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983); *see also U.S. v. Carr*, 557 F.3d 93, 102 (2d Cir.2009) (the first facet of the law-of-the-case doctrine is that "when a court has ruled on an issue," that decision should generally be adhered to by that court in subsequent stages in the same case.") (citing *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d

Cir.2002), *cert. denied*, 539 U.S. 902 (2003)).

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the motion of Defendants for summary judgment [Doc. 97] dismissing the Plaintiff's Amended Complaint is GRANTED IN PART and DENIED WITHOUT PREJUDICE IN PART.

To implement its RULING, the Court makes the following ORDER:

1.  Defendants' Motion for Summary Judgment [Doc. 97] is GRANTED as to Counts One, Two, Three, Five and Six of Plaintiff's Amended Complaint [Doc. 126]; and DENIED WITHOUT PREJUDICE as to Count Four, which asserts violations by Defendants of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816(6) ("CUIPA") via the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110a, *et seq*. ("CUTPA").

2.  With respect to the claims alleged in Count Four, the Court orders the following further submissions:

> a.      On or before **February 20, 2015**, Plaintiff is directed to file and serve a letter, stating  whether she intends to press all or any of the claimed violations by Defendants of CUIPA/CUTPA, as alleged in Count Four of the Amended Complaint, or whether those claims are abandoned in their entirety.  If Plaintiff decides to press some but not all of those claims, the letter must state specifically which claims are pressed.

      b.      If Plaintiff's letter declares her intention to press all or any of the CUIPA/CUTPA claims alleged in Count Four, and Defendants are advised to move for summary judgment on those claims, Defendants are directed to file and serve papers, including a memorandum of authorities, in support of such motion on or before **March 13, 2015.**

      c.      If Defendant files a motion for summary judgment as to any remaining claims under Count Four, Plaintiff is directed to file and serve opposing papers on or before **March 24, 2015**; and Defendants may file and serve reply papers, if so advised, on or before **March 31, 2015.**

    3.  The Clerk is directed to enter judgment for Defendants with respect to Counts One, Two, Three, Five, and Six of Plaintiff's Amended Complaint.

    It is SO ORDERED.

Dated:  New Haven, Connecticut
      January 28, 2015


                                                */s/Charles S. Haight, Jr.*
                                              CHARLES S. HAIGHT, JR.
                                              Senior United States District Judge