# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

TERI TUCKER,

              Plaintiff,

  v.

AMERICAN INTERNATIONAL GROUP, INC.; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., A SUBSIDIARY OF AMERICAN INTERNATIONAL GROUP, INC.,

              Defendants.

3:09 - CV - 1499 (CSH)

APRIL 5, 2016

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CUIPA/CUTPA COUNT [DOC. 170]

**HAIGHT, Senior District Judge:**

## I. INTRODUCTION

Plaintiff Teri Tucker brings this diversity action on an employment practices liability insurance policy ("the Policy") issued by the Defendant insurance companies, American International Group, Inc. ("AIG") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively "Defendants"), to her former employer, newspaper publisher Journal Register East.[1]   In particular, Plaintiff seeks to collect from Defendants the $4 million judgment entered in her favor in *Tucker v. Journal Register East*, No. 3:06-CV-307 (SRU) (herein "*Tucker I*"), the

---

[1]  For purposes of clarity the 2004 Policy in suit bears policy number 729-15-02 and contains the effective dates of January 12, 2004 through January 12, 2005.  *See* Doc. 154-2 & 154-3 ("Employment Practices Liability Insurance Policy," provided by National Union as a "member of American International Group, Inc.").

1

earlier action Plaintiff filed against her former employer as the result of her allegedly unlawful discharge in 2003.[2]

In its latest Ruling, the Court granted summary judgment for Defendants as to all counts except Count Four, Plaintiff's claim for violation of CUIPA/CUTPA.[3]  *See Tucker v. Am. Int'l Grp., Inc.*, No. 3:09-CV-1499 (CSH), 2015 WL 403195, at *1 (D. Conn. Jan. 28, 2015).  As to that claim, the Court denied the motion for summary judgment without prejudice, and ordered submissions from the parties, as follows:

    a.    "a letter [from Plaintiff], stating  whether she intend[ed] to press all or any of the claimed violations by Defendants of CUIPA/CUTPA, as alleged in Count Four of the Amended Complaint:"

    b.    in the event her letter "declare[d] her intention to press all or any of the  CUIPA/CUTPA claims    alleged in  Count  Four," and  if

---

[2]  In its numerous  prior Rulings, the Court further recounted the facts of this case in detail. *See*  728 F.Supp.2d 114 (D.Conn. 2010), 745 F.Supp.2d 53 (D.Conn. 2010), 2011 WL 6020851 (D.Conn. Dec. 2, 2011),  2012 WL 314866 (D.Conn. Jan. 31, 2012), 2012 WL 685461 (D.Conn. Mar. 2, 2012), 281 F.R.D. 85 (D.Conn. 2012), and 936 F.Supp.2d 1 (D.Conn.  2013); 2015 WL 403195 (D. Conn. Jan. 28, 2015).   Familiarity with these facts is assumed.

[3]  Defendants' overriding argument on summary judgment was that Tucker "has sued for recovery pursuant to a 2004 claims first made insurance policy that does not apply to her underlying claim." Doc. 98, p. 1.  Specifically, Defendants argued that "Tucker's claim was first made on November 3, 2003," but "[t]he policy at issue became effective on January 12, 2004." *Id.* Defendants maintained that under such reasoning, if Tucker's claim against Defendants is not covered by the Policy, all of her dependent causes of action fail.  The Court concurred with Defendants, granting summary judgment on all claims except Count Four, CUIPA/CUTPA. In the absence of coverage under the 2004 Policy, the insured, Journal Register, would not have been able to recover from its insurers for any payment the insured incurred as the result of Tucker's claim. Tucker, as subrogee, has no greater rights than Journal Register to recover from the Defendant insurers.

        Defendants were so advised, a second motion for summary judgment on those claims; and

c.    "[if] Defendant file[d] a motion for summary judgment as to any remaining claims under Count Four," opposing papers from Plaintiff and a reply by Defendants on or before designated dates.

2015 WL 403195, at *36.

The parties complied fully with these orders. On February 4, 2015, Plaintiff filed her letter, affirming her intent "to pursue her claims arising under subsections (B), (C), (D), (E), (G), and (N) of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816(6)." Doc. 166, at 1. Plaintiff clarified that "while she [was] not abandoning her claims arising under the other subsections of CUIPA, (A), (F), and (M), and respectfully reserve[d] the right to press them in the event of a successful appeal, she [was] willing to limit the remaining scope of her action to subsections (B), (C), (D), (E), (G) and (N) to conserve time and resources."[4] *Id.*

As one would expect in this historically contentious case, Defendants thereafter promptly filed a motion for summary judgment and detailed supporting memorandum with respect to the CUIPA/CUTPA claim. Doc. 170, 171. Plaintiff then filed thorough reply papers, Doc. 174, and most recently, a supplemental authority, Doc. 176-77. The motion is resolved herein.

---

[4] The Court notes that Plaintiff added subsection (G) to her CUIPA/CUTPA claim, which had not been specified in the allegations in her Amended Complaint. Doc. 126, ¶ 104. It is thus questionable whether such a claim may now be asserted absent further amendment of the complaint.

## II. <u>DISCUSSION</u>

### A. <u>Standard for Summary Judgment</u>

As the Second Circuit has repeatedly articulated, pursuant to Rule 56(a), Fed. R. Civ. P., "[s]ummary judgment is appropriate only if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 533 (2d Cir. 2016). *See also Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (same)."[5]

"[A] fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Baldwin*, 805 F.3d at 25 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). As the United States Supreme Court explained, the summary judgment standard "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Liberty Lobby, Inc.*, 477 U.S. at 247-48.

"In deciding a summary judgment motion, a court must not 'weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.'" *Victory v. Pataki*, No. 13-3592, __F.3d __, 2016

---

[5] Rule 56(a), captioned "Motion for Summary Judgment or Partial Summary Judgment," provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

4

WL 373869, at *6 (2d Cir. Feb. 1, 2016)[6] (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Victory*, 2016 WL 373869, at *6 (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). As set forth *supra*, in analyzing the record, the court must "construe the facts in the light most favorable to the non-moving party," *Breyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008), and is "required to resolve all ambiguities and draw all inferences in favor of the non-movant," *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir.1999).  If the movant succeeds in carrying its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

The ultimate test "is whether the evidence can reasonably support a verdict in Plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir. 2000).  Put simply, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Wright v. City of Ithaca*, No. 15-1293-CV, __F. App'x __, 2016 WL 860420, at *1 (2d Cir. Mar. 7, 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

---

[6]  As amended (Feb. 24, 2016).

**B.**   **Alleged Violation of CUIPA/CUTPA**

Plaintiff's sole remaining claim in this action is Count Four of the Amended Complaint, which alleges violation of numerous subsections of the "unfair settlement practices" provision of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-816(6), asserted through Connecticut's Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.* In Count 4, Plaintiff alleges that the Defendants' "acts and omissions" in handling her claim violated CUIPA in that Defendants "failed to properly investigate the facts surrounding Tucker's claim, failed to conduct a timely or thorough investigation of the facts, failed to make any coverage determination for more than four years, and only after an adverse jury verdict against its insured . . . [and] outright refused to even participate in the alternative dispute resolution procedures specified in the Policy itself." Doc. 126, ¶¶ 103-04. Tucker further asserts that she "may bring a private right of action against the defendants for the identified CUIPA violations pursuant to the Connecticut Unfair Trade Practices Act." *Id.*, ¶105. Lastly, she alleges that Defendants' CUIPA violations "have been the proximate cause of substantial compensatory and actual damages to [her], entitling her to recover treble and other punitive damages, in addition to satisfaction of her judgment." *Id.*, ¶ 106.

In the world of private litigation, the CUTPA and CUIPA statutes have a significant but not entirely understood interaction.  CUTPA prohibits the use of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b. CUIPA defines "unfair methods of competition" as applied to the insurance trade. Conn. Gen. Stat. § 38a-815. "Connecticut courts generally do not recognize a private cause of action under CUIPA;" however, "violations of CUIPA may be alleged as a basis for a CUTPA claim." *Royal Indem. Co. v. King*, 532 F.Supp. 2d 404, 410 (D. Conn. 2008)(quoting *Bepko v. St. Paul Fire &*

*Marine Ins. Co.*, No. 3:04 CV 01996 (PCD), 2005 WL 3619253, at *3 (D. Conn. Nov. 10, 2005)),

*aff'd sub nom., Arrowood Indem. Co. v. King*, 699 F.3d 735 (2d Cir. 2012).

It thus follows that a plaintiff may assert a private cause of action based on a substantive

violation of CUIPA through CUTPA's enforcement provision. *See, e.g.*, *Belz v. Peerless Ins. Co.,*

46 F.Supp.3d 157, 165 (D.Conn. 2014)*; Karas v. Liberty Ins. Corp.*, 33 F.Supp.3d 110, 116-17 (D.

Conn. 2014) (citing *McCulloch v. Hartford Life and Acc. Ins. Co.*, 363 F.Supp.2d 169, 181 (D.Conn.

2005) and *Mead v. Burns*, 199 Conn. 651, 663 (1986)). *See also  Bepko*, 2005 WL 3619253, at *3

("[J]ust as CUTPA is dependent on CUIPA for substantive content, CUIPA is dependent on CUTPA

for enforcement by private parties." )  (citation and internal quotation marks omitted); *O&G Indus.,*

*Inc. v. Travelers Prop. Cas. Corp.*, No. CV010084433S, 2001 WL 1178709, at *1 (Conn. Super. Ct.

Sept. 7, 2001) (a "plaintiff may not bring a cause of action under CUTPA based on conduct which

does not also violate CUIPA where the alleged misconduct is related to the insurance industry")

(citation omitted).[7]

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair

or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat.§ 42-

110b(a). The statute creates a private cause of action for "any person who suffers any ascertainable

loss of money or property, real or personal, as a result of the use or employment of a [prohibited]

---

[7] "Whether a CUIPA violation is a private cause of action in and of itself separate from CUTPA has not been decided by [Connecticut's] appellate courts." *Riether v. Mesa Underwriters Specialty Ins. Co.*, No. CV146046729S, 2014 WL 4413584, at *3 (Conn. Super. Ct. July 30, 2014). Therefore, "[w]hether CUIPA allows a private cause of action independent of CUTPA remains an open question." *H & L Chevrolet v. Berkley Ins. Co.*, 110 Conn.App. 428, 441 n. 7 (2008). Because Tucker has expressly alleged a CUIPA violation through CUTPA in Count Four, this Court will not not address whether CUIPA may independently provide a private cause of action for individual claimants.

method, act or practice. . ." Conn. Gen. Stat. § 42–110g(a). "[T]o prevail in a CUTPA action, a

plaintiff must establish both that the defendant has engaged in a prohibited act and that, 'as a result

of' this act, the plaintiff suffered an injury." *Royal Indem. Co.*, 532 F. Supp. 2d at 411 (quoting

*Abrahams v. Young & Rubicam*, 240 Conn. 300, 306 (1997)). "The language 'as a result of' requires

a showing that the prohibited act was the proximate cause of a harm to the plaintiff." *Abrahams*, 240

Conn. at 306.[8]

The CUIPA statute defines "unfair methods of competition and unfair and deceptive acts or

practices in the business of insurance." Conn. Gen. Stat. § 38a–816. In addition to proving a

particular violation under the defined "unfair" practices in CUIPA, a plaintiff must show, with

respect to "[u]nfair claim settlement practices," that Defendants were "committing or performing"

said  unfair practices  "with such frequency as to indicate a general business practice. . . ." Conn.

Gen. Stat. § 38a-816(6).[9]  Therefore, "[t]he plaintiff must show more than a single act of insurance

_____

[8]With respect to CUTPA claims, the Connecticut Supreme Court has adopted "the criteria
set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice
is unfair: (1) [W]hether the practice, without necessarily having been previously considered
unlawful, offends public policy as it has been established by statutes, the common law, or otherwise
– whether, in other words, it is within at least the penumbra of some common law, statutory, or other
established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous;
(3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ]." *State
v. Acordia, Inc.*, 310 Conn. 1, 29 (2013) (quoting *Conaway  v. Prestia*, 191 Conn. 484, 492-93
(1983)).  However, "[b]ecause CUIPA provides the exclusive and comprehensive source of public
policy with respect to general insurance practices," the Connecticut Supreme Court has concluded
"that, unless an insurance related practice violates CUIPA or, arguably, some other statute regulating
a specific type of insurance related conduct, it cannot be found to violate any public policy and,
therefore, it cannot be found to violate CUTPA." *State v. Acordia, Inc.*, 310 Conn. at 37 (2013).

[9] *See also  Davis v. Globe Life and Acc. Ins. Co.*, No. 3:12–CV–01583 (VLB), 2013 WL
5436907, at *6 (D.Conn. Sept. 27, 2013) ("Unfair claim settlement practices constitute a CUIPA
violation when they are '[c]ommitt[ed] or perform[ed] with such frequency as to indicate a general
business practice.'") (quoting Conn. Gen. Stat. § 38a-816(6)).

misconduct; isolated instances of unfair settlement practices are not sufficient to establish a claim."

*Karas*, 33 F.Supp.3d at 117. *See also Royal Indem. Co.*, 532 F.Supp.2d at 411 ("In requiring proof

that the insurer has engaged in unfair claim settlement practices with such frequency as to indicate

a general business practice, the legislature has manifested a clear intent to exempt from coverage

under CUIPA isolated instances of insurer misconduct.") (quoting *Lees v. Middlesex Ins. Co.*, 229

Conn. 842, 849 (1994)); *Exantus v. Metro. Prop. & Cas. Ins. Co.*, 582 F. Supp. 2d 239, 249-50 (D.

Conn. 2008) (granting summary judgment for defendant insurer on CUIPA/CUTPA claim because

even assuming *arguendo* the  defendant insurer "committed unfair business practices with respect

to [the plaintiff's] claim, there is no evidence in the record suggesting that [the insurer] ha[d]

committed similar violations with respect to other claims" – *i.e.*, no evidence "sufficient enough to

establish a claim under CUIPA as a matter of law"); *State v. Acordia, Inc.*, 310 Conn. 1, 31 (2013)

("The definition of unacceptable insurer conduct in [CUIPA] reflects the legislative determination

that isolated instances of unfair insurance settlement practices are not so violative of the public

policy of this state as to warrant statutory intervention.") (quoting *Mead v. Burns*, 199 Conn. 651,

665-66 (1986)).[10]

---

[10]   With respect to  the  level of  specificity required in  pleading a  "general business
practice," one Connecticut Superior Court noted:

"A split of authority exists regarding the degree of specificity required when pleading
a general business practice under CUIPA to survive a motion to strike." *Wirth v.
Progressive Casualty Ins. Co.*, Superior Court, judicial district of New Britain,
Docket No. CV 09 5012844 (February 14, 2010, Swienton, *J.*) (49 Conn. L. Rptr.
211, 212); *see Afifi v. Standard Fire Ins. Co.*, Superior Court, judicial district of New
Haven, Docket No. CV 11 6017083 (October 21, 2011, Zoarski, *J.T.R.*)
(acknowledging split). "One line of cases . . . requires that the plaintiff plead specific
facts to demonstrate acts of insurer misconduct that go beyond the plaintiff's
immediate claim . . . . However, other Superior Courts have held, essentially, that as
long as the plaintiff alleges that the insurer misconduct involves other insureds,

In the case at bar, Tucker now "pursue[s] her claims arising under subsections (B), (C), (D), (E), (G), and (N) of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816(6)."[11]  Doc. 166, at 1.  Those provisions include: "(B) failing to acknowledge and act with reasonable promptness upon communications with  respect to claims arising under insurance policies; (C) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (D) refusing to pay claims without conducting a reasonable investigation based upon all available information; (E) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;" (G) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;" and (N) "failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."[12]  Each of these allegations relates to Defendants' conduct in handling, investigating and settling Tucker's claim, particularly the reasonableness of investigation and promptness of

---

pleading specific instances of such misconduct is not required." (Citations omitted.)
*Wirth v. Progressive Casualty Ins. Co., supra*, 212-13.

*Katz v. Hartford Fin. Servs. Grp., Inc.*, No. CV116020408S, 2012 WL 2149405, at *3 (Conn. Super. Ct. May 11, 2012).

[11] Plaintiff, having failed to include subsection (G) in the allegations of her Second Amended Compliant [Doc. 126], seeks to explain in her Notice to the Court on February 4, 2015 that she now "respectfully includes subsection (G) given the defendants' unwillingness to resolve her claims promptly in mediation and arbitration, as called for by the EPLI policy."  Doc. 166, at 1.  She makes no argument as to why the Amended Complaint should be interpreted to include this allegation in her current CUIPA claim, or why procedurally she need not seek amendment to expand said claim.

communications with respect to that claim.

### 1.      Defendants' Motion for Summary Judgment

Pursuant to the Court's Ruling on January 28, 2015, Defendants move for summary judgment on Plaintiff's remaining CUIPA/CUTPA claim, stating that "[t]here is no factual dispute." Doc. 171, at 2. "This case is missing the most basic evidentiary ingredient for a cause of action for 'unfair settlement practices' – 'an insured that wanted a settlement.'" *Id.*, at 1. Defendants maintain that in order to survive a motion for summary judgment, the action "must be supported by evidence sufficient to support a finding that unfair conduct within the scope of the relevant provisions of the Act occurred with sufficient frequency to be considered a 'general business practice' of the insurance company." *Id.* Defendants conclude that because there is no proof, or even allegation of such an unfair practice, harm, or general business practice by Defendants, summary judgment should enter against Plaintiff on this claim. *Id.*

In short, the crux of Defendants' argument for summary judgment is that "Defendant National Union did not insure Plaintiff," "did not employ" her, and never "retaliate[d] against her." *Id.,* at 2. According to Defendants, "National Union was responsive, acted in good faith, and met all of its legal obligations to its insured," which was Plaintiff's former employer, the New Haven Register, LLC, a wholly owned subsidiary of Journal Register, Inc.[13] *Id.* Furthermore, Defendants emphasize that Journal Register failed to provide National Union with timely notice of Plaintiff's claim either when the claim was first made in 2003 or when Tucker received a "right to sue" letter from the

---

[13] Defendants clarified that for purposes of discussion in their Memorandum in support of their summary judgment motion, they referred to the New Haven Register, LLC and Journal Register East, Inc. collectively as "Journal Register." *See* Doc. 171, at 2.

Connecticut Commission on Human Rights and Opportunities ("CCHRO").  *Id.*  In addition, Journal

Register  failed to provide National Union with notice that  Plaintiff's claim "had proceeded past an

administrative filing until the jury verdict [was entered] in her favor" in *Tucker I.  Id.*, at 2- 3.

National Union also asserts that "[t]he records of this Court are clear" that "Journal Register never

once asked National Union to be involved in a settlement with Plaintiff before it filed its bankruptcy

petition."  *Id.*, at 3.

Furthermore, Defendants make clear that Journal Register never conceded liability for

Tucker's claims in *Tucker I*:

> Journal Register continued to contest its liability in post-trial motions and
> successfully limited Plaintiff's post-trial security causing this Court to note that
> remittitur drastically limiting the verdict amount was likely. (SOF ¶¶ 24, 28, 30).[14]
> The post-trial settlement conference with Magistrate Judge Garfinkel never occurred,
> because Journal Register filed its [bankruptcy] petition two days before it was
> scheduled. (Amended Complaint, ¶ 65; SOF  ¶ 31). Journal Register did not
> withdraw the post-trial motions until January 5, 2011, as part of its settlement of
> Plaintiff's unsecured claim in bankruptcy. (Amended Complaint, ¶ 73; SOF ¶¶ 37,
> 38).

Doc. 171, at 3.  Defendants thus infer that Journal Register consistently maintained that Plaintiff's

*Tucker I* claim was "without merit."  *Id.*

With respect to the CUIPA statute, Defendants assert that CUIPA "does not impose a legal

obligation on persons with insurance to settle claims they contend to be without merit."  *Id.*

Moreover, CUIPA is designed "to protect persons who secure insurance, not the people adverse to

[those insured]."  *Id.*  All duties National Union owed were "to Journal Register, not Plaintiff" and

Journal Register chose to exercise its legal right to seek bankruptcy protection."  *Id.*, at 3-4.

---

[14]  Defendants use the acronym "SOF" to cite their "Statement of Material Facts," filed as
Doc. 171-1.

Accordingly, Defendants conclude that the relief Plaintiff seeks under CUIPA "is unprecedented, unjust, and contrary to the very purpose of [the statute]." *Id.*, at 4.

As to unfair settlement practices, Plaintiff first attempted to make her own claim against National Union in July of 2009, after Journal Register filed for bankruptcy protection. *Id.* She was "eventually ignored when she attempted to pose as a policyholder and make a demand for mediation with the American Arbitration Association pursuant to the alternative dispute resolution procedures specified in the policy, which Journal Register had given [to] her in its initial disclosures in *Tucker I.*" *Id.* Defendants explain that in July of 2009, "Plaintiff had not yet been assigned any policy rights and was not standing in the shoes of the Journal Register in any manner." *Id.* (citing Amended Complaint, ¶¶ 71-73). Because Journal Register "never sought mediation concerning the denial of coverage," Plaintiff possesses "no right to pursue such claims concerning conduct toward her in 2009, either on her own account or as someone who now 'stands in the shoes' of Journal Register." *Id.* National Union thus argues that "[i]t was not an unfair settlement practice . . . not to second guess anything Journal Register was doing in directing its own defense under a policy it understood to have a $150,000 self-insured retention." *Id.* (citing Amended Complaint, ¶ 8).

### 2.    **Plaintiff's Objection to Summary Judgment**

Plaintiff continues to assert her CUIPA/CUTPA claim in Count Four of the Amended Complaint, alleging violations of numerous subsections of Conn. Gen. Stat. § 38a-816(6), by way of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110a, *et seq.* At this time, as set forth *supra*, she pursues her claims under subsections (B), (C), (D), (E), (G)and (N) of CUIPA, claiming that Defendants' violations of these non-coverage-related subsections entitle

her "to a jury trial, damages, and equitable relief." Doc. 174, at 1.

Plaintiff alleges that when Journal Register submitted her CHRO/EEOC claim (through Marsh broker Douglas Worth) to AIG's Keith Zinsley, Meghan McConville, a trainee in AIG's claims handling department, essentially mishandled the file. For example, McConville failed to copy Journal Register on the June 1, 2004 letter she sent to Worth at Marsh, stating that she had been assigned the claim; AIG was reserving its rights, privileges, and defenses under the policy; and that Marsh should "kindly inform" AIG of "any significant events including, litigation . . . or settlement within the retention." Doc. 174-2 (Ex. 6). Thereafter, "no AIG employee ever contacted anyone at Journal Register to obtain more information about the May 2004 Claim." Doc. 174, at 5.

Tucker points out that the "Tucker file was closed in March 2005," while her CHRO and EEOC claim "was still pending, without any communication to the insured, without a prompt coverage determination, and without a prompt or, indeed any investigation of the claim at all." Doc. 174-3 (Ex. 7, 8, 12). She thus argues that the "record [of] evidence reveals a complete lack of diligence in responding to or handling the May 2004 Claim." Doc. 174, at 6. There are "no notes in the claim file showing that McConville, or any other AIG employee, ever placed any phone calls, requested any documents, attempted to schedule any interviews, sent any follow up letters, made any coverage determination or made any other attempts to contact the insured before the file was closed in March 2005."[15] Doc. 174-12 ("Statement of Facts" ("SOF"), ¶ 9) (citing Doc. 143, Ex. 7, 8, 12).

AIG thereafter "never provided a coverage determination to Journal Register on Tucker's

---

[15] Tucker asserts that AIG violated its own policy that a letter "always" was sent to the insured when a claim file was closed. Doc. 174-14, at 5 (discussing and quoting McConville's deposition testimony, admitting that it was a "standard procedure to send out that final letter before [AIG] closed a file," Doc. 143, Ex. 23, at 7 (p. 20)).

CHRO/EEOC claim for more than four years, and not until after a $4 million judgment had been entered against the insured." Doc. 174, at 8; Doc. 174-2 ( Ex. 7), Doc. 174-3 (Ex. 10-11).  That failure to follow up with the insured – to issue a "coverage evaluation promptly after receipt of a claim" – was a violation of AIG's admitted "standard operating procedure." Doc. 174-12, at 6 (citing deposition testimony of AIG's Barry Aranowitz and Japhet Boutin).[16]

Tucker also suggests that due to Defendants' failure to investigate the May 2004 claim promptly, "no one ever obtained the November 2003 letter from Attorney Horner to their insured; or . . . if any of them did, none considered it a Claim under the policy at issue which justified denial of coverage."[17]  Doc. 174, at 10.

---

[16] Aranowitz testified that he would determine whether a claim was covered within "60 days or so, 45 days," following "[a] certain amount of time to review it." Doc.174, Ex. 26, at 28.  Boutin testified "I understood the importance of letting people know whether or not their claim is covered and I tried to do it as soon as I got all the information." *Id.*, Ex. 25, at 18.

[17] Plaintiff alleges that the November 2003 letter and the May 2004 claim were submitted to AIG together "*at the same time in May 2004*." Doc. 174, at 10 (emphasis in original).  She states that the wording in the cover letter from Marsh to AIG and the facsimile transmission stamps of May 11, 2004 show that AIG likely received the November 2003 letter with the May 2004 claim.  Doc. 174-2 (Ex. 5) (stating "we have also attached a copy of the complaint which was recently filed with the Connecticut Human Rights & Opportunity Commission," and showing fax transmission stamp of "May-11-2004 2:33pm).

Defendants have refuted this assertion, arguing that they had no knowledge of the November 2003 letter until it was produced during discovery in this case. Doc. 98, at 5.  Defendants maintain that prior to said discovery, they believed that the claim was first made on May 13, 2004, when Journal Register's broker, Marsh, "provided National Union notice of the Tucker claim [by] citing Tucker's March 2004 CHRO Complaint," Doc. 100, ¶ 18; Doc. 100-2 & -17, Ex. B & Q. If, as Defendants assert, they had no knowledge of the November 2003 letter until discovery in this action, it was unintentional error or a good faith mistake if they ever suggested or implied there was coverage under the 2004 Policy (in violation of the claims made provisions).

In sum, the date Defendants received the November 2003 letter remains in issue.  In the absence of proof of an intention to mislead Plaintiff, Defendants could not be held liable under a theory of equitable estoppel.  However, the Court's finding in this regard does not dictate whether

With respect to an alleged "regular business practice" of violations, Plaintiff has listed seven cases litigated in federal court.[18]  Doc. 174, at 2.  She professes that "[t]here is no 'magic number' of cases [she] needs to  advance to oppose defendants' renewed motion for summary judgment, nor must she show that the insured wanted a settlement, as [D]efendants argue."  *Id.* (citations and internal quotation marks omitted).   Rather, she argues that the Policy "imposed no obligation [on the insured] to settle any claim, nor does CUIPA."  *Id.*  Rather, the Policy mandates that the insured "defend and contest any Claim against them."  *Id.*, at 2-3.

Plaintiff asserts that "[t]he evidence shows that Journal Register received no value for the premiums . . . paid given the [D]efendants' gross inaction in response to the May 2004 CHRO/EEOC claim, which included (i) the lack of any investigation, (ii) [ the lack of] any direct communication with Journal Register, and (iii) a four year delay before making a determination of no coverage."  *Id.,* at 3.

Furthermore, Plaintiff asserts that "the existence or non-existence of coverage [under the

---

Defendants could have, as a matter of law, failed to engage in a "reasonable investigation" of Plaintiff's claim under CUIPA if Defendants (1) should have obtained that November 2003 letter in May 2004 by investigation and (2) should have realized that the letter constituted a claim first made in November 2003.

In dismissing Plaintiff's judicial estoppel claim, the Court held that there were no grounds for such a claim because there was no proof that Defendants took an inconsistent position in any prior court proceeding which lead to any unfair advantage in their favor (no "chicanery" on the court).  Alternatively, the Court explained that, even if Plaintiff had brought an "equitable estoppel" claim, that claim would also fail in that there was no proof that Defendants acted intentionally to delay denial of coverage (to induce Plaintiff to act to her detriment) and no proof that Plaintiff changed her  position (*i.e.*, adopted Defendants' view regarding lack of coverage) at any time.  *See* 2015 WL 403195, at *31-34.

[18]  As set forth, *infra*, Plaintiff later provided evidence of the existence of an eighth case by filing a supplemental authority with the Court on March 29 and 30, 2016.  Doc. 176-77.

Policy] is not a relevant factor for the particular subsections of CUIPA at issue." *Id.* (quoting the Court's Opinion at 2015 WL 403195, at * 27). She relies on the Court's prior Ruling on summary judgment in which it clarified that Defendants' argument rejecting Plaintiff's claim as falling outside the policy coverage was "insufficient" because "[i]n a CUIPA and CUTPA claim, the insurer's duty stems not from the private insurance agreement but from a duty imposed by statute." 2015 WL 403195, at *27 (quoting *Lees v. Middlesex Ins. Co.*, 219 Conn. 644, 653 (1991)).

### 3.   **Analysis**

### a.   **Alleged Violation of Statutory Provisions of CUIPA**

First, to clarify, Tucker has stepped into the shoes of Journal Register as subrogee under the 2004 Policy.[19] Thus, Defendants' argument that her CUIPA/CUTPA claim must be dismissed because she is not the insured is of no avail. As a subrogee, she has the rights of the insured, but only those rights.[20] *See Connecticut Sav. Bank of New Haven v. First Nat'l Bank & Trust Co. of New*

---

[19] On January 5, 2011, Plaintiff's unsecured claim in Journal Register's bankruptcy was reduced to $3 million in exchange for Journal Register's agreement to waive any objections to her claim in bankruptcy court. Doc. 126, p. 17 (¶ 70). With respect to *Tucker I*, Plaintiff and Journal Register entered into a Stipulated Settlement Agreement (*Tucker I*, Doc. 142-1) in which she agreed to accept $109,457.00 in exchange for providing Journal Register with a specific and general release of her claims. Moreover, as part of that agreement, Journal Register assigned all claims and rights under the 2004 Policy to Tucker, including "any and all claims against National Union, AIG and/or their or [the insured's] brokers or agents." *Tucker I*, Doc. 142-1, ¶ 7. Journal Register expressly excluded any representation or warranty as to the viability of any claims or rights under the 2004 Policy. *Id.*, ¶ 8.

[20] In addition, Tucker gains no additional rights under the Policy as the result of Journal Register's alleged repeated representations to Tucker in its Initial Disclosures in *Tucker I* (No. 3:06-CV-307) that "it had . . . insurance against which Tucker could recover if her claims were successful." Doc 143, p. 11 (citing Doc. 143-6, Ex. 16). An insured's statements to an eventual subrogee regarding viability of coverage are not binding on the insurers. In this case, the Stipulation into which Plaintiff and Journal Register entered in *Tucker I* explicitly excluded any representation

*Haven*, 138 Conn. 298, 305 (1951) ("A subrogee can obtain no greater rights against a third person than its subrogor had.").

Second, this Court has previously observed that "although the insurance claim Tucker asserts against the Defendant insurers, while she stands in the shoes of the insured Journal Register, fails because the claim falls outside the coverage of the 2004 Policy, that is not determinative on the viability of Tucker's claims under CUIPA by way of CUTPA." 2015 WL 403195, at *25 . In *Lees v. Middlesex Ins. Co.*, 219 Conn. 644, 653 (1991), the Connecticut Supreme Court stated that in a CUIPA/CUTPA action, the insurer's duty arises not from the terms of the private insurance agreement, but from the statutory duty not to engage in unfair business practices. The *Lees* court reasoned:

> In an action on an insurance policy, the conduct giving rise to the insurer's liability is a failure to pay out the policy proceeds when the insurer is contractually bound to do so. The factual inquiry focuses on the nature of the loss, the coverage of the policy and whether the parties have complied with all of the terms of the policy. In a CUIPA and CUTPA claim, however, the insurer's liability is ordinarily based on its conduct in settling or failing to settle the insured's claim and on its claims settlement policies in general. The *factual inquiry focuses*, not on the nature of the loss and the terms of the insurance contract, but *on the conduct of the insurer*. Furthermore, in an action "on [the] policy," the insurer's duty to comply with the policy provisions stems from the private insurance agreement and is contractual in nature. In a CUIPA and CUTPA claim, the *insurer's duty stems* not from the private insurance agreement but *from a duty imposed by statute.*

219 Conn. at 653 (emphasis added).[21]  *Accord  Lawrence & Mem'l Hosp., Inc. v. Health Net, Inc.*,

---

or warranty as to the viability of any claims or rights under the 2004 Policy, referenced in the preamble of the Stipulation (para. 4) as "Employment Practices Liability Policy No. 729-15-02." *See Tucker I*, Doc. 142-1, ¶ 8.

[21]  As set forth *supra*, Plaintiff is the subrogee under the relevant policy.  However, with respect to non-subrogees or third party claimants, the Court notes that Connecticut's "appellate courts have not addressed whether CUTPA remedies based on CUIPA violations may be sought by injured third parties who are not the insured" so that Connecticut's superior courts have been split on this

No. HHDX07CV075019865S, 2010 WL 5158334, at *4 (Conn. Super. Ct. Nov. 24, 2010) ("CUIPA and CUTPA claims . . . [are] independent actions based on factual inquiries and sources of duty separate from actions on the policy.") (quoting *Lees*, 219 Conn. at 657); *Alsharabi v. State Farm Ins. Co.*, No. 51 79 95, 1992 WL 98154, at *1 (Conn. Super. Ct. Apr. 29, 1992) ("Plaintiff's CUIPA and CUTPA claims arise, not from the insurance contract, but rather from the alleged violation by the defendant-insurer of a duty imposed upon it by the Connecticut legislature.")*.

To state a viable claim under CUIPA/CUTPA, Tucker has pled the two required factors:  (1) that the defendant insurers engaged in an unfair insurance practice as defined under CUIPA, and (2) that she was  proximately harmed by the insurers' conduct.  In particular, she alleges that "[t]he record shows that [her] CHRO/EEOC claim was reported in May 2004, and acknowledged by the defendants in writing on June 1, 2004." Doc. 174, at 27.  "Yet the disclaimer of coverage was issued four years later on August 18, 2008."[22]  *Id.; see also* Ex. 5,  6, 11.  Therefore, "[c]ontrary to AIG's own  unwritten  claims  handling  guidelines  and  the  clear  requirements  of  CUIPA,  no  prompt investigation  of the claim occurred."  Doc. 174, at 27- 28.  Rather, the file was closed on March 28, 2005, without a coverage determination.  *Id.; see also* Ex. 7, 12.  In sum, Plaintiff argues that there was "[a] four year delay in disclaiming coverage" – a "virtually unprecedented" delay for such a determination.  Doc. 174, at 28.

---

issue.  *Asmus Elec., Inc. v. G.M.K. Contractors, LLC*, No. CV040489527, 2005 WL 758126, at *5 (Conn. Super. Ct. Feb. 25, 2005).  However, with respect to such third parties,  Connecticut's lower courts have at least generally recognized that in cases where there has been "some direct contact by the defendant insurers or insurance agents with the plaintiffs," a CUIPA/CUTPA withstands a motion to strike.  *Id.* (collecting cases).

[22]  Although the intervening four years may not have prejudiced the insured, Journal Register, due to its bankruptcy, Plaintiff asserts that the delay caused her to incur attorney's fees and litigation costs in pursuing damages from an entity without insurance coverage.

Plaintiff further asserts that Defendants' "violations of CUIPA have been the proximate cause of substantial and actual damages to Tucker."   Doc. 126, p. 23 (¶ 106).   For example, in her Amended Complaint, she alleges that she incurred "attorneys' fees and costs" in pursuing payment and/or settlement under the 2004 Policy, believing that, as Journal Register had indicated to her throughout *Tucker I* and the commencement of the bankruptcy action,  there was coverage for her claims under the 2004 Policy.[23]

Even if the "claims made" provisions of the 2004 Policy prevent contractual coverage for Tucker's claim, Plaintiff asserts that such a finding is not determinative on her CUIPA claim.   The Connecticut Supreme Court has repeatedly held that adherence with contract terms is not the general focus of CUIPA/CUTPA.   *See, e.g.*, *Heyman Associates No. 1 v. Ins. Co. of State of Pa.*, 231 Conn. 756, 790 (1995) ("We have previously recognized that CUTPA and CUIPA claims both 'ordinarily involve different factual inquiries' and that 'the duties ordinarily associated with them derive from different sources' than claims that rely instead on an underlying insurance contract.") (quoting *Lees v. Middlesex Ins. Co.*, 219 Conn. 644, 653 (1991)).   The  insurer's liability is based on its conduct in processing, investigating, and settling – or failing to settle –  insureds' claim and on the insurer's

---

[23] In other words, Plaintiff claims that the lapse of time between knowledge of her  claim and its resolution worked to her detriment, because during that interval, Journal Register represented that it believed it had insurance coverage for her claim.  Plaintiff initiated *Tucker I*, Case No. 3:06-cv-307 (SRU) on March 6, 2006 – during the period after Defendants received notice of her CCHRO/EEOC claim (on or about June 1, 2004) and before National Union outright rejected her claim (on or about August 18, 2008).   Her argument suggests that her expenses in litigating *Tucker I* may have been prevented or reduced had National Union investigated the claim earlier and notified Journal Register that Tucker's claim fell outside the "claims made" policy. She also claims that "if she had not been mislead [sic] about the existence of a policy providing coverage for her claim, [she] could have applied in 2006 for a prejudgment remedy protecting the judgment she eventually obtained in July 2008."  Doc. 174, at 37.

claims settlement policies in general.[24]

In support of summary judgment on the CUIPA/CUTPA claim,  Defendant insurance companies once again rely on the fact that Tucker's claim predates the 2004 Policy and thus fall outside of its coverage.  In so doing they focus solely on the terms of the insurance contract, instead of addressing their own conduct in handling the claim at issue.  This argument fails to respond to the definition and broad remedial purpose of a CUIPA/CUTPA claim under *Lees v. Middlesex Ins. Co.* and its progeny.  "In a CUIPA and CUTPA claim, the insurer's duty stems not from the private insurance agreement but from a duty imposed by statute." *Lees*, 219 Conn. at 653.

Furthermore, Defendants misdirect the focus of their argument for summary judgment on Plaintiff's actions in July of 2009, *after* coverage was denied and Journal Register had filed for bankruptcy protection. Doc. 171, at 4.  They allege that Plaintiff improperly posed as a policyholder at that time and demanded mediation with the American Arbitration Association pursuant to alternative dispute resolution procedures in the policy.  *Id.*  However, even assuming that Plaintiff had no contractual rights to arbitration in 2009, Defendants miss the mark regarding Plaintiff's present CUIPA claim for failure to *investigate* the original claim by Journal Register in 2004, long before the prospect of mediation arose, and to promptly inform her of her lack of coverage.  Plaintiff

---

[24] The Court notes that there have been two unpublished opinions by Connecticut Superior Courts dismissing CUIPA/CUTPA claims where the defendant had no liability  under the policy at issue. *See Rancourt v. Allstate Ins. Co.*, No. CV065001222, 2008 WL 5255560, at *3 (Conn. Super. Ct. Dec. 1, 2008) ("since the defendant had no obligation to pay under the policy, the defendant could not have violated CUIPA or CUTPA"); *Wright v. State Farm Mutual Auto. Ins.*, No. CV 960561270, 1997 Conn. Super. LEXIS 3122, at *10 (Conn. Super. Ct. Nov. 18, 1997) ("Having no obligation to pay under the policy, [the insurance company] could not have violated CUIPA or CUTPA").  These broad-brushed rulings, however, conflict with the *Lees v. Middlesex,* 219 Conn. 644 (1991).  Until the Connecticut Supreme Court states otherwise, the focus of a CUIPA/CUTPA claim is on the alleged conduct of the insurer and not the actual terms of the contract, or the plaintiff's ability to recover under it.

contends that it was Defendants' failure to make a determination on her claim during *Tucker I* that preceded her request for mediation, allegedly contributing to her continuing expenditure of costs and attorney's fees in litigation.   After all, the particular CUIPA provisions under which Plaintiff now seeks to proceed pertain to *investigation* as well as notice of determination on said claim.

Lastly, Defendants cite the Court's prior ruling in dismissing Plaintiff's judicial estoppel claim to argue that there can be no CUIPA/CUTPA violation.   Doc. 171, at 11 (citing Doc. 164, at 69). They suggest that because the  Court noted no extensive delay in Defendants' actions of making a reservation of rights in June 2004 and disclaiming coverage after the *Tucker I* jury verdict in August of 2008, there can be no failure to make a reasonable investigation.   Despite the Court's finding that Defendants  responded quickly each time they were contacted regarding Plaintiff's claim (May 2004 and July 2008), the Court made no findings regarding the reasonableness of their investigation, or lack thereof, and in fact explicitly left open Plaintiff's CUIPA/CUTPA claim, addressing Defendants' behavior in settling her claim.

Examining the CUIPA subsections under which Plaintiff now proceeds and the factual submissions of the parties, there are numerous genuine issues of material fact regarding how Tucker's claim was processed and investigated beginning in June of 2004.   In particular, the parties dispute whether the appropriate actions were taken by AIG upon receipt of Tucker's CHRO/EEOC claim, and whether there was an unreasonable delay in the National Union's eventual denial of coverage.   Tucker asserts that National Union's computer system placed the  claim file on the "inactive" status" 90 days after it was submitted in May 2004, while her CHRO and EEOC claims were still in their early stages. Doc. 174, at 5; Ex. 2, at 4. The file was then closed in March 2005 "without any communication to the insured, without prompt coverage determination, and without

a prompt or, indeed, any investigation of the claim at all." Doc. 174, at 6, Ex. 7, 8, 12.[25]   As  t o

investigation by National Union, "[t]here are no notes in the claim file showing that McConville, or

---

[25]  In Doc. 174, Exhibit 7 (D&O Claim Digest, dated June 11, 2004), AIG acknowledges receipt of Tucker's CHRO claim (May 19, 2004) and labels that claim as "inactive," stating simply that she is a "[c]hemist [who] has filed a charge of discrimination against Journal Register Company, Inc. with the CHRO," alleging "unlawful discriminatory practices, retaliation and sexual harassment" which resulted in her "wrongful termination" as a Marketing Manager.  The digest further acknowledges that Tucker "alleges she was terminated based on her involvement as a witness in a sex harassment complaint."  At that time, "coverage" was discussed as follows: "we acknowledge this submission as a Claim as defined by the policy."  However, AIG's sole action was to issue a "Reservation of Rights" letter to reserve all rights, privileges, and defenses under the policy.  There is no indication whether any investigation was performed regarding the merits of Tucker's claim.

Thereafter on July 25, 2008, when AIG Agent Brian Conlin drafted a "General Note" [Doc. 174, Ex. 8], he stated that Marsh agent Tom Gallegos (for Journal Register) had informed him on July 22, 2008 that the matter was "now in suit." Conlin requested a "copy of [the] suit," and when Gallegos failed to send the complaint, Conlin called again, but Gallegos was "out of the office." Conlin then contacted Larry Peikes of Wiggin and Dana on July 24, 2008, because Peikes had been counsel for Journal Register in the past. At that time, Conlin was informed that the matter had been tried to a jury on July 21, 2008 and the jury had returned a verdict of $1 million in compensatory and $3 million in punitive damages. Conlin stated that he transferred this file to VP Joni Mason "today" and found out that Journal Register's contact was "Ed Yocum," whose phone number he recited. There is no indication that Mason thereafter performed any investigation or that Conlin actually phoned Yocum. There is also no indication whether any investigation of the claim was made before the "General Note" was written.

On August 18, 2008, Elizabeth Pittaluga of the Willis brokerage firm, on behalf of Journal Register, inquired of AIG (in Doc. 174, Ex.12) as to the timing and reason that National Union had closed the Tucker claim file in 2005. She received an email from Japhet Boutin of AIG on September 4, 2008, which stated simply that "[h]aving received no further communication from the Insured, the file was closed in March 2005." There is no indication what efforts AIG may have made to obtain such communication.

By email dated October 3, 2008 [Doc. 174, Ex. 13], Pittaluga informed Boutin that because he had failed to respond to her request for documents relating to the date and reasons the claim filed was closed, she presumed that AIG's file "contains no copies of any written attempts, or documentation of any efforts, by the handling claim examiner(s) to contact the Insured or former broker before unilaterally deciding to close the file." Although she "look[ed] forward to [Boutin's] prompt response," there is no indication in the record that she ever received one. Doc. 174, Ex. 13.

23

any other AIG employee, ever placed a call, requested a single document, attempted to schedule a single interview, sent any follow up letters, made a coverage determination, or made any other attempts to contact the insured before the filed was closed in March 2005." Doc. 174, at 7, Ex. 7, 8, 12.  Put simply, Tucker alleges that the May 2004 claim "was not investigated, monitored or handled in any meaningful way by AIG's team of 'professional claims analysts' at all." Doc. 174, at 6, Ex. 1, p. 1.  Tucker concludes that Defendants' "completely lackadaisical response to the May 2004 Claim simply cannot be reconciled with the defendants' obligations under CUIPA." Doc. 174, at 10.

In contrast, Defendants contend that they handled the claim promptly by denying coverage after losses arising from *Tucker I* were presented to them in July 2008.  They note that the 2004 Policy was "an indemnity only claims-made Employment Practices Liability Insurance Policy with no duty to defend." Doc. 171-1 (SOF), ¶ 43 (citing Kirby Dec. at Ex. 1,pp. 30–71).[26]  "As National Union did not have a duty to defend Journal Register, National Union did not have any liability under the 2004 Policy until after final judgment triggered its duty to indemnify." Doc. 171-1 (SOF), ¶ 44 (citing Kirby Dec. at Ex. 1, pp. 30–71 (2004 Policy), p. 41, at ¶8 ("The Insurer does not assume any duty to defend."); p. 47, at ¶18  ("Any person . . . who has secured [a] judgment [against the insured] or written agreement [settling an action against the insured] shall thereafter be entitled to recover under this policy . . . .").

National Union reserved its rights within a few weeks after receipt of Journal Register's May

---

[26]  With respect to the Kirby Declaration, the Court notes that Kelly M. Kirby is an attorney with Gordon & Rees, LLP, who is counsel of record for Defendants (AIG and National Union) in this matter. Doc. 171-2, at  ¶ 2.  By affidavit, Kirby attested to the fact that the Exhibits Defendants attached to their summary judgment motion were "true and correct" copies of the documents they purported to be.

13, 2004 notice of Tucker's CHRO/EEOC claim; and then denied coverage to Journal Register one

month after being asked by Journal Register to provide indemnity for the Tucker verdict (*i.e.*, on

August 18, 2008, upon learning that *Tucker I* was in suit and had proceed to a jury trial and verdict).

*See* Doc. 174, Ex. 6 (June 1, 2004 letter from Meghan McConville, AIG, to Douglas S. Worth,

Marsh USA, acknowledging submission of Tucker's claim and reserving all "rights, privileges, and

defenses under the policy and available at law or in equity").  From the facts before it, upon learning

of failed settlement attempts and the jury verdict, Defendants concluded that it was within their

rights to disclaim coverage under Clause 8 of the Policy, after not being given the opportunity to

participate in settlement or associate in Journal Register's defense in *Tucker I*.

> In particular, as to investigation, National Union stated:

> National Union did not "refus[e] to pay claims without conducting a reasonable
> investigation based upon all available information." § 38a-816(6)(d). When National
> Union learned the Plaintiff's issues had been subjected to litigation and reached a jury
> verdict, it promptly gathered information to determine what had happened. (SOF
> ¶¶18,19). National Union tracked down the people involved and spoke to Journal
> Register's counsel. (SOF ¶¶ 19, 20). National Union learned that, not only had it had
> been kept in the dark about the ongoing litigation, but also that it had been given no
> notice of the settlement discussions leading up and through trial, which included
> multiple offers to settle for a fraction of the eventual verdict. (SOF ¶¶20-22).

Doc. 171, at 17.

> In other words, Defendants assert that they were only required to investigate after learning

of the *Tucker I* jury verdict. They have stated that in the context of an "indemnity policy without a

duty to defend," "National Union had no duty to investigate the substantive merits of the

administrative claims." Doc. 171, at 14-15.  After all, Journal Register "had the attorney of its choice

defending the matter [in the CHRO/EEOC claim] and interviewing witnesses." *Id.*, at 15; *see also*

Doc. 171-1 (SOF ¶ 11, 20).

In contrast, Plaintiff argues that Defendants never performed a proper investigation of her claim at all.  In support, she points out that on October 28, 2010, in AIG's "Answer and Affirmative Defenses," it admitted that "it did not conduct any investigation of Tucker's claim." Doc. 174, Ex. 14, ¶ 51.[27]  In that same pleading, Defendants admitted that "neither defendant assumed defense of the claim," "AIG . . . did not make any effort to obtain information regarding Tucker's claim," National Union "did not exercise its right to associate in the defense of the claim," and National Union "did not disclaim coverage until after an adverse verdict."[28] *Id.*, ¶¶ 27, 47.

Resolving all ambiguities and drawing all permissible factual inferences in favor of Tucker, as the party against whom summary judgment is sought, there remain genuine disputes of material fact regarding whether Defendants engaged in unfair business practices with respect to the investigation and processing of Tucker's claim under the 2004 Policy under subsections (C) and (D) of Conn. Gen. Stat. § 38a-816.  Even if Tucker ultimately had no contractual rights thereunder due to the claims-first-made provision, CUIPA requires insurance companies to process claims without the use of unfair business practices.  The exact steps Defendants took, if any, and the policies they followed to process Tucker's  claim in June 2004 are murky and disputed.  Plaintiff claims no investigation was taken; Defendants allege that "[p]rior to reserving its rights, the National Union

---

[27]  In ¶ 51, Defendants stated, in relevant part: "AIG admits that it did not conduct any investigation of Tucker's claim."  *See* Doc. 174, Ex. 14, ¶ 51.

[28]  Moreover, as Tucker noted, National Union stated that because it believed that its only duties were to Journal Register, as opposed to Tucker, National Union was within its rights to essentially ignore Tucker when she attempted to act as a policyholder and/or when she sought mediation as a remedy. *See, e.g.*, Doc. 171, at 3, 4  ("It is a fundamental principle of insurance law that at the relevant times, National Union owed duties to Journal Register, not Plaintiff;" "Journal Register never sought mediation concerning the denial of coverage so Plaintiff has no right to pursue claims concerning conduct toward her in 2009").

claims handler that received Journal Register's notice of Plaintiff's claim with the CCHRO reviewed the claim, reviewed the relevant policy, and then made an initial determination *upon its investigation* as to whether a claim had been made as defined by the Policy." Doc. 171-1, ¶ 7 (emphasis added) (citing Kirby Dec. at Ex. 5 (Claims Handling Notes indicating that claims handler "[r]eceived and review[ed] new assignment," summarized claim, and acknowledged submission as a claim as defined by policy)).

Also, other than the June 1, 2004 letter [Doc. 174, Ex. 6] in which AIG (via McConville) reserved its rights and the August 18, 2008 letter in which AIG (via Boutin) rejected Tucker's claim, the parties dispute whether, when, and how Defendants communicated regarding the claim with Journal Register and/or Tucker. Although Defendants, at one point, stated that they did not make *any* effort to obtain information regarding Tucker's claim after it was submitted in early June 2004 [Doc. 51, at ¶ 27], they later stated in their Memorandum in support of Summary Judgment that upon learning of the jury verdict in *Tucker I*, National Union "reasonably investigated the circumstances relevant to Journal Register's request for coverage prior to denying coverage" in August of 2008 [Doc. 171, at 11].

Thus, even if, as it turned out, Tucker's claim was not properly covered by the claims-first-made policy, and thus Defendants were correct in ultimately denying coverage in August of 2008, the question remains whether Defendants' investigation of the claim prior to that determination was reasonable – sufficient and/or properly *conducted* – so that a CUIPA violation did not occur. Specifically, did Defendants "adopt and implement reasonable standards for the prompt investigation of claims arising under [the] insurance polic[y]" at issue?" Conn. Gen. Stat. § 38a-816(6)(C). Exactly how and when did Defendants investigate Tucker's claims and were the steps they took, if

any,  "reasonable" and/or "based upon all available information"?[29]  *Id.*, at § 38a-816(6)(C)-(D).

For example, should Defendants have contacted Journal Register directly in May 2004 to gather relevant documentation and/or set up direct lines of communication with the insured regarding status updates of the claim?  Even if Defendants eventually reached the proper conclusion that there was no claim under the 2004 Policy, would and should that conclusion have been reached earlier if there had been a proper preliminary investigation regarding documentation and status of the claim in June 2004?  The Court thus finds that Tucker's claims with respect to subsections (C) and (D) remain viable with respect to prong one:  there are genuine issues of material fact regarding whether Defendants conducted a "reasonable investigation" and/or "refus[ed] to pay [Tucker's] claim[ ] without conducting a reasonable investigation based upon all available information."

On the other hand, with respect to CUIPA subsections (B), (E), (G),  and (N), §38a-816(6), the Court will enter summary judgment for the Defendants.  As to (B), Defendants did not "fail to acknowledge and act with reasonable promptness upon communications with respect to claims"

---

[29]   For example, did Defendants carefully review the materials submitted to them with Plaintiff's May 2004 CHRO/EEOC claim?  Was there a copy of Horner's November 2003 letter attached?  And even if there was no such attachment, should Defendants had conferred with Journal Register following notice of the claim in May 2004 to gain background information and set up status updates?  Would Defendants have learned in 2004 that Journal Register had a demand letter of November 3, 2003 from Tucker's attorney, Stephen Homer, in Journal Register's file?  *See* Doc. 154-11 ("Litigation Report" in Journal Register's files, discussing November 3, 2003 letter). Under those circumstances, Defendants could have rejected the claim at an earlier opportunity, thereby possibly obviating further litigation between Tucker and Journal Register, or at least altering the parties' approach to settlement.

Although Defendants promptly issued a reservation of rights upon receipt of the claim (June 1, 2004) and ultimately rejected the claim  swiftly upon learning of the jury verdict in *Tucker I* (in August 2008) under Clause 8, what investigation, if any, did Defendants perform in the interim? And if Defendants closed the file without investigating, was that a reasonable insurance practice under the circumstances?

arising under the policy at issue.  As shown in Ex. 6 [Doc. 174-2, at 34], Defendants acknowledged

receipt of Tucker's CHRO May 19, 2004 claim promptly on June 1, 2004 and requested further

information on this claim.  *See* Doc. 174, Ex. 6 (letter from AIG's Meghan McConville to Marsh

agent Douglas S. Worth (dated June 1, 2004) (acknowledging receipt of claim and requesting notice

of "any significant events including litigation, mediation, arbitration, withdrawal, or settlement

within the retention")).  Defendants reached out to the insured Journal Register at that time by

notifying its broker.

Thereafter, in late July 2008, upon learning that there had been litigation of the claim

(*Tucker I*), resulting in a jury verdict, Defendants communicated with the insured within days to

advise Journal Register's General Counsel, Ed Yocum, that there was no coverage pursuant to Clause

8 of the 2004 Policy.   Doc. 174, Ex. 10 & 11.[30]

Similarly, as to subsection (E), Defendants did not "fail[ ] to affirm or deny coverage of

claims within a reasonable time after proof of loss statements ha[d] been completed."  According to

the record, once Marsh broker Tom Gallegos phoned AIG claims analyst  Brian Conlin  on July 22,

2008, to apprise Defendants of the *Tucker I* jury verdict ("proof of loss"), Defendants swiftly denied

coverage of the $1 million compensatory and $3 million punitive damages under Clause 8 of the

2004 Policy.[31]  The  jury award solidified the amount of the "losses" at issue and Defendants rapidly

---

[30]   In finding that AIG's communications at these times were prompt, the Court makes no
finding as to whether the actions leading up to these communications were sufficient or reasonable
insurance practices.  The facts of the actions themselves are disputed by the parties.

[31]   The facts presented on summary judgment show that Defendants first learned of actual
losses/damages under Tucker's claim when AIG was notified in July of 2008 that *Tucker I* had  been
initiated, gone to trial, and resulted in a jury verdict.  Doc. 174-3, at 3 ("General Note" by AIG's
Brian Conlin on 7/25/2008).

disclaimed coverage thereof.[32]   *See* Ex. 10 [Doc. 174-3, at 7] ((August 4, 2008 email of Joni F. Mason, V.P. of AIG's Domestic Claims, to Thomas Zona of AIG, explaining that Mason had that day spoken to Journal Register's General Counsel Ed Yocum and "advised [him] that there was a coverage issue in connection with failure to cooperate and breach of policy provisions that would have allowed [AIG] to associate in the defense"); *id.*, Ex. 11 (August 18, 2008 letter from Japhet Boutin of AIG Domestic Claims to Ed Yocum, General Counsel to Journal Register Company, denying coverage of Tucker's claims pursuant to Clause 8 of the Policy). Whether or not Clause 8 was ultimately the proper basis or the only basis for disclaiming coverage, Defendants denied coverage within a reasonable time after being provided proof of loss.

As to subsection (G), violation of that subsection was not included in the allegations of Plaintiff's Amended Complaint, Doc. 126, ¶ 104, so that Tucker may not pursue such a claim simply in opposition to Defendants' motion for summary judgment. However, even were she allowed to pursue this claim, the Court would grant summary judgment on (G).  There is no evidence that Defendants compelled either Journal Register or Plaintiff to institute litigation "to recover amounts due under an insurance policy by offering substantially less than amounts [Journal Register or Tucker] ultimately recovered in actions brought by such insureds." [33]   On the facts of this case, there

---

[32]   Under the 2004 Policy, "there was nothing for National Union to pay on notice of filing an administrative claim" (i.e., Tucker's CHRO/EEOC claim).  Doc. 171, at 15-16.  *See also* Doc. 174, Ex. 1 (2004 Policy) (defining "loss" as "damages (including back pay and front pay, judgments, settlements, pre- and post-judgement interest and Defense costs")).  Prior to incurring a "loss," there would be no proceeds for National Union to pay out on the policy, even if Tucker's claim were covered.

[33]   On the present record, the settlement negotiations between Defendants and Plaintiff in the case at bar occurred after Plaintiff commenced *Tucker I* and this litigation.  It cannot therefore be the case that Defendants induced Plaintiff to institute litigation in *Tucker I* by offering her a low settlement amount.  *See* Doc. 31-33 (regarding settlement conference before Magistrate Judge

were no "amounts due under an insurance policy" when Tucker commenced either *Tucker I* or this action. Tucker's claim was not "first made" under the 2004 Policy.  It was made prior to, and falls outside of, that policy.  It is unfortunate for Tucker that Journal Register failed to provide Defendants with notice of her claim during the period of a relevant EPL Policy period, if any existed.

Finally, with respect to subsection (N), Defendants did not "fail[ ] to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of [the] claim."  Conn. Gen. Stat. §  38a-816(6)(N).  On August 18, 2004, after being informed of the *Tucker I* trial,  Defendants denied coverage of Tucker's claim with a "reasonable explanation," application of Clause 8 in the Policy.  That clause stated that "[t]he Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment , or incur any Defense Costs without the prior written consent of the Insurer."  Moreover, "when [the Insurer] has not assumed the defense of a claim pursuant to this clause 8," the Insurer "shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim." Doc. 174, Ex. 1, at 16.  Until July of 2008,  Defendants were unaware that litigation in *Tucker I* was underway, had gone to trial, and resulted in a verdict.  Furthermore, Journal Register never afforded the Defendants the opportunity to effectively associate in Journal Register's defense or to negotiate any of the proffered settlements.  *See* Doc. 171-1 (SOF),  ¶ 22 ("Journal Register had bypassed a prior settlement demand of $500,000 without informing National Union, as well as a demand of $250,000 while the jury was deliberating, further without informing National Union") (citing Kirby Dec. at Ex. 6, p. 9 (AIG internal email, dated August 4, 2008).  Therefore, when presented with an adverse judgment – a loss under the Policy – Clause 8 provided a "reasonable" basis for Defendants

---

Garfinkel).

to disclaim coverage under those circumstances and at that time.[34]

It is not clear on the record whether Defendants would or could have learned earlier of the "claims first made" basis for disclaiming coverage had Defendants performed an investigation into Tucker's claim prior to July of 2008.   Nonetheless, on the record presented by the parties on summary judgment, Defendants' disclaimer of coverage under Clause 8 did not violate subsection (N) because Clause 8 provided a "reasonable" – if not the best or only – explanation to disclaim coverage once Defendants were presented with the *Tucker I* jury verdict (a "loss" under the Policy).

### b.    General Business Practices

Before making a final determination as to whether Plaintiff's CUIPA/CUTPA claim should be allowed to proceed under subsections (C) and (D) of Conn. Gen. Stat. § 38a-816(6), the Court must examine the facts regarding the second requirement to support a CUIPA/CUTPA claim: proof of an unfair "general business practice" by the Defendants.   To demonstrate such a "general business practice" of faulty investigation of claims, Plaintiff has provided eight litigated cases in which there were "other instances of unfair claims handling or settlement practices on the part of the defendants or their wholly-owned subsidiaries."   Doc. 174, at 2, 14; Ex. 42-48; Doc. 176-77.   For these cases, Tucker submitted  printouts of the court's decision and/or relevant pleadings in which the plaintiffs alleged improper business practices by Defendants and/or AIG's wholly-owned subsidiaries. [35] The

---

[34]   Neither Tucker nor either Defendant is responsible for Journal Register's failure to file Tucker's claim within the proper policy period (*i.e.*, under a 2003 policy) and to apprise National Union of the fact that Tucker had initiated *Tucker I* in 2006.

[35]   For the first seven cases, Plaintiff submitted the court's decision; and for the eighth case, submitted via a supplemental filing, Plaintiff provided the Court with relevant portions of the Second Amended Complaint and a certified copy of the verdict form.   Doc. 176-77.

cases are presented in various procedural postures, *e.g.*, on a motion to dismiss, on summary judgment, upon a jury verdict, and on appeal of a judgment.

With respect to these cases, Plaintiff professes that "[t]here is no 'magic number' of cases [she] needs to advance to oppose defendants' renewed motion for summary judgment, nor must she show that the insured wanted a settlement, as [D]efendants argue." Doc. 174, at 2 (citing *Belz v. Peerless Ins. Co.*, 46 F.Supp.3d 157, 167 (D.Conn. 2014)). In support, Plaintiff cites recent federal decisions in this District, which hold that "as few as two or three [incidents of unfair business practices] are sufficient to suggest a regular business practice." *Id.* (citing *Belz*, 46 F.Supp. 3d at 167; *Karas v. Liberty Ins. Corp.*, 33 F.Supp.3d 110, 117 (D.Conn. 2014)). Plaintiff clarifies that there is no requirement that the unfair insurance practices occur within Connecticut, nor that the cases presented consist of "actual adjudications of bad faith claims handling or settlement practices." Doc. 174, at 13. Moreover, Plaintiff points out that all of the entities who allegedly engaged in unfair business practices were controlled by AIG and held out to the public as "AIG Companies." *Id.*, at 14.

As further evidence of unfair general business practices, Plaintiff has submitted to the Court a "list and report compiled by the American Association for Justice[, an association of American trial lawyers,] entitled: 'The Ten Worst Insurance Companies in America: How They Raise Premiums, Deny Claims, and Refuse Insurance to Those Who Need it Most.'" Doc. 174, at 22, Ex. 49. The report discusses AIG's claims handling practices in a negative light, describing "claims-handling abuses" which are based on AIG's focus of "turning a profit on underwriting." Doc. 172, at 23; Ex. 49, at 8-9. Tucker contends that the report is admissible pursuant to Rule 803(17), Fed. R. Evid., as a "market report and similar commercial publications" in that it is "a list" and a "compilation of

information about the insurance industry generally relied upon by the members of a particular profession, *i.e.*, the legal profession." Doc. 174, at 23; *see also* Ex. 52 (describing the "American Association for Justice," which prepared the report at issue).

Lastly, Plaintiff relies on her expert's principal and supplemental reports (Ex. 21 & 22), discussing and refuting Defendants' allegations that they had "no obligation to" investigate Tucker's claims because the 2004 Policy was an "excess policy." Doc. 174, at 22.  Plaintiff's expert, Daryll W. Martin of Percipient Resources, Inc., avers that in his experience as "both senior litigation counsel for two of the world's largest insurance brokers" and "as an insurance brokerage executive," he has never encountered an insurer who "attempted to make a primary liability policy an excess policy" in an effort to "try[ ] to distance itself from even a minimal claim investigation obligation." Doc. 174, at 22 (quoting Ex. 22, at 1-2) (emphasis omitted).

Defendants counter by arguing that "Plaintiff's claims are so unique and novel as to simply defy the type of proof required under CUIPA." Doc. 171, at 8.  Moreover, Plaintiff "merely points to allegations raised against various AIG entities in an attempt to attribute those acts to AIG itself." *Id.*, at 25.  According to Defendants, Plaintiff fails to provide a basis to attribute the actions of the AIG subsidiaries to either National Union or AIG and to justify deviating from what Defendants term, "the traditional legal rules of corporate structure." *Id.*  However, AIG fails to actually refute Plaintiff's assertions that AIG's subsidiaries appearing in the cited cases were not "wholly owned" and controlled by AIG.

Finally, Defendants attack the "inadmissible" forms of evidence Plaintiff has presented.  They argue that each of the cases is "factually distinguishable from the present case" and more than one case occurred outside Connecticut.  Defendants also argue that Plaintiff's baseless allegations, "even

cast in the most positive light, amount to hearsay and online gossip." *Id.*, at 25-29.

### c.    General Business Practices Evidence

As Judge Underhill described in *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157 (D. Conn. 2014) , on a motion to dismiss,  the "appropriate consideration [when analyzing a CUIPA claim] is whether the plaintiff has made facially plausible factual allegations that, in the circumstances of the particular case, the defendant has engaged in the alleged wrongful acts enough to suggest it has a general business practice of doing so." 46 F. Supp. 3d at 166 (citing *Karas*, 33 F.Supp.3d 110, 117 (D.Conn. 2014); *Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 672 (1992)). To state a plausible claim under Rule 12(b)(6), Fed. R. Civ. P., "[r]elevant factors may include: the degree of similarity between the alleged unfair practices in other instances and the practice allegedly harming the plaintiff, the degree of similarity between the insurance policy held by the plaintiff and the policies held by other alleged victims of the defendant's practices; the degree of similarity between claims made under the plaintiff's policy and those made by other alleged victims under their respective policies; and the degree to which the defendant is related to other entities engaging in similar practices." *Belz*, 46 F.Supp. 3d at 166.

On summary judgment, as in the case at bar, the plaintiff must come forward with some proof that the defendant has an actual business practice of engaging in wrongful acts.  The question arises: do the federal cases presented, the industry report, and/or the opinion of Plaintiff's expert present evidence of such similar unfair business practices?  I conclude that at least four cases presented offer such evidence of an adjudicated wrongful business practice by Defendants that resembles the allegedly wrongful practices in the present case.  *See, e.g.*,  *Acacia Research Corp. v. Nat'l Union Fire Ins. Co.*, No. SACV 05-501 (PSC) 2008 WL 4179206, at *16  (C.D. Ca. Feb. 8, 2008) (in

findings of fact and conclusions of law, trial court held that insurer engaged in unreasonable conduct in connection with insured's claim, including failure to properly investigate, so "that Defendant improperly and unreasonably withheld benefits due to Plaintiff under the Policy"); *Anderson v. Amer. Int'l Group, Inc.*, No. 2003-01212-B (Mass. Super. Ct. April 8, 2014) (upholding jury verdict for plaintiffs against National Union and AIG, having "no difficulty in concluding, in the circumstances of this case, that AIGCS and AIGTS' investigation of [plaintiff's] accident failed to meet [the] standard" for a reasonable investigation based on all available evidence).[36] *See also United Technologies Corp. v. Am. Home Assur. Co.*, 118 F.Supp. 2d 181, 184 (D. Conn. 2000) (denying motion to alter or amend judgment, finding that "[a] jury was thus justified in drawing from these facts the inference that [property insurer] 'parked' the property pollution claims, while misleading or deceiving the plaintiff insured into believing that productive steps towards claims resolution were underway").[37]

In addition, Plaintiff has presented, as a supplemental authority, *Victaulic Co. v. American Home Assurance Co., et al.*, No. RG12642929 (Alameda County Superior Court, California), in which a "$155 million [jury] verdict was entered against National Union and two other AIG entities for malicious claims handling." Doc. 176 (filed March 30, 2016). As Plaintiff asserts, the jury

---

[36]   "AIGCS" is the acronym for AIG Claims Services, Inc. and "AIGTS" is the acronym for AIG Technical Services, Inc., the same AIG entities responsible for handling claims for National Union in Tucker's case. Doc. 174, at 21.

[37]   To the extent that AIG actually controls the operations of American Home Assurance Company, the cited case also includes examples of failure to properly investigate a claim. American Home Assurance is, as a matter of public record, a "wholly-owned subsidiary" of AIG; but a parent corporation's control over a subsidiary must be proven, rather than presumed. *SFA Folio Collections, Inc. v. Bannon*, 217 Conn. 220, 232 (Conn. 1991), *cert. denied*, 501 U.S. 1223 (1991). In the event that Plaintiff offers American Home Assurance as an alter ego for AIG at trial, AIG may defend by proving that such an entity should be treated as  separate and distinct for legal purposes.

"found that the claims themselves were handled in an irresponsible, misleading and deceptive fashion." In support, Plaintiff has presented the Second Amended Complaint in that action, which alleges inadequate investigation by the defendant insurers. *See* Doc. 177-1, ¶ 96 (defendant insurers "first failed to timely investigate and respond in an appropriate manner to Victaulic's demands for coverage, delaying unreasonably their responses to the notice of claims[;] [m]oreover, due to the failure of Defendants to properly conduct an investigation, Defendants purported to base the numerous purported restrictions on coverage on allegations not supported by actual facts or on suppositions containing no basis in reality"); ¶ 185 (g) (alleging that defendant insurers "fail[ed] to conduct a full and thorough investigation of the Claims and facts surrounding them, and assert[ed] grounds for denying coverage based on a willful disregard for the truth and/or a misunderstanding of the facts resulting from their inadequate investigation").

Granted, the facts of the aforementioned cases are similar, rather than identical to, the facts in Plaintiff's case. However, each of these cases provides examples of the defendant insurer's general failure to properly and/or timely investigate a claim.

In contrast, with respect to the proffered list of the "Ten Worst Insurance Companies," the Court cannot determine from the evidence presented whether it qualifies as an exception to the hearsay rule as a "market report" or "list" relied upon by attorneys under Rule 803(17). Insufficient background information has been presented (*e.g.*, as to methods of fact gathering, credentials of the authors) to so qualify this list. The Court is merely provided with Plaintiff's representation that the author, "[t]he American Association for Justice is an association of American trial lawyers who are presumably all officers of the courts to which they are admitted." Doc. 174, at 23. Moreover, Plaintiff contends that the list is a "compilation of information about the insurance industry generally

relied upon by members of . . . the legal profession." *Id*. She offers no proof as to how the list was compiled and no examples of when/how the list is allegedly used.

The Court also necessarily refrains from ruling at this time on the admissibility of Plaintiff's expert's report at this time. There are numerous factors to be evaluated before a Court may admit such evidence.[38] *See* Fed. R. Evid. 104(a) (mandating that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible"). The Court must determine whether the expert's testimony will be reliable and helpful. All considerations to be analyzed with respect to expert testimony are not available on the current record.

As a threshold matter, the Court must "ascertain[ ] the reliability of proffered testimony," and/or "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert, v. Merrell Dow Pharmaceuticals,* 509 U.S.579, 592 (1993). "Unlike an ordinary witness [governed by Rule 701, Fed. R. Evid.], an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id.,* 509 U.S. at 590. The exception made for such experts "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* Plaintiff has provided Martin's "Curriculum Vitae," which provides information as to his positions held, educational background, past experiences testifying as an expert, and $300 per hour billing rate. Martin also lists materials upon which he relied in drafting his report, without fully describing his methodology in

---

[38] The party who presents an expert bears the burden of proving each element necessary to the admissibility of that expert's testimony and report. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S.579, 592 (1993); Fed. R. Evid. 702, advisory committee note (2000). Plaintiff may, if so advised, present her expert witness at trial, including a full foundational basis for admitting his report. Defendants may counter with objections. The Court will then be in the position to make a proper ruling on admissibility.

producing the report.

In any event, the  Court need not determine the admissibility of Martin's proffered expert report at this time, Fed. R. Evid. 702, because even without considering that report or the list of "worst insurance companies," the Court finds that Plaintiff has presented sufficient evidence of similar unfair business practices in the case law she has presented.  Such evidence creates a genuine issue of material fact regarding an unfair  "general business practice," so that this claim may withstand Defendants' motion for summary judgment at this time.

### d.    <u>Damages</u>

Although the Court finds that there are genuine issues as to whether Defendants acted reasonably in investigating Tucker's claim and whether Defendants committed unfair general business practices, the Court must also determine whether there is a genuine dispute as to the second component of a viable  CUIPA/CUTPA claim – damages.  "[T]o prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, 'as a result of' this act, the plaintiff suffered an injury." *Royal Indem. Co. v. King*, 532 F. Supp. 2d 404,  411 (D.Conn. 2008) (quoting *Abrahams v. Young & Rubicam*, 240 Conn. 300, 306 (1997)). "The language 'as a result of' requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff." *Abrahams*, 240 Conn. at 306.

In the case at bar, with respect to damages, it is clear that Plaintiff cannot recover the damages awarded in the jury verdict in *Tucker I.*[39]   As this Court has previously held, 2015 WL

---

[39] On February 28, 2006, Plaintiff filed her claim against Journal Register in *Tucker I* in this District, No. 3:06-CV-307 (SRU).  On July 23, 2008, the jury found in her favor on all counts and awarded her $1 million in compensatory damages and $3 million in punitive damages. *Tucker I*, Doc. 69. The jury also found that Tucker was entitled to economic damages in an amount to be determined

403195, the 2004 Policy at issue was explicitly a "claims made" policy with an effective policy period of January 12, 2004 through January 12, 2005. Because the November 3, 2003 letter [Doc. 154-9] from Tucker's counsel, Horner, to Journal Register's publisher, Walsh, was a demand letter, constituting a "claim" under the policy, Plaintiff's claim pre-dated the 2004 Policy's period. Accordingly, the claim fell outside the coverage of the 2004 Policy so that Plaintiff's claim to recover the *Tucker I* judgment under that policy fails. As subrogee on the 2004 Policy, Plaintiff has no greater rights than Journal Register to recover from Defendants on the policy; and Journal Register was not entitled to indemnity on Tucker's claim, which fell outside the requisite policy period. *See Connecticut Sav. Bank of New Haven v. First Nat. Bank & Trust Co. of New Haven*, 138 Conn. 298, 305 (1951) ("A subrogee can obtain no greater rights against a third person than its subrogor had."); *see also Southland Corp. v. Self*, 36 Conn.Supp. 317, 319 ( Conn. Super. Ct. 1980) ("An insurer, as subrogee or assignee of claims of its insured, stands in the insured's shoes and is subject to any and all defenses which are available against the insured had he brought suit in his own name.").[40] In sum, Plaintiff has no right to recover policy proceeds with respect to the 2004 Policy under her CUIPA/CUTPA claim.

In contrast, Plaintiff may, in the event she is able to prove her CUIPA/CUTPA claim, recover statutory damages if she can demonstrate at trial that she has been damaged by Defendants' failure "to adopt and implement reasonable standards for the prompt investigation" of the claim or by

---

by the court. *Id.* On July 29, 2008, Judge Underhill entered judgment on the verdict in the amount of $4 million. *Id.*, Doc. 73.

[40] In addition, by standing in the shoes of Journal Register, as assignee or subrogee on the policy, Tucker also bore the responsibility of reading the policy's terms, including its "claims first made" restriction.

Defendants' refusal to pay said claim "without conducting a reasonable investigation based upon all available information."  Conn. Gen. Stat. § 38a-816(C), (D).   However, proving the existence of such damages will present a considerable challenge for Plaintiff.  She has argued that if she had known earlier that her claim would be rejected, she would not have incurred all of the attorney's fees and costs that she did in pursuing Journal Register in *Tucker I*. [41]   One problem, however,  is that Plaintiff takes no responsibility for the fact that she may have had, or be imputed with, knowledge of the November 2003 demand letter, the basis for Defendants' ultimate rejection of her claim, since it was drafted by her former counsel, Stephen Horner.[42]   It is the existence of that letter that an insurer's investigation might have revealed.  Also, as  subrogee  with respect to the 2004 Policy, she

---

[41]  Tucker did not file her claim in *Tucker I* until February 28, 2006; and if she had learned that her claim was not covered in 2004, it is conceivable that she may have approached her claim differently, knowing she would have to battle the insurance companies, as well as Journal Register, in order to recover.

[42]  As this Court previously noted in this action:

> Because plaintiff and her attorney are principal and agent as a matter of law, *United States v. International Brotherhood of Teamsters*, 986 F.2d 15, 20 (2d Cir.1993), she is imputed with the knowledge of the facts he gained in acting on her behalf . . . . *See, e.g., Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir.1994) (concluding that appellant's civil rights action was time-barred because counsel's knowledge of a tainted line-up was imputed to the client despite client's lack of actual knowledge); *Dandorph v. Fahnestock & Co.*, 462 F.Supp. 961, 964 (D.Conn.1979) (for purposes of the statute of limitations, "notwithstanding plaintiff's statement in her affidavit that Attorney Grossman 'did not ... mention' to her that she had 'a possible claim for 'churning,'' the knowledge of her attorney is imputed to her so that she knew or reasonably should have known of the situation").

*Tucker v. Am. Int'l Grp., Inc.*, No. 3:09-CV-1499 CSH, 2012 WL 314866, at *15 (D. Conn. Jan. 31, 2012)

41

is responsible for having read the policy's terms, including its "claims made" provisions.[43]

Throughout this litigation Plaintiff has challenged the legal significance of the November 2003 letter as a "demand letter," so it is somewhat problematic for her to now argue that she was damaged by the delay of that letter's emergence. If, as Plaintiff contends, the letter has no legal significance as a demand letter (*i.e.*, it was just a letter), the time when Defendants discovered it would have no effect on Tucker's choice to litigate. She would, both before and after learning of the letter's existence, pursue her actions against Journal Register and Defendants, expecting to eventually recover proceeds under the 2004 Policy for her underlying verdict in *Tucker I*.

Furthermore, as Defendants argue, the record reflects the possibility that Tucker's counsel was aware that there was an issue as to whether the 2004 Policy covered Tucker's claim when, before commencing this action and shortly after Journal Register filed for bankruptcy, Tucker's counsel wrote to Journal Register's General Counsel: "We understand that there are coverage issues and I assume the client may be concerned about having *blown coverage*. That is something we can work on together." Doc. 100-22 (email from Jed Horwitt, Esq. to Shaunna Jones of broker Wilkie, Farr & Gallagher, dated March 11, 2009) (emphasis added). Tucker questions the construction of her counsel's language in that email, but the language "blown coverage" arguably speaks for itself.

---

[43]   On prior occasion, the Court explained:

> An insured, such as Journal Register, bears the responsibility of knowing the contents of its own insurance policy and/or whether or not it has received notice of a claim upon it. By standing in the shoes of Journal Register, as assignee or subrogee on the policy, Tucker also bore the responsibility of reading the Policy's terms, including its "claims first made" restriction. Lack of knowledge regarding a policy's terms is not grounds for expanding coverage through equitable estoppel. *See, e.g.*, *Paese v. Hartford Life and Acc. Ins. Co.*, 449 F.3d 435, 447 (2d Cir.2006).

2015 WL 403195, at *33.

In sum, to succeed on her present CUIPA/CUTPA claim, Plaintiff must prove that she actually incurred damages (*e.g.*, attorney's fees, costs of litigation) *as the result of* Defendants' unfair business practices (failure to properly investigate). Whether or not Defendants performed a reasonable investigation of Plaintiff's claim, they denied coverage in August of 2008. Both *before and after* that denial, Plaintiff vigorously litigated, initially against Journal Register and then against Defendants, to recover her losses stemming from her wrongful termination by Journal Register. She thus faces the challenge of proving that her attorney's fees and litigation costs were *created by* Defendants' alleged CUIPA/CUTPA violations. Needless to say, those alleged damages are contested by Defendants, giving rise to genuine issues of material fact.[44]

Because the Court must view the facts in the manner most favorably to Plaintiff at this juncture, her CUIPA/CUTPA claim may proceed on subsections (C) and (D) of Conn. Gen. Stat. § 38a-316(6). The jury can thus decide whether, for example, the Defendants' earlier discovery of the November 2003 letter, albeit drafted by Tucker's own prior counsel, would have prevented Tucker from further expenditure of attorney's fees or costs in *Tucker I* and/or this matter. As the Second Circuit recently articulated, on summary judgement, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, No. 13-3592,

---

[44] Defendants argue that under Connecticut law, Plaintiff must prove that Defendants' alleged CUIPA violation was "both a substantial and reasonably foreseeable factor in bringing about the complained of harm." Doc. 171, at 17 n. 7 (quoting *McCulloch v. Hartford Life & Accident Ins. Co.*, 363 F.Supp. 2d 169, 181 (D.Conn. 2005)). Defendants conclude that "even if National Union inadequately implemented a prompt investigation of Journal Register's initial claim, in light of the steps National Union *did* take to investigate the claim and the failure of Journal Register to communicate with National Union until Plaintiff's claims had gone to a jury," Plaintiff has "failed to produce any evidence to show that such a failure was a substantial and foreseeable factor in bringing about her "harm." Doc. 171, at 17 n. 7 (emphasis in original). However, because Defendants' actions in investigating are disputed, the Court cannot take the leap to find no substantial and foreseeable harm to Plaintiff as a matter of law.

__F.3d __, 2016 WL 373869, at *6 (2d Cir. Feb. 1, 2016) (citation and internal quotation marks omitted).

## III. <u>CONCLUSION</u>

For the foregoing reason, Defendants' Motion for Summary Judgment as to Plaintiff's CUIPA/CUTPA claim [Doc. 170] is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED as to Conn. Gen. Stat. §§ 38a-816(6) (B), (E), (G), and (N).  With respect to these subsections of Connecticut's Unfair Insurance Practices Act, "there is no genuine dispute as to any material fact" and Defendants, as movants, are "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

Summary judgment is DENIED as to Conn. Gen. Stat. §§ 38a-816(6) (C) and (D).   As to these CUIPA subsections, resolving all ambiguities and drawing  all permissible factual inferences in favor of Plaintiff, the party against whom summary judgment is sought, the Court finds that there remain genuine issues of material fact,  Fed. R. Civ. P. 56(a).

Having ruled on the last-filed dispositive motion in this action, the Court sets the due date for filing the joint trial memorandum as **May 5, 2016.**  The case will be regarded as trial ready on **June 6, 2016.**

The Court reminds the parties that Magistrate Judge Garfinkel long ago extended the offer to counsel to contact his Chambers "when they are ready to schedule another settlement conference in this matter." Doc. 33.  Given the parties' arduous and bitterly contentious history in  litigating this matter, they may wish to have one final opportunity to seek a mutually acceptable resolution of

the case before submitting the matter to trial.

The foregoing is SO ORDERED.

Dated: New Haven, Connecticut
       April 5, 2016

/s/Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge